**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

NEW YORKERS AGAINST CONGESTION
PRICING TAX, DANNY BUZZETTA, DR. GREGOR          Civ. Case No.1:24-cv-367
WINKEL, LEE BERMAN, MEREDITH LeVANDE,
RITA SUE SIEGEL, TOMMY LOEB, KATHRYN FREED,      **AMENDED**
TREVER HOLLAND, RICKY YANG, PAUL ENG,            **CLASS ACTION**
BARUCH WEISS, ROBERT FRIEDRICH, KEVIN            **COMPLAINT**
FORRESTAL, WARREN SCHREIBER, CHRISTOPHER
RYAN, BEN MASON, DENNIS ROSARIO, RABBI Y.S.
GINZBERG, JACOB ENGLANDER, AARON GONZALEZ,
HOWARD CHIN, ELAINE LA PENNA, THOMAS
ANTHONY SCARPACI, COUNCILMEMBER KRISTY
MARMORATO, COUNCILMEMBER VICKIE PALADINO,
COUNCILMEMBER JOANN ARIOLA, COUNCILMEMBER
SUSAN ZHUANG, COUNCILMEMBER KALMAN
YEGER, COUNCILMEMBER INNA VERNIKOV,
COUNCILMEMBER, ROBERT F. HOLDEN, RICHARD
PASSARELLI, STEVEN TRAUBE, FRANCISCO
GONZALEZ, JOSE COLLADO, VITO LaBELLA, AIXA
TORRES, JULIE VELEZ, DAPHNE BRUCCULERI,
DR. ALAN L. MINTZ, D.D.S., ASSEMBLYMEMBER
SIMCHA EICHENSTEIN, THOMAS ZABIELSKIS,
NINA JODY, MICHAEL KEKAFOS, NORMAN SPIZZ,
MICHAEL GROSS, EFRAIM REISS and ASSEMBLYMEMBER
MICHAEL NOVAKHOV, individually and on behalf
of all others similarly situated,

                      Plaintiffs,

            v.


UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, SHAILEN BHATT,
in his official capacity as Administrator of the
Federal Highway  Administration,
RICHARD J. MARQUIS, in his official capacity
 as Division Administrator of the New York Division
of the Federal Highway Administration,
METROPOLITAN TRANSPORTATION AUTHORITY,
TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, NEW YORK CITY DEPARTMENT
OF TRANSPORTATION and TRAFFIC MOBILITY
REVIEW BOARD,

                      Defendants.
-------------------------------------------------------------------------x

1

Plaintiffs NEW YORKERS AGAINST CONGESTION PRICING TAX, DANNY

BUZZETTA, DR. GREGOR WINKEL, LEE BERMAN, MEREDITH LeVANDE, RITA SUE

SIEGEL, TOMMY LOEB, KATHRYN FREED, TREVER HOLLAND, RICKY YANG, PAUL

ENG, BARUCH WEISS, ROBERT FRIEDRICH, KEVIN FORRESTAL, WARREN

SCHREIBER, CHRISTOPHER RYAN, BEN MASON, DENNIS ROSARIO, RABBI Y.S.

GINZBERG, JACOB ENGLANDER, AARON GONZALEZ, HOWARD CHIN, ELAINE LA

PENNA, THOMAS ANTHONY SCARPACI, COUNCILMEMBER KRISTY MARMORATO,

COUNCILMEMBER VICKIE PALADINO, COUNCILMEMBER JOANN ARIOLA,

COUNCILMEMBER SUSAN ZHUANG, COUNCILMEMBER KALMAN YEGER,

COUNCILMEMBER INNA VERNIKOV, COUNCILMEMBER ROBERT F. HOLDEN,

RICHARD PASSARELLI, STEVEN TRAUBE, FRANCISCO GONZALEZ, JOSE COLLADO,

VITO LaBELLA, AIXA TORRES, JULIE VELEZ, DAPHNE BRUCCULERI, DR. ALAN L.

MINTZ, D.D.S., ASSEMBLYMEMBER SIMCHA EICHENSTEIN, THOMAS ZABIELSKIS,

NINA JODY, MICHAEL KEKAFOS, NORMAN SPIZZ, MICHAEL GROSS, EFRAIM REISS

and ASSEMBLYMEMBER MICHAEL NOVAKHOV on behalf of themselves and all other

similarly situated, by and through their undersigned counsel, hereby file this Complaint against

UNITED STATES DEPARTMENT OF TRANSPORTATION ("USDOT"), FEDERAL

HIGHWAY ADMINISTRATION ("FHWA"), SHAILEN BHATT, in his official capacity as

Administrator of the Federal Highway  Administration, RICHARD J. MARQUIS, in his official

capacity as Division Administrator of the New York Division of the Federal Highway

Administration, METROPOLITAN TRANSPORTATION AUTHORITY ("MTA"),

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY ("TBTA"), NEW YORK STATE

DEPARTMENT OF TRANSPORTATION ("NYSDOT"), NEW YORK CITY DEPARTMENT

OF TRANSPORTATION ("NYCDOT") and TRAFFIC MOBILITY REVIEW BOARD

("TMRB").

## I.   <u>NATURE OF THE CASE</u>

1.      This case joins other legal challenges brought by institutional, individual and *pro se*

litigants to the arbitrary, capricious and unlawful proposed implementation of New York's Central

Business District Tolling Program ("Congestion Pricing").[1]  Plaintiffs herein comprise grassroots

community-based organizations and a cross-section of citizens representing various communities

in New York City. Plaintiffs raise critical environmental, constitutional and socioeconomic issues

left unexamined or unresolved by virtue of Defendants' unlawfully abbreviated and truncated

environmental review process.

2.      Plaintiffs will suffer negative environmental and socioeconomic consequences of

Congestion Pricing. Plaintiffs are all individually harmed by the federal and state governments'

failure to follow the environmental, constitutional and rulemaking mandates of federal and state

law. Plaintiffs have participated in the administrative review process and have raised the

environmental, constitutional and socioeconomic objections set forth herein.

3.      Plaintiffs challenge FHWA's failure to conduct and prepare an Environmental

Impact Statement ("EIS"). FHWA published a Finding of No Significant Impact ("FONSI") on

June 22, 2023 in relation to the environmental consequences of Congestion Pricing despite the

prior publication of a Final Environmental Assessment ("EA") in May 2023 that found significant

adverse environmental consequences, particularly significant negative environmental

consequences to residents of environmental justice communities in the Lower East Side, South

---

[1] *Mark Sokolich, et al. v. United States Department of Transportation, et al.,* United States District Court, District of
New Jersey, Case No. 2:23-CV-21728
*Michael Mulgrew et al. v. United States Department of Transportation, et al*., United States District Court, Eastern
District of New York, Case No. 24-CV-81
*Elizabeth Chan et al. v. United States Department of Transportation, et al.*, United States District Court, Southern
District of New York, Case No.: 1:23-CV-10365
*State of New Jersey v. United States Department of Transportation, et al.*, United States District Court, District of New
Jersey Case No. 2:23-CV-03885

Bronx and East Harlem of the City of New York.

4.      The significant environmental consequences of Congestion Pricing concern, among other things, the severe adverse impacts of increased traffic flow and congestion to certain neighborhoods within and in proximity to the Central Business District ("CBD"), particularly communities of low income, minority populations and neighborhoods designated as environmental justice communities, and the financial burdens upon the working poor with no mass transit options to commute to their employment.

5.      The FONSI produced by the federal government in violation of controlling environmental law, New York State constitutional law, and State rulemaking required to be followed by MTA and TBTA failed to assess the significant environmental and socioeconomic hardships and displacement that will be caused by the implementation of Congestion Pricing. The FONSI and the EA failed to examine proper mitigation  -- viable alternatives such as carpooling, pricing of parking, ride sharing and high occupancy lanes.

6.      TMRB and the sponsoring New York agencies – MTA and TBTA -- failed to follow the statutory provisions of the State Administrative Procedure Act ("SAPA") in refusing to assess the socioeconomic impacts of Congestion Pricing upon the small businesses of New York City and the financial burdens and resulting job losses that will be faced by struggling working-class citizens.

7.      The National Environmental Policy Act ("NEPA") mandates that a federal agency conduct a full environmental review of federally-funded actions. Whenever a proposed federal action is of such consequence that it will "significantly affect the quality of the human environment" (42 U.S. § 4332(2)(C)), a complete EIS must be undertaken prior to the implementation of such action.

8.      In this case, FHWA arbitrarily ignored the findings set forth in the EA and the

public review process undertaken in accordance with SAPA that adverse environmental and socioeconomic consequences will result from implementation of Congestion Pricing to neighborhoods within and in proximity to the Central Business District. This failure foreclosed the possibility of an examination of viable alternatives and proper mitigation in environmental justice neighborhoods in New York City such as the Lower East Side, the South Bronx and East Harlem.

9.      To compound the violation of federal law, binding state legislation was ignored in the government's rush to implement Congestion Pricing. TMRB, MTA and TBTA are required to follow New York's Administrative Procedure Act ("SAPA") (Article 2 §§ 201-206), in designing and implementing rulemaking mandated by State legislation authorizing the tolling structure of Congestion Pricing.

10.     TBTA and MTA are empowered pursuant to New York Vehicle and Traffic Law §§ 1701 and 1704(a) to set tolling rates and procedures, including tax credits, waivers, hours of operation, geographical mitigations and exemptions, pursuant to the rulemaking authority of SAPA.

11.     Furthermore, Congestion Pricing violates two federal executive orders mandating that agencies "make achieving environmental justice part of [their] mission[s]." Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7,619, 7,629 (Jan. 27, 2021). Executive Order 12,898 directs federal agencies to identify and address, as appropriate, disproportionately high and adverse effects of federal actions on minority and low-income populations using data collected from the U.S. Census Bureau's Census Transportation Planning Package (EA 17-3.2). The Lower East Side, South Bronx and East Harlem fall squarely within this definition. In direct contravention of those directives, the EA and the subsequent FONSI failed to mitigate adverse environmental consequences upon environmental justice communities. It is undeniable and indisputable, based upon data in the EA, that the already

burdened and environmentally vulnerable environmental justice communities including the Lower East Side, a community bordering the FDR Drive, will face increased pollution, congestion, health risks and socioeconomic concerns due to implementation of Congestion Pricing.

12.     These Executive Orders, and the Council on Environmental Quality's NEPA Environmental Justice guidance, require federal agencies to study and address environmental justice issues when conducting a NEPA review. The guidance provides that environmental justice issues may arise at any step of the NEPA process and agencies should consider these issues, as appropriate. The guidance further provides that agencies should specifically consider the demographics of the affected area, to determine whether minority populations, low-income populations, or Native American tribes are present in the area impacted by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on them. Pursuant to environmental justice guidelines, relevant public health and industry data concerning the potential for multiple and cumulative exposure to human health or environmental hazards in the affected population must be analyzed. In order to comply with NEPA, agencies should seek input from environmental justice communities as early in the process as information becomes available. Mitigation policies, procedures and proposals were absent from the NEPA process in relation to the Lower East Side in defiance of reason, rationality or explanation.

13.     Article 1, Section 19 of the New York State Bill of Rights enshrines basic environmental protections and environmental justice into the legal fabric and framework of environmental protections afforded each citizen of the State of New York. Therefore, the failure of the NEPA and SAPA review process to consider and incorporate the constitutional rights of the citizens of New York into its final approval was unlawful and an arbitrary and capricious abuse of discretion.

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action presents a federal question under the laws of the United States, including NEPA and the federal Administrative Procedure Act ("APA") 5 U.S.C. § 706. This Court also has jurisdiction because the United States is a Defendant.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Additionally, venue is proper under 28 U.S.C. § 1391(e)(1)(C) because no real property is involved in the action and several Plaintiffs reside in the District.

## III.    PARTIES

16.    Plaintiff New Yorkers Against Congestion Pricing Tax is a grassroots community-based organization representing individuals and businesses adversely affected by the failure of the government to adequately assess the negative socioeconomic and environmental impacts of Congestion Pricing. Each of the individual members of the organization will be personally harmed in a distinct and individualized manner due to one or more of the adverse consequences of increased air pollution, congestion, health risks, increased cost of business, loss of consumers and/or financial burdens resulting from Congestion Pricing.

17.    Plaintiff Danny Buzzetta is a resident of New York City, New York County. Mr. Buzzetta is the owner of the Peter Jarema Funeral Home located at 129 East 7th Street, New York, New York. Mr. Buzzetta's business relies upon vehicular transportation to cemeteries, crematories, hospitals and medical examiner locations outside the CBD zone. He needs to drive from inside the CBD zone to various locations outside the CBD zone multiple times per day. Every single cemetery and crematory is located outside the CBD zone and many hospitals and medical examiners relied upon by Mr. Buzzetta are also outside the CBD zone. For obvious reasons, Mr.

Buzzetta cannot use public transportation to transport deceased New York City residents. The financial burdens created by Congestion Pricing will force Mr. Buzzetta to lose his business.

18.     Plaintiff Dr. Gregor Winkel is a resident of New York City, New York County, residing in the Lower East Side. Dr. Winkel is the caretaker for his life partner, who suffers from blindness, is confined to a wheelchair and has had kidney and pancreas transplants. Dr. Winkel's life partner resides in New Jersey in an area remote from mass transit and relies upon Dr. Winkel's vehicular access to be transported to receive emergency care and for doctor visits inside the CBD zone. Dr. Winkel is on a fixed income as a New York City teacher and the costs of Congestion Pricing will have a devastating financial impact upon him and prevent him from providing necessary care to his life partner. Dr. Winkel is further harmed because the FONSI has not evaluated or considered the actual impacts of the tolling structure or program to be implemented by the MTA.

19.     Plaintiff Lee Berman is a resident of New York City, New York County, residing in the Lower East Side. Mr. Berman will suffer catastrophically from the health risks and financial burdens imposed by Congestion Pricing. Mr. Berman resides with his wife and two daughters. Mr. Berman's wife suffers from numerous medical conditions including neurological, cardiac and mobility issues. Mr. Berman resides one block from the FDR Drive in an area the EA cites as an environmental justice community that will suffer severe negative environmental consequences from increased vehicular congestion, air pollution and health risks. Mr. Berman lives paycheck to paycheck and relies upon his automobile to visit his in-laws residing in northern New Jersey. Additionally, Mr. Berman's wife can no longer take mass transit to work or to shop because of her medical conditions, which include fainting, arrythmia and other symptoms, making riding on or waiting for buses or trains a health hazard. Mr. Berman transports his wife from work three days per week in addition to transporting her to and from doctor appointments and for medical tests at least two to three times per month at New York Presbyterian Hospital, located at 68th Street and

York Avenue. Additionally, Mr. Berman's daughter participates on her high school track team in the Bronx, typically five to six days per week. She frequently ends practice after 7PM in the Bronx or at the New Balance Armory on West 168th Street. She also frequently needs to be at a race or practice on weekends anywhere from 7AM to 9PM on Randall's Island, Van Cortland Park, the Armory or other locations far from home and inaccessible to mass transit. Mr. Berman has another daughter who is asthmatic and will suffer from the increased health risks of Congestion Pricing.

20.     Plaintiff Meredith LeVande is a resident of New York City, New York County, residing in the Lower East Side. Ms. LeVande suffers from asthma that is already aggravated because of her residence close to the FDR Drive. Ms. LeVande is an early childhood music teacher who works in the Bronx, primarily for not-for-profit City and federally funded preschools. Ms. LeVande has a master's degree in music and an additional master's degree in early childhood education and early childhood special education. She also teaches music to several hundred children and performs approximately 20 classes per week, five days per week in seven different Bronx locations. Ms. LeVande works with preschool children who have disabilities and preschool children in the general education classroom. Ms. LeVande commutes by driving from the Lower East Side every day. She must transport heavy, extensive and expensive musical equipment every day. The equipment utilized by her students cannot be stored in the classroom due to lack of space and educational resources to secure the equipment. Ms. LeVande does not use public transportation because doing so would be physically impossible as mass transit is close to one mile away from her home, in addition to which she must travel from school to school hauling expensive and heavy equipment throughout the day. Because of Congestion Pricing, Ms. LeVande will face enormous financial hardship, with her only alternative spending several hours daily using public transportation. Neither the FONSI nor the MTA SAPA review has evaluated the impact of Congesting Pricing on Ms. LeVande's financial and respiratory burdens.

21.     Plaintiff Rita Sue Siegel maintains two residences. Ms. Siegel resides in New York

City, New York County, within the CBD. Ms. Siegel also resides in Cold Spring, New York. Ms. Siegel's dual residency began in an effort to avoid health risks from the pandemic. She visits doctors on a regular basis at Weill Cornell Hospital in New York City. Commuting into Manhattan over the George Washington Bridge is already a financial burden for Ms. Siegel. The increased costs from Congestion Pricing will impose a severe financial burden upon Ms. Siegel. Ms. Siegel's health conditions preclude her from using public transportation because she must commute by car to maintain her mandatory health visits.

22.     Plaintiff Tommy Loeb is a resident of New York City, New York County, residing in the Lower East Side. Mr. Loeb resides in a building on the FDR Drive service road directly facing the FDR Drive. The EA found that this location will suffer increased levels of air pollution, congestion, noise and related health risks due to air pollution. Mr. Loeb is 76 years old and is vulnerable to the health risks caused by increased vehicular congestion. Additionally, Congestion Pricing coincides with New York City's decision to remove approximately 1,000 mature trees along the FDR Drive to accommodate the East Side Coastal Resiliency Project. Thus, Congestion Pricing will not only increase existing air pollution, it will aggravate the ongoing failure of the City of New York to mitigate the negative environmental consequences of the East Coast Resiliency Project.

23.     Plaintiff Kathryn Freed is a resident of New York City, New York County, residing in lower Manhattan. Ms. Freed lives in a residential apartment building in close proximity to the FDR Drive service road. The EA found that this location will suffer increased levels of air pollution, congestion, noise and related health risks due to air pollution. Ms. Freed is a retired State Supreme Court Justice and a former New York City Council Member, representing lower Manhattan. She is vulnerable to the health risks caused by increased vehicular congestion. Congestion Pricing also coincides with New York City's decision to remove approximately 1,000 mature trees along the FDR Drive to accommodate the East Side Coastal Resiliency Project.

Congestion Pricing will not only increase existing air pollution, it will aggravate the ongoing failure of the City of New York to mitigate the negative environmental consequences of the East Coast Resiliency Project.

24.     Plaintiff Trever Holland is a resident of New York City, New York County, residing in the Lower East Side. Mr. Holland has lived within the environmental justice community known as the Two Bridges for 30 years. The Two Bridges neighborhood already faces heightened health risks with elevated levels of asthma and other respiratory diseases. This area also suffers from one of the highest Covid-19 rates and fatalities in all of New York City. Mr. Holland lives directly alongside the FDR Drive and is a member of a minority group, as defined in Executive Order 12,898.

25.     Plaintiff Ricky Yang resides in New York City, New York County. Mr. Yang is a small business owner of a well-known longstanding ice cream and dessert establishment located on Baxter Street in Chinatown for almost a decade. Mr. Yang's business will be negatively impacted due to the increased costs of frequent truck and auto deliveries that Mr. Yang's business is dependent upon. Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Yang's revenue. The economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by TBTA. This statutory failure on the part of TBTA directly harms Mr. Yang's livelihood.

26.     Plaintiff Paul Eng is a resident of New York City, New York County. Mr. Eng is a small business owner in Chinatown. He runs a family-owned business that has operated since 1933. Mr. Eng's business services the local community with Toisanese staples including tofu, soy milk, noodles and rice cakes. His business will be negatively impacted due to the increased costs of frequent truck and auto deliveries that Mr. Eng's business is dependent upon. Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Eng's revenue. Mr. Eng

is harmed because the economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by TBTA.

27.     Plaintiff Baruch Weiss is a resident of New York City, New York County. Mr. Weiss is the proprietor of Eastside Glatt Kosher Butcher Shop located on Grand Street in the Lower East Side. His business will be negatively impacted due to the increased costs of frequent truck and auto deliveries that Mr. Weiss' business is dependent upon. Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Weiss' revenue. Mr. Weiss is harmed because the economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by the TBTA.

28.     Plaintiff Robert Friedrich is a resident of New York City, Queens County. Mr. Friedrich is the President of a cooperative apartment complex located in Glen Oaks Village, Queens with 3,000 families and 10,000 residents. Many of the residents are seniors living on a fixed income who will be economically harmed by the cost of commuting as well as increased cost to travel to the CBD to receive necessary healthcare. Mr. Friedrich will be individually harmed in commuting to his business located within the CBD.

29.     Plaintiff Kevin Forrestal is a resident of New York City, New York County. Mr. Forrestal was President of the Queens Civic Congress from 2016-2022 and has been President of the Hillcrest Estates Civic Association from 2000 to the present. He is retired, living on a fixed income with serious health issues. Mr. Forrestal will be adversely impacted by the increased cost of travel to the CBD, and by the increased traffic congestion on the Grand Central Parkway, which is in close proximity to Mr. Forrestal's home.

30.     Plaintiff Warren Schreiber is a resident of New York City, Queens County. Mr. Schreiber lives in Bayside, and is the current President of the Queens Civic Congress. He lives in close proximity to the Cross Island Parkway, Clearview Expressway and Northern Boulevard. All

of these major vehicular arteries will experience increased traffic congestion and air pollution due to traffic diversions resulting from Congestion Pricing. Additionally, the Long Island Railroad, relied upon by Mr. Schreiber for mass transit, is extremely over-congested at the Bell Boulevard station and will experience greater congestion and safety hazards as a result of the increased mass transit commuters resulting from Congestion Pricing. Mr. Schreiber also relies upon health services within the CBD and will face increased financial burdens due to the cost of Congestion Pricing.

31.    Plaintiff Christopher Ryan is a resident of New York City, New York County. Mr. Ryan has lived in the Lower East Side for more than 30 years. He is responsible for supporting a family of four and is the co-caretaker for his wife's parents living hundreds of miles away. Mr. Ryan is self-employed as a freelance electrical technician and independent contractor, working in the entertainment industry, specifically, the motion picture industry. His work schedule and work locations — i.e. the beginning and ending times of his work day and at what employer job site or job sites he will work during a given day — are variable and dependent upon the needs of the entertainment industry employers operating within and outside of the CBD. Mr. Ryan's work "day" often includes night work as well as work that begins in the late afternoon or evening of one calendar day and concludes early, mid or late morning the following calendar day. Mr. Ryan's work schedule and load of equipment, tools and supplies vary day-to-day, but he is always dependent upon vehicular transportation due to the weight and value of his electrical equipment, and due to the impracticability of transporting that equipment via mass transit, often to more than one job site during the same work day. The several motion picture industry guilds and unions — including IATSE (Mr. Ryan's union), SAG-AFTRA and the DGA — that represent thousands of workers who are residents of New York City have negotiated contracts with employers establishing job site "zones." These zones radiate in distances ranging from 8 miles to 50 miles from the center point, Columbus Circle, New York City which happens to be in the CBD.

Employers who select job sites outside of these contractually established zones, are required to pay employees additional wages for travel time to the out-of-the-zone job site. These job site zones incentivize employers to reduce production costs by choosing job sites within the zones, including the CBD. The increased cost of Congestion Pricing will jeopardize the financial viability of Mr. Ryan's business. The socioeconomic impact upon Mr. Ryan's small business is not being evaluated within the rule making process governing toll prices, exemptions and discounts. This breach of statutory mandates by TBTA will cause direct harm to Mr. Ryan.

32.     Plaintiff Ben Mason is a resident of New York City, New York County. Mr. Mason resides in the environmental justice community of East Harlem in close proximity to the FDR Drive. He currently suffers from health effects due to severe vehicular congestion on the FDR Drive. Mr. Mason is self-employed and is the sole caretaker for his mother who relies on social security and has significant medical costs. Mr. Mason relies upon his vehicle to transport his mother to doctor and hospital visits and will be catastrophically impacted by the increased financial costs associated with commuting into the Central Business District.

33.     Plaintiff Dennis Rosario is a resident of New York City, Bronx County. Mr. Rosario suffers from various health infirmities and will be severely negatively impacted by the increased traffic and congestion that will be visited upon his South Bronx neighborhood. Mr. Rosario resides at 454 East 160th Street, Apt. 1E, Bronx, New York, which is within an environmental justice community. The EA details the significant negative environmental impacts that will result from increased vehicular congestion in his neighborhood. Mr. Rosario's daughter commutes to P.S.-M.S. 29, which is also located in an environmental justice community. Mr. Rosario's daughter will be exposed in her daily commute to the hazardous condition resulting from increased traffic congestion, which includes health concerns alongside safety concerns. The impacts upon the South Bronx from Congestion Pricing, while disclosed in the EA, have not been sufficiently mitigated due to Defendants' failure to conduct an EIS.

34.     Plaintiff Rabbi Y.S. Ginzberg is a resident of New York City, New York County. Rabbi Ginzberg has lived in the Lower East Side of Manhattan for 42 years. He is employed as the school principal of Mesivtha Tifereth Jerusalem of America in the Lower East Side community. Many of the students attending Mr. Ginzberg's school will face financial hardships due to the increased cost of commuting from neighborhoods all over New York City and New Jersey. Students may be forced to leave school and transfer to other educational institutions due to this financial hardship. Additionally, Rabbi Ginzberg lives in an area of the Lower East Side inaccessible to mass transit. Therefore, he must rely on vehicular transportation to purchase necessities such as kosher dairy products, which are only available in the community closest to the Lower East Side - Williamsburg Brooklyn. Rabbi Ginzberg will also suffer the ill health effects of living in close proximity to the FDR Drive, Brooklyn Bridge and three to four miles from the Holland and Lincoln tunnels. Rabbi Ginzberg will therefore be negatively impacted by traffic diversions causing increased congestion and pollution within this already environmentally burdened community.

35.     Plaintiff Jacob Englander resides in New York City, New York County. Mr. Englander resides in a building in close proximity to the FDR Drive. The EA found that this location will suffer increased levels of air pollution, congestion, noise and related health risks due to air pollution.

36.     Plaintiff Aaron Gonzalez is a resident of New York City, New York County. Mr. Gonzalez has resided in the Lower East Side with his wife for 37 years. He lives in a building within 80 feet of the FDR Drive. The EA found that this location will suffer increased levels of air pollution, congestion, noise and related health risks due to air pollution.

37.     Plaintiff Howard Chin is a resident of New York City, New York County. Mr. Chin resides in the Lower East Side in close proximity to the FDR Drive. Mr. Chin is a United States

Army veteran who served in Operation Iraqi Freedom in 2005. He is a member of the American Legion Lt. B. R. Kimlau Chinese Memorial Post 1291. The EA found that Mr. Chin's Lower East Side neighborhood will suffer increased levels of air pollution, congestion, noise and related health risks due to traffic diversions to that portion of the FDR Drive. Mr. Chin relies on his car to commute to work, and will face financial hardships under Congestion Pricing by virtue of having to commute to work each day.

38.     Plaintiff Elaine La Penna is a resident of New York City, New York County. Ms. La Penna resides in the Lower East Side of Manhattan in close proximity to the FDR Drive. She suffers from diabetes, heart disease, peripheral artery disease and high blood pressure hypertension. All of these ailments will be exacerbated due to the increased air pollution and congestion that will occur in Ms. La Penna's surrounding neighborhood.

39.     Plaintiff Thomas Anthony Scarpaci is a resident of New York City, Richmond County. Mr. Scarpaci lives on the North Shore of Staten Island. According to the EA, Staten Island and the North Shore of Staten Island in particular already suffer from poor air quality. Health metrics related to air quality – asthma (including ozone and PM2.5 asthma), emergency room visits and respiratory hospitalizations – are all significantly higher in the North Shore of Staten Island compared to the greater New York City area, and will see increased pollutants under the proposed action. The Final EA also recognized that the Verrazzano-Narrows Bridge, relied upon by Mr. Scarpaci, will see increases in peak-hour traffic volume. Mr. Scarpaci will suffer a disproportionate burden from Congestion Pricing given the limited availability of mass transit on Staten Island. That limited availability is compounded by the fact that Staten Island is already the only borough that must pay an existing toll to access the remainder of the City by car. The new toll places further burden without countervailing benefit.

40.     Plaintiff Councilmember Kristy Marmorato resides in New York, Bronx County.

Ms. Marmorato and her constituents will be directly impacted by increased air pollution due to vehicular congestion caused by traffic diversion resulting from Congestion Pricing. Residents of her district will be adversely affected by Congestion Pricing because many rely on automobiles to get to Manhattan for their employment, school and medical appointments due to the scarcity of mass transit within the district. A large portion of Ms. Marmorato's district is made up of first responders, emergency workers, police officers and other uniformed services alongside elderly and retired people living on fixed incomes. Ms. Marmorato's district, which is close to Interstate 95 and the Cross-Bronx Expressway will be one of the most adversely impacted communities under Congestion Pricing. There are many small businesses within Ms. Marmorato's district that will suffer an economic strain, not only from the cost of transporting goods and materials into the CBD, but also from a loss of business from customers who must reverse commute from the CBD to Ms. Marmorato's district.

41.     Plaintiff Councilmember Vickie Paladino is a resident of the New York City, County of Queens. Ms. Paladino represents the northeast section of Queens, and has lived in the Whitestone community for 40 years. Ms. Paladino's district contains a large percentage of seniors who rely on their cars to attend medical appointments within the CBD. Elderly residents of New York City living on fixed incomes will be severely impacted by the additional costs related to Congestion Pricing. Many of the Community Boards and Civic Associations within Ms. Paladino's district have voiced concerns and opposition to Congestion Pricing due to financial hardships from commuting to the CBD for employment, entertainment and visiting friends and relatives.

42.     Plaintiff Councilmember Joann Ariola is a resident of New York City, Queens County. Ms. Ariola is a lifetime resident of Ozone Park and Howard Beach. Her district is in close proximity to major vehicular arteries including the Belt Parkway, Grand Central Parkway and Jackie Robinson Parkway. These highways will suffer from increased traffic diversions adding pollution and congestion to these communities. Many neighborhoods within Ms. Ariola's district

have been characterized as mass transit deserts due to the inaccessibility and unreliability of mass transit. Ms. Ariola's district also includes many small businesses that will be burdened by the increased costs of transporting goods and services out of and into the CBD. Increased congestion in communities within Ms. Ariola's district close to the periphery of the CBD will result in additional burdens.  These include scarce parking space by virtue of commuters driving into Ms. Ariola's district and leaving their automobiles in her community to avoid paying the tolls required to enter Manhattan.

43.     Plaintiff Councilmember Susan Zhuang resides in New York City, Kings County. Ms. Zhuang represents a unique district in Kings County. Within Ms. Zhuang's district is a community known as "Brooklyn Chinatown". This community contains many small Chinese-owned businesses that rely on Manhattan's Chinatown to deliver and retrieve goods and services. The additional costs of Congestion Pricing will force many small businesses in Ms. Zhuang's district to literally disappear due to the economic burdens imposed by this daily tax of Congestion Pricing. Ms. Zhuang's district also contains a large portion of non-English speaking seniors on fixed and limited income who are only able to travel by car for healthcare treatment in Manhattan's Chinatown. The impacts upon Ms. Zhuang's community will be severe and dire, as many non-English speaking immigrants rely upon Manhattan's Chinatown for their livelihood.

44.     Plaintiff Councilmember Kalman Yeger resides in New York City, Kings County. Mr. Yeger represents the Brooklyn neighborhoods of Bensonhurst, Gravesend (West), Sunset Park (East), Borough Park (West), Borough Park Mapleton, Midwood (West), Gravesend (East) and Homecrest in the City Council (District 44). Mr. Yeger's district is remote from mass transit, and Congestion Pricing will operate as a tax on his constituents who do business in professions that require them to commute by car to the CBD.

45.     Plaintiff Councilmember Inna Vernikov is a resident of New York, Kings County.

Ms. Vernikov's district is an environmentally sensitive community that has suffered the severe impacts of natural disasters such as Hurricane Sandy. A large portion of Ms. Vernikov's district relies upon vehicular transportation into the CBD for medical appointments. Additionally, a large portion of the businesses within her district are small businesses that rely on shipping to and from the CBD. The increased costs of Congestion Pricing will have a devastating impact upon the business community within Ms. Vernikov's district.

46.     Plaintiff Councilmember Robert F. Holden is a resident of New York City, Queens County. Mr. Holden represents a district in central Queens, which includes Middle Village and Maspeth. Mr. Holden and his constituents will be directly impacted by increased air pollution due to vehicular congestion caused by traffic diversion resulting from Congestion Pricing. Residents of his district will be adversely affected because many rely on automobiles to get to Manhattan due to the remote location of mass transit within the district. A large portion of Mr. Holden's district is made up of elderly and retired people living on fixed incomes. The district is close to the Long Island Expressway and the entrances to the Midtown Tunnel and 59th Street Bridge and will be one of the most adversely impacted due to increased traffic diversions resulting from avoiding the CBD. A trip into Manhattan from a significant portion of his district requires the utilization of two forms of public mass transportation and can take a considerably longer time than commuting by car. Congestion Pricing poses a severe hardship upon the elderly and disabled members of his district, and upon the financially-strapped working people – particularly civil servants, healthcare workers, teachers, emergency workers and disabled residents dependent upon their livelihood or healthcare within the CBD.

47.     Plaintiff Richard Passarelli is a resident State of New York, City of New York, County of New York. Mr. Passarelli resides at the border of the CBD at 60th Street. His residence is one block away from the FDR Drive. Mr. Passarelli will suffer increased levels of air pollution, congestion, noise and related health risks due to traffic diversions to that portion of the FDR Drive.

Mr. Passarelli is also a restaurateur who owns Bobby Van's Steakhouse, located in the CBD. Congestion Pricing will place an undue burden on Mr. Passarelli's business and personal finances. Congestion Pricing will increase parking fees in the area and will lead to a decrease in property values in the area due to the diverted traffic that will result from an increase in drivers outside of CBD in search of parking. Mr. Passarelli's business will be financially harmed due to the increased costs of required and necessary frequent truck and auto deliveries that Mr. Passarelli's business is dependent upon.  Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Passarelli's revenue.

48.     Plaintiff Steven Traube is a resident of the State of New York, City of New York, County of New York. Mr. Traube is the proprietor of Wall Street Grill, a kosher restaurant and steakhouse, located in lower Manhattan in the CBD. Mr. Traube's restaurant employs 67 individuals with a daily average of 220 customers. The restaurant relies on patrons from Brooklyn, Queens, Long Island, New Jersey, the Bronx, Monsey, Westchester and surrounding Tri-State area who often dine in the evenings, weekends and holidays. Congestion Pricing will place an undue financial burden on Mr. Traube's business. Mr. Traube estimates a 40% decrease in business as a result of Congestion Pricing. His business will be negatively impacted due to the increased costs of frequent truck and auto deliveries that Mr. Traube's business is dependent upon.  Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Traube's revenue. He will have to eliminate staff and hours by 45% as a result. For staff that drives in to work due to the lack of public transportation alternatives, Mr. Traube estimates 15% of his staff will find employment outside of the CBD.  Mr. Traube is harmed because the economic impacts of Congestion Pricing are not being evaluated within the mandate rulemaking process being undertaken by the TBTA.

49.     Plaintiff Francisco Gonzalez is a resident of the State of New York, City of New York, County of New York, residing in the Lower East Side.  Mr. Gonzalez suffers from asthma that is already aggravated because his residence is one block away from the FDR Drive.  Mr.

Gonzalez is a real estate broker, co-founder of the Lower East Side Small Business Alliance and a board member of the East Village Independent Merchants Association. The financial burdens created by Congestion Pricing will have a negative effect on Mr. Gonzalez's real estate business due to the decrease in commercial tenants who are no longer interested in signing 5 - 10 year leases. The economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by TBTA. This statutory failure on the part of TBTA directly harms Mr. Gonzalez's livelihood.

50.     Plaintiff Jose Collado is a resident of the State of New York, City of New York, County of New York, residing in the Gramercy Park section of Manhattan.  Mr. Collado will suffer from both health risks and financial burdens imposed by Congestion Pricing.  Mr. Collado, his wife and four children reside two blocks from the FDR Drive in an environmental justice community that will suffer severe negative environmental consequences from increased vehicular congestion, air pollution and health risks.  Mr. Collado is a small business owner of a pizzeria and four delis, two in the Lower East Side and two in the Bronx for over two decades.  Mr. Collado's businesses will be negatively impacted due to the increased costs of frequent truck and auto deliveries that Mr. Collado is dependent upon.  Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Collado's revenue. Mr. Collado is harmed because of the economic impacts of Congestion Pricing are not being evaluated within the mandate rulemaking process being undertaken by the TBTA.

51.     Plaintiff Vito LaBella is a resident of the State of New York, City of New York, County of Kings.  Mr. LaBella is a retired New York City Police Officer living on a fixed income with his wife and three children.  Mr. LaBella and his wife receive their medical treatment in Manhattan.  Mr. LaBella's wife is disabled and can no longer take mass transit to these appointments; therefore Mr. LaBella transports his wife to and from Manhattan for medical

appointments. The increased costs from Congestion Pricing will impose a severe financial burden upon Mr. LaBella.

52.     Plaintiff Aixa Torres is a resident of the State of New York, City of New York, County of New York, residing in the Lower East Side.  Ms. Torres has lived within the Smith House in the Two Bridges neighborhood of Manhattan for over 50 years, the Smith House is located within an environmental justice area.  The Two Bridges neighborhood already faces heightened health risks with elevated levels of asthma and other respiratory diseases.  This area also suffers from one of the highest Covid-19 rates and fatalities in all of New York City.  The Smith House has been overwhelmed with victims of respiratory and other 911 cancers. Ms. Torres lives one block from the FDR Drive in an area the EA cites as an environmental justice community that will suffer severe negative environmental consequences from increased vehicular congestion, air pollution and health risks. Ms. Torres has a prosthesis valve in her heart and suffers from diabetes.  Ms. Torres needs to see five specialists and an internist to manage her health and Congestion Pricing would place undue financial and health burdens on Ms. Torres.  Ms. Torres is a member of a minority group, as defined in Executive Order 12,898.

53.     Plaintiff Julie Velez is a resident of the State of New York, City of New York, County of Queens.  Ms. Velez resides with her husband and their two young children. Ms. Velez works for a hospital located in the CBD, her husband also works within the CBD in a hotel. Her daughter attends school in the CBD.  It would be a hardship for Ms. Velez and her husband to relocate to comparable jobs outside of the CBD because both the Medical Mile and the heart of the hotel industry are based within the CBD. Ms. Velez and her husband commute to work by automobile via carpool. One of their children accompanies them into Manhattan and attends a school within the CBD. Ms. Velez drives her ailing father, a veteran living in Queens, to the Margaret Cochran Corbin VA Campus located within the CBD for healthcare. Congestion pricing would cause significant economic hardship for their family. Ms. Velez is a member of a protected

minority group, as defined in Executive Order 12,898.

54.     Plaintiff Daphne Brucculeri is a resident of the State of New York, City of New

York, County of Kings.  Ms. Brucculeri's son has special needs and attends school within the CBD.

Congestion Pricing would cause significant economic hardship for their family. Ms. Brucculeri

often needs to drive her son to and from school. The imposition of Congestion Pricing will cause

Ms. Brucculeri to enroll her son (with special needs) and her daughter to a school outside of the

CBD. As a student with special needs, Ms. Brucculeri's son is entitled to Free and Appropriate

Public Education (FAPE). Congestion Pricing creates barriers for her son to attend schools in the

CBD. This issue was not evaluated by the Defendants in either the NEPA or SAPA review process.

55.     Plaintiff Dr. Alan L. Mintz, DDS is a resident of the State of New York, City of

New York, County of New York. Dr. Mintz is an Adjunct Clinical Professor at NYU College of

Dentistry, and Clinical Instructor at NY Brooklyn Methodist Hospital. Congestion Pricing would

cause significant economic hardship for Dr. Mintz. Dr. Mintz lives on West 61st Street,

immediately outside of and in close proximity to the CBD. Traffic diversion from the CBD will

demonstrably increase air pollution, congestion and health hazards caused by Congestion Pricing.

Dr. Mintz's place of employment (NYU College of Dentistry) is within the CBD. Dr. Mintz has a

mobility disability and cannot take public transportation.  He relies on his car for transportation in

order to fulfill his employment obligations at both NYU College of Dentistry and NY Brooklyn

Methodist Hospital.

56.     Plaintiff Assemblymember Simcha Eichenstein is a resident of the State of New

York, City of New York, County of Kings.  Assemblymember Eichenstein represents constituents

in the Borough Park and Midwood neighborhoods of Brooklyn with high rates of asthma.

Congestion Pricing will place unnecessary health burdens on his constituents.  Vehicles diverted

outside the CBD will increase congestion in this Brooklyn community. Already limited parking

will be further limited forcing drivers to circle blocks searching for parking. The increased vehicular congestion will increase air pollution in this vulnerable community.  Congestion Pricing will also place economic hardship on small business owners residing within Assemblymember Eichenstein's district. Many of Mr. Eichenstein's constituents are employed in the diamond industry and therefore, due to security concerns, cannot commute via public transportation because they rely upon their vehicles to transport highly valuable goods required to operate their businesses.

57.     Plaintiff Peter Thomas Zabielskis is a resident of the State of New York, City of New York, County of New York, residing in the Lower East Side within the CBD. Mr. Zabielskis is a retired professor with no income and living on his savings. He will suffer catastrophically from the financial burden imposed by Congestion Pricing.  Mr. Zabielskis suffers from spinal stenosis, compressed spinal disc, and has diabetes. Mr. Zabielskis walks with two sticks and cannot walk for more than 50 feet without pain which makes taking public transportation a hardship. Mr. Zabielskis relies on his car for his various doctors' appointments.

58.     Plaintiff Nina Jody is a resident of the State of New York, City of New York, County of New York, residing in Lower Manhattan within the CBD.  Ms. Jody is retired and lives on a fixed income.  Congestion Pricing will create an economic hardship for Ms. Jody. The weekend public transportation in her neighborhood is unreliable; therefore Ms. Jody relies on her car for her weekly visits to see her daughter and granddaughter who reside in Carroll Gardens, Brooklyn.

59.     Plaintiff Michael Kekafos is a resident of the State of New York, City of New York, County of New York. Mr. Kekafos is the proprietor of Zafis Luncheonette located on Grand Street in the Lower East Side. His business will be negatively impacted due to the increased costs of frequent truck and auto deliveries that Mr. Kekafos depends upon. The majority of Mr. Kekafos patrons are from low- and moderate-income households. If he passes the cost onto the consumers, they will not come and if Mr. Kekafos absorbs the increased cost, due to Congestion Pricing it will

diminish Mr. Kekafos' revenue. Mr. Kekafos is harmed because the economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by the TBTA. This statutory failure on the part of the TBTA directly harms Mr. Kekafos' livelihood.

60.     Plaintiff Norman Spizz is a resident of the State of New York State, County of Nassau. He is the proprietor of SPN Music and Entertainment, Inc. Mr. Spizz's business will suffer from financial burden due to Congestion Pricing. Mr. Spizz dispatches musicians, bands and entertainers into the CBD for performances. Musicians and performers from his company need to drive into Manhattan with their equipment for performances, the extra tax imposed due to Congestion Pricing will deter his contractors from going into the CBD therefore Mr. Spizz cannot fulfill his contracts. Mr. Spizz is harmed because the economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by the TBTA.

61.     Plaintiff Michael Gross is a resident of the State of New York City, City of New York, County of New York, residing in the CBD. Mr. Gross' dog suffers from Addison's Disease and requires a monthly injection at a veterinarian's office in order to stay alive. Mr. Gross needs to transport his dog using his car which is parked one block away from the FDR Drive in Midtown. Mr. Gross will be negatively impacted due to Congestion Pricing due to imposition of Congestion Pricing he needs to pay in order to take his dog to the veterinarian's office.

62.     Plaintiff Efraim Reiss is a resident of the State of New York, City of New York, County of Kings.  Mr. Reiss is the proprietor of Jack Reiss LLC which has been a family business for over 75 years. For over 50 years, the firm has been located in the New York City Diamond District along 47th Street in the CBD. Mr. Reiss' business employs qualified and specialized workers in the Diamond and Jewelry industry.  The firm currently has 15 workers commuting from Brooklyn, Queens and Rockland County, who all need to drive because of the nature of the valuable and irreplaceable merchandise they are transporting.  Additionally, Mr. Reiss sells

wholesale to retail shops around the tristate area (New York, New Jersey and Connecticut) and relies on its 15 workers to drive the merchandise to its customers. Customers traveling by car due to the nature of the purchase will no longer travel to the Diamond District which involves multiple trips. The firm needs to be at 47th Street location because of the presence of other Jewelers, armored carriers, including Brinks and the GIA (Gemology Institute of America) which does independent appraisals of the firm's merchandise. Congestion Pricing will place an additional financial burden on Mr. Reiss's business. Mr. Reiss estimates a 30% decrease in business as a result of Congestion Pricing. His business will be negatively impacted due to the increased costs of frequent auto deliveries that Mr. Reiss's business is dependent upon. Additionally, the increased cost to consumers due to Congestion Pricing will diminish Mr. Reiss's revenue. He will have to eliminate staff and hours by 45% as a result. Mr. Reiss is harmed because the economic impacts of Congestion Pricing are not being evaluated within the mandated rulemaking process being undertaken by the TBTA.

63.     Plaintiff New York State Assemblymember Michael Novakhov is a resident of the State of New York, City of New York, County of Kings. Mr. Novakhov represents the Brooklyn neighborhoods of Sheepshead Bay, Midwood, Gravesend, Manhattan Beach and Brighton Beach in the New York State Assembly (District 45). Mr. Novakhov's district is remote from mass transit, and Congestion Pricing will operate as a tax on his constituents who do business in professions that require them to commute by car to the CBD. Mr. Novakhov's constituents will see a dramatic cost increase to goods and services due to the tax imposed on trucks and businesses as a result of Congestion Pricing. Mr. Novakhov has held numerous rallies and press conferences calling for Congestion Pricing to not be implemented.

64.     Defendant United States Department of Transportation ("USDOT") is the executive department of the federal government responsible for oversight of the transportation planning process, including implementing the requirements of NEPA, and ensuring the conformity of

federally-developed, funded or approved transportation projects.

65.     Defendant Federal Highway Administration ("FWHA") is a federal agency within USDOT that supports state and local governments in the design, construction and maintenance of the Nation's highway system. Among its management responsibilities, FHWA must ensure that the activities it authorizes comply with governing federal environmental statutes, including NEPA. FHWA authorizes States to toll on federal roads and highways under the Value Pricing Pilot Program ("VPPP") (23 U.S.C. § 129). FHWA issued the Final EA and FONSI for Congestion Pricing and must approve it under the VPPP. FHWA was required to perform a NEPA review pursuant to its regulations (23 C.F.R. Part 771).

66.     Defendant Shailen Bhatt is the Administrator of FHWA and is responsible for the Final EA and FONSI. He is named herein in his official capacity.

67.     Defendant Richard J. Marquis is the Division Administrator for the New York Division of FHWA and is responsible for the Final EA and FONSI at issue and is a signatory to each document. He is named and mentioned here in his official capacity. Defendants FHWA, Administrators Bhatt and Marquis are collectively referred to in this complaint as the FHWA.

68.     Defendant Metropolitan Transportation ("MTA") is a public benefit corporation chartered by the New York State Legislature in 1968 under the Metropolitan Transportation Authority Act (N.Y. Pub. Auth. Law § 1260 et seq). MTA is a program sponsor for Congestion Pricing.

69.     Defendant Triborough Bridge and Tunnel Authority ("TBTA") is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York, empowered to acquire, design, construct, maintain, operate and improve and reconstruct toll bridges and toll tunnels that connect the five boroughs of New York City. The Traffic Mobility Act provides that TBTA design, develop, build and run the Congestion Pricing program. The Act also

authorizes the TBTA Board to establish the Traffic Mobility Review Board, which was tasked with issuing the final tolling structure for the Congestion Pricing program.

70.     Defendant New York State Department of Transportation ("NYSDOT") is the State agency responsible for the development and operation of highways, railroads, mass transit systems, ports, waterways and aviation facilities in the State of New York. NYCDOT is a co-project sponsor for Congestion Pricing and was charged, along with MTA, with developing proposals for the scheme and releasing the Final EA for the program.

71.     Defendant New York City Department of Transportation ("NYCDOT") is the City agency charged with maintaining and enhancing the transportation infrastructure of New York City. NYCDOT is a co-project sponsor for Congestion Pricing and was charged, along with MTA, with developing proposals for the scheme and releasing the Final EA for the program.

72.     Defendant Traffic Mobility Review Board ("TMRB") is a six-person board appointed by TBTA. TMRB recommended the toll price, the time period when the toll will be operative, credits to cars that access the Manhattan CBD through the tunnels and already pay a toll, exemptions for taxis, pricing schemes for buses, small and large trucks and other facets of Congestion Pricing.

## IV.     FACTUAL BACKGROUND

73.     In April 2019, the New York State Legislature passed the MTA Reform and Traffic Mobility Act ("Congestion Pricing"). The legislative goals were two-fold: to ameliorate traffic congestion in New York City, and to create a dedicated revenue stream, that, at a minimum, ensures revenues and fees equivalent to $1 billion per year, with an ultimate estimated total of $15 billion to be used for mass transit capital improvements. The legislation also directed that TBTA, an affiliate of MTA, establish and charge variable tolls and fees for vehicles entering or remaining in the Central Business District ("CBD"). The CBD includes all of Manhattan south of 60th Street,

with the exceptions of the FDR Drive and West Side Highway. The geographical limitations are set forth at New York VTL § 1704(2).

74.     Congestion Pricing is unprecedented in the United States. No major city or metropolitan area has instituted any comparable program. Upon information and belief, Congestion Pricing only exists in London, Stockholm and Singapore -- municipalities with much different demographics, geographic concerns and socioeconomic conditions. For this reason, among others, the Environmental Protection Agency ("EPA") recommended that FHWA perform a full Environmental Impact Statement ("EIS").

75.     The EPA's written comments recommended that sufficient mitigation be provided where the analysis in the draft Environmental Assessment  ("EA") projected that traffic congestion will likely worsen due to the implementation of Congestion Pricing.

76.     With respect to air quality, the EPA recognized that "[t]raffic diversion may result in continued or increased air pollution in many residential neighborhoods," including the Lower East Side, South Bronx, East Harlem and portions of Queens County in close proximity to major arteries experiencing increased traffic diversion (EA 17-4).  The EPA indicated that "all tolling scenarios suggest a potential increase in vehicle and truck traffic," with some scenarios seeing  "an additional 700 trucks per day" in the South Bronx, and that the "[p]rojected benefits for the CBD are not expected to offset" the increased traffic to the South Bronx and Lower East Side. This increase in pollution and congestion will severely impact the environmental justice communities of the City of New York in violation of constitutional rights set forth in New York's Green Amendment.

77.     The EPA urged the inclusion of a "more expansive microscale screening analysis of intersections" including in the South Bronx and Lower East Side, where residents will see increased traffic and air pollutants from 2023 to 2045 as a result of Congestion Pricing.  The EPA

encouraged FHWA to consider *"[a]ll potential adverse impacts* . . . irrespective of benefits to other areas," and prepare a "comprehensive mitigation package" accordingly (*emphasis added*).

78.     This more expansive screening analysis was not conducted in accordance with EPA recommendations and a minimal mitigation package has been prepared, although implementation remains to be determined upon completion of MTA review.

79.     The EPA recommended that the Project Sponsors provide more detailed analysis of the "cumulative effects" on economic justice communities in accordance with NEPA implementing procedures. As the EPA noted, the pediatric rates of asthma emergency room visits and hospitalization in the South Bronx and East Harlem are already exceedingly high. The Lower East Side also bears disproportionate asthma disparities for both adults and children.

80.     No such further analysis of cumulative effects in these communities have been conducted. The EPA concluded that "additional analysis should be conducted to identify mitigation measures to reduce disproportionate, significant impacts to communities with EJ [Environmental Justice] concerns," and stated that the Project Sponsors should include "concrete mitigation requirements as commitments in its decision document."

81.     Besides the EPA, a wide spectrum of public officials, community groups, non-profit and private sector associations, government agencies and individuals wrote in strong opposition to Congestion Pricing commenting upon the Draft EA, including:

      a.   The U.S. Department of Health and Human Services recommended additional health protective mitigation measures for the neighborhoods surrounding the Cross-Bronx Expressway.

      b.   The New York Civil Liberties Union pointed out that disabled people will be unable to simply switch to public transit in response to Congestion Pricing because, of the 493 transit system stations in New York City, only 123 are

accessible under the Americans with Disabilities Act.

c.   The American Bus Association, an organization representing the nearly 11,000 buses operating in the tri-state area, indicated that it would be imprudent for FHWA to make a finding of "no significant impact" without knowing which pricing model will be implemented. "Coach USA," one of the largest transportation operators in the United States, also argued that the public comment period was "rushed and inadequate" and did not comply with the NEPA process.

d.   City Council Speaker Adrienne Adams expressed her concern that the Draft EA did not sufficiently account for the impact on environmental justice communities and communities in the outer boroughs who cannot rely on mass transit to reach Manhattan. She questioned the Draft EA's conclusion that Congestion Pricing would result in "small changes" in parking demand (in neighborhoods where there is already easy subway access) and urged FHWA to re-examine the impacts to parking demand and quality of life. Like the EPA, Speaker Adams highlighted the EA's projection of increased air pollutants in the Bronx and in Staten Island and emphasized that simply monitoring the particulate in these areas would not be sufficient without more appropriate mitigation efforts.

e.   Civic organizations including Queens Civic Congress and Hillcrest Civic Association.

82.   In 1991, Congress established the VPPP as a pilot program for Congestion Pricing. The VPPP, by supporting programs throughout the country, was intended to demonstrate whether, and to what extent, roadway congestion could be reduced through congestion pricing strategies.

83.     In 2007, then-Mayor Bloomberg announced "PlaNYC: A Greener, Greater New York," a plan involving open space, energy improvements, improving water and air quality, addressing climate change and, lastly, congestion pricing.

84.     Mayor Bloomberg proposed an $8 toll for vehicles entering parts of Manhattan between 6 a.m. and 6 p.m. on weekdays. The project was expected to produce $491 million annually for transit improvements and propel a transit build-out for the MTA. Due to a lack of public support, State legislators blocked the project in 2008.

85.     In 2017, then-Governor Cuomo brought together community representatives, officials and business leaders from across the State and tasked the group with developing recommendations to address congestion in Manhattan and identify sources of revenue to fix the ailing subway system. The panel issued a report recommending that "the MTA must first invest in public transportation alternatives and make improvements in the subway system before implementing a zone pricing plan to reduce congestion." Pertinent here, the report explicitly mentioned that this type of zoning congestion plan would require "completion of an Environmental Impact Statement."

86.     In March 2021, MTA officials stated that they had "heard from the Federal Highway Administration that they are going to fast-track our environmental process."

87.     Shortly thereafter, FHWA authorized MTA and New York transportation agencies to proceed with a NEPA Class III EA action pursuant to 23 C.F.R. § 771  (Final EA, at 1).  In its authorization letter, FHWA emphasized that it would "expedite its efforts wherever possible," and that the EA would require "enhanced coordination and public involvement that engages stakeholders from throughout all three States."

88.     Starting in May 2021 and continuing through August 2022, the Project Sponsors prepared the Draft EA for Congestion Pricing.  At the time of its preparation, neither FWHA nor the Project Sponsors had any idea how much the toll would be, when the toll would be in effect

and what the procedures for, and exemptions to, the tolls would apply. New York's SAPA review process will determine with finality, procedures regarding tolling which will then be incorporated into a NEPA final approval process.

89.     FHWA considered only one alternative to Congestion Pricing—the "No Action Alternative." All other potential revenue raising alternatives were rejected at the outset in large part because they would not achieve the $15 billion revenue goal set forth by the Traffic Mobility Act—notwithstanding the fact that they would have reduced traffic congestion. FHWA also did not consider whether a combination of alternatives could meet its budgetary goals or revenue raising objectives.

90.     On August 10, 2022, the completed Draft EA was made available to the public. The Draft EA determined that an EIS was not required for Congestion Pricing. The publication of the Draft EA initiated a 30-day formal comment period, which was subsequently extended by only 14 days despite requests for substantially longer extensions.

91.     Despite the tight timeframe, during the comment period, FHWA and the Project Sponsors received nearly 70,000 submissions.

92.     In early May 2023, FHWA published its "Final EA", which is subject to further review pursuant to New York State's SAPA process. Despite the litany of concerns identified by the public, the EA remained largely unchanged from the initial draft. Although a few mitigation measures were added, they failed to address New York State's constitutional Green Amendment.

93.     Aside from the promise to study the issues further, to "mitigate the traffic diversions, related air pollutants and associated health effects," the EA included "regional and place-based mitigation" for communities adversely impacted by Congestion Pricing. As contrasted with the $1 billion in annual revenue and an overall estimate of $15 billion revenue to the MTA capital program, the Program Sponsors committed a mere $155 million over five years to mitigation, for initiatives such as "install[ing] roadside vegetation to improve near-road air-

quality" (EA, ES-22). None of the air pollution or traffic mitigation efforts that the EPA and others recommended, nor any further studies were included in the EA as required by New York's Green Amendment.

94.     The mitigation is wholly inadequate both in scope and in value to ameliorate the severely deleterious impact of Congestion Pricing, particularly on residents of the Lower East Side, the South Bronx, Queens County, East Harlem and communities bordering the CBD that will be impacted by increased traffic, congestion, pollution, utilization of scarce parking and socioeconomic burdens on small businesses and economically burdened commuters.

95.     Alongside the EA, FHWA published a Draft Finding of No Significant Impact ("FONSI"). In the Draft FONSI, FHWA arbitrarily determined that the EA adequately and accurately documented the purpose and need, environmental issues and impact of the Proposed Action upon the residents of New York City and that appropriate mitigation measures would be undertaken. FHWA thus summarily and unlawfully found that the EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required."

96.     Without having before it the ultimate toll structure that it was supposed to be reviewing, FHWA determined there was "no mitigation needed" and "no adverse effects" of Congestion Pricing, but did recommend that TBTA work with New York City Department of Health and Mental Hygiene, as well as the New York State Department of Environmental Conservation, to monitor particulate matter to determine whether changes in air pollution occur as a result of the changes in traffic patterns in New York.

97.     The Draft FONSI was made available for public review for 30 days. In June 2023, FHWA published its FONSI without notable changes. The EA and FONSI failed to assess the various tolling scenarios and their possible effects on neighboring districts, small businesses, people dependent on mass transit, environmental justice communities and economically burdened

commuters. Therefore, the FONSI failed to require necessary mitigation measures, particularly in all communities with environmental justice concerns, and failed to consider alternatives – all culminating in an unjustified finding of no significant impact that provided for minimal mitigation measures while simultaneously acknowledging that the FONSI did not review the actual toll structure to be implemented, as that structure was not yet determined.

98.     Instead, the FONSI considered a number of hypothetical tolling scenarios, with no requirement that the ultimate tolling structure resemble those scenarios.  The scenarios contemplated peak toll rates ranging from $9 to $23, applicable from 6:00 AM to 8:00 PM weekdays and 10:00 AM to 10:00 PM weekends (EA, at ES-12).  The EA committed to a nighttime (12:00 AM to 4:00 AM) discount of at least 50%.  Several of the scenarios included credit toward the CBD toll for tolls paid at the Queens-Midtown, Hugh L. Carey, Lincoln, and Holland Tunnels (*Id.*)  One included credit for tolls paid at the Robert F. Kennedy, Henry Hudson, and George Washington bridges.  As for exemptions, the EA considered three types of exemptions or limitations for taxis, for-hire vehicles, and certain buses (city and inter-city).  Tolls for trucks also spanned a very wide range.  In approving these disparate components, FHWA admitted that the actual tolling structure would only be determined after issuance of the FONSI, leaving open that the "pricing structure could vary by time of day, day of week, and day of year and could be different for different types of vehicles," among other differences (FONSI, at 25).

99.     Accordingly, the FONSI provides that FHWA will re-evaluate the actual toll structure and related mitigation upon completion of the SAPA review process.  Such "re-evaluation," despite there never being an initial evaluation of the actual tolling structure, shifts the agency's legal obligation under NEPA to take a "hard look" at the impacts of Congestion Pricing to TBTA, requiring only that it demonstrate such changes are "consistent with the effects disclosed in the Final EA."  This after-the-fact look leaves the process unfinished and fails to guarantee the analysis and public process that should have occurred when evaluating the central components of

the proposed plan.

## TMRB's Recommendations

100.　　On November 30, 2023, TMRB released its recommended toll structure, which is now undergoing a mandatory New York State SAPA review process. However, the TBTA has announced that it will not follow the statutory requirements of SAPA because it states, contrary to the facts of this process, that its review merely involves rate making. This conclusion is arbitrary, capricious, and violates rationality.

101.　　The TMRB review process includes provisions for tax credits, exemptions, waivers, discounts, and hours of operation. The substantive areas under review reach far beyond rate making and extend without question into rulemaking with wide reaching environmental and socioeconomic impacts.

102.　　The recommended daytime toll rate applies from 5 AM to 9 PM on weekdays and 9AM to 9PM on weekends (longer periods capturing many more drivers and causing diversion of traffic from an earlier hour to surrounding areas) (TMRB Report, at 19).  It includes the following tolls for vehicles entering the CBD, no more than once per day:

- •　　$15 for passenger vehicles and passenger-type vehicles
- •　　$24 for small trucks and intercity buses
- •　　$36 for large trucks and tour buses
- •　　$7.50 for motorcycles

## Future Actions

103.　　Commencing on December 27, 2023 and continuing for 76 days and ending March 11, 2024, members of the public may submit written comments online and by email, mail or fax addressing the above TMRB recommendations.

104.　　Public hearings will begin on Thursday, February 29, 2024 and conclude on March 4, 2024. Members of the public who wish to speak at the hearings are required to register online or

by calling the public hotline at 646-252-6777. Registration will open one week before the start time of each hearing and will close 30 minutes after the beginning of the hearing. Speakers will be given two minutes to speak.

105.    Following the public comment period, TBTA is required by SAPA to review the public comments and adopt rules pursuant to the New York State Administrative Procedure Act ("SAPA").

106.    As set forth in more detail below, SAPA mandates consideration, review, analysis and reporting of socioeconomic conditions, particularly as it relates to job creation, job retention and small businesses. The TBTA has stated publicly through counsel, that no such analysis or reporting will be undertaken by TBTA.

107.    Thereafter, the adopted TBTA toll rates and structure will have to be re-evaluated to determine if the decision made in the FONSI is still valid. This requires that TBTA demonstrate to FHWA that the effects of the final tolling rates and programmatic structure are consistent with the effects disclosed in the EA and that the mitigation is still valid. The EA included no reference, analysis, review or mitigation in relation to socioeconomic impacts upon small businesses or job retention. Therefore, if TBTA follows the mandate of SAPA, of necessity, the FONSI must be reevaluated as to its validity, particularly in relation to New York State's Green Amendment.

108.    Upon completion of the SAPA process, the Project Sponsors and FHWA are required to enter into a tolling agreement allowing the Project Sponsors to participate in the FHWA Value Pricing Pilot Program (VPPP).

109.    Only after completion of all federal requirements, including acceptance in VPPP, may tolling operations *be approved* and commence.

## V.    STATUTORY FRAMEWORK

### A.  NEPA  -- 28 U.S.C. § 4321-4332

110.    Signed into law on January 1, 1970, the National Environmental Policy Act ("NEPA") establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. §4321. "NEPA itself does not mandate particular results" in order to accomplish these ends. *Robertson v. Methow Valley Citizens Council*, 490 U. S. 332, 350 (1989). Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions. Id. at 349–350.

111.    At the heart of NEPA is a requirement that federal agencies "include in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

112.    NEPA requires federal agencies to analyze the environmental impact of their proposals and actions in an Environmental Impact Statement (EIS), but Council of Environmental Quality regulations allow an agency to prepare a more limited Environmental Assessment ("EA"), *only* if the agency's proposed action is categorically excluded from the EIS production requirement or would clearly require production of an EIS. An agency that decides, pursuant to an EA, that no EIS is required must issue a "Finding of No Significant Impact" (FONSI).

113.    The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects. *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87 (1983); *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, 454 U.S. 139 (1981). It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.

114.    An EIS is a much more comprehensive document than an EA. An EIS requires a comprehensive discussion of reasonable alternatives, and a "hard look" at the *cumulative* impacts of the proposal along with all existing reasonably foreseeable short-term and long-term future developments. The use of an EA rather than an EIS forecloses an agency's requirement to assess the cumulative existing and reasonably foreseeable future impacts. The EA functions as a *piecemeal* planning device, which very often leaves determinations on critical aspects of the proposal to future post-environmental review decision-making. Congestion Pricing is currently subject to future decision-making determinations that will not be subject to environmental review.

115.    Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated, only to be discovered after resources have been committed or the die otherwise cast. Moreover, the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies "to respond to the needs of environmental quality." 115 Cong.Rec. 40425 (1969) (remarks of Sen. Muskie).

116.    Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency "has indeed considered

environmental concerns in its decision-making process," *Baltimore Gas & Electric Co., supra*, at 462 U. S. 97, and, perhaps more significantly, provides a springboard for public comment.

117.    The Council of Environmental Quality, established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement. See 40 CFR § 1500.3 (2003).  See §§ 1501.4(a)–(b). The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." §1508.9(a). If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a "Finding of No Significant Impact" (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment. See §§ 1501.4(e), 1508.13. The reasoning to produce a FONSI and forego an EIS must be based upon sound reasoning and evidence in the record. An EA that contains references to significant adverse environmental consequences requiring alternatives and mitigation requires an EIS. 40 C.F.R. § 1502.7.

**B.  APA -- 5 U.S.C. § 706**

118.    The judicial standard to review the sufficiency of an EA and the issuance of a FONSI as opposed to an EIS is determined in accordance with the arbitrary, capricious and abuse of discretion standard set forth in 5 U.S.C. §706(2)(A).

119.    The sufficiency of an EA or an agency's decision to issue a FONSI is further analyzed under a "rule of reason standard" based on evidence in the record (*see Meyersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015).

120.    The statute in full states as follows:

§706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret

constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## C. New York Vehicle and Traffic Law § 1701-1706 – The Traffic Mobility Act of 2019

121.    The Traffic Mobility Act imposed four requirements for the ultimate congestion pricing scheme: (1) qualifying vehicles transporting persons with disabilities and authorized emergency vehicles are exempt; (2) passenger vehicles will be tolled no more than once a day; (3) individuals whose primary residence is in Manhattan and whose New York State adjusted gross income is less than $60,000 will be eligible for a tax credit equal to the amount of tolls paid per year; and (4) passenger vehicles that "remain" in the Manhattan CBD, that are detected when leaving but were not detected entering the same day, will be charged for  remaining in the CBD. *See Id.* § 1704-a(2).

122. The remaining contours of the congestion pricing scheme are left up to the TBTA and its appointed TMRB. For example, TMRB will decide the toll price, the time period when the toll will be operative, any tax credits to cars that access the Manhattan CBD over bridges and through tunnels and already pay a toll, exemptions for taxis, pricing schemes for buses and small and large trucks, among other considerations.

123. Shortly after the Traffic Mobility Act's enactment, the State Legislature passed the 2019-2020 budget authorizing the congestion pricing scheme and mandating that it be implemented no earlier than December 31, 2020. Thereafter, TBTA, New York State Department of Transportation ("NYSDOT") and New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") began developing proposals for the congestion pricing scheme.

### D. The Value Pilot Pricing Program (VPPP) – 23 U.S.C. § 129

124. In 1991, Congress established the VPPP. Value pricing "includes a variety of strategies to manage congestion" on highways and streets, such as priced highways, zones, road networks, or usage-based vehicle charges. The purpose of the VPPP is to determine whether and to what extent roadway congestion may be reduced through congestion pricing strategies, and the magnitude of such strategies' impact on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs.

125. Through the VPPP, FHWA must approve tolling schemes proposed by state and local governments that would toll existing federal-aid highway lanes, as would the congestion pricing scheme here, before they can be implemented. When FHWA reviews an application to the VPPP, it must evaluate the potential environmental effects of the proposed action under NEPA.

126. For admission to the VPPP, the Project Sponsors need to receive federal approval before the final Congestion Pricing scheme can be implemented. Following enactment of the

Traffic Mobility Act, the Project Sponsors submitted an Expression of Interest to FHWA, seeking tolling authority under the VPPP to implement its congestion pricing scheme. *To date, FHWA has not approved the congestion pricing scheme for admission to the VPPP*. Therefore, final approval must be subject to New York State's constitutional mandate pertaining to New York's Environmental Bill of Rights.

### E.  New York State Administrative Procedure Act  -- § 201-a and § 202-b

127.     New York's Administrative Procedure Act ("SAPA") mandates a socioeconomic assessment of Congestion Pricing's impact upon job retention and creation as well as economic impacts upon small businesses. This assessment was not carried out in the EA and there is no indication that such assessment is anticipated to be carried out with respect to TMRB's recommendations and during the SAPA rulemaking process.

128.     Section 5 of the FONSI highlights the importance of the economic issue. FHWA clearly indicates that Congestion Pricing cannot commence until TBTA's Board approves a final tolling structure following a public hearing process governed by SAPA's provisions.

129.     SAPA requires that an economic impact study determine effects upon small business and job creation. It is imperative, therefore, that during the SAPA public hearing and review process that this concern be evaluated.

130.     Once toll rates and structures have been determined, TBTA must demonstrate that the effects of the final tolling rates and structures are consistent with the effects disclosed in the current EA and that the mitigation is still valid. The current EA includes no provision for mitigating economic harm to small businesses or economically struggling workers.

131.     Completion of the SAPA process requires another written finding by FHWA. At this final stage, the EA must be modified to address concerns raised during the SAPA public hearings. TBTA, NYCDOT and NYSDOT must enter into a tolling agreement with FHWA in

order to enter into the FHWA VPPP. This agreement must include provisions taking into account the socioeconomic assessments determined during the SAPA review process. This will necessitate a revision of the EA and nullification of the FONSI.

132.    SAPA provides, in relevant part:

§ 201-a. Job impact. 1. In developing a rule, an agency shall strive to accomplish the objectives of applicable statutes in a manner which minimizes any unnecessary adverse impacts on existing jobs and promotes the development of new employment opportunities, including opportunities for self-employment, for the residents of the state.

§ 202-b. Regulatory flexibility for small businesses. 1. In developing a rule, the agency shall consider utilizing approaches that will accomplish the objectives of applicable statutes while minimizing any adverse economic impact of the rule on small businesses and local governments. Consistent with the objectives of applicable statutes, the agency shall consider such approaches as:

(a)    the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small businesses and local governments or the time needed by small businesses or local governments to come into compliance with the rule;

(b)    the use of performance rather than design standards; and

(c)    an exemption from coverage by the rule, or by any part thereof, for small businesses and local governments so long as the public health, safety or general welfare is not endangered.

**F.  Article 1 § 19 of the New York State Bill of Rights ("The Green Amendment")**

133.    The State of New York passed a public referendum in 2022 codifying environmental justice into its Bill of Rights.

134.    For decades, the federal government alongside state and local governments of New York have established a regulatory structure through NEPA and its companion State Environmental Quality Review Act ("SEQRA") and city regulations implementing SEQRA through the City Environmental Quality Review ("CEQR") rules to ensure that notwithstanding the density and

44

congestion of the City and State of New York, that citizens be protected to the greatest extent practicable from the health and safety hazards congestion and air pollution.

135.    New York State has enshrined state and city environmental rules and statutes into the constitutional framework of New York. The right to a safe and healthy environment is not only statutorily mandated, but it is a constitutional right. Article 1, Section 19 states "*each person shall have a right to clean air and water, and a **healthful environment***." ("The Constitutional Amendment.")

136.    The New York State Legislature defines environment to include noise. The Environmental Conservation Law ("ECL") §8-0105(6) defines environment as follows:

> 6. "Environment" means the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character.

137.    Article 1, Section 19 became the law in New York State in January 2022. The intent of the Constitutional Amendment is to afford every citizen of the State of New York the right to a healthy and safe environment so that they will not be compromised due to governmental inaction or negligence that may damage the environment and impair public health. Scientific studies have undeniably confirmed the deleterious impacts of air pollution and congestion upon public health.

138.    Constitutional Amendments are implemented in New York State as a means to emphasize, redefine and expand upon existing rights. During the legislative debates to implement the Constitutional Amendment, Assemblymember Englebright stated:

> This is a proposed Constitutional Amendment to enable something that everyone believes, in many cases is already a right, but has never previously been formalized. And that right is to a clean environment, clean air, clean water, and a healthful environment. It's in the largest sense, a proposed Constitutional Amendment that is an expression of optimism. It is intended to assure our citizens that they will not be betrayed circumstantially by environmental degradation, and that the health and wellbeing of they and

45

their families will not be compromised due to governmental
inactions or negligence that may otherwise damage our air,
land or water.

139.    The specific provisions of the New York State Constitution reflect amendments

adopted over the years by the New York State Legislature and ratified by public referendum to

implement and accommodate governmental actions in relation to major policy concerns.

140.    New York State has adopted constitutional rights in relation to major areas of policy

concerns. For example, wrongful death recoveries set forth in Article 1, Section 16, labor rights set

forth in Article 1, Section 17 and Workers' Compensation set forth in Article 1, Section 18.

141.    The Constitutional Amendment set forth in Article 1, Section 19 enshrines, through

legislative amendment and public ratification, the right to a healthful environment enhancing and

clarifying existing statutory rights.

142.    New York State voters amended the New York State Bill of Rights in January 2022,

and have declared that it is a public purpose to assure that every citizen breathes clean air,

consumes clean water, and enjoys the right to a healthful environment.

143.    The Constitutional Amendment has raised environmental rights to the level of other

rights enshrined in the New York State Constitution including trial by jury set forth in Article 1,

Section 2, freedom of worship and religious liberty set forth in Article 1, Section 3, due process set

forth in Article 1, Section 6, compensation for taking prior property set forth in Article 1, Section 7,

and free speech set forth in Article 7, Section 8.

144.    The Constitutional Amendment removes any doubt that it is the responsibility of the

government to protect the citizens of the State of New York from environmental harm. This is

particularly the case where citizens lack basic environmental protections from the ongoing

activities or inactivity of government. The failure of the NEPA and accompanying SAPA process

to guarantee the constitutional rights of members of environmental justice communities violated

the constitutional rights of Plaintiffs residing in environmental justice communities of the South

Bronx, East Harlem and the Lower East Side.

## VI.    CLASS ACTION ALLEGATIONS

145.    The proposed class representatives bring this putative class action pursuant to Fed.

R. Civ. Proc. 23(b)(1), 23(b)(2) and 23(b)(3) on behalf of themselves and all members of the

proposed classes (or any other class authorized by the Court) defined as follows: Environmental

Justice Class; Small Business Class; Economically Burdened Commuter Class; New York City

Residents Dependent Upon Mass Transit, who ordinarily take mass transit into or through

Manhattan and who will experience significant overcrowding and delays as a result of the

additional people who will be forced to take mass transit prior to any funding for upgrades to

transit infrastructure.

146.    Class Members will generally face increased traffic, pollution, congestion, health

risks and financial burdens resulting from Congestion Pricing.

### A. Numerosity of the Class: Fed. R. Civ. Proc. 23(a)(1)

147.    The proposed classes are so numerous that individual joinder of all potential

members is impracticable under Fed. R. Civ. Proc. 19 or 20. Approximately 617,000 residents live

in the Manhattan Central Business District, many of whom are dependent upon mass transit.

Approximately 219,000 residents, or 14% of the commuters to the Manhattan CBD, are low

income. 74,363 reside within the Lower East Side according to data provided by the U.S. Census

Bureau. (EA 17-21). Low income and working-class commuter residents will experience financial

and economic burdens due to implementation of Congestion Pricing.

**Environmental Justice Communities**

148.    Relevant to this class action, the EA describes residents of the Lower East Side,

Chinatown, East Harlem and the South Bronx as members of environmental justice communities

(EA 17-4).

149.    Plaintiffs are residents of environmental justice communities in Chinatown, the Lower East Side, Clinton, East Harlem and the South Bronx.  The Congestion Pricing EA details and chronicles diverted trips resulting from Congestion Pricing that will cause adverse environmental impacts that remain unmitigated in environmental justice communities.

150.    Adverse environmental effects will result from increased southbound and northbound traffic on the Franklin D. Roosevelt ("FDR") Drive between East 10th Street and the Brooklyn Bridge. This will burden residents of the Lower East Side community (EA 17-26).

151.    Residents of East Harlem and the South Bronx (notably Hunts Point and Highbridge) have census tracts with high pre-existing health burdens. These residents will face further adverse environmental and health consequences due to increased traffic along the Cross Bronx Expressway (EA 17-43).

152.    Due to Congestion Pricing, Plaintiffs and members of the putative class face risks of health concerns increasing the likelihood of heart and lung diseases, acute and chronic bronchitis, asthma attacks and general respiratory problems and premature mortality. This is likely because residents of the Lower East Side, the South Bronx and East Harlem currently experience poor air quality and resulting health impacts. The EA acknowledges that individuals residing in environmental justice communities are already exposed to increased air toxin cancer risks by virtue of pre-existing traffic, congestion and pollution (EA 17-63; 17-4; 17-6.1; 17-6.1.1; 17-6.1.2; 17-6.1.3; 17-6.1.4). Adverse environmental effects due to increased traffic also will be experienced by residents bordering the southern end of the FDR Drive north to East 10th Street and residents in close proximity to the Cross Bronx Expressway (EA 17-65).

**Small Businesses**

153.    There are 600 businesses characterized as small businesses within the CBD. The EA details that Congestion Pricing will increase the cost of shipping to the CBD as a result of the

price of the toll. The specific changes to cost will vary depending on the toll rate and the tolls charged to trucks. Small businesses in the CBD such as grocery stores, restaurants and small market convenience stores will be more likely to be affected by increased delivery costs than businesses in general because they depend on frequent deliveries of smaller loads and delivery of goods represent a high percentage of small business operating costs (EA 17-47; 17-48).

154.    The EA engaged in no analysis of the impact of Congestion Pricing on small businesses dependent on vehicular consumer traffic, particularly in Chinatown.

155.    Clearly, numerosity has been satisfied by virtue of the number of individuals represented by the named Plaintiffs in this case.

156.    Plaintiffs have adequately and objectively defined the Classes, as detailed above, so that the Court and class members will be able to use the definitions to determine class members.

**B. Existence of Common Questions of Law and Fact: Fed. R. Civ. Proc. 23(a)(2) and 23(b)(3).**

157.    Common questions of law and fact exist as to all members of the proposed classes and predominate over issues of law and fact affecting individual members of the proposed classes. These issues include but are not limited to:

(a) Whether Defendants improperly failed to consider and give appropriate weight in adopting the Final EA to determine the true impact that Congestion Pricing will have on Plaintiffs and members of the putative class identified above;

(b) Whether, as a result of Defendants' cursory consideration of the environmental and socioeconomic impacts of Congestion Pricing upon the putative class, an EIS and comprehensive SAPA review should be required prior to the implementation of Congestion Pricing;

(c) Whether members of environmental justice communities will suffer an expected increase in respiratory illnesses and exacerbation of pre-existing respiratory illnesses due to

traffic diversion resulting from Congestion Pricing;

(d) Whether New York City residents relying upon mass transit to commute into Manhattan or through Manhattan will suffer from current deficiencies in New York City's mass transit infrastructure;

(f) Whether proposed class members are entitled to monetary damages and injunctive relief pursuant to Fed. R. Civ. Proc. 23(b)(2); and

(g) Whether the Court should establish a constructive trust fund to assist residents of environmental justice communities -- Lower East Side, the South Bronx and East Harlem -- with the expected increased incidence of asthma and other respiratory diseases.

## C. Typicality of Claims or Defenses of a Definable Class: Fed. R. Civ. Proc. 23(a)(3).

158.    The proposed class representatives' claims and defenses are typical of the claims and defenses of proposed class members of each class.

(a) Class claims for environmental, financial and socioeconomic burdens arise out of living in areas in New York City that will be impacted adversely due to the unmitigated and significant adverse environmental consequences of Congestion Pricing;

(b) Class claims for the asthma and respiratory distress class arise out of additional pollution anticipated by the individuals adversely impacted by living in locations that will experience more air pollution due to the increased traffic resulting from drivers attempting to avoid the CBD and payment of the Congestion Pricing toll(s). There are no defenses to Plaintiffs' claims on the part of Defendants that are unique or different from the proposed class.

## D. Adequate Representation: Fed. R. Civ. Proc. 23(a)(4).

159.    The proposed class representatives will fairly and adequately protect the interests of

the proposed class and subclasses. The proposed class representatives' claims and the proposed class members' claims are so interrelated that the interests of the proposed class members will be fairly and adequately protected in their absence. The proposed class counsel is highly experienced in complex class actions and has been appointed class counsel in numerous other class actions. Neither Plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the class members.

**E. Superiority of a Class Action: Fed. R. Civ. Proc. 23(b)(3).**

160.   Maintenance of a class action in one court is the most economical procedural device to litigate both for class members and for Defendants. Prosecution of separate actions by individual members of the class could create risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, as recognized by Fed. R. Civ. Proc. 23(b)(1)(A).

161.   Prosecution of separate actions by individual members of the class could create risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members of the class who are not parties to the adjudication or substantially impair or impede their ability to protect their interests, as recognized by Fed. R. Civ. Proc. 23(b)(1)(B).

162.   There is a substantial likelihood that Defendants will oppose this class action and will further act or refuse to act on grounds generally applicable to the class, thereby making it appropriate for the court to grant final injunctive relief or corresponding declaratory relief with respect to the class as a whole, as recognized by Fed. R. Civ. Proc. 23(b)(2).

163.   Questions of law and fact common to members of the classes predominate over any questions affecting any individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, as recognized by Fed. R. Civ.

Proc. 23(b)(3).

## FIRST CAUSE OF ACTION

### (Violation of NEPA)

164.    Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "163" as if repeated in full.

165.    FHWA's Final EA and FONSI failed to analyze or take the required "hard look" at significant negative environmental and socioeconomic impacts of Congestion Pricing. FHWA's failure to issue an EIS as a result of the negative significant environmental impacts found in the EA was an arbitrary and capricious abuse of discretion in violation of 40 C.F.R. § 1501.3(a)(3).

166.    FHWA failed to prepare an adequate environmental review of Congestion Pricing that considers all environmental impacts and provides for sufficient public commentary and participation in the public review process, in violation of NEPA and its implementing regulations. 42 U.S.C. § 4321 et seq.; 40 C.F.R. § 1500.1 et seq.

167.    Defendants failed to: 1) consider direct, indirect and cumulative effects of Congestion Pricing; 2) propose adequate mitigation measures to alleviate the negative environmental consequences of air pollution, congestion, health risks and impacts upon environmental justice communities; 3) consider reasonably viable alternatives that meet the objectives of the state statute; 4) assess the negative and adverse socioeconomic impacts upon small businesses; 5) assess the impact upon the current infrastructure and safety elements of mass transit; 6) assess the actual tolling alternative that will be selected by TBTA; and 7) provide for adequate public participation in the preparation of the FONSI.

168.    FHWA's final EA and FONSI are arbitrary, capricious and an abuse of discretion in violation of the APA. 5 U.S.C. §§ 701-706.

## SECOND CAUSE OF ACTION

### (Violation of NEPA – Failure to Supplement)

169.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "168" as if repeated in full.

170.     NEPA directs that if a statement, such as an EA, is "so inadequate as to preclude meaningful analysis," an agency "shall prepare and circulate a revised draft" or a supplement to the statement. 40 C.F.R. § 1502.9(a) and (d).

171.     Agencies are required to prepare supplements to either draft or final statements if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(i) and (ii).

172.     On November 30, 2023, TMRB issued its recommendation regarding the toll rates by vehicle, time of day, credits, discounts and exemptions.

173.     Most of these recommendations – including the toll price recommended – were not adequately analyzed, modeled or discussed in the final EA or FONSI and require a "hard look" at the potential socioeconomic and environmental consequences.

174.     TMRB's recommendation constitutes significant new circumstances or information relevant to environmental concerns and bear on the proposed action and its impact, rendering the FONSI inadequate and devoid of meaningful analysis.

175.     Defendants acknowledge that a further analysis need now be taken and, in light of the gross deficiencies in their prior examination, they should be directed to fully supplement their analysis.

176.     Accordingly, FHWA's current determination that it will re-evaluate rather than supplement the FONSI or Final EA to address this new information – without taking the hard look required by law – violates NEPA and its implementing regulations. 40 C.F.R. §§ 1502.9(a) and (d)(1)(i) and (ii).

### THIRD CAUSE OF ACTION

#### (Violation of SAPA)

177.    Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "176" as if repeated in full.

178.    The New York Administrative Procedure act (SAPA) mandates a socioeconomic assessment of Congestion Pricing's impact upon job retention and creation as well as economic impacts upon small businesses. This assessment was not carried out in the EA and there is no indication that such assessment is anticipated to be carried out with respect to TMRB's recommendations and during the SAPA rulemaking process.

179.    Defendants' failure to follow the rulemaking procedures of SAPA constitutes an arbitrary and capricious abuse of discretion.

### FOURTH CAUSE OF ACTION

#### (Class Action Declaratory and Equitable Relief)

180.    Plaintiffs repeat, reallege and incorporate by reference, the allegations set forth in paragraphs "1" through "179" as if repeated in full.

181.    The proposed class representatives and proposed class members have sustained and will continue to sustain environmental and socioeconomic harm as a result of Defendants' actions and omissions in failing to conduct a proper environmental review pursuant to NEPA and a proper rulemaking review pursuant to SAPA.

182.    Plaintiffs and members of the class will sustain environmental harm due to air pollution, health risks, increased financial burdens and socioeconomic displacement as a result of Defendants' actions and omissions, particularly upon environmental justice communities.

183.    As a result of the foregoing, Plaintiffs seek equitable and declaratory relief in relation to class action certification.

184.     The putative class seeks the performance of an EIS establishing proper health monitoring, proper evaluation upon residents of environmental justice communities and proper evaluation through the SAPA procedure, impacts upon the small business putative class, the class of commuters to the CBD, the class of New York City residents living in close proximity to areas of increased traffic congestion, and to residents of the CBD reliant upon mass transit.

## FIFTH CAUSE OF ACTION

### (Violation of the Green Amendment)

185.     Plaintiffs repeat, reallege and incorporate by reference, the allegations set forth in paragraphs "1" through "184" as if repeated in full.

186.     The failure of the MTA, TBTA and TMRB to evaluate and mitigate the significant adverse environmental consequences of Congestion Pricing upon Plaintiff residents of environmental justice communities violates Plaintiffs' constitutional rights to "clean air and water and a healthful environment."

187.     New York State's Green Amendment mandates that prior to the implementation of Congestion Pricing, that all appropriate, reasonable, applicable and necessary steps be taken to assure the constitutional rights of Plaintiffs.

188.     New York State's Green Amendment mandates that Plaintiffs residing in environmental justice communities, including the South Bronx, East Harlem and the Lower East Side, already burdened by pre-existing air pollution, congestion, asthma and other chronic diseases, be protected from the significant negative environmental impacts that will be caused by traffic diversions caused by the implementation of Congestion Pricing.

189.     The failure of the environmental and state administrative review process to incorporate or take into account the Green Amendment into the recommendations and findings set forth in the final approval for Congestion Pricing violates the constitutional rights of Plaintiffs.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

i.      Issue preliminary and permanent injunctions vacating and setting aside Defendants' FONSI, EA and final approval pursuant to SAPA and the VPPP and compelling Defendants to complete a full and proper EIS for Congestion Pricing;

ii.      Declare that FHWA's failure to prepare an EIS for Congestion Pricing, or adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations and the APA;

iii.      Declare that Defendants' actions, including their FONSI, EA and final approval, are invalid as a matter of law and violate Plaintiffs' constitutional rights;

iv.      Order FHWA to prepare a full and proper EIS for Congestion Pricing;

v.      Declare that TBTA, MTA and TMRB's rulemaking in violation of SAPA is unlawful, arbitrary, capricious and invalid as a matter of law;

vi.      Issue a preliminary and permanent injunction vacating and setting aside TBTA's determinations relating to Congestion Pricing tolling policies and procedures;

vii.      Issue a mandatory injunction compelling TBTA to follow the rulemaking procedures of SAPA in determining Congestion Pricing tolling policies and procedures and to assess the socioeconomic impacts of Congestion Pricing upon small businesses and job loss and retention;

viii.      Declaring that Congestion Pricing violates Plaintiffs' constitutional rights pursuant to the Green Amendment;

ix.      Issue an order that Defendants monitor and appropriate sufficient resources to assure that Plaintiff members of environmental justice communities are protected under New York State constitutional provisions safeguarding Plaintiffs' rights to a safe and healthful environment;

x.      Issue an order pursuant to Fed. R. Civ. Proc. 23(c) certifying the class and subclasses;

xi.     Issue an order appointing Plaintiffs class representatives of the proposed class and designating the Law Offices of Jack L. Lester, Esq. as counsel for the proposed class pursuant to Fed. R. Civ. Proc. 23(g);

xii.    Issue a judgment for proposed class representatives and proposed class members against Defendants on all issues and counts;

xiii.   Award Plaintiffs and the class their costs for the action, including reasonable attorneys' fees; and

xiv.    Grant such other relief as this Court deems just and proper.

Dated: February 26, 2024

Respectfully submitted,
The Law Offices of Jack L. Lester, Esq.
41 Squaw Road
East Hampton, NY 11937
631.604.2228
Jllcomlaw@aol.com

_____
Jack L. Lester, Esq.