UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

NEW YORKERS AGAINST CONGESTION   :
PRICING TAX, *et al.*,   :
   :
   :
              Plaintiffs,   :
   :   No. 1:24-cv-00367-LJL
          v.   :
   :
UNITED STATES DEPARTMENT OF   :
TRANSPORTATION, *et al.*,   :
   :
              Defendants.   :

------------------------------------------------------------------ x

MICHAEL MULGREW, *et al.*,   :
   :
              Plaintiffs,   :
   :
          v.   :   No. 1:24-cv-01644-LJL
   :
UNITED STATES DEPARTMENT OF   :
TRANSPORTATION, *et al.*,   :
   :
              Defendants.   :

------------------------------------------------------------------ x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

The Law Office of Jack L. Lester, Esq.
*Attorney for Plaintiffs*
41 Squaw Road
East Hampton, NY 11937
631-604-2228
Jllcomlaw@aol.com

April 5, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………….....ii

PRELIMINARY STATEMENT…………………………………………………...1

INTRODUCTION…………………………………………………………………1

FACTUAL BACKGROUND……………………………………………………...3

STANDARD OF REVIEW………………………………………………………...6

ARGUMENT………………………………………………………………………6

    I.     Defendants' Motions to Dismiss the NEPA Claims Should be Denied..……………6

          A.  The *New Yorkers* Plaintiffs' First NEPA Claim is not Time-Barred……………7

          B.  The *New Yorkers* Plaintiffs' Second NEPA Claim Should not be Dismissed…..11

    II.    The MTA Defendants' Motion to Dismiss the SAPA Claim Should Be Denied……13

          A.  Awaiting a Final Administrative Determination Would be Futile and Unduly Prejudicial…………………………………………………………………..14

          B.  Defendants' Challenge to the *New Yorkers* Plaintiffs' SAPA Claim Should be Denied………………………………………………………………..16

CONCLUSION………………………………………………………….…20

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

## FEDERAL DECISIONS

*Bechtel v. Competitive Techs.,*
    448 F.3d 469, 471 (2d Cir. 2006) ……………………………………………………17

*Bell. Atl. Corp. v. Twombly,*
    550 U.S. 544, 570 (2007) …………………………………………………………….6

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147, 153 (2d Cir. 2002) ……………………………………………………6

*CTIA-Wireless v. FCC,*
    466 F.3d 105, 110 (D.C. Cir. 2006) …………………………………………………10

*In re Ames Dep't Stores, Inc.*,
    582 F.3d 422, 427 (2d Cir. 2009) ……………………………………………………16

*Jaghory v. New York State Dep't of Educ.,*
    131 F.3d 326, 329 (2d Cir. 1997) ……………………………………………………6

*Louis Vuitton Malletier S.A. v. LY USA,*
    676 F.3d 83, 108 (2d Cir. 2012) ……………………………………………………16

*Public Citizen v. NRC,*
    901 F.2d 147, 150 (D.C. Cir. 1990) …………………………………………………10

*Skubel v, Fuoroli,*
    113 F.3d 330, 334-35 (2d Cir. 1997) ………………………………………………14

*Sweet v. Sheehan,*
    235 F.3d 80, 83 (2d Cir. 2000) ………………………………………………………6

*United Transp. Union-Ill. Legislative Bd. v. Surface Trans. Bd.*,
    132 F.3d 71, 75-76 (D.C. Cir. 1998) ………………………………………………10

## NEW YORK STATE DECISIONS

*Matter of Fischer v. Roche,*
    81 A.D.2d 541 (1st Dep't 1981), *aff'd* 54 N.Y.2d 962 (1981)…………………………8

*Matter of Springer v. Board of Educ. of City Sch. Dist. of City of New York,*
    27 N.Y.3d 102, 107 (2016) …………………………………………………………18

*New York Pub. Int. Res. Group v. Metropolitan Transp. Auth,*
    309 A.D.2d 127, 134 (1st Dep't 2003) …………………………………………………17

*Rocovich v. Consolidated Edison Co.,*
    78 N.Y.2d 509, 515 (1991) ……………………………………………………………18

*Treadway v. Town Board of Town of Ticonderoga,*
    163 A.D.2d 637, 638 (3rd Dep't 1990) …………………………………………………8

*Watergate v. Buffalo Sewer,*
    46 N.Y.2d 52, 57 (1978) ……………………………………………………12,14,15

*Young Men's Christian Ass'n v. Rochester Pure Waters Dist.,*
    37 N.Y.2d 371, 375 (1975) ……………………………………………………………14

**Federal Statutes & Authorities:**

23 U.S.C. § 139(l)(1) …………………………………………………………………6

40 C.F.R. § 1502(9)(a) and (d) ………………………………………………………11

40 C.F.R. § 1502.9(d)(1)(i) and (ii)……………………………………………………11

Federal Rule of Civil Procedure 12(b)(1) ……………………………………………6

Federal Rule of Civil Procedure 12(b)(6) ……………………………………………6

National Environmental Procedure Act "(NEPA") ………………………..1,2,6,7.9,10,11,12,20

United States Code § 391(l)(1) of title 23……………………………………………7

**State Statutes & Authorities**

N.Y. Veh. & Traf. Law § 1701……………………………………………………1,8

N.Y. Veh. & Traf. Law § 1701-1706………………………………………………...1

N.Y. Veh. & Traf. Law § 1704-A(3) and (4). …………………………………………9

N.Y. Veh. & Traf. Law §1704(1) ……………………………………………………18

N.Y. Veh. & Traf. Law §1704(3)(a) …………………………………………………18

SAPA § 102(2)(a)(i)………………………..…………………………………………16

SAPA § 102(2)(a)(ii) ………………..………………………………………………2,16

SAPA § 201-a………………………………..……………………………………....13,16

SAPA § 201-a(6)(a) ………………..…………………………………………………16

SAPA § 201-b…………….…...…………………………………………………….13

SAPA § 202-b(3)(a) …………….…...……………………………………………..16

SAPA Article 2 …...…………….…………………………………….…..…2,5

State Administrative Procedure Act ("SAPA")………………………………1,2,5,13-20

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) …...……………………………………17

Merriam-Webster Dictionary…...…………………………………………………17

## PRELIMINARY STATEMENT

A full recitation of the procedural steps, background and statutory provisions of Congestion Pricing is set forth in Plaintiffs' Amended Complaint and in the companion complaints and memoranda of law submitted in *Michael Mulgrew et al. v. United States Department of Transportation, et al*., Case No. 1:24-CV-1644 and *Elizabeth Chan et al. v. United States Department of Transportation, et al.;* Case No.: 1:23-CV-10365. In this action, Plaintiffs' Memorandum of Law will address the relevant issues raised in Defendants' motions to dismiss, particularly in relation to the State Administrative Procedure Act ("SAPA") and the timing of Plaintiffs' challenge to the violation of the National Environmental Procedure Act "(NEPA").

## INTRODUCTION

To circumvent Defendants' federal and state statutory obligations to engage the public in a democratic, participatory and collaborative review process, Defendants' motions to dismiss mischaracterize Congestion Pricing as a mere monetary or rate imposition for the benefit of a capital project. This assertion is presented by the Defendants despite the fact that there is no capital project being proposed at the present time. The purported goal of Congestion Pricing is to fund unspecified speculative projects in the future which will be subject to their own independent environmental review.

Defendants put forward this false notion despite the fact that the Traffic Mobility Act ("the Act") (VTL §§ 1701-1706) charges the Triborough Bridge and Tunnel Authority ("TBTA") with the responsibility of implementing the first in the nation Congestion Pricing program. TBTA's responsibilities in rulemaking and implementation of the Act will have profound environmental and socioeconomic impacts upon millions of people. TBTA's responsibilities pursuant to the Act include rulemaking pertaining to the program's timing, categorization and classification of vehicles subject to Congestion Pricing, establishing peak periods, initiating

credits, discounts and exemptions alongside the responsibility to take all necessary and desirable steps to implement the Act (Summary of Congestion Pricing Resolution adopted by the Metropolitan Transportation Authority ("MTA"), on March 27, 2024). (Ex. A.) On December 27, 2023, TBTA, in violation of the State Administrative Procedure Act ("SAPA"), published a notice in the State Register that the establishment of Congestion Pricing by the TBTA would be subject to § 102(2)(a)(ii) of SAPA (Ex. B). This classification of TBTA's role in Congestion Pricing commonly known as a "type (ii)" action seeks to exempt TBTA from mandated public review and hearing procedures set forth in SAPA to assess socioeconomic impacts of rulemaking decisions.

As set forth in greater detail herein, TBTA's responsibility impacts socioeconomic conditions clearly enunciated by the public review procedures required in Article 2 of the State Administrative Procedure Act ("SAPA"). Moreover, contrary to Defendants' assertion regarding this lawsuit's timing, the National Environmental Procedure Act ("NEPA") review has not reached finality. Defendants' clear violation of NEPA results from their failure to conduct an Environmental Impact Statement ("EIS"). The collaborative review process required between the Federal Highway Administration ("FHWA") and TBTA subsequent to TBTA's approval of Congestion Pricing program of March 27, 2024 (Ex. A) has now left the NEPA review process incomplete. The NEPA review process must be subject to further analysis incorporating the vital elements of TBTA's programmatic rulemaking into FHWA's final environmental assessment.

Plaintiffs in this action represent a cross-section of citizens and elected officials from every county in New York City. Plaintiffs include, among others, members of environmental justice communities, small business owners, civil servants, teachers, medical professional, and a

retired emergency first responder living on a fixed income. Each of these Plaintiffs will be economically and environmentally impacted by the implementation of Congestion Pricing.

## FACTUAL BACKGROUND

Basic statistics set forth in the Environmental Assessment ("EA") prepared by FHWA and asserted by Plaintiffs in their Amended Complaint, belied the obviously misconceived notion that Congestion Pricing is merely ratemaking to collect revenue for a capital project. Congestion Pricing and rule implementation will have drastic environmental and socioeconomic consequences throughout the New York metropolitan region. An estimated 1,856,000 people traverse the Manhattan Central Business District ("CBD") on a daily basis. The impacted metropolitan region is the largest in the United States with 22.2 million people and more than 10.7 million jobs. According to the U.S. Bureau of Economic Analysis, the New York metropolitan region accounted for approximately 10% of the nation's gross domestic product in 2020 (see EA Appendix 18A-1). There are approximately 77,000 businesses in the CBD. Most of these businesses (approximately 90 percent) are small businesses dependent upon frequent vehicular deliveries and consumers that arrive by vehicles to patronize businesses, particularly restaurants in Chinatown and Little Italy and businesses within the theatre district (EA 6-12). Approximately 617,000 people live in the CBD, many of whom are elderly, disabled, living on fixed incomes and otherwise dependent upon either their vehicles or mass transit. Vehicular dependent residents of the CBD will be forced to endure severe financial strain and those dependent upon mass transit will, in turn, be impacted by the diversion of people from vehicles to an already overburdened and unsafe mass transit system. Approximately 220,000 residents, or 14% of the commuters to the Manhattan CBD, are low income. Approximately 75,000 people reside within the Lower East Side according to data provided by the Census Bureau. (EA 17-21).

Defendants do not dispute that low income and working-class commuter residents will experience financial and economic burdens due to implementation of Congestion Pricing. (¶ 147, Amend. Compl.) However, Defendants attempt to minimize the socioeconomic impacts and reach of TBTA's implementation of the nature, extent and scope of Congestion Pricing by referring to TBTA's role as merely ratemaking. As set forth in the Amended Complaint, the EA describes hundreds of thousands of residents of the Lower East Side, Chinatown, East Harlem and the South Bronx that will be impacted by the costs, increased pollution, health hazards and congestion of Congestion Pricing as members of environmental justice communities (EA 17-4).

Plaintiffs in this action are residents of environmental justice communities in Chinatown, the Lower East Side, Clinton, East Harlem and the South Bronx.  Adverse environmental impacts upon Plaintiffs will result from increased southbound and northbound traffic on the Franklin D. Roosevelt ("FDR") Drive between East 10th Street and the Brooklyn Bridge. This will burden residents of the Lower East Side community (EA 17-26). (¶ 149-151, Amend. Compl.) Residents of East Harlem and the South Bronx (notably Hunts Point and Highbridge) have census tracts with high pre-existing health burdens. These residents will face further adverse environmental and health consequences due to increased traffic along the Cross Bronx Expressway (EA 17-43). Due to Congestion Pricing, Plaintiffs in this action face risks  of health concerns increasing their likelihood of heart and lung diseases, acute and chronic bronchitis, asthma attacks and general respiratory problems and premature mortality. (¶¶ 20, 24, 36, 37, 38, 39, Amend. Compl.) This is likely because residents of the Lower East Side, the South Bronx and East Harlem currently experience poor air quality and resulting health impacts. The EA acknowledges that individuals residing in environmental justice communities are already exposed to increased air toxin cancer risks by virtue of pre-existing traffic, congestion and

pollution (EA 17-63; 17-4; 17-6.1; 17-6.1.1; 17-6.1.2; 17- 6.1.3; 17-6.1.4). Adverse environmental effects due to increased traffic also will be experienced by residents bordering the southern end of the FDR Drive north to East 10th Street and residents in close proximity to the Cross Bronx Expressway (EA 17-65). The EA also recognizes that small businesses will be impacted by increased delivery costs, particularly those small businesses that have a high rate of deliveries, such as grocery stores, restaurants, and small market convenience stores, which are dependent on frequent deliveries of smaller loads and delivery of goods representing a high portion of their operating costs. Plaintiffs in this action are representative of this group and will be financially devastated, yet TBTA intentionally omitted a mandated socioeconomic review in establishing the Congestion Pricing program (EA 18A-61) (¶¶ 25-27, Amend. Compl.).

Notwithstanding all of the weighty and serious socioeconomic and environmental implications that will result from TBTA's implementation of the Act, Defendants have chosen to present TBTA's responsibilities in the implementation of the Act as simply ratemaking for the benefit of a capital project. Defendants ignore that TBTA decision-making relative to timing, determination of peak hours, issuance of exemptions, discounts and credits, will have severe and permanent socioeconomic impacts upon Plaintiffs affected by job retention, small business viability and displacement of entire industries in Chinatown, Little Italy and the Theatre District. TBTA's disallowance of the critical review process set forth in Article 2 of SAPA has severely prejudiced the Plaintiffs in this action.

## STANDARD OF REVIEW

In defeating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)[1], a complaint must allege "only enough facts to state a claim for relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court must construe the complaint "liberally," drawing "all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002). *See also Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir. 1997) (When considering a motion to dismiss, "the court must accept all factual allegations in the complaint as true and draw all inferences from those allegations in the light most favorable to the plaintiff."). Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts which would enable him or her to relief." *Sweet v. Sheehan,* 235 F.3d 80, 83 (2d Cir. 2000).

## ARGUMENT

### I.     Defendants' Motions to Dismiss the NEPA Claims Should be Denied

Both the MTA Defendants and the Federal Defendants move to dismiss NEPA claims brought by both the *New Yorkers* Plaintiffs and the *Mulgrew* Plaintiffs. The Federal Defendants move to dismiss the NEPA claims set forth in the First and Second Causes of Action in the *New Yorkers* Plaintiffs' Amended Complaint (*New Yorkers'* Amend. Compl., ¶¶ 164-68, 169-76).  The MTA Defendants move to dismiss only the NEPA claim set forth in the *New Yorkers* Plaintiffs' First Cause of Action.[2] The First Cause of Action charges that the EA and the FONSI failed to

---

[1] Defendants also move to dismiss under Federal Rule of Civil Procedure 12(b)(1), but cite no case in this jurisdiction holding that a statute of limitations defense pursuant to 23 U.S.C. § 139(l)(1) implicates a court's subject matter jurisdiction.

[2] The MTA Defendants also move to dismiss the *New Yorkers* Plaintiffs' Fourth Cause of Action, which seeks class action declaratory and equitable relief including establishing health monitoring in environmental justice communities. Declaratory relief may include court-ordered monitoring notwithstanding the elimination of class action claims.

sufficiently analyze and take a "hard look" at significant and cumulative negative environmental and socioeconomic impacts of the Congestion Pricing program and failed to propose adequate mitigation measures; it petitions the Court to declare that the EA and FONSI are invalid as a matter of law and to issue an injunction setting aside the EA and FONSI and compelling defendants to undertake a full and proper EIS.  The Second Cause of Action charges that, in conducting the EA and issuing the FONSI, Defendants failed to analyze critically important aspects of the Congestion Pricing program that were not available to Defendants when they undertook their environmental analysis, including the actual toll amounts, exemptions, credits, discounts, time-of-day distinctions, etc. Plaintiffs urge that rather than simply re-evaluate this critical information, Defendants must fully incorporate the information into their environmental analysis when the new information becomes available (which it now has).

### A.  The *New Yorkers* Plaintiffs' First NEPA Claim is not Time-Barred

Section 391(l)(1) of title 23 of the United States Code provides as follows (emphasis supplied):

> Notwithstanding any other provision of law, a claim arising under Federal Law seeking judicial review of a permit, license, or approval issued by a Federal agency ***for a highway or public transportation capital project*** shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register ***announcing that the permit, license, or approval is final*** pursuant to the law under which the agency action is taken. . . .

FHWA issued its "Final" FONSI for this project on June 23, 2023 and then published notice of that action in the Federal Register on June 23, 2023 (88 Fed. Reg. at 41,998). Defendants argue that this lawsuit is time-barred because the *New Yorkers* Plaintiffs filed the

lawsuit on January 19, 2024, more than 150 days after publication of the notice in the Federal Register.[3]

In making this argument, Defendants of course seek to preclude any legal challenge to their environmental evaluation of this nationally unprecedented and enormously impactful project. And they do so even though courts have long interpreted statutes of limitation and time-bar provisions narrowly against defendants, due to the reluctance to deny litigants their day in court. *See, e.g., Matter of Fischer v. Roche,* 81 A.D.2d 541 (1st Dep't 1981), *aff'd* 54 N.Y.2d 962 (1981) (ambiguity about when statute of limitations period began to run must be resolved against the public body). *See also Treadway v. Town Board of Town of Ticonderoga,* 163 A.D.2d 637, 638 (3rd Dep't 1990) (same).

In fact, Defendants' efforts to shut the courthouse doors on Plaintiffs fail, for two reasons. First, under the plain terms of the statute, §139(l)(1) does not apply to this program. The statute applies, in relevant part, to federal claims seeking judicial review of an approval issued by a federal agency "for a highway or public transportation capital project." The Congestion Pricing program does not meet this definition. The state statute establishing the program (N.Y. Veh. & Traf. Law § 1701, *et seq.*) explains in its legislative findings and declaration that the program has two purposes: (i) to relieve traffic congestion, and (ii) to provide a stable funding source to repair and upgrade mechanical and infrastructure deficiencies in the public transit system. Section 139(l)(1), however, expressly encompasses only "a highway or public transportation capital project." The Congestion Pricing program is plainly not a "highway" or a highway capital project." Nor is the program a "public transportation capital project." If implemented,

---

[3] Defendants make the same argument in the *Mulgrew* lawsuit, which was filed on January 4, 2024, also more than 150 days after the Federal Register notice.

Congestion Pricing may well lead to specific "public transportation capital projects," which will likely require their own environmental evaluations, but that is not now the case. FHWA's environmental assessment did not address any specific, concrete capital projects that Congestion Pricing may ultimately spawn, as that is for the future.

Moreover, FHWA's environmental review cannot in any respect be deemed "final," as required under § 139((l)(1). In their papers in support of their motions to dismiss, Defendants themselves elucidate why that is so under the unusual, if not unique, nature of the ongoing NEPA review of this program.  FHWA's characterization of its Environmental Assessment and its ensuing FONSI as "Final" ignores reality. As the MTA Defendants readily acknowledge, "crucial steps remain outstanding before the Project is finalized and put into effect" (MTA Defendants' Memorandum of Law in Support of Partial Motion to Dismiss, dated March 18, 2024, at 5, hereinafter "MTA Defendants' Memorandum of Law").  The Federal Defendants list some of the factors yet to be decided at the time this lawsuit was filed---***including the toll amounts themselves***--- along with traffic mitigation measures, operating costs, public safety, hardships, vehicle type, discounts for motorcycles, peak and off-peak amounts and environmental impacts including but not limited to air quality and emission trends (Federal Defendants' Memorandum of Law in Support of Motion to Dismiss, dated March 18, 2024, at 5-6, hereinafter "Federal Defendants' Memorandum of Law").  Under the state legislation, Defendant TBTA is directed to make these determinations aided and informed by the recommendations provided by TMRB. N.Y. Veh. & Traf. Law § 1704-A(3) and (4).

So it could not be clearer that Defendant FHWA's EA and FONSI are anything but "final." Merely saying that they are "final" does not make it true. From the start, the NEPA review was designed as a two-step, ongoing process (FONSI at 26), which would reach its

conclusion only after the critical TBTA determinations were made and then presented and
reviewed in the NEPA process. Notably, Defendants cite cases involving application of the
§139(l)(1) time-bar in which, unlike here, new information **came to light after** otherwise final
environmental evaluations were issued. *See* MTA Defendants' Memorandum of Law, p. 8;
Federal Defendants' Memorandum of Law, p. 12.

A line of analogous federal cases provides further support for Plaintiffs' position.  The
"reopening" doctrine has for decades provided an exception to statutory time limits on the time
for seeking review of an agency decision. *See CTIA-Wireless v. FCC*, 466 F.3d 105, 110 (D.C.
Cir. 2006). The doctrine arises when "an agency conducts a rulemaking or adopts a policy on an
issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the
issue again without altering the original decision. *United Transp. Union-Ill. Legislative Bd. v.
Surface Trans. Bd.* 132 F.3d 71, 75-76 (D.C. Cir. 1998). The principle underlying the doctrine is
"that if the agency has opened up the issue anew, even though not explicitly, its renewed
adherence is substantively reviewable." *Public Citizen v. NRC,* 901 F.2d 147, 150 (D.C. Cir.
1990). So even if the agency made a determination, the time-bar does not apply to a subsequent
litigation if the agency is deemed to have opened up the issue anew. Given this doctrine, it is
difficult to imagine a time-bar blocking the instant litigation. Here, FHWA has yet to finalize its
NEPA review of the Congestion Pricing program; by its own acknowledgements, that must await
its further review and consideration of TBTA's determinations.

Tellingly, Defendants' positions regarding finality in their motions to dismiss are
disturbingly inconsistent. The Federal Defendants argue not only that Plaintiffs' First Cause of
Action is time-barred, but also that the Second Cause of Action is not ripe (*see* Section I(B) of
*New Yorkers* Plaintiffs' Memorandum of Law, *infra*). That must mean, according to them, that

Plaintiffs either should have commenced this lawsuit within the § 139(l)(1) 150-day time period, even though the Federal Defendants acknowledge that the administrative record is patently incomplete; or they should have commenced this lawsuit only once the administrative record is complete, at which point they would claim it is time-barred. The MTA defendants do not argue that the NEPA claims are not ripe, but only that the lawsuit is time-barred. As the MTA Defendants would have it, however, Plaintiffs should have brought their lawsuit at an earlier date, on an admittedly incomplete administrative record. Notwithstanding this strained logic, one thing is crystal clear: Defendants do not want a judicial review of the environmental evaluation of this critically important public project, and they are not beneath manipulating the NEPA-mandated environmental review process to achieve that end.

In sum, it is clear that the Congestion Pricing program does not fall within the scope of § 139(l)(1), and that the EA and the FONSI issued in this case were not final. Accordingly, Plaintiffs' claims are not time-barred.

### B. The *New Yorkers* Plaintiffs' Second NEPA Claim Should not be Dismissed

NEPA's regulations provide that if a statement such as an Environmental Assessment is "so inadequate as to preclude meaningful analysis," an agency shall prepare and circulate a revised draft" or a supplement to the statement. 40 C.F.R. § 1502(9)(a) and (d). Agencies are required to prepare supplements to either draft or final statements if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(i) and (ii).

As discussed in (I)(A), *supra,* herein, critical elements of the Congestion Pricing program were not yet decided upon when Defendant FHWA issued its EA and FONSI. Unavailable at the

time were the actual toll amounts and variations, along with other important features including exemptions, discounts, credits, time-of-day provisions, etc. It was that reality that compelled Plaintiffs to allege in their Second Cause of Action that these features were not adequately considered and analyzed and require a "hard look" at the potential socioeconomic and environmental consequences. Plaintiffs have further alleged that FHWA, rather than simply "re-evaluate" the additional information without taking the hard look required by law, must supplement the EA and FONSI with such additional information in accordance with NEPA and its implementing regulations (Amend. Compl. ¶¶ 170-176).

The Federal Defendants have moved to dismiss this claim, arguing that because they had not yet been provided with this critical additional information, Plaintiffs' Second Cause of Action is not ripe. However, on March 27, 2024, the MTA Board approved a resolution adopting TBTA's proposals on the tolling and related features for the Congestion Pricing program (Ex. A). Plaintiffs' legal claim, therefore, is now ripe for consideration, as FHWA has all the information it needs to finalize its environmental review.

Any contention by FHWA that Plaintiffs' claim is still not ripe because FHWA now needs to "re-evaluate" the new information is meritless. As discussed above, under the applicable NEPA regulations, FHWA must now supplement their EA and FONSI with the new information, rather than simply re-evaluate it without taking the requisite "hard look." *See* 40 C.F.R. §§ 1502.9(a) and (d), 1502.9(d)(1)(i)(ii).

If the Court finds the claim is still not yet ripe, which respectfully it should not, Plaintiffs have serious concerns that they will be greatly prejudiced if their legal claim is not reviewed and decided before the Congestion Pricing program commences. *See generally Watergate v. Buffalo Sewer,* 46 N.Y.2d 52, 57 (1978) (administrative exhaustion rule not inflexible and need not be

followed when resort to an administrative remedy would cause irreparable injury). Obtaining the relief they seek will be far more difficult, if not impossible, after that point in time. It is Defendants that have put Plaintiffs in this bind by scheduling the commencement of Congestion Pricing so close in time---in June---to the MTA's March 27 approval of TBTA's proposals. Ideally, FHWA would be subject to a timetable that would require it, before the start of Congestion Pricing, to complete its assessment of the new information and how the new information impacts the EA and FONSI. This would prevent Defendants from running out the clock and afford Plaintiffs the opportunity to make their case for the relief they seek.

## II.     The MTA Defendants' Motion to Dismiss the SAPA Claim Should Be Denied

TBTA has failed to undertake a socioeconomic assessment of Congestion Pricing's impact on job creation and retention and its economic impacts on small businesses, as required under New York's Administrative Procedure Act ("SAPA").  SAPA provides, in relevant part:

> 201-a.  Job impact.  In developing a rule, an agency shall strive to accomplish the objectives of applicable statutes in a manner which minimizes any unnecessary adverse impacts on existing jobs and promotes the development of new employment opportunities, including opportunities for self-employment, for the residents of the state.
>
> 202-b.  Regulatory flexibility for small businesses. 1. In developing a rule, the agency shall consider utilizing approaches that will accomplish the objectives of applicable statutes while minimizing any adverse economic impact of the rule on small businesses and local governments. Consistent with the objectives of applicable statutes, the agency shall consider such approaches as:
>
>> (a) The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small businesses and local governments or the time needed by small businesses or local governments to come into compliance with the rule;

(b) The use of performance rather than design standards; and

(c) An exemption from coverage by the rule, or by any part thereof, for small businesses and local governments so long as the public health, safety or general welfare is not endangered.

## A. Awaiting a Final Administrative Determination Would be Futile and Unduly Prejudicial

In general, one who objects to the act of an administrative agency must exhaust available administrative remedies before litigating in a court of law. *See, e.g., Young Men's Christian Ass'n v. Rochester Pure Waters Dist.,* 37 N.Y.2d 371, 375 (1975). An important exception to the exhaustion of administrative remedies principle, however, arises when fulfilling that requirement would be "futile." *See Skubel v, Fuoroli,* 113 F.3d 330, 334-35 (2d Cir. 1997) (futile to petition administrative agency for rulemaking where administrators' correspondence to plaintiff was clear that there were "no plans" to change the challenged policy which would be altered only by a court order). *See also Watergate v. Buffalo Sewer,* 46 N.Y.2d 52, 57 (1978) (exhaustion rule not inflexible and need not be followed when resort to an administrative remedy would be futile or would cause irreparable injury).

The MTA Defendants argue that the SAPA claim is not fit for judicial review and decision because the administrative process "has not reached finality," and that no rule has been adopted yet and no tolls have been set. Initially, the MTA Defendants fail to recognize that Plaintiffs are not challenging a specific rule; they are challenging an administrative process. And the TBTA Congestion Pricing rulemaking process has ignored the SAPA requirements that socioeconomic impacts be considered and assessed.

14

In any event, this case provides a classic example of one in which waiting out the full administrative process would be an exercise in futility.  Defendants TBTA and MTA have made it abundantly clear that they are not following SAPA's requirements for a socioeconomic assessment of Congestion Pricing's impact on job creation and retention and its impact on small businesses in general (*see* TBTA's Notice of Public Hearings, 45 N.Y. Reg. 46 at 48, Dec. 27, 2003 (Ex. B); MTA's Resolution adopting Congestion Pricing tolls, March 27, 2024 (Ex. A).[4] This unequivocal determination is based on TBTA's interpretation of the SAPA statute, an interpretation it has unilaterally applied on numerous prior occasions (*see* MTA Defendants' Memorandum of Law, at 15-16). Given TBTA's complete intransigence on this question, awaiting a final administrative determination, as the MTA Defendants urge, serves no purpose in these circumstances---TBTA has not undertaken a socioeconomic assessment, and will not do so absent a court order so directing.

Waiting any longer would also be highly prejudicial and harmful to Plaintiffs.  Courts have held that the administrative exhaustion doctrine can yield to a showing of prejudice or irreparable harm. *See, e.g., Watergate*, 46 N.Y.2d at 57. The MTA has publicly announced its expectation that Congestion Pricing will begin this June. If Plaintiffs are to wait any further, the adjudication of this question may well take place after the Congestion Pricing program has begun and is underway. That will inevitably place Plaintiffs at a severe disadvantage, making their litigation of this matter immeasurably more difficult, if not impossible. Because further delay of the adjudication would be futile and highly prejudicial to Plaintiffs, this Court should allow the prosecution of this claim to proceed now. Alternatively, if the Court determines that the claim is

---

[4] MTA's March 27, 2024 Resolution holds open the possibility of further proceedings "as may be necessary or desirable . . . to complete the administrative process (Ex. A).

not ripe, Plaintiffs respectfully urge the Court to permit them to amend their Amended Complaint now, which will avoid the necessity of filing a new lawsuit.

## B. Defendants' Challenge to the *New Yorkers* Plaintiffs' SAPA Claim Should be Denied

The MTA Defendants' motion to dismiss the SAPA claim should be denied. The SAPA statute provides for two categories of administrative rules. Type (i) rules include "the whole or part of each agency statement, regulation or code of general applicability that implements or applies law, or prescribes a fee charged by or paid to any agency or the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof." SAPA § 102(2)(a)(i).  Type (ii) rules include "the amendment, suspension, repeal, approval, or prescription for the future of rates, wages, security authorizations, corporate or financial structures or reorganization thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs or accounting or practices bearing on the foregoing whether of general or particular applicability." SAPA § 102(2)(a)(ii).  Importantly, SAPA requires agencies to  conduct a range of economic assessments as part of the rulemaking process for Type (i) rules. *See* §§ 201-a(6)(a), 202-b(3)(a).

Questions of statutory interpretation require the Court to "begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY* USA, 676 F.3d 83, 108 (2d Cir. 2012) (citations omitted). The statutory scheme must be read as a whole to give full meaning to the intent of the legislation. *Allstate Ins. Co. v.* Shaw, 52 N.Y.2d 818, 820 (1980).  *See also In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 427 (2d Cir. 2009). Courts must interpret a specific provision in a way that renders it "consistent with the tenor and structure of the whole act or statutory scheme of which it is a part

[and] . . . give effect, if possible, to every clause and word of a statute." *Bechtel v. Competitive Techs.,* 448 F.3d 469, 471 (2d Cir. 2006) (citations and internal quotation marks omitted).

The MTA defendants argue that TBTA's Congestion Pricing's rulemaking process falls within SAPA's Type (ii) category, and therefore does not require the economic assessments that SAPA otherwise mandates. They argue that the Congestion Pricing rulemaking process encompasses the prescription of "rates," which is a Type (ii) item. They assert that this is how TBTA has interpreted SAPA in other instances, as well as in TBTA's notice of public hearings herein for the Congestion Pricing program (*see* 45 N.Y. Reg. 46, at 48, Dec. 27, 2023 (Ex. B). They point to several dictionary definitions of "rate" as "an amount paid or charged for a good or service." *See, e.g.,* Black's Law Dictionary (11th ed. 2019). *See also* Merriam-Webster Dictionary ("rate" defined as "an amount of payment or charge based on another amount"). They further argue, without referencing any authority, that "[p]eople ordinarily refer to charges applied to vehicles for crossing designated roadways, bridges, or tunnels as 'toll rates.'" And they cite a few cases in which judges, in other contexts, have used the term "toll rates."

None of these arguments is persuasive. In their singular focus on the term "rate," Defendants wholly fail to address the fact that included within the Type (i) rules, which require the economic assessments that need to be undertaken in this case, is the term "fee." Dictionaries define "fee" as "a payment or charge for services rendered, usually in the form of money or property." Legal Information Institute. *See* Black's Law Dictionary (8th ed) (defining "fee" as "a charge for labor or services"). If some judges have used the term "toll rates" in their decisions, others have used the term "fees" in the tolls context. *See, e.g., New York Pub. Int. Res. Group v. Metropolitan Transp. Auth*, 309 A.D.2d 127, 134 (1st Dep't 2003). And that TBTA has avoided

conducting economic assessments in other rulemaking situations based on its own self-serving interpretation of SAPA is of no legal consequence.

Additionally, Defendants would ignore the plain language of SAPA § 102(2)(a)(i) that expressly includes within the scope of Type (i) a "regulation or code of general applicability that implements or applies law." That is precisely what is at issue here---a regulation implementing the Traffic Mobility Act statute. Defendants argue that such language is so broad that it would apply not just to the rulemaking here but to all rulemaking implementing a law. Yet their construction would essentially require reading that clause entirely out of the SAPA statute, something this Court should be loathe to do. *See Rocovich v. Consolidated Edison Co.,* 78 N.Y.2d 509, 515 (1991) ("It is an accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided."). *See also Matter of Springer v. Board of Educ. of City Sch. Dist. of City of New York,* 27 N.Y.3d 102, 107 (2016) (same).

Consideration of this question in the broader context of the statutory Congestion Pricing scheme further supports Plaintiffs' position. The Traffic Mobility Act legislation is replete with references to "fee" and "fees." The same is not true for "rates."  Moreover, TBTA's role in this far-reaching program is immeasurably broader than simply determining the amount of the toll. Under the enabling state legislation, TBTA has the fundamental responsibility to "establish the central business district tolling program." N.Y. Veh. & Traf. Law §1704(1). It performs the primary role of coordinating the "planning, design, installation, construction and maintenance" of this vast program. *Id.* §1704(3)(a). The magnitude of TBTA's role extends far beyond simply setting a toll. Yet even TBTA's toll-setting responsibilities here are broader in scope and complexity than is typically the case, as TBTA must determine not just the toll amounts for

Congestion Pricing but also exemptions, discounts, credits, time-of-day variations and other key program parameters. These are determinations that go beyond mere toll/fee/rate making, which takes TBTA's rule-making responsibilities in the Congestion Pricing program squarely out of the Type (ii) SAPA category and places them firmly in Type (i).

In the end, no one can dispute that the Congestion Pricing program is an enormous, groundbreaking initiative---nothing like it has been introduced anywhere else in the nation. As it pertains to Congestion Pricing, TBTA has broad and expansive powers. Moreover, TBTA is not merely setting tolls; it is implementing a program unprecedented in this country and designing its introduction into an island community that is set off from the mainland by a transportation system of tolls and bridges. Designed and implemented by TBTA, Congestion Pricing will impact millions of people relying upon entrance to the CBD for their jobs, livelihoods and businesses. It is not unreasonable to insist that the government agencies responsible for designing, developing, implementing and operating this unprecedented and far-reaching program adhere to the intent of laws governing democratic participatory processes. A critical way to achieve this goal is to conduct the socioeconomic assessments mandated under SEPA. Small businesses in the Central Business District will be profoundly impacted (*See New Yorkers* Plaintiffs' Amend. Compl. ¶¶ 17, 25, 26, 27, 40, 42, 43, 45, 47, 48, 49, 50, 56, 59, 60, 62). Those impacts and the impacts on job creation and retention need to be evaluated so that negative consequences can be identified and, where possible, addressed and mitigated. Defendants have wholly failed to justify a contrary result.

For all these reasons, the motion to dismiss Plaintiffs' SAPA claim should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the motions to dismiss Plaintiffs' NEPA claims and Plaintiffs *New Yorkers'* SAPA claim.

Dated: April 5, 2024

Respectfully submitted,

_____

Jack L. Lester, Esq.
41 Squaw Road
East Hampton, NY 11937
631-604-2228
jllcomlaw@aol.com