# EXHIBIT 4

**MONDAY, FEBRUARY 8, 2021**                    **2:41 P.M.**

SPEAKER HEASTIE:  The House will come to order.

Reverend Elia will offer a prayer.

REVEREND DONNA ELIA:  Let us pray.  Eternal God, we come before You, thank You to be felt to be in Your presence.  Humble as we seek Your blessing, hopeful as we anticipate the work ahead.  In times of joy and of sorrow, You, our God, pour out a generous measure of Your blessing upon all Legislators and staff, working for the well-being of our communities and our State.  Empower them, especially when the tasks are challenging.  Help them to find the way forward, especially in times of disagreement.  Give them clarity in speaking, and help them to have an open mind in listening.  Thank You for their willingness once again to take on the

1

NYS ASSEMBLY                          FEBRUARY 8, 2021

mantle of public service, and bless their families and all their dear

ones.  Give healing to any who struggle with illness, and strengthen

those who are weary.  We are grateful, O God, for the opportunity to

celebrate Black History Month.  Thank you for the gifts of Black

leaders, those whom we can name and those whose names are lost to

history but who struggled for justice and an end to oppression.  Cure

our land and the world of the scourge of racism.  Help us all, people of

every race and ethnicity, to commit to the work of antiracism.  Grant

us peace with justice.  In Your holy name we pray.  Amen.

SPEAKER HEASTIE:  Visitors are invited to join the

members in the Pledge of Allegiance.

(Whereupon, Speaker Heastie led visitors and

members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the

Journal of Friday, February 5th.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move to

dispense with the Journal of Friday, February the 5th, and ask that the

same stand approved.

SPEAKER HEASTIE:  Without objection, so

ordered.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.

Speaker.  I'm pleased to be back in Chambers today with members

who are both here with us and those who are participating remotely.  I

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

will provide again the schedule for today, but I do want to leave us with a quote. We ended last week with the entire stanza from "Lift Every Voice and Sing" that was designed by the Jeff -- the Johnson Brothers. Today we're just going to go with a stanza of it, Mr. Speaker. It's, *Lift every voice and sing, till Earth and Heaven ring. Ring with the harmonies of liberty. Let our rejoicing rise, high as the listening skies. Let it resound loud as the rolling sea.* Again, Mr. Speaker, that is a verse from "Lift Every Voice and Sing."

The members do have on their desks a -- the main Calendar. It has nine bills on it. These new bills begin on page 4 with Calendar No. 78 and it goes through Calendar No. 86. We will start our work today by taking up a resolution by you, Mr. Speaker, commemorating Black History Month in the State of New York. We will then continue with the consent on the main Calendar where we left off on page 10 with Calendar No. 58. Then we will take up Calendar No. 50 by Mr. Englebright, the Constitutional Amendment on the right to clear air and water and a healthful environment. Following today's Session there will be a need for an immediate Majority Conference and, Mr. Speaker, as always we will consult with our colleagues on the other side to determine what their needs may be.

That is a general outline, Mr. Speaker. Now it would be appropriate if we have any housekeeping and/or resolutions, which you do.

SPEAKER HEASTIE: No housekeeping. But I would like to say good afternoon and in just a moment we will

NYS ASSEMBLY                          FEBRUARY 8, 2021

continue our longstanding Assembly tradition recognizing February as

Black History Month with a Legislative Resolution.  For many years,

society history books often overlooked or minimized the vital

contributions made by people of color.  But here in the People's

House, I am proud that we celebrate the accomplishments of our

ancestors because we know we stand on their shoulders.  As the first

African-American Speaker of the People's House, I've always said that

if I did this job right that -- that detail would be a footnote in history.

But instead we recognize our accomplishments and contributions

because Black history is American history.  Today we celebrate the

history made by those that came before us, and we commit to

honoring that history by building on it right here in the People's

House.  And although February is Black History Month, I believe

every day and every month is Black History Month.

       Thank you.

       The Clerk will read the title of the resolution.

       THE CLERK:  Assembly Resolution No. 45, Mr.

Heastie.

       Legislative Resolution memorializing Governor

Andrew M. Cuomo to proclaim February 2021 as Black History

Month in the State of New York.

       SPEAKER AUBRY:  Mr. Aubry on the resolution.

       MR. AUBRY:  Thank you, Mr. Speaker, for allowing

me to speak on this resolution.  I often stood in front of this august

Body and talked a bit about my history as an African-American in this

4

country and a son of the South, born in New Orleans, Louisiana.  And
so I think it's appropriate for a minute let me take you places maybe
you haven't been and maybe you haven't had the opportunity to
consider.  In the South where -- when Separate But Unequal was
established, there were Black schools.  Black colleges, Black high
schools, because we couldn't go to school with our White neighbors.
It was not allowed.  It was against the law.  But in that process in a
segregated South, the history of African-Americans in this country
was taught.  It was taught because we were taught for the most part by
African-American teachers.  And there was both an oral and a written
history so that you would understand who you were and where you
came from.  Now, this might not have been universal, but at least
existed within the Southern culture among the, at those times, Negro
communities that existed.  But that was not everywhere.  And nor was
it universally understood.  So when I was raised and schooled in the
north, as my parents brought me up here at a very young age, there
was very little history taught about what happened to
African-Americans.  There was a mild reference to the slavery, but it
was not exemplified in any way that you might understand it.  For
instance, I heard of the 100-Year War [sic] in Europe, the Habsburgs
and the struggles that happened between England and France and
Spain.  That was fully talked about.  And the history of Italy, of
course, the boot, where that went on.  And even what happened in the
Urals in Russia.  Those things -- and I was a history major when I
went to college -- even in college there was no recognition of what

5

African-Americans had contributed to this country.  And so, same things I'm sure you were taught.  So the idea that we were this powerful force in this country, providing all kinds of enhancements, helping the country, building the country, culturally making this country rich, were left out.  And so generations would grow up not knowing who they were.  And of course from slavery, that was the plan.  When you were brought from the shores of Africa here, you were taken to places where they called "breaking in."  And in the process of breaking in, to make a good slave you have to remove any of his history and his culture and have him accept the culture of being a slave.  It was in my mind of all the things that I could think of that was most horrible about slavery was the denial of your culture, of your humanity, of yourself, because they didn't want that.  That made you a very poor slave if you held on to this sense of self and independence.  Of course like anybody else, if you are independent with your own resources, with your own mind, with your own feelings, you will rebel.  And of course, rebellion was most feared in this country because of the millions of slaves that were brought across to work the cotton fields and work in the houses and all the part of the Triangle Trade that made this country an economic power.  So the creation of Black History Month was done to help those who had not gotten that education to get it, because it wasn't going to be brought -- brought to you in schools because teachers coming out of particularly White institutions weren't taught that, right, they didn't know.  They weren't taught it.  It wasn't a course of study as you might find now today in

6

NYS ASSEMBLY                                    FEBRUARY 8, 2021

these more modern times, but in those days, not so much.  And so we
all wandered around in the dark, thinking what we were taught to
think and acting what -- the way we were taught to act.  So the
development of this day -- it was a day, it became a week, we wanted
-- it is a month -- all was established in recognition of that missing
piece in these human beings' lives that they could not connect.  Many
of you might be able to say, *My parents were born in Italy in a little
small town outside of Rome.*  Or in Poland in Warsaw in Rzeszów.  In
England or in France, somewhere on the River Seine.  But
African-Americans in the United States, only until very recently,
could never point to a place in Africa where they knew their family
came from.  Knew that they had -- knew that there was a history.
Knew that there was a village, a tribe, a city that they belonged to.  So
the viciousness of slavery and the denial of your humanity and your
connection, both cultural and human-wise, was very complete.  And
so we celebrate today the reconnection of that.  And we celebrate with
you because it's important for you to understand those people who you
live next to, work next to, see on the street, watch on television.
Where they came from.  Who they were.  What they bring as a part of
our culture and the many accomplishments, all the lists of inventors
that were a part of the United States.  All of the great military minds
that were a part of this country.  It is important for this country to
understand what the original sin was, and to help us and to help
yourself and to help this country recover.

               So I salute you, Mr. Speaker, for bringing this

7

resolution.  I thank you for the work that you've done.  I thank you for your leadership, and I thank the members of this House for enjoying this opportunity to celebrate together.  And I'm even more happy because this is the anniversary of my 73rd birthday.

(Applause)

And they're getting to be not so many of us around. So I want to thank you so very much, Mr. Speaker, my members.

(Applause)

SPEAKER HEASTIE:  Thank you, Mr. Aubry.

Mr. Barron on the resolution.

MR. BARRON:  Thank you very much, Mr. Speaker. When we speak of Black history, African history, we must not start our history in enslavement.  We are an African people, torn us under from our continent.  The richest continent known to the world.  We are an African people that gave the world mathematics, science, astrology, astronomy.  We gave the world the mighty Sphinx, the Pyramids, the Rock-Hewn Churches of Ethiopia.  We are an African people that gave the world Imhotep, the real father of medicine.  We are an African people.  So whenever you start your history in enslavement, you missed the glorious African ancestry.  You missed the pre-colonial times in Africa when we were kings, queens, princesses and when Africa was rolling with diamonds and gold and they're shared amongst the masses of African people.  So we must not start our history during enslavement here in America.  We are an African people.

8

Secondly, we must begin to tell our history of resistance, not only the history of repression.  We seem to always talk about how bad people did us, and believe me, they did and that must be brought up.  But we had a history of resistance.  From the shores of Africa, the inland resistance, many Africans were never conquered because they resisted European invaders.  During the great so-called "Middle Passage" where millions of us died, the African Holocaust was the worst Holocaust known to humankind.  But there were mutinies.  Many of the ships never made it to America because Africans rolls up on those ships and they killed the crew that was enslaving them and turned the ships back to Africa, never to be enslaved.  Oh, they'll show you the Amistad with Joseph Cinqué because a White man, John Quincy Adams, when they took over their ship, they guided it not back to Africa, they left the crew alive, the Africans did, and they guided it to America, Long Island.  And John Quincy Adams, the great White savior, saved them and they went back to Africa.  Oh, they won't tell you about the fact that we first came here in 1526, not 1619 when the Spanish -- Spaniards brought 200 Africans to the Pee Dee River in South Carolina, in that area, and colonized us there.  We united with the indigenous people.  And they won, they rebelled, revolted, tore down the colony, sent the Europeans back to San Domingo, where they came from, and they were able to live freely with the indigenous people, so-called Indians.  The Africans, they united.  They won't tell you about the rebellion of Cato in 1763 in South Carolina, rose up and went from plantation to

9

plantation freeing Africans until they were finally caught.  They won't tell you about the 1811 rebellion in Louisiana when we rose up once again, having been inspired by the Haitian revolution, the first liberation of insulated people in the Western Hemisphere.  We were motivated by that, and they ran from plantation to plantation on their way to New Orleans to start a new independent African State of New Orleans, saying, *Liberty, liberty at last*.  They don't tell you about that story.  They don't tell you the story about Madison Washington, who during the Middle Passage and after he came here and he was enslaved, he freed himself in Virginia.  And then wanting to go back to get his wife, he went back.  They enslaved him again.  He took over a ship and took the ship back to Africa and found out that his wife was on that ship.  Tell us that story of African liberation.

So when we celebrate African or Black History Month, it's just not dates and personalities.  History teaches of what can be done, what is possible.  So if it's possible for Harriet Tubman to free over 400 of us, then it's possible for us to do that today.  If it's possible for Nat Turner to go from plantation to plantation freeing our people, we can go from Black community to Black community, freeing our people from the economic, racist, parasitic, capital oppression that keeps poverty in our communities.  And we should not allow them to front Black leadership, put Black faces in high places and you say that's progress.  Until the masses of us are progressing, there is no progress.  The struggle continues.  We will celebrate Black history, but like the Speaker said, Black history is every day and we

NYS ASSEMBLY                          FEBRUARY 8, 2021

should honor that every day, not just the coldest and shortest month on

the calendar.

ACTING SPEAKER AUBRY:  Ms. Bichotte

Hermelyn.

You need to -- thank you.

MS. BICHOTTE HERMELYN:  Thank you, Mr.

Speaker, for allowing me to speak on this resolution proclaiming

February of this year as Black History Month in our State.  During

Black History Month we celebrate and we pay tribute to our culture,

history which unfortunately continues to be forgotten in history books

and teachings.  As you know, a Utah school earlier this month even

allowed parents to opt their children out of taking in Black History

Month learning.  Not understanding that Black history is American

history, is world history, is global history.  I remember when I was in

high school at -- at LaGuardia High School of the Performing Arts

where the Black Student Union, which I was part of, did a Black

history program where we educated our class where math and science

came from.  It came from the African people.  The teachers -- some of

the teachers in the school wanted to ban our program and wanted to

withhold educating things like Socrates and Plato, again, students of

African people.  So I join my colleagues in making sure that as we

celebrate Black History Month, we celebrate, we pay tribute, but it's

so that we do not forget where we come from.  And our history and all

the things that made America America because of Black people.  The

pandemic has also shined a light on the egregious racial disparities

11

that have long plagued our State and City, particularly in districts like mine where we have struggled with healthcare, education, housing inequities.  During this pandemic, African-Americans, Black people, bore a greater burden from the virus as rates of infection and fatality surged in our communities far beyond that of other communities. African-Americans served as frontline workers, as healthcare professionals, teachers, transportation workers.  And despite this, we are seeing disparities in the vaccine distribution as well.  How can we solve these inequities?  Our State Legislature can take this step by, of course, not only passing this resolution today, but continuously honoring African-American heroes and teaching future generations about our history and our progress.  But we cannot stop there.  We must continue to demand equity in every aspect of our society.  We must build on this foundation for desegregating our inner-city schools, taxing the rich to fund educational programming for our young, and fixing our broken -- our very broken criminal justice system.  We must honor Black mothers by passing legislation that helps Black women and babies receive the same standard of care as everyone else, and improve on that standard of care for everyone.  Shirley Chisholm, the first Black woman elected to the United States Congress, lived right here in Brooklyn near the district I now represent.  In addition to representing the New York's 12th Congressional District for seven years, Chisholm became the first Black candidate to run for President of the United States as well as the first woman to run for her party's presidential nomination.

NYS ASSEMBLY                                FEBRUARY 8, 2021

Today I proudly present -- represent my district as a Black woman. My county as a Black woman. A Black woman who is of Haitian descent. The kin of the revolutionist, Dessalines. And that spirit in it -- in me keeps me going. That is the resistant spirit. And this year we celebrate an enormous victory with the swearing-in of our first Black female Vice President of the United States, Kamala Harris. Our future is with hope -- is with hope to look bright with the signs of progress. We still got a long way to go.

I acknowledge and thank our Speaker for introducing this, and my colleagues in the Assembly for supporting this Black History Month resolution. Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY: Thank you, ma'am.

Ms. Frontus.

MS. FRONTUS: Thank you so much, Mr. Speaker. Thank you for allowing me to speak on this resolution to recognize the month of February as Black History Month. I wanted to take just a very brief moment to echo the sentiments of my colleagues who spoke before me, and to say how important it is that all of us today realize that Black history is American history, and Black history is not just a month. It's something that we need to celebrate every single day.

I wanted to share a few thoughts about the last 400 years of our history here and the plight of the African-American. I don't know that I can say it better than Assemblymember Aubry who shared some very eloquent words about what African-Americans had to endure over the years. Essentially, as we know, Assemblymember

13

NYS ASSEMBLY                                    FEBRUARY 8, 2021

Barron mentioned, our history actually doesn't begin in 1619 with

slavery.  I'd like to say that we were a proud African people who were

formally enslaved.  We were formally enslaved, but we were great

before slavery and we continue to be great today.  One of the things

that I shared during my inauguration was the reason why I ran for

office is when I think about justice and what justice means to me, it

means using the halls of government to redress the wrongs of the past.

When we look at the institutionalized racism that we've had to endure

over the years, when we look at the insidiousness of anti-Blackness

which is present in every segment of our society.  Blacks have had to

endure physical, emotional, mental and psychological violence.

Messaging in every single way from our schools, from our

entertainment industry, that Blacks are inferior, which has caused

great harm to the psychology and the mental health of Black children

across the U.S.  A lot of people don't realize that our government and

our policies literally shaped the two Americas that we see today.  It

shaped the plight of the African-American and the segregation and all

of the ills that we often complain about in our urban communities.

They didn't fall from the sky.  We had a hand in it.  And so one of the

things that I want to say today is just as we use our halls of

government to create these injustices in the past to oppress the

African-Americans which were brought here against their will, we

now have an obligation to use these same chambers of government to

redress the wrongs of the past and to really echo in a new era of

equality and dignity not only for African-Americans, but for all

14

NYS ASSEMBLY                          FEBRUARY 8, 2021

minorities who have been treated as second-class citizens.

        Thank you, Mr. Speaker.

        ACTING SPEAKER AUBRY:  Thank you so much.

        Mr. Lawler.

        MR. LAWLER:  Thank you, Mr. Speaker, and thank you for sharing your remarks earlier.  I rise just to say I -- I support this resolution.  I think as you mentioned earlier, Black history is American history.  And it's something that should not be taught in a single day or a single month, but every day and every month throughout the year.  And when we talk about history, we're obviously talking in large part about education and educating our populous and educating young people about our history and what has occurred in the United States over -- over the course of our country and its founding.  And it's why I believe so strongly that education is today the civil rights issue of our generation, and every child, regardless of their race, regardless of their zip code or their parents' income deserves access to a quality education.  And so as we embrace Black History Month, let us work towards ensuring that every child has opportunity and has access to a quality education in this State and in this country, and so that they are never left in a failing school system or left behind.  That is the best way to ensure equality and justice in our State and in our country, and the best way to honor Black History Month.

        Thank you.

        ACTING SPEAKER AUBRY:  Thank you, sir.

15

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

Mr. Goodell on the resolution.

MR. GOODELL:  Thank you, sir.  When we reflect back on Black history, as you yourself so eloquently pointed out, there is such a need to recognize and appreciate the incredible contributions that have been made over history, both pre the formation of the United States, during slavery and afterwards.  And just reflecting just for a moment about some of the Blacks that made such a difference in the United States.  People like Frederick Douglass or Harriet Truman [sic] or Booker T. Washington.  Or in the music field.  I mean, think about the incredible contributions we got from Scott Joplin or Duke Ellington, whom I actually saw perform.  Maybe that tells you that my age is closer to yours than some of our freshmen.  Louis Armstrong, Count Basie.  And of course there are so many extraordinary athletes that we don't have time to list them.  But Satchel Paige or Jackie Robinson or what about that phenomenal world-changing performance by Jessie Owens in the 1930's.  But it's -- it's not just sports or entertainment or -- or music.  The highest, highest level of accomplishment for any attorney is sitting on the Supreme Court, like Thurgood Marshall or Clarence Thomas.  And on the politics side, we have President Obama and Vice President Harris.  In the military we had Colin Powell, who rose to the very top.  Or Condoleezza Rice.  I mean these are incredible people who are making incredible contributions.  And I just wanted to highlight one that may not be on the top of the history books, but an individual named Walter Washington, who came from my district and went on to become the

16

first elected mayor in the City of Washington, D.C.  We have so much

to celebrate and so much to learn.  And I'm thankful that we have this

resolution as we develop a greater understanding of the incredible

contributions on every level of society that are reflected by our Black

friends and neighbors, political leaders, performers, sports heroes,

legislators, including those in our very Chamber with Speaker Heastie

and our Majority Leader Crystal Peoples-Stokes and yourself.

So thank you for moving this resolution forward, and

I look forward to supporting it enthusiastically.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.

Speaker.  I rise today to, like my colleagues, support this really

important resolution that honors Black History Month.  Clearly, as it

-- as it has been said, a month is not long enough, a day is not long

enough.  It really does take a lifetime to pay attention to the

contributions that have been made by African-Americans in this great

country of ours.  Today, however, though, I'd like to focus on Dr.

Kizzmekia Corbett.  She is an African-American scientist that has

been lauded for the key science behind COVID-19 vaccines.  Dr.

Corbett is a research fellow and a scientific lead for the coronavirus

and vaccines team.  In fact, she was actually meeting at the National

Institute of Health with the former president when a lot of these

conversations began.  Dr. Corbett was appointed to the VRC, Vaccine

Research Center, to use her training and expertise to propel the novel

NYS ASSEMBLY                    FEBRUARY 8, 2021

vaccine development for the pandemic preparedness.  Her work

focuses on developing this virus, including mRNA 112, 1273, which

was designated by her team and deployed by industry to Moderna.  In

response to this ongoing global pandemic, many of us know

Manderma -- Moderna is one of the two most well-known vaccines

that are being used.  We first learned about Dr. Corbett, Mr. Speaker,

in March of '20, again, as I said when she was meeting with this team

of scientists and the former president.  At the time, the U.S. had not

felt the real impact of COVID quite yet because it was March '20.  But

when asked about her participation, she commented that it was

important -- a very important step forward for young scientists and for

people of color.  She furthermore stated that she felt like it was

necessary to be seen and not to be a hidden figure, so-to-speak.  She

felt it was important to do that because the level of her visibility

allows young ladies and young men who look like her to see

themselves in that same kind of work.  Mr. Speaker, Dr. Corbett's

statement is about being -- about it being necessary to be seen and not

a hidden figure resonated with me very, very strongly.  In fact, I

remember being at Public School Number 31 when the entire country

was heralding the fact that the astronaut John Glenn had gotten to the

moon.  Yet, Mr. Speaker, I was well over 50 years old before I ever

heard that it was a Black woman mathematician, a Black woman

engineer, and a Black woman who supervised the area's computer that

they used.  No one ever told me that when I was at Public School

Number 31.  Mr. Speaker, this information was not taught to us then,

and in many cases it's not taught to us now.  If it had not been publicated in a book and then later made into a movie, we would still not know the significance of these women.  So back in 2005, a relatively new member in this Chamber, I got a chance to vote for some legislation that was sponsored by our former colleague Keith Wright called the Amistad Commission.  And the Amistad Commission was a pretty simple mission.  It was passed over to SED, State Education.  They were supposed to come up with some strategies to figure out to infuse the complete history of African-Americans in American history.  I remember with some excitement that my predecessor brought then-Governor Pataki into Buffalo to the Underground Railroad Church where he sat and signed that legislation into law.  And here we are, Mr. Speaker, in 2021.  And ask me if SED has implemented Amistad.  Or ask anybody.  The answer to that is no.  That's the problem, Mr. Speaker.  And so today as we celebrate Black history - and I thank you for bringing up this resolution and I thank you for the opportunity to do this - we need Amistad to be implemented.  And we need State Education to begin working with us to make sure that that act happens.  Not just to honor Black history, but to honor our former colleague Keith Wright, and to honor my predecessor, Arthur O. Eve, and quite honestly, to honor Governor Pataki, who signed it into law.  That wasn't just a frivolous method of means that they took.  They were serious.  They wanted to see something happen.  It's 2021.  Let's make it happen.

Happy Black History Month.

19

NYS ASSEMBLY                              FEBRUARY 8, 2021

ACTING SPEAKER AUBRY:  Thank you, Majority Leader.

On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, we're going to go right to page 10 and start with Calendar No. 58 by Mr. Gottfried.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Assembly No. A00190, Calendar No. 58, Gottfried, Paulin, L. Rosenthal, Abinanti, Colton, Sayegh, Galef.  An act to amend the Public Health Law, in relation to hospital establishment.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00213, Calendar No. 59, Paulin, Galef, Abinanti, Otis, Jacobson.  An act to amend the Not-for-Profit Corporation Law, in relation to voting requirements of the board of certain corporations.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Calendar No. 59, bill A.213.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously

20

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A00254, Calendar No. 60, Perry, Vanel.  An act to amend the Public Officers Law, in relation to the unauthorized release of sealed records.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00297, Calendar No. 61, Gottfried, Dinowitz, Colton, Cahill, Weprin, Otis, Gallagher, Sayegh.  An act to amend the Uniform City Court Act, the Uniform District Court Act, the Uniform Justice Court Act and the New York City Civil Court Act, in relation to obtaining jurisdiction over certain defendants.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00413, Calendar No. 62, L. Rosenthal, Lupardo, Sayegh.  An act to amend the Public Health Law, in relation to adding dysmenorrhea to the list of conditions covered for lawful medical use of marihuana.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00563, Calendar No. 63, Paulin, De La Rosa, Galef, Jean-Pierre, Abinanti, Dinowitz, Englebright, Epstein, Hunter, Gottfried, Pichardo, McDonough, Reilly, Cook, Steck, Griffin, Otis, Vanel, Sayegh.  An act to amend

NYS ASSEMBLY                              FEBRUARY 8, 2021

the Public Service Law, in relation to requiring certain notices to be
provided to customers receiving telephone service through fiber
optic-based telephone lines.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00744, Calendar No.
64, Wallace, Abinanti, Vanel.  An act to amend the General Business
Law, in relation to the requirement that certain health clubs shall have
at least one automated external defibrillator available upon the
premises.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00879, Calendar No.
65, Gottfried, Dinowitz, Galef, Paulin, L. Rosenthal, Colton, Abinanti,
Rajkumar.  An act to amend the Public Health Law and the Insurance
Law, in relation to the definition of clinical peer reviewer.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A00964, Calendar No.
66, Zebrowski.  An act to amend the Executive Law, in relation to
violations of the Uniform Fire Prevention and Building Code.

ACTING SPEAKER AUBRY:  On a motion by Mr.
Zebrowski, the Senate bill is before the House.  The Senate bill is
advanced.

The bill is laid aside.

THE CLERK:  Assembly No. A00970, Calendar No.
67, Cymbrowitz.  An act to amend the Private Housing Finance Law,
in relation to the membership of the New York State Housing Finance

Agency, the Housing Trust Fund Corporation and the Affordable Housing Corporation.

ACTING SPEAKER AUBRY:  On a motion by Mr. Cymbrowitz, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect January 1st.

ACTING SPEAKER AUBRY:  The Clerk will record vote on Senate print S.871.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  This Chapter Amendment changes some of the appointments to the members of the New York State Housing Finance Agency, and the change in the number of appointments is -- is not an issue for me.  However, I would like to point out that when we created this group we made sure there was an appointment from the Majority members in this House and in the Senate, but not a single appointment from the Minority. And the Minority Conference represents a substantial portion of New York State.  Our perspective is sometimes different, but still valuable. And I think everyone in this Chamber recognizes the importance of listening to minorities including, I hope, the Republican Minority.  So I would urge that as we go forward with new commissions and new

23

NYS ASSEMBLY                              FEBRUARY 8, 2021

agencies that we look to include a diversity of opinions across the
State reflecting both the Majority and the Minority.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, sir.

(Pause)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record the
following Republican Assemblymembers in the negative:  Mr. Byrne,
Mr. Schmitt and Mr. Walczyk.

Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A01150, Calendar No.
68, Abinanti, Solages, Taylor, Griffin, Fahy, Hevesi, Dickens, Thiele,
Simon, Englebright, Seawright, McDonough, Ashby, Pichardo,
Morinello, Paulin, Gottfried, Barron, Sayegh, Rodriguez, M. Miller,
Cruz, Lupardo, Fernandez, Dinowitz, Weprin, Stirpe, Bronson.  An
act to amend the Public Health Law, in relation to adding autism to
the list of conditions covered for lawful medical use of marihuana.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A01253, Calendar No.
69, Gottfried, Abinanti, Barron, Colton.  An act to amend the Public
Health Law, in relation to the confidentiality of contact tracing

24

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

information.

ACTING SPEAKER AUBRY:  On a motion by Mr. Gottfried, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print S.900.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A01523, Calendar No. 70, Pretlow.  An act to amend the Public Health Law, in relation to prohibiting approved organizations in the Child Health Insurance Plan from limiting the participation of certain healthcare providers.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A01615, Calendar No. 71, Perry, Barron, Colton, Cook, Taylor, Weprin.  An act to amend the Public Health Law, in relation to requiring physicians and hospitals to obtain the name of the school attended by school-aged patients and to include this information in their admission registration forms.

ACTING SPEAKER AUBRY:  The bill is laid aside.

25

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

THE CLERK:  Assembly No. A01899, Calendar No. 72, Dinowitz, Gottfried, Vanel.  An act to amend the Executive Law, in relation to providing for the award of attorney's fees and expert witness fees in appropriate cases.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A01920, Calendar No. 73, Barrett, Buttenschon, Thiele, Stern, Abinanti, Taylor, Gunther, Englebright, Jones, Galef, Nolan, Burdick, Jacobson, Cusick, Morinello, Montesano, Salka, Hawley, Simpson, DeStefano, McDonough, Lemondes.  An act to amend the Executive Law, in relation to New York State veterans' cemeteries.

ACTING SPEAKER AUBRY:  On a motion by Mrs. Barrett, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly [sic] print S.866.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Anderson to explain his vote.

MR. ANDERSON:  Good afternoon.  Thank you, Mr. Speaker.  I'm voicing my support for this bill, as it helps to ensure that

26

NYS ASSEMBLY                          FEBRUARY 8, 2021

New York State veterans receive the proper benefits and services that
they deserve without certain restrictions.  Some of our vets don't or
cannot receive State benefits and services as they're not qualified to
receive veteran's benefits due to their ineligibility on the Federal level.
So this bill being passed allows folks who have served and have --
have given their duty to, you know, to our State and to this nation, the
help that they need.  It's vitally important.  I want to thank
Assemblymember Barrett for introducing this bill and my fellow
colleagues who have cosponsored this very important bill.

                I vote in the affirmative.

                ACTING SPEAKER AUBRY:  Mr. Anderson in the
affirmative.

                Are there any other votes?  Announce the results.

                (The Clerk announced the results.)

                The bill is passed.

                THE CLERK:  Assembly No. A02014, Calendar No.
74, Barrett, Griffin, Lavine, McDonough.  An act to amend the
Executive Law, in relation to defining certain qualifying conditions
for veterans.

                ACTING SPEAKER AUBRY:  Read the last section.

                THE CLERK:  This act shall take effect immediately.

                ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Assembly print A.2014.  This is a fast roll call.  Any
member who wishes to be recorded in the negative is reminded to
contact the Majority or Minority Leader at the numbers previously

27

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A02203, Calendar No. 75, Barrett, Wallace, McDonough.  An act to amend the Executive Law, in relation to directing the Division of Veterans' Services to provide information to veterans who experience post-traumatic stress disorder and traumatic brain injury.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 60th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print A.2203.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Angelino on the bill.  To explain his vote, I'm sorry.

MR. ANGELINO:  Thank you, Mr. Speaker.  I appreciate this opportunity to explain my vote.  I want to thank the Veterans Committee for unanimously passing this and bringing this forward.  I rise today to ask members and anybody who hears my

28

Case 1:24-cv-00367-LJL    Document 124-4    Filed 12/03/24    Page 30 of 96

voice that as we discuss veterans issues, sometimes we send young men and women far from home into harm's way to do the business that we ask them to do, and in so doing they sometimes have to do unthinkable things on our behalf.  If we really want a distraught veteran to take advantage of all of these programs of which we're offering, I would ask that we drop the letter D from PTS.  This should not be considered a disorder that brings with it a negative connotation.  What we ask these young people to do shouldn't be considered a disorder, it should be considered expected when we -- when we welcome them back home.  In the future, when we can - I know the Federal government calls it PTS with the D - I would like that D dropped and just be considered post-traumatic stress.

With that said, I will support this and I'll be voting in the affirmative.

ACTING SPEAKER AUBRY:  Thank you, sir.  Mr. Angelino in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A02679, Calendar No. 76, Cymbrowitz.  An act to amend the Public Housing Law, in relation to directing the Commissioner of Housing and Community Renewal to promulgate rules and regulations regarding the use of electronic records and signatures for certain residential leases.

ACTING SPEAKER AUBRY:  Read the last section.

29

**NYS ASSEMBLY**                          **FEBRUARY 8, 2021**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print A.2679.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, if we could now go back to page 9, we're going to take up Calendar No. 50 on debate by Mr. Englebright.  This is regarding the second passage of the Constitutional Amendment.

ACTING SPEAKER AUBRY:  The Clerk will read.

THE CLERK:  Senate No. S00528, Calendar No. 50, Senator Jackson (A01368, Englebright, Griffin, Colton, Gottfried, Santabarbara, Dinowitz, Glick, Fahy, Abinanti, Otis, Jean-Pierre, Lavine, Simon, Galef, Cook, Hunter, Steck, Bichotte Hermelyn, Ramos, Weprin, Hyndman, Seawright, Lupardo, L. Rosenthal, Walker, Carroll, De La Rosa, Thiele, Gunther, Davila, Aubry, Cruz, Bronson, Barrett, Kelles, Burdick, Zinerman, Nolan, Lunsford, Epstein, Williams, Dickens, Rozic, Sayegh, Magnarelli, González-Rojas, Jackson, Rajkumar, Benedetto).  Concurrent

30

NYS ASSEMBLY                          FEBRUARY 8, 2021

Resolution of the Senate and Assembly proposing an amendment to
Article I of the Constitution, in relation to the right to clean air and
water and a healthful environment.

              ACTING SPEAKER AUBRY:  Mr. Goodell.

              MR. GOODELL:  An explanation, please.

              ACTING SPEAKER AUBRY:  An explanation is
requested, Mr. Englebright.

              MR. ENGLEBRIGHT:  Yes, Mr. Speaker.  Can you
hear me?

              ACTING SPEAKER AUBRY:  Absolutely, sir.

              MR. ENGLEBRIGHT:  Thank you very much.  This
is a proposed Constitutional Amendment to enable something that
everyone believes in many cases is already a right but has never
previously been formalized.  And that right is to a clean environment,
clean air, clean water, and a healthful environment.  It's in the largest
sense a proposed Constitutional Amendment that is an expression of
optimism.  It is intended to assure our citizens that they will not be
betrayed circumstantially by environmental degradation, and that the
health and well-being of they and their families will not be
compromised due to governmental inaction or negligence that may
otherwise damage our air, land or water.

              ACTING SPEAKER AUBRY:  Mr. Smullen.

              MR. SMULLEN:  Thank you, Mr. Speaker.  Would
the sponsor kindly yield for a few questions?

              ACTING SPEAKER AUBRY:  Mr. Englebright, will

NYS ASSEMBLY                          FEBRUARY 8, 2021

you yield?

MR. ENGLEBRIGHT:  I yield.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. SMULLEN:  Thank you, Member Englebright.
I really appreciate the opportunity to have a dialogue here in public
today about this most important Constitutional Amendment.  I think
it's very important that we get the terms and the conditions of this
Constitutional Amendment that are clear and public.  We passed it
once before, and I believe this is a -- the second passage prior to when
it has to go before the voters this November; is that correct?

MR. ENGLEBRIGHT:  That is correct.

MR. SMULLEN:  And will this be the second
amendment before the voters this fall, in addition to the election
redistricting commission?

MR. ENGLEBRIGHT:  I haven't been trying to keep
track of that full calendar, so I'll take your word for it.  I -- I am only
focused on this one because it comes through my committee and I'm
the sponsor.

MR. SMULLEN:  Sure, and I really appreciate that.
Because I think Constitutional Amendments, whether at the Federal
level or at the State level, are extremely important.  So I wanted to ask
you, I looked through our Constitution in preparation for this
discussion, and I noticed that a lot of the Article I rights in the New
York State Constitution are, in fact, political rights.  Would you
agree?

32

MR. ENGLEBRIGHT:  I don't have any reason to disagree.

MR. SMULLEN:  Well, I'm -- just for instance, there's the right to free speech, to assembly, to the various procedural mechanisms that allow people to address their grievances and in which -- from which further laws are made.  Is that fair in how the Constitution is supposed to work?  Is it -- it's a foundational document from which further laws flow?

MR. ENGLEBRIGHT:  It can work that way.  As I understand it, the Bill of Rights in our Constitution is not just for political purposes or procedural purposes.  That can flow from it, I suppose.  But that it is intended to be primarily a definition of the rights of being a citizen of the State.

MR. SMULLEN:  Certainly.  And I -- I would hardly agree with that as the interpretation of it.  So I have to ask you, in this context, what does "clean" -- the word "clean" mean in this proposed amendment?

MR. ENGLEBRIGHT:  Well, clean basically means that the environment should not be allowed to compromise the health or well-being of any citizen, and that there should be no harm, no sickness, no disease, no convulsion, no injury from simply being a citizen living in this State.

MR. SMULLEN:  Well, absolutely.  I think that's something that we should certainly all aspire to.  But obviously, words have meaning in a legal context.  What does the word "healthful"

**NYS ASSEMBLY**                          **FEBRUARY 8, 2021**

mean in this legislation before us today?

MR. ENGLEBRIGHT:  Healthful means there will be no biological sickness or harm.

MR. SMULLEN:  Okay.  And I'll -- I'll take that to include some of the things that are covered by the Clean Air Act, the Federal Clean Air Act of 1970 and the Federal Clean Water Act of 1972, almost 50 years ago, which have been wonders in making sure that our -- our country and our State remains clean.  Does this -- in any way does this affect any of the laws of New York State in the environmental area which you -- which you look after?  What does it do to those laws that are in effect today?

MR. ENGLEBRIGHT:  It doesn't change any other law, but what rather it does is it offers context, guidance and instruction to the various organs of State government.  I'd like to think of it as -- that this Constitutional Amendment is the frame for a collage of State agencies and institutions that are all supposed to be working in the same direction to protect the health and well-being of our citizens.  So I see this, basically, as the frame of context that will give a greater sense of expectation, a sharper rendering of the expectation of being a -- a member of our society in New York, vis-à-vis what will it mean to you and your loved ones' health.

MR. SMULLEN:  Well, thank you for that, because I -- I have some concerns.  Would you agree that New York is one of the most litigious states in these United States of America?

MR. ENGLEBRIGHT:  It has that reputation.

34

MR. SMULLEN:  I -- I know it has that reputation. In -- in fact, it's one of the most litigious states.  So one of the concerns about this amendment which is already covered by Federal law and by State Law, is that this amendment will actually provide legal standing for civil actions.  Would you say in your framework that you've described, would that be the case?

MR. ENGLEBRIGHT:  I would not be able to predict how that would translate.  I would point out that the amount of litigious activity is also a reflection of the density of population of any given state, as well as the -- the level of sophistication of its citizens. That we have a -- an act before us or to place this before the people of the State does not change, however, any of the existing laws of the State.

MR. SMULLEN:  And so the Department of Environmental Conservation, which is, would you agree, is the primary regulator of environmental law in New York?

MR. ENGLEBRIGHT:  I would agree.

MR. SMULLEN:  So is the -- as the primary environmental regulator, is that now going to be the Attorney General as the primary protector of rights in terms of the legal process here in New York?  Will the Attorney General take over that role in our -- in our system?

MR. ENGLEBRIGHT:  Certainly not.  Nothing changes except perception.  You're asking whether or not this is an initiative that would completely reform and redirect the energy of

NYS ASSEMBLY                              FEBRUARY 8, 2021

environmental protection.  It does not do that.

        MR. SMULLEN:  I thank you very much for your time and answering --

        MR. ENGLEBRIGHT:  (Inaudible/cross-talk)

        MR. SMULLEN:  -- your questions.

        Mr. Speaker, on the bill.

        ACTING SPEAKER AUBRY:  On the bill, sir.

        MR. SMULLEN:  I think Mr. Englebright had something he wanted to say.  I didn't want to cut him off.  I didn't mean to inadvertently, sir.

        ACTING SPEAKER AUBRY:  Mr. Englebright.

        MR. ENGLEBRIGHT:  If I could just finish my thought.  Thank you very much.  I appreciate your courtesy.  I was just going to say try not to read too much into this in terms of intent, other than to enable our citizens to empower themselves and to have a -- a crisper understanding that they have a right to clean air and water and a healthful time while living and being a part of our State.

        Thank you for your courtesy.

        MR. SMULLEN:  Thank you.  On the bill.

        And I appreciate the aspirational nature of this bill, but therein lies the concern, in my mind.  This bill is going to provide legal standing for people that do not like an outcome that may be present in -- in our process of governance, whether it's having to do with local governments, with industry.  It's going to provide them legal standing in which to litigate.  And they can use that litigation as

36

NYS ASSEMBLY                          FEBRUARY 8, 2021

-- basically as a cudgel to beat whomever they want to into submission

on a variety of -- of things.  And the reason is that this bill and this

amendment is not specific enough.  It sounds good, it feels good, but

the reality is is that it has to be adjudicated in court.  And there'll be

lots of -- I suspect -- I suspect that there'll be lots of actions in court

related to this legislation, particularly with regards to property.

There's a term of art called NIMBY, which is "Not in My Backyard."

When someone doesn't want something to happen, then they -- they

file suit.  And here's -- here's a prime lever in which I believe that

citizens will now have the ability to -- to file civil actions against their

fellow citizens.  Contrary to 50 years -- it's been 50 years since the

Clean Air Act and the Clean Water Act have been established.  New

York has a robust environmental regulatory structure.  I'm not really

sure what this bill and what this amendment is going to do to our

Constitution than what's already been done before.

            For those and for a host of many other reasons, I will

be voting against this bill today, as I did in the past, but I will also

encourage voters to look very carefully at this to make sure that they --

they see what is present and what the words actually mean and what

will happen going forward when they consider this at the ballot box in

-- in November.

            Thank you very much, Mr. Speaker.

            ACTING SPEAKER AUBRY:  Thank you, sir.

            Mr. Palmesano.

            MR. PALMESANO:  Yes, thank you, Mr. Speaker.

37

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

Will the sponsor yield for a few questions?

      ACTING SPEAKER AUBRY:  Mr. Englebright, will you yield?

      MR. ENGLEBRIGHT:  I yield.

      MR. PALMESANO:  Thank you, Steve.  I appreciate your time, good to see you.

      ACTING SPEAKER AUBRY:  The sponsor yields.

      MR. PALMESANO:  I have a few questions I wanted to address on this issue, particularly around the energy side of things. First of all, I think -- I know you'll will probably agree that all of us want to support and provide clean water and clean air for our residents; wouldn't you agree with that absolutely?

      MR. ENGLEBRIGHT:  I would hope that that would be the case --

      MR. PALMESANO:  Me, too.

      MR. ENGLEBRIGHT:  -- but if some people end up finding a way to vote no, which I'm puzzled by --

      MR. PALMESANO:  I understand that.

      MR. ENGLEBRIGHT:  -- but maybe that'll change today and we'll have a unanimous consent at the end of this.

      MR. PALMESANO:  Maybe not, though.

      (Laughter)

      Steve, right now, under the law right now we have Federal and State regulations.  We address a lot of these issues through State legislation, through DEC regulation and review, we pass

38

NYS ASSEMBLY                              FEBRUARY 8, 2021

bond acts, environmental bond acts.  We do things like that right now
to help protect our environment, don't we?

     MR. ENGLEBRIGHT:  We do.

     MR. PALMESANO:  And I guess -- I think where
I'm trying to get at with this amendment, this Constitutional
Amendment, this would create an individual's right of private action
under Constitutional purposes, correct?

     MR. ENGLEBRIGHT:  Not correct.  This does not
create anything new in terms of rights of action.  Anyone who wants
to use the legal system to bring an action now can do that.  No, that's
not the purpose.

     MR. PALMESANO:  Okay --

     MR. ENGLEBRIGHT:  The purpose is to frame the
expectations of the State government and to enable our citizens to put
people who look a lot like you and me, legislators, more -- more
precisely into the pathway of expectation to protect the citizens' health
and well-being.

     MR. PALMESANO:  Yeah, Steve, I understand
you're saying it doesn't create a right of private action and that's not
the intent behind it, but it certainly, with any piece of legislation, there
are consequences to it and certainly if an individual wants to file an
action that their Constitutional right is being violated if this becomes
part of the Constitution, they'll have the right to do that, and that can
also apply to -- and where I'm concerned on that front of it, on the
energy side of things, our ability in New York State to, you know, to

39

NYS ASSEMBLY                    FEBRUARY 8, 2021

produce energy, our energy sector, the ability to generate electricity.
Now, certainly, that could apply to, let's say a natural gas plant.  I
know a lot of people don't like natural gas, and I get that, but if
someone wants to bring suit because they feel even though we have
the regulatory process with the DEC and others, if someone feels
under this legislation, this Constitutional Amendment, if their
Constitutional rights are being violated, they would have the right to
bring suit as an individual, correct?

            MR. ENGLEBRIGHT:  Just like I am a geologist not
a lawyer, I will leave that to the lawyers to determine.  I can tell you
this:  There is no -- there's very short language in the proposed
amendment and it does not address rights of legal action; it doesn't
even speak to that issue.  What I believe the primary consequence of
its passage will be is to enable our citizens to hold Legislature
activities, such as the list that you mentioned, to a higher standard and
to have a higher expectation of performance from us.

            MR. PALMESANO:  Right, and I guess, Steve,
where I get also concerned is maybe not just on the, say not on natural
gas and I see it's not intended to do that, but again, this can also have
an impact on our renewable projects that are going on in place, as
well, if say we go through the regulatory process, again, an individual
would have the right under the Constitution if they feel for whatever
reason these projects, whether it's renewable, whether it's natural gas,
have a violation of their Constitutional right, they would have that
opportunity to do that.  So, I know you keep saying that you don't have

40

NYS ASSEMBLY                                FEBRUARY 8, 2021

lawsuits and I understand that, so I don't want to belabor that point

with you, so I appreciate -- I appreciate the intent of what you're trying

to do with the bill, so I'll just go on the bill, then, Steve.

        Mr. Speaker, on the bill.

        ACTING SPEAKER AUBRY:  On the bill, sir.

        MR. PALMESANO:  Thank you, Mr. Speaker, my

colleagues.  And I understand the intention behind this legislation.  I --

I -- knowing the sponsor, his intentions are well conceived,

well-meaning as always is when he puts legislation forward.  I think

my concern is the unintended consequences of what this legislation

will do.  This will certainly create a right of private action for

individuals to bring -- file for lawsuits as an individual person from a

Constitutional perspective.  And I think where I have concern on this,

certainly is what I was talking about as far as our energy generation

side of things, because right now we already have in place a regulatory

process with the DEC, we passed legislation, we have bond acts and I

think -- I guess I get concerned that, you know, we're also going to be

shifting more from the governmental side, you know, where powers

are bestowed on the Legislature and the Executive to handle some of

those regulatory processes, you're going to create -- shift more of that

to the Judiciary which is going to allow the courts to have more say

because they're going to have to have say because you're going to

open up this system to more litigation, more private actions across the

board on a Constitutional basis versus, you know, the regulatory

process that we handle these projects.  And this is going to -- and I

41

NYS ASSEMBLY                    FEBRUARY 8, 2021

mentioned nuclear -- natural gas plants.  I know, again, some people think that natural gas, anything we can do to stop natural gas, that's a good thing.  I disagree with that.  I think natural gas should be a part of -- of our portfolio, our energy portfolio.  But with this process, we're not just talking about natural gas, we're opening this right of action, private action on renewable projects as well, because I think it's going to cause some Constitutional problems.  I mean, you can have private right of actions and lawsuits against wind farms that are being developed.  You know, there's been issues brought up about wind farms.  There's not a lot of support in the public, in certain areas, for wind farms and solar farms.  The flicker, that shadow when the sun is low in the sky and it's just behind the turbine, the rotating turbine, which has produced problems for people with photo sensitivity to -- with epilepsy and seizure disorders because of these triggers.  The other issues with wind farms, the noise and what's going to happen to the blades.  I mean, those are issues that could be brought forward.  You're going to have more suits on that relative than just dealing with the process that we have, whether it's Article 10 or the Office of Renewable Energy -- you know, where they are siting these projects now whether it's wind farms or solar farms, without any local public input, without any feedback or participation from the local government because the State just says where it's going to go, so...

             You also have this situation on the solar farms, you know, there's material in the solar panels, lead and cadmium, what's going to happen with the disposal when there's -- when there's

42

washout and how this can transpose -- you know, when there's
rainwater and what that -- affects that getting into the ground water,
into the ground and rainwater.  That's -- that's going to be impactful.
That's going to open up this action for civil rights of action by
individuals, as well, which is certainly going to have a challenge to,
you know, a possible slowing down the goals a lot of people have in
support of the CLCPA, which I have voiced my concerns about as a
whole, but you also have the issue about the -- what are we going to
do about the underwater hydroelectric electric lines that are going to
be coming from Canada down to New York City.  I mean, they go
through an extensive review process and approval process, but now
you're going to add on top of that more from private right of action
that can happen and will happen because you're opening up this for
further litigation.  I mean, I know when there's litigation that happens
up when there's regulatory process, it goes through an Article 78, but
this is talking about a Constitutional right and then when people
falling on our Constitutional purposes, I think that can be very
problematic.

What about someone, you know, who has a wood
stove?  Is that going to allow a neighbor to file a lawsuit against
someone if they have a wood stove?  That's going to be infringing
upon their Constitutional right, or a natural gas boiler?  I mean, from
that process -- I mean, we have a process right now in place that we
use with open legislative oversight, and I think a Constitutional
Amendment opens up that windfall of lawsuits that is just going to

NYS ASSEMBLY                         FEBRUARY 8, 2021

cost more, it's going to provide a great deal of uncertainty to our
energy markets, as well.  You know, the goals, as I mentioned, of the
CLCPA, believe it or not, people can find ways to file lawsuits on
these things, and they will if you're creating that type of Constitutional
Amendment.

       Again, we all want clean water, clean air, but I think
by doing this, I think we're just going to open this up more, again, for
uncertainty and challenges with the energy markets, with the business
community.  You know, obviously the goal of having affordable and
reliable energy supply for our families, our farmers, our businesses,
and our manufacturers, I think that's going to cause a problem for
them, as well, because of the lawsuits and how this is going to
continue to fester and carry on.  I just think it's going to lead to costly
and expensive litigation, it's going to be duplicative issues that right
now can be handled through the regulatory process with the DEC,
with the Federal government through the legislative process and the
laws that we pass and create in the regulations we have.  I just -- I just
think we're -- what this action is going to cause is not the way we need
to be.

       We're all for clean water and clean air.  I just think
this Constitutional Amendment is just going to take us down the
wrong path.  It's going to, again, create costly litigation, it's going to
have an impact on our energy markets and our energy portfolio.  It's
going to be -- it could cause problems for the CLCPA.  I know many
people support the CLCPA.  I think that's something that could be

NYS ASSEMBLY                          FEBRUARY 8, 2021

problematic, as well, because you are going to have people that can

challenge wind farms, you're going to have people that can challenge

solar farms because of the environmental impacts that can create, too,

whether immediately or down the road.  So I just think that's

something to keep in mind as we move forward with this.  So, for

those reasons, Mr. Speaker, I'll be voting in the negative on this and

I'm going to encourage my colleagues to do the same.  Thank you.

                    ACTING SPEAKER AUBRY:  Thank you.

                    Mr. Manktelow.

                    MR. MANKTELOW:  Thank you, Mr. Speaker.

Would the sponsor yield for a few questions?

                    ACTING SPEAKER AUBRY:  Mr. Englebright, will

you yield?

                    MR. ENGLEBRIGHT:  I yield, yes.

                    ACTING SPEAKER AUBRY:  The sponsor yields.

                    MR. MANKTELOW:  Thank you, Chairman.  Thank

you, Speaker; thank you, Chairman.  Just a few questions.  I know we

-- we went through this bill a few years ago on the floor and one of the

questions I had asked then was why -- or is there an exemption for Ag

in this bill this year?

                    MR. ENGLEBRIGHT:  There's no exemptions.

There's no reason to have exemptions because there is no direct

reference to Ag.  There is no anticipated negative impact or positive

impact either way toward agriculture.  It speaks to the general premise

that living in New York should be something that you can do without

45

apprehension that it's going to compromise your health, and that shouldn't be -- that shouldn't be interpreted through the lens of transportation or agriculture, recreation or any of the other activities of -- of our complex State.

        MR. MANKTELOW:  Thank you.  Thank you, Steve, for that.  One of my concerns is with the shift of population, we see many individuals moving out of the city areas out to the suburbs and the rural areas, and I know as a farmer for many years, and I think we've talked about this, Steve, that when we harvest soybeans and we harvest grain and we harvest wheat, there's a lot of dust that's involved in that and it has to be that way, otherwise you can't harvest the -- the product.  And one of the concerns I have is if we have a neighbor move in from the city that's not used to this and I'm out -- I'm out harvesting wheat and all of a sudden this person has an asthma attack because of the dust, you know, what happens at that point?

        MR. ENGLEBRIGHT:  That is not something that we would, from reading or enacting this, have any way of predicting. If there is a way to correct that, I would hope that it would be corrected locally through the action of local government.  You know, I live in a county that was and still is the number one agricultural county in the State, and as growth and development has taken place in my community and others, we have had subdivisions built right next to farms and the -- the conflicts of that -- of land use activities have sometimes manifested themselves.  Those are the types of problems that really need to be addressed with land use setbacks for new

NYS ASSEMBLY                              FEBRUARY 8, 2021

subdivisions.  That's something that should be part of the planning process at local government.  It is not something, though, that's directly within the scope of this particular resolution.

MR. MANKTELOW:  All right.  Steve, so if it goes back to the local government, is there -- I saw in the sponsor's memo that there would be no financial implications for State or local municipalities.  So if this happens, there will definitely be expenses to the local municipalities if they're going to have to deal with this locally, and I've got grave concern as people move into these areas and the dust is flying, whether it's, you know, harvesting or in the spring when we have a dry spell and the dust will fly and go for a long ways.  If an individual puts a stop to a farming operation or decides to bring a lawsuit against Manktelow Farms, for instance, what happens to -- what happens to me?  Do I have to stop?  Do I have to wait for an answer from the local government?  How is that going to be addressed?

MR. ENGLEBRIGHT:  It would be addressed in the same way that it's addressed now.  Nothing in this particular measure changes or addresses the type of circumstance that -- that you point toward.  Again -- and these are important considerations, but there are mechanisms and precedents and recommended activities such as having setbacks and rows of tree plantings and other activities to take care of dust.  This is not, again, within the scope of a precise expectation of this measure.

MR. MANKTELOW:  Steve, I think with all due

47

respect -- and I agree with some of your points on this. I think that without those specifics being in here that we're really opening up a can of worms for a lot of local lawsuits. I just don't see how that will not happen, whether it's spring or fall, you know, whether it's smell. You know, we have fertilizers and I know our farmers are doing a great job with the new fertilizers that we have, keeping our water systems clean. You know, we want clean water, we want clean air just as well. Is smell going to be part of clean air? If there's a hog operation or a chicken operation or a cow operation, how do we deal with that with trees and buffers, because that's not going to change. That smell is going to go through those trees. Is that going to be part of this? Will the citizen have the right to stop that operation at that point?

MR. ENGLEBRIGHT: This does not empower any particular lawsuit or any particular fine grained actions such as what you described. I will say it sets the expectation that those who are elected, those are who in elected office have a sharpened responsibility and expectation to anticipate and to act wisely to help prevent the kinds of conflicts you've given a couple of examples; we can go on for many hours listing potential such conflicts. That doesn't mean that we should abandon the general premise of making it possible for people to live in a community and know that they will not have their health compromised, that their lungs will not be diseased, that they will not suffer from environmental poisoning, that they should not have to just say, *Oh well*, when there is a contamination

48

NYS ASSEMBLY                              FEBRUARY 8, 2021

event such as the Grumman Bethpage plume, or the kinds of
poisonings that have occurred in some Upstate communities that the
citizens have been victimized by.  Those who are in elected office
need to do better and to make sure that the citizens have a right to that
expectation we have put forward this measure.

   MR. MANKTELOW:  So, you know, going back to
the local -- local elected officials.  So in a situation here, are we going
to put the onus back to the local elected officials to, again, fix a
problem that we're going to create at the State level?

   MR. ENGLEBRIGHT:  This speaks primarily to the
State to the extent that all of the other units of government, the county,
town, village, et cetera, are subsets that have been authorized by the
State Legislature is reasonable, but really it puts the onus really on us
at the State level.

   MR. MANKTELOW:  Okay, and I think that's why
we're, again, addressing some of these questions.  I think in the
situation where we have Ag, Ag is predominantly the business of New
York State, especially in the Upstate areas.  I think there needs to be
language in this bill that does allow Ag exemptions.  I was hoping to
see that with the second time around.  We passed it two years ago, of
course in April, of '19 and I was hoping to see that, but we didn't.

   But another big issue that I'm hearing in my district is
smell, okay.  We have two very large landfills in my district, several
around the district, and I know in New York State the Governor is
pushing for a better, cleaner, green New York State.  So the situation

NYS ASSEMBLY                          FEBRUARY 8, 2021

with a lot of the landfill material coming out of New York City/Long Island area, going to our landfills here a few miles from where I live, the smell is atrocious, it's absolutely disgusting.  So if we get a bunch of people together, and it's going to happen, and they bring a lawsuit, what happens if that landfill gets shut down?  Where does the -- where does the material from New York City and Long Island go?

            MR. ENGLEBRIGHT:  The question you pose is one that has an infinite number of possible answers, but I can tell you this: The -- when you have a circumstance in which odor from a landfill or from any activity that is authorized by -- by government, really causing great discomfort, that's a warning sign.  That's why we have olfactory capability, to warn us when we are in harm's way from having biological harm to the tissues and functions of our organs.  So it's a serious matter you rightly raise, and all I can say is that isn't changed by this measure, but in terms of the expectation to the extent that State agencies may help oversee these landfills or -- or dumps, there -- they would be put on a higher level, I would hope, a higher level of performance expectation.

            MR. MANKTELOW:  Well, you know, I've been to these landfills, I've been to their -- their operations and I see that they're doing everything basically they possibly can.  One of the issues is bringing all the material up and the cost that it costs to get here, how much fuel are we using, whether it's diesel fuel, diesel fuel through a train.  Again, we're opening -- opening up something that I think needs to be addressed in this bill before we go ahead and put it

50

NYS ASSEMBLY                              FEBRUARY 8, 2021

on the ballot because we really need to know those answers before all of a sudden someone comes up and says, *Well, I don't want to smell this anymore*.  And in my district, every day we get calls about the smell from these landfills and I've got concern that we need to have a game plan of what we're going to do if -- if someone does bring suit to this because it's going to happen, just like some of the other colleagues have spoke already.  Things are going to happen because we're giving the people the right to do so.  And we do a good job with dealing with it now, but it's going to get worse and I just want to know why we don't have an answer for that in this, or what is your answer, I guess, how are we going to deal with this?

       MR. ENGLEBRIGHT:  Make your question a little more specific.

       MR. MANKTELOW:  Sure, okay.  So, Steve, as we we're talking about the landfills, right.  There's going to be people that are going to ban together and they're going to ask for these landfills to be shut down because they're sick and tired of the smell, especially when all the landfill material are coming from Downstate.  People are not happy about it, doesn't matter what letter they have behind their name.  When they -- when they do this, what are we going to do as a State when some of these landfills get held up by the courts and say, *We've got to stop this until we figure this out*.  What are we going to do?  Who's going to figure it out and what are we going to do?

       MR. ENGLEBRIGHT:  Part of the answer, of course, is the State agencies, most particularly the Department of

51

Environmental Conservation will have to make recommended new law which we will pass, or we will hold hearings and ask all of the stakeholders to share their information and insights, and we will push for a new policy that is appropriate to meet the challenge of the moment.

MR. MANKTELOW:  I think you may be --

MR. ENGLEBRIGHT:  You can't have - let me just finish my thought if I could - you can't have a Constitutional Amendment anticipate every specific concern in every particular area and expect to spell that out; in fact, what we are trying to do here is just frame the expectation for every citizen that if they live in New York, that they know that they can raise their family here and their loved ones and be in an environment that is safe to do that.

MR. MANKTELOW:  I totally agree with you, and I think that should be framed through our agencies of New York State, not through a Constitutional Amendment because there's so much vagueness in this it can go in any direction.  If we put the onus back on our -- on our departments of New York State to come up with the things that we want to see done, we could do it at a much better -- cheaper cost and a much better solution.  This -- this just leaves us wide open and I have grave concern for our Ag communities, I really do, and for -- for everyone because, you know, you might be barbecuing next door and I don't like the smell of your barbecue sauce.  Is that going to be an issue?  I hope not --

MR. ENGLEBRIGHT:  You mention smell.  You

**NYS ASSEMBLY**                                      **FEBRUARY 8, 2021**

know, smell sometimes is a warning of harm.  In other cases, some people don't like the smell of onions, but they like the taste of them. So, smell by itself is -- is very difficult to quantify and to write in, which is why you don't see it in our existing environmental laws very much, but there are other biological indicators that are more accurate that are more frequently addressed.

MR. MANKTELOW:  Well thank you, I'm glad you said that because I thought smell shouldn't be in there but hearing it from the Chairman of the Committee, it just reassures me that you're on the same page with me about the smell.  The smell should not be an issue with this bill -- with this piece of -- this Constitutional Amendment.  So, again, Mr. Chairman, I thank you for your time, I thank you for your patience in answering my questions.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the -- well, I'm afraid you exhausted your time.

MR. MANKTELOW:  I'm sorry?

ACTING SPEAKER AUBRY:  I'm afraid your time is up.

MR. MANKTELOW:  On the bill.

ACTING SPEAKER AUBRY:  Yes.  Your time has been expended with the question and answer even if you wanted to go on the bill.

MR. MANKTELOW:  Okay.  I'll go -- I'll go on my vote then.  Thank you, sir.  Thank you, Mr. Speaker.

53

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

ACTING SPEAKER AUBRY:  Thank you.

Ms. Giglio.

Mr. Brown.

MR. BROWN:  Thank you, Mr. Speaker.  Will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY:  Mr. Englebright, will you yield?

MR. ENGLEBRIGHT:  I will yield, Mr. Speaker.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. BROWN:  First off, Mr. Englebright, it is my distinct honor and pleasure to be speaking to you about this bill.  Your reputation as an environmental protective stalwart for the State of New York and on Long Island is unsurpassed and I, for one, have watched your career for quite some time, so it is a pleasure.  But I rise today to talk about this proposed Constitutional Amendment because I'm in favor, but I have some severe concerns.  I'm somewhat conflicted because as much as I think it's a laudable goal and aspirational, I -- I firmly believe that when it comes to protecting the environment, it's one of those rare instances where we have legislation that cuts across both aisles of this Body.  I think, though, that this Constitutional Amendment raises more issues than it answers.  And my first question, Mr. Englebright, is I'm sure you're familiar with the New York State Conservation Law and when they were passed; they were passed back in the 1970s by Governor Carey and the then Legislature, correct?

54

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

MR. ENGLEBRIGHT:  Many of them were.  We have some environmental laws that go back to the 19th Century, but there was a, as you rightly point out, a -- a point in time centered in the '70s which is called the Environmental Revolution.

MR. BROWN:  Right, and there was a big push at that time to pass several pieces of legislation for -- for the Clean Air Act, the Clean Water Act, the New York State Navigation Law, et cetera, correct?

MR. ENGLEBRIGHT:  That's correct.

MR. BROWN:  And during this time, the Legislature and the Governor saw fit to pass this legislation in order to protect the environment but yet, at that time, they did not choose to pass a Constitutional Amendment; is that correct?

MR. ENGLEBRIGHT:  I don't believe the Constitutional Amendment was even considered.

MR. BROWN:  Right.  So do we know what the impact of the proposed Constitutional Amendment will be on, say, businesses or industry, or perhaps even local government or State agencies, for that matter?

MR. ENGLEBRIGHT:  I believe it will be positive to the extent that we can have a heightened awareness in our citizens of powers that we, as legislators, have and expect for us to do our job to prevent the kind of conflict and negativity that theoretically might -- might be in the future is something that empowers our citizens and should help empower also all of the activities of our society, including

55

NYS ASSEMBLY                                    FEBRUARY 8, 2021

our enterprising activities.

           MR. BROWN:  So on that note, do you think this proposed Constitutional Amendment will give a rise to citizen suits against the State, the county or local governments that are not provided -- if they do not provide a clean environment?

           MR. ENGLEBRIGHT:  No, I don't believe that that's the case, and I say that because we have examined the -- the issue that you raise.  We called the National Conference of State Legislatures.  As you may know, there are six other states that have already passed similar Constitutional provisions and have a little bit of time to see if there was any negative consequence in terms of litigation.  We have been following this and to date, we have not seen any increase in citizen lawsuits.

           MR. BROWN:  So let me cut to the chase.  I apologize, but I only have a short period of time.  Using the most extreme example, do you think this Constitutional Amendment could give a rise to a citizen lawsuit challenging that the State government has not provided a COVID-free environment?

           MR. ENGLEBRIGHT:  Listen, anyone can bring a lawsuit for any time that -- that they talk to a lawyer.

           MR. BROWN:  Well, that's true.  Well, that's true.  We are creating, by virtue of this Constitutional right, a right which also corresponds with expectations, does it not?

           MR. ENGLEBRIGHT:  If -- if you're trying to suggest that placing this before the voters of the State is in some way

NYS ASSEMBLY                    FEBRUARY 8, 2021

going to predictably cause mayhem, I would respectfully disagree with
that.  I don't see that --

MR. BROWN:  I can feel my time ticking away so
I'm going to get to some more questions.

ACTING SPEAKER AUBRY:  Mr. Brown.

MR. BROWN:  Yes, sir.

ACTING SPEAKER AUBRY:  Slow down.

MR. BROWN:  I'm sorry.

ACTING SPEAKER AUBRY:  Let the man answer
-- the member to answer your questions.  You still have a significant
amount of time.

MR. BROWN:  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  You're welcome.

MR. BROWN:  So with respect to many of the
expectations that you cited to before, you stated that many of these
things we already have the right for under State law and Federal law,
do we not?

MR. ENGLEBRIGHT:  Can you repeat the question?
I'm sorry.

MR. BROWN:  I said we already have many of these
rights under State law that we're talking about, clean air, clean water,
right, protecting our environment.  We have many of these rights
already under State law and Federal law currently on the books.

MR. ENGLEBRIGHT:  We do not have these framed
and given context in a manner that this will provide, and we have not

57

NYS ASSEMBLY                           FEBRUARY 8, 2021

gone to the voters themselves to involve them in -- in the process of
making such a determination in conjunction with our legislative
activities, that's new; however, as you rightly point out, on specific
subject matters, we do have a lot of environmental law already in
place.

        MR. BROWN:  Okay, and I appreciate that and I
fully respect that, Assemblyman Englebright.  I just want to -- on the
bill, I guess.

        ACTING SPEAKER AUBRY:  On the bill, sir.

        MR. BROWN:  So, Mr. Speaker, I appreciate
Assemblyman Englebright's answers to the questions, but I just want
to point out for the fellow members of the Assembly just some
context.  The current New York State Environmental Conservation
Law Section 1-0101, Declaration of Policy states and I quote, "The
quality of our environment is fundamental to our concern for the
quality of life.  It is hereby declared the policy of the State of New
York to conserve, improve, and protect its natural resources and
environment to prevent and abate and control water, land, and air
pollution in order to enhance," and this is the important part, "enhance
the health, safety, and welfare of the people of the State and their
overall economic and social well-being."  Furthermore, Section
47-0103 has a similar Declaration of Policy where it states, "Local,
county, and regional understanding of the importance of all aspects of
the environment is necessary for the most balanced use of natural
resources."

NYS ASSEMBLY                              FEBRUARY 8, 2021

The point being, Mr. Speaker, and to the Chairman of the Environmental Conservation Committee and the sponsor of this bill, is that we, as a State, already have the process in place for balance in our law, a balance between protecting the environment and also creating an economic opportunity for people to thrive in this State while protecting the environment.  And as much as I -- I appreciate and applaud this Constitutional Amendment, I feel it's -- it's just a "feel good" bill.  It -- it doesn't, however, strike the proper balance.  It is too vague and it's unclear as to enforcement, and it's too open-ended.  And I don't believe it's necessary given the current Federal, State and environmental laws.  I feel like it's going to bog down the already overwhelmed State court system with additional -- additional lawsuits and as much as I appreciate the endeavor, I am going to vote in favor of it to give the people the opportunity to vote on the amendment.  So, thank you very much for your time.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Burdick.

MR. BURDICK:  Thank you, Mr. Speaker.  I strongly support the Constitutional Amendment in placing this on the ballot. As the Chair had indicated, you know, we can come up with scores and scores of theoretical and remote concerns.  It's always easy to say no on a measure such as this.  It would take weeks, as the Chair indicated, to attempt to address each one of them.  There's nothing insidious or menacing here.  Other states have adopted this form of Constitutional Amendment and the sky did not fall; in fact, 43 states

59

have some form of expression of environmental values in their Constitutions.  Our neighbors in Pennsylvania are among them. Article 1, Section 27 of the Pennsylvania Constitution actually goes further:  Not only clean air and pure water, but also the "Preservation of the natural, scenic, historic, and esthetic values of the environment," end quote.

Rather than the mayhem that is feared, this actually will be the contrary.  It will provide a tremendous boost to the objectives of the CLCPA and, yes, it will put an onus on the Legislature to deliver to the residents of this State.  The Chair stated it would sharpen our responsibility, and that's right.  We should be held accountable.  We should be accountable to everyone in the State for providing this basic human right, and I respectfully disagree with the Minority that it would take us down the wrong path.  I think it will take us down the right path.  I will vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, sir.

Ms. Kelles.

MS. KELLES:  Yes, I just wanted to thank the Chairman Englebright for bringing this forward.  I think this is an incredibly positive move to give the right to clean air and water to the citizens of this State.  I did want to make one clarification as I see this. This -- this gives the State and elected officials a mandate to ensure clean air and water.  This is a mandate not only to ensure clean air and water, but to use the existing science that would dictate when we are or are not leading in a direction of contaminating air and water, and I

think that this is a -- this is a win for science in that right.

One thing that I wanted to just add here that I'm finding a bit concerning is the discussion of a right of private action, specifically as it pertains to actions of one private citizen to the other. This is a mandate to our government to clean air and water. This is not a stipulation specific to actions between private citizens. And so, I just wanted to make that clarification because it's a bit concerning, I think, that it can be misleading to the public, and I think that this is really important because it is telling us, it is a guidance for us and our regulations to ensure that we are moving in the direction of clean air and water.

I also want to point out that we have talked about history and actions that were taken historically with respect to whether or not this was added or not added to the Constitution, and I would hope that we would be allowed to grow as humans with new knowledge, and right now we are in a time of profound climate change. We are not looking at something in the future, we are looking at something that is passing us by, that we are in right now. So establishing this in the middle of the profound climate crisis that we're in is the right move not only for our current generation, but future generations of all citizens, whether they be farmers, not farmers, living in rural areas, living in urban areas. This is a move because of the science that we have seen in climate change. So I just wanted to point out that distinction, legally speaking. This is a mandate to states not interfering between private individuals. So thank you so much for

NYS ASSEMBLY                              FEBRUARY 8, 2021

bringing this forward and I am absolutely in support.  Thank you so

much, Chairman Englebright.

ACTING SPEAKER AUBRY:  Thank you so much.

Ms. Gallagher.

MS. GALLAGHER:  Thank you so much.  I am also

speaking on the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. GALLAGHER:  Thank you.  I live in

Greenpoint, Brooklyn, and my apartment is just a few blocks from

Newtown Creek which during the Gilded Age was nicknamed "The

Little Mississippi of the North," which was home to many practices

that have since been made illegal, but we are still cleaning up those

industries' mess.  Our water is still not swimmable, our sewage

overflow concerns make this a never-ending commitment for cleanup.

The long history of environmental degradation at the hands of industry

in this community has lasted for over 100 years, and my district has

suffered from one of the largest oil spills in the country's history.  Both

in the air and under the ground, we suffer from extra pollution.  From

above, we have trucks and cars spewing lead and other chemicals into

our lungs from the Williamsburg Bridge and from the

Brooklyn/Queens Expressway.  From underground, we have lead in

the soil and a multitude of plumes that include autoimmune

disruptors, cancer-causing agents, and heavy metals.

For generations, my community has fought big

industry.  We did not need this bill to do it.  We fought with lawsuits.

NYS ASSEMBLY                              FEBRUARY 8, 2021

And we've also fought with action and with our own elbow grease.
Sometimes we win, but the struggle is so much bigger and so much
more -- feeling insurmountable at times. The DEC is underfunded,
our water quality standards are well behind modern standards in the
rest of the country, and we are in climate crisis. It takes a great deal of
willpower to stand up for your right to live healthfully, especially if
you are struggling with poverty and structural racism on top of all
else. This amendment will grant that bit of courage that we all need to
say that this land is our land and this land is your land, that we and our
families have a right to survive with the basic necessities offered by a
clean environment.

        I am in full support of this bill and I would like to
thank Chairman Englebright for bringing it to the floor. My
community needs this bill and we need the support of the
Constitution. Thank you. I will be voting in the affirmative.

        ACTING SPEAKER AUBRY: Thank you.

        Mr. Gottfried.

        MR. GOTTFRIED: Thank you, Mr. Speaker. You
know, in 1776 the first draft of the Declaration of Independence said
that we are endowed with the right to life, liberty, and property.
Fortunately, Thomas Jefferson had the good sense to change that to
life, liberty, and the pursuit of happiness. Our rights are more than --
than the right to property, and this amendment recognizes some rights
that might have been expressed in some of our statutes, but I think the
right to a clean environment is something that is important enough

63

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

that it ought to be recognized in our Constitution.  And that's what this does.

Now, what is a right?  You know, if you can't enforce something, you really can't call it a "right."  You know, I might think I have the right to vanilla ice cream, but there's really no way for me to enforce that right.  So it isn't really a "right."  And our rights should not, in America, should not be seen as something that is graciously enforced on our behalf by the Legislature.  Yes, the Legislature should be protecting our -- our rights, but we shouldn't be totally beholden to the Legislature to be protecting our rights.

You know, we've had a lot of talk here today about whether, oh my goodness, can we -- does this give us a right not to have bad smells coming over from our neighborhood -- our neighbor's property.  Well, I don't think anyone really doubts whether if your neighborhood -- if your neighbor is producing polluted water that migrates to your property that that polluted water is a violation of your rights for which you might be able to have legal recourse.  Why should it be different if your neighbor is sending air as opposed to water onto your property that can sicken you?

Now, a bad smell is not necessarily unclean or unhealthy, and in many cases it wouldn't be recognized as any kind of right to be free of a -- of a smell you don't like.  But a bad smell might be indicative of something really serious.  And a bad smell coming from your neighbor's property might be something that is so severe that it is essentially depriving you of the use of your property, in

64

NYS ASSEMBLY                            FEBRUARY 8, 2021

which case one of the reasons why we've had courts for the last, I
don't know, thousand or so years of Anglo-Saxon American history is
to protect us in circumstances like that.  That's among the reasons why
we have courts to protect our rights, and it's also why occasionally we
need to take action to add to the bundle of rights that we, as New
Yorkers, are entitled to.  Thank you.

        ACTING SPEAKER AUBRY:  Thank you.

        Ms. Forrest.

        MS. SOUFFRANT FORREST:  Thank you.  Mr.
Speaker, on the bill.

        ACTING SPEAKER AUBRY:  On the bill, ma'am.

        MS. SOUFFRANT FORREST:  Thank you, Mr.
Speaker and thank you, Chairman Englebright.  I absolutely love this
bill.  This bill sets the expectation for all citizens, corporations,
government agencies, that the environment should be safe.  Every
New Yorker should expect and trust that the water that they're
drinking is clean and safe from toxin.  The expectation and trust that
everyone is held accountable, that the air is safe and clean, and that
you should expect that the air that you're breathing will not trigger
asthma, COPD or anything else.

        This bill says that New York State, that its value --
that it values its environment and believe that it's a resource that
should be available to all regardless of where you live, the color of
your skin, or your socioeconomic status.  Voters should understand
and be educated through this Constitutional change that their -- that

65

NYS ASSEMBLY                                    FEBRUARY 8, 2021

their -- that their State values their health and access to quality of life. New Yorkers should have the right to fight and defend what -- those values. We fight for speech, we fight for guns; this bill says that you have the right to fight for clean space, period. As a legislator, I don't concern myself too much about potential courts -- excuse me, potential torts or legal cases. I, as a legislator, my job is to defend rights for people. I -- I vote firmly and proudly in the affirmative. Thank you.

ACTING SPEAKER AUBRY: Thank you.

Ms. Glick.

MS. GLICK: Thank you, Mr. Speaker. I was not going to speak on this bill, but listening to the debate caused me to feel like I wanted to weigh in just a little bit. Currently, under current law, people can, in fact, bring suits. The A -- the Attorney General can intervene in certain circumstances under current law. This does not change the law. What it does is that it creates a Constitutional marker that ensures that while laws can change, the basic underpinning of the Constitution does not.

One of our colleagues referenced the fact that many people move from the City to suburban or -- or rural areas, and I would simply say as someone who has done that for weekends and summer, the sweet smell of manure is a marker of a certain time of the year, and it really is incumbent upon real estate agents to point out to people, as did our real -- realtor that we were moving into an agricultural community; that there would be noises at some time that

66

would involve maybe quarrying, which is just down the road; that there might be smells that we were unaccustomed to; there is a slurry down the -- just down the road and there are times when the field is fertilized that there is a -- an odor carried on the breeze, but it dissipates.  This is, you know, living in the country is not something that people from the City are anxious to do in order to disrupt the lives of people who have been living for generations providing food to other New Yorkers.  So I think some of this is a bit overblown, and I understand there's anxiety, but it's, I think, not something that is likely, by passing this, to create greater confusion or greater sense of disruption to the lives of people who have been living in rural communities.

I would also just like to point out, Mr. Speaker, that since we are not in the Chamber and we are operating remotely, it is a little more difficult for the debate to occur, and perhaps at some point we should remind members, especially new members, that this is not a court of law, but rather an opportunity for us to have an exchange of ideas between colleagues, and that we give each other a chance to answer and that we are not defendants on -- in a court, or witnesses at -- in a courtroom.

So with that, Mr. Speaker, I want to just thank Mr. Englebright for his constancy in trying to protect New York's environment, and that this Constitutional Amendment which will go before the public will be something that will create a framework in the Constitution and that the vagaries of lawmaking will not undermine.

67

**NYS ASSEMBLY**                          **FEBRUARY 8, 2021**

And with that, I lend my support to the measure.

          ACTING SPEAKER AUBRY:  Thank you.

          Ms. Lunsford.

          MS. LUNSFORD:  Thank you.  Like my colleague, I -- I had also not planned to speak on this bill, but I've been inspired.  There's nothing in this amendment that creates a private right of action.  I know several of us have said that, but I feel it bears repeating:  A private right of action must be affirmatively conveyed.  It cannot be read backwards into a law.  There is nothing that gives a citizen an explicit right to sue another private citizen or private corporation, a landfill, a farm, a wind turbine manufacturer, under this law.  If Twitter bans someone for violating their community standards, the banned person does not sue the government because Twitter violated their right to free speech.  It's not how these laws work.  And I think that there has been a lot of discussion around the many scenarios that litigation can arise in without contemplating, as several of my other colleagues have pointed out, that other areas of litigation are already open and exist for attending to these issues.

          I, too, have a landfill in my district.  There are currently two lawsuits pending surrounding the smell and other attendant issues of this landfill.  Public nuisance, land use laws, negligence, we have any number of avenues for people to bring suit for exactly the kind of problems contemplated by my colleagues today.  This amendment does not convey upon the citizenry any additional rights of action against other businesses, against other

68

NYS ASSEMBLY                              FEBRUARY 8, 2021

people, against their neighbors.  What it does do is expressly vest in the people an affirmative right.  It takes from us, as a government, the power to harm our people without repercussion.  It allows the people to hold to account not just this legislative Body, but all future legislative Bodies, if we attempt to roll back the good environmental progress that we have made.  It holds us accountable by giving the power back to the people.  And that's what this amendment is about.

This isn't a gesture.  This amendment ensures that our planet, our health, and our children's futures will not be subject to the whim of politics or the fashion of the day.  It reaffirms our commitment to making New York a climate action leader throughout the country and the world.  I vote in the affirmative, and thank you very much to the Chair and to all the advocates who have fought for this bill.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Septimo.

MS. SEPTIMO:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. SEPTIMO:  So right now we're debating a Constitutional Amendment to guarantee the right to clean air and clean water to every New Yorker.  And some colleagues have mentioned that they believe the Federal regulations go far enough to guarantee this.  Well, I wanted to point out first that the first Federal clean water regulations began in 1948, but in year 2000, a rusted car

69

NYS ASSEMBLY                          FEBRUARY 8, 2021

was pulled out of the Bronx River.  And Federal clean air regulations

began in 1950, but today, in 2021, children where I grew up in the

neighborhood of Hunts Point in the Bronx still have asthma attacks as

the number one reason they miss school each year.  The South Bronx

has more than 30,000 tractor trailer trucks drive through the area each

day, and thousands more cars.  And the effect of this is that the South

Bronx has the highest asthma rate in the entire nation - the highest

asthma rate in the entire nation - and, yet, we are here debating

whether or not to guarantee the right to clean air and clear water to

every New Yorker.

            I hear colleagues discussing some of the uncertainty

they think will arise with the passage of this amendment because they

are concerned about litigation and heightened responsibility, and have

even gone as far as suggesting exemptions.  And I want to center what

we're really talking about:  Exemptions about a guaranteed right to

clean and clean water.  That would be a list of times or situations

where we believe people are not entitled to live with clean air and

clean water.

            This measure will simply make it so that companies,

developers, governments, and everyone in between must be thoughtful

about environmental impact and how that impact relates to real living,

breathing people.  There's a -- actually, a common phrase to discuss

the South Bronx's history that you may have heard that says, *The

Bronx is burning*, but thanks to the work of organizations like the

Point CDC, Youth Ministries for Peace and Justice, Mothers on the

NYS ASSEMBLY                              FEBRUARY 8, 2021

Move, the New York City Environmental Justice Alliance, Rocking
the Vote, the Bronx River Alliance, and so many others, that phrase
has become that, *The Bronx is breathing*.  Today we have beavers and
schools of fish regularly in the Bronx River, and organizations who
use river work as a tool for development for young people.  And while
this speaks to remarkable development, as long as people are
unhealthier due to the air they breathe, as long as polluting industries
are allowed to thrive at the expense of individuals, and as long as
asthma could ever be the number one reason children miss school, we
have a lot of work to do.

          I'm so proud to support this legislation that finally
guarantees what we, in the Bronx, know to be true, which is that clean
air and clean water are rights that should be fiercely protected,
defended, and expanded.  And I look forward to continuing to set high
standards for air quality and continue -- continuing to expand
waterfront access for communities throughout New York.  But for
now, I strongly support this measure for providing the space for all of
us to breathe a bit more freely.  Thank you, Mr. Speaker.

          ACTING SPEAKER AUBRY:  Thank you.

          Mr. Epstein.

          MR. EPSTEIN:  Thank you, Mr. Speaker.

          On the bill.

          ACTING SPEAKER AUBRY:  On the bill, sir.

          MR. EPSTEIN:  I want to thank the sponsor for
bringing this Constitutional Amendment forward, and I'm proud to be

NYS ASSEMBLY                          FEBRUARY 8, 2021

a cosponsor of this.  First, we need to think about people over profits.
This bill centers around the needs of normal human beings, normal
New Yorkers.  The impact it will have to provide clean air and clean
water is immeasurable.  We've seen time and time again incidents of
people denied access to clean water, the risk of exposure, the risk of
lead paint, the risk of healthy air.  Whether it's asthma that we've seen
with my children in the Lower East Side, or we've heard children in
the Bronx, the risk is too high.  The risk of water pollution throughout
the State, where my mother lives on Long Island, where other citizens
Upstate we've heard time and time again, the risk is high.

             The question before you and before us all is:  When is
it too late for New York to act?  Today is a day for New York to act.
We must stand together, stand for the environment, stand for our
children, stand for the New Yorkers to come and say we, as a
Legislature, believe you have a right, a Constitutional right to air and
water, and we're going to fight for that for you for generations to
come.  I'm deeply concerned about this.  I applaud the sponsor and
encourage us to do as much as we can to get this passed, get it out of
the Legislature, and get it passed on the ballot in November.  Thank
you, Mr. Speaker.  I'm glad to cosponsor and support this bill.

             ACTING SPEAKER AUBRY:  Certainly.

             Ms. Giglio.

             MS. GIGLIO:  Good afternoon, Mr. Speaker.  Will
the sponsor yield?

             ACTING SPEAKER AUBRY:  Mr. Englebright, will

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

you yield?

MR. ENGLEBRIGHT:  I yield.

ACTING SPEAKER AUBRY:  The sponsor yields.

MS. GIGLIO:  Good afternoon, Mr. Englebright.

MR. ENGLEBRIGHT:  Good afternoon.

MS. GIGLIO:  I just have a couple of questions.  I wanted to know if there was any funding for any of the plumes that have come out of the Grumman facilities.

MR. ENGLEBRIGHT:  The funding is something that is contemplated for -- within our current budget as proposed by the Executive.  What we have done there is advance approximately $26 million of State funds.  We're looking to have a settlement with Northrop Grumman and the U.S. Navy that would return that money to us.  We're presently using the funds -- or anticipating if we pass the budget with this as proposed, using environmental damages account funds.  As you know, environmental damages account, it has a sole trustee, it's the Commissioner of the DEC.  So the answer is yes, we are planning to use some State money, we're hoping to be reimbursed.

MS. GIGLIO:  Well, that's wonderful news.  And my second question is:  Do you think that it is healthy or healthful to sell recreational marihuana within 500 feet of a school district when school districts often leave their windows open and in the spring and in the summer, and the potential for the smoking of marihuana in close proximity to the schools could have a health risk to those students?

73

NYS ASSEMBLY                          FEBRUARY 8, 2021

MR. ENGLEBRIGHT:  That -- my own particular opinion is that that's not relevant necessarily to the measure before us, but I don't -- I would not favor that personally.

MS. GIGLIO:  Okay.  Thank you to the sponsor.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. GIGLIO:  I think everyone in the Chamber and all the Assembly and Senate and all of our elected leaders agree that everybody should have a right to clean water and a healthful environment.  The Grumman facility in my district does have a plume that has affected several drinking water wells within the vicinity.  The State lowered the standards of the parts per trillion from 70 parts per trillion to 10 parts per trillion, and the Navy is not acknowledging that.  So, a small municipality like the Town of Riverhead with their own water district could be responsible for paying nearly $5 million in connecting these people to public water.  So, I hope that the funding does get passed and the Riverhead municipality does get the money to extend public water to those people whose wells have been tested and have contaminants in them, number one.

Number two, the -- the farmers and the dust in a very heavy agricultural district and seeing the opposition letters from all of the Farm Bureaus in the -- in Upstate, it's a concern that farmers would have to, if there was an action brought against them because it is a right to clean air under the New York State Constitution, if this should pass, to sell their properties and create residential dwellings on

74

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

those farms, which would heavily impact the school district.

I come from the North Fork of Long Island, which is a -- a tourism district. People come out for the farms. People come out to go out on the ferry, to go to Greenport, to enjoy the waterfront community, so clean water is of utmost importance. When it comes to job creation and manufacturing and trucks carrying finished goods to other destinations either in the State or outside of the State, I -- I -- I'm concerned that somebody could say there's too many trucks coming out of that facility that's creating thousands of jobs for the neighboring residents. So there are a lot of things that concern me with this. I -- I said I agree, we all believe in clean air, water, and a healthy environment. And I will leave it up to the voters in my district to decide on the ballot and referendum as to what the costs are associated with this and the rights under the new New York State Constitution as amended. So, I will be voting in the affirmative, but I will be talking to my constituents about all of my concerns, and I will be listening to theirs. Thank you.

ACTING SPEAKER AUBRY: Thank you.

Mr. Phillip Steck.

MR. STECK: Very briefly on the bill, Mr. Chairman -- Mr. Speaker, I mean. Of course everyone is for clean air and clean water, but for some, laws are only symbolic of our aspirations. I disagree. I favor enforcement of the law. Laws are meant to be real and really accomplish things, not just to be avoided every time someone conjures up a doomsday scenario. Step two is to actually

NYS ASSEMBLY                          FEBRUARY 8, 2021

provide funding so we can have clean air and clean water.  This

Constitutional Amendment is a critical step in that process, therefore,

I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Anderson.

MR. ANDERSON:  Thank you, Mr. Speaker, and

thank you to my colleagues who are joining me today in support of

this critically, critically important amendment to our State's

Constitution.  Our residents here in the State of New York have the

right to clean air and water and a healthy environment.  And today

we're affirming that right, Mr. Speaker, by passing this very, very

critical Constitutional Amendment.  And we are making sure that in

this moment, instances where communities of color who are

predominantly impacted by air pollution and water pollution are

prioritized and remembered in this right that all of our residents here

in the State of New York have, here in -- or will have.

Here in Southeast Queens and parts of the district that

I represent, there has been a history of chemicals being used, the same

chemicals that are used in dry cleaning -- dry cleaners and auto repair

shops detected in our water supply just ten to 15 short years ago.  We

have consistent airplane flyovers as JFK Airport is in the heart of my

Assembly District.  And so, this moment by passing this amendment,

we are saying to those people, to those residents, to those families, to

those communities that basic human rights of clean air and clean

water are a priority for the State, and I look forward to voting in the

76

**NYS ASSEMBLY**                          **FEBRUARY 8, 2021**

affirmative on this bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Bichotte Hermelyn.

MS. BICHOTTE HERMELYN:  Thank you, Mr. Speaker, for allowing me to speak on this bill.  I first want to thank the sponsor for this bill, which is a great bill that relates to the Constitutional right to clean air and water and a health -- healthy environment.  This bill will guarantee our legal and Constitutional right to clean air and water and a healthy environment.  A few years ago, we witnessed the Flint water crisis.  Between 6,000 and 12,000 children were exposed to drinking water with high levels of lead.  This is unacceptable for any state in our nation.  Unfortunately, New Yorkers are frequently left questioning what is in our water.  In my apartment in Brooklyn, my own tap water is frequently brown and murky.  My constituents are also often concerned by the quality and color of their water.

With many homes so close to highways and major expressways in Brooklyn, asthma is a concern for many residents of our borough.  Healthy air quality is more important now than ever.  With health care disparities exposed, our central Brooklyn neighbors must be protected from the endless pollutants in our City's air and water.  I vote in the affirmative.  Clean air and clean water rights must be protected.  We deserve the right to protect our health.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

77

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

Mr. Simpson.

MR. SIMPSON:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. SIMPSON:  Mr. Speaker, I represent probably one of the most resource-rich districts in New York State.  And, you know, it's our environmental protections in the Adirondacks that has provided for much needed revenue to all of our communities.  And our environment is one of our highest priorities.  We've seen where current regulations have failed.  The Hudson River, which is a mighty river that runs through our district, is forever polluted.  We cannot eat more than a certain amount of fish out of that river.  Now, that may be minor, but that's hundreds of years of trying to rectify that in the future before that can be corrected.

And I just want to ask everyone a simple question:  If not when -- if not now, when are we going to address these issues in the environment and protect this for the future generations?  I will be voting affirmative on this bill, and thank you very much.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Goodell to close.

MR. GOODELL:  Thank you, sir.  Would the sponsor yield?

ACTING SPEAKER AUBRY:  Mr. Englebright, will you yield?

MR. ENGLEBRIGHT:  Yes, I yield.

**NYS ASSEMBLY**                              **FEBRUARY 8, 2021**

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. GOODELL:  Thank you, Mr. Englebright.
Every year, we have a number of environmental regulations and
statutes that go through our Environmental Committee, of which
you're the Chair - I think you've done a -- a great job for many years -
has it ever been brought into question our authority to enact
environmental legislation?

MR. ENGLEBRIGHT:  Not that I'm aware of.

MR. GOODELL:  As you know, this year, for
example, we've had a number of Chapter Amendments.  Some of
those Chapter Amendments related to environmental legislation that
we passed earlier and the Governor signed the original legislation but
pointed out there were countervailing considerations.  And so, we
passed legislation in one instance to move the effective date of -- of
one bill out a year.  We passed another Chapter Amendment that said
that you could use certain chemicals under certain circumstances or
herbicides when the alternatives were not as good.  It seems to me that
the Legislature is going through that constant balancing act.  Is there
any reflection of that type of balancing act in this proposed
amendment?

MR. ENGLEBRIGHT:  No, not specifically.  This
amendment is not intended to speak to any particular measure, rather
it is intended to provide context, and the metaphor I've used is to
provide a frame around all of the many units of government, including
us, that are supposed to be acting in concert with one another to

79

protect the air and water and environment of the State.

MR. GOODELL:  And I appreciate that.  I look at the Pennsylvania amendment which is worded differently but has the same general context, and one of our colleagues brought that up.  In Pennsylvania, even though the Constitutional language was similar to ours, the Pennsylvania courts enacted a three-part standard in reviewing any litigation brought under it.  And the first one was whether or not there was compliance with applicable rules and regulations.  The second is whether there's a reasonable effort to reduce the environmental incursion, and the third was a balancing act, balancing the environmental damage with the benefit that's being claimed by the proposed action.  Would you envision that the New York State courts would likewise -- likewise enact such a balancing act?

MR. ENGLEBRIGHT:  I don't see these as directly analogous and so, I don't see that as a likelihood.  In the Pennsylvania case, you know, much of the litigation was independent of the Constitution and involved a fracking issue specifically.  And as we've seen in *Gasland*, the movie, and testimony that we've received over the years, our neighboring state, in the opinion of many, has been reckless in the way that they've gone about tapping their gas reserves.  So, I'm not sure that one can derive from that a predictive model for New York at all.

MR. GOODELL:  Well, would you envision that the New York courts in evaluating the meaning and intent of this

80

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

legislation would look at whether or not the action was consistent with

our environmental laws and regulations, our land use requirements,

for example, and all the other existing statutory and regulatory

provisions, is that a factor you think the New York courts should look

at in evaluating the meaning and the intent of this statute -- or this

Constitutional Amendment?

        MR. ENGLEBRIGHT:  We're different from

Pennsylvania and the courts in our State, as well as in Pennsylvania,

are separate from the Legislature.  Again, I don't see any way to draw

highly predictive modeling from what has occurred there --

        MR. GOODELL:  Okay.

        MR. ENGLEBRIGHT:  -- to apply it to New York.

        MR. GOODELL:  Of course as you know, our current

Constitution, Article XIV, particularly Section 4 and 5, already have

specific provisions relating to the environment, the provisions that

have been in place I think since at least 1969, some of it goes back to

as early as 1938.  And looking at that section of the Constitution, it

says, *The policy of the State shall be to conserve and protect the -- the*

*natural resources and scenic beauty, and encourage the development*

*and improvement of agricultural lands for the production of food and*

*other agricultural products*.  Would it be your understanding that if

the proposed Constitutional Amendment is enacted that both sections

would be read harmoniously so that they both have meaning, or is it

your intent that this Constitutional Amendment would in some way

repeal or replace the current Constitutional language that's in Article

XIV?

MR. ENGLEBRIGHT:  Just a second, I'm getting a phone call that I don't want to have -- interrupt our colloquy here.

MR. GOODELL:  Oh, you can go ahead and take it if you wish.

MR. ENGLEBRIGHT:  No, no, I don't -- I don't want to take it, I just had to turn it off.  Those provisions aren't contradictory.  I anticipate that the voters will be favorable to this if we place this before them, and that they would expect that the various parts of our Constitution will, in fact, harmonize with one another.

MR. GOODELL:  So you would envision --

MR. ENGLEBRIGHT:  I should also point --

MR. GOODELL:  -- I'm sorry.  You would envision it then as supplementing rather than replacing the current Constitution?

MR. ENGLEBRIGHT:  Well, it being rather than supplanting and complementing -- I should also -- let me just, if I could, make two other observations.  Number one, the Article XIV, Section 4 that you refer to is attempting to directly relate to the Forever Wild provisions of the Adirondacks specifically, but in the larger sense it speaks to conservation resources, whereas our initiative, the one -- the matter before us this instant moment, really speaks to the rights of people.  And they're different, but they compliment and they're not mutually exclusive if they're both passed.

MR. GOODELL:  Thank you, Mr. Englebright.  I would point out that Article XIV, Section 4 goes on to say that, *The*

82

NYS ASSEMBLY                                    FEBRUARY 8, 2021

*Legislature, in implementing this policy, shall include adequate provisions for the abatement of air and water pollution, and of excessive and unnecessary noise and the protection of agricultural lands, and the development and regulation of water resources.* What struck me about the current language in the Constitution is that it's clear that it's the Legislature that has the responsibility. In your proposed Constitutional Amendment, it doesn't put the responsibility on the Legislature, right? It says, each person shall have the right to clean air and water and a healthful environment. So it -- it drops the role of the Legislature; is that correct?

         MR. ENGLEBRIGHT: That is not correct.

         MR. GOODELL: Okay.

         MR. ENGLEBRIGHT: The Legislature's role is continuing and important, and the responsibility is something that is maintained and necessary. What it does, however, is frame the expectations of the actions of the Legislature and the other units of government so that they are all acting in concert with one another toward the goal of protecting the air and water and land and environmental resources of the state for the people --

         MR. GOODELL: And I very much appreciate that answer and -- and I appreciate your comments. There's been some discussion whether or not this proposed amendment would create a private right of action or whether it is instead intended to help guide and direct the Legislature. Would -- is it your intent that this legislation would create a private right of action, or do you envision

83

NYS ASSEMBLY                              FEBRUARY 8, 2021

that the Legislature would still maintain a predominant role?

MR. ENGLEBRIGHT: I see the Legislature as the voice of the people. We are duly-elected to represent their thoughts and this initiative is, again, to ensure that people have the right to clean air and water and a healthful environment. That is its primary purpose. It should put us in more of a self-conscious position, though, each time that we touch upon issues going forward after this passes. We should be much more self-conscious about the outcome of our debates, and we should measure our effectiveness against the expectations of our public.

MR. GOODELL: And if an individual or group of individuals feel that we have not met that expectation, is it your understanding that this would create a private right of action?

MR. ENGLEBRIGHT: I'm, again, a geologist, not a lawyer. I would leave that to the lawyers to decide. That is certainly not a intent because we have not spoken to it and we have not attempted in the language of the measure to create a -- a right of action. But I would -- it's my understanding, I would point out, that anyone can sue anybody for anything. So, it doesn't prevent that, but it doesn't create anything new either.

MR. GOODELL: Thank you very much, Mr. Englebright.

On the bill.

ACTING SPEAKER HUNTER: On the bill.

MR. GOODELL: Thank you, Madam Speaker. As

84

all of our colleagues have said on both sides of the aisle, we all support clean air and clean water and a healthy environment. But as often is said, the devil is in the details, and in the past, prior to this proposed amendment, those details were hammered out in the legislative process. And so in the past, we haven't said that you're entitled to distilled water through your public municipal system, we're -- we said you're entitled to safe water. And the word "clean" and the word "safe" are different. And so, of course, our local municipalities often add chlorine to make sure there's no bacterial infection. Sometimes they add fluoride. They certainly don't -- they surely don't have distilled water. And New York City, by the way, its water supply comes from Upstate in open reservoirs. Don't want to break it to my New York City colleagues too much, but there's a lot of stuff that flows into those reservoirs from animals and fish, and we don't need to go into all the gory details because it's all too much to know. But while the New York City water supply is safe, it most assuredly is not pure. And, likewise, when it comes to air, we want to make sure the air we breathe is safe, but "safe" and "clean" are two different things. We don't filter the air that we breathe here in the Chambers, maybe we should, but we don't.

              And so, we're asked to vote on language that nobody really knows what it means. We do know, though, that if a private right of action is available, and some people have expressed concerns about it, then our municipalities may see extraordinarily expensive litigation where people who are claiming the water is not clean, or the

air is not clean, or clean enough.  So, when we change the
Constitution, which already gives this Legislature an express directive
to protect and preserve the environment, that's already in there, and
when we change the Constitution to say that every person has a
personal right, we transfer power and responsibility for that legislative
balancing act from the Legislature and from the experts at the DEC
and elsewhere to the courts, and we give no guidance to the courts on
what this Constitutional Amendment means.

So instead of us debating whether or not we should
restrict glyphosate, for example, or -- or whether or not we should put
other restrictions in, or what the terms and conditions are, rather than
us doing it, rather than your local Legislature doing it, whether your
local town board deciding on what the right setbacks are and what the
right restrictions are, we delegate it to the courts.  And, unfortunately,
I think that's a mistake because when we look at economic
development throughout our State, we recognize the importance of
being able to provide guidance to those who are coming to the State
and investing millions and millions of dollars, and they need to know
if they meet every environmental standard and every environmental
law can they move forward, and the answer with this amendment is
maybe not.

So, I appreciate very much the desire to have clean
air and water and a healthy environment, a desire that I fully support,
but I think we need to define this and maintain that checks and
balances that are so important, and for us to retain the role that we

86

NYS ASSEMBLY                              FEBRUARY 8, 2021

have representing our constituents in making those -- those difficult decisions.  Thank you again very much, Mr. Speaker, for allowing me to speak.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print S.528.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This will be a Party vote.  The Republican Caucus will be generally in the negative, although I anticipate some support within our Caucus, as well.  So, those who wish to vote for this amendment, please call the Minority Leader's office and advise them.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference will be voting in the affirmative on this measure.  Members deciding to go -- have an exception to that, they can please feel free to contact my office, we'll be happy to record your vote.  Thank you, Mr. Speaker.

(The Clerk recorded the vote.)

To explain my vote.

ACTING SPEAKER AUBRY:  To explain your vote,

87

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

Mrs. Peoples-Stokes.

          MRS. PEOPLES-STOKES:  Mr. Speaker, I want to commend the Chair of this Committee, Mr. Englebright for -- for the second year of, you know, going through a -- a debate on an ideal that can not only bring us to an opportunity where we're literally living in a cleaner, fresher society, both air and the water, but it also brings us to the opportunity to say to the people who elected us, we need your opinion here.  It brings us an opportunity to take to the electorate -- I'll wait until these gentlemen are finished.

          ACTING SPEAKER AUBRY:  Okay.

          Gentlemen, you will -- thank you, You...

          MRS. PEOPLES-STOKES:  Thank you, gentlemen.

          Mr. Speaker, I want to reiterate how valuable I think it is for us to, one, be paying attention to the environment in the manner that we are; but two, be paying attention to the fact that sometimes we should let the voters speak other than just electing us here.  And so I'm grateful for this as an opportunity to move this measure forward.  And I do want to thank Mr. Englebright for his work on this issue, for his diligence in the debate, and for all of my colleagues who can agree that this is the right thing to do and it's the right time to get it done.  Thank you, Mr. Speaker.

          ACTING SPEAKER AUBRY:  Ms. Niou.

          MS. NIOU:  Thank you, Mr. Speaker, for allowing me to speak about my vote and explaining it.  I just wanted to thank the sponsor for his diligent fight for our environment.  He is an

incredible Chair and one that has fought for all of our rights for a very long time.

I wanted to also note that, you know, New York is a State that has broken treaty after treaty with our native -- with our native tribes and I just wanted to say that, you know, just because some of these treaties are old, it doesn't mean that they are not more important and hold even more sway than our own Constitution and even the Constitution of the United States. These are rights that we have granted are -- the -- the tribes that we have stolen our land from, and I just want to remind folks that, you know, even with this -- even with this law in place, we will still be far from the rights that we -- and -- and the protections that we owe them. So, I just wanted to note that, and I think that this is a step in the right direction in making sure that we can protect and honor those treaties.

And I just wanted to say a couple of things from, you know, from some of our different tribes around the nation: *When all the trees have been cut down, when all the animals have been hunted, when all the waters are polluted, when all the air is unsafe to breathe, only then will you discover you cannot eat money.* And that is a Cree prophecy that -- you know, the Cree people were here. So just wanted to note that. And the other one is a Native American proverb which is, *The frog does not drink up the pond in which he lives.* And I want us all to remember that as well. And then the last one is my own -- my own -- Chief Seattle, back in Seattle, *We do not own the freshness of the air or the sparkle of the water. How can you buy them from us.*

So, I just wanted to have folks remember those beautiful words and to remember them every step of the way when we are trying to protect our environment.  Thank you, again, to the sponsor of this --

ACTING SPEAKER AUBRY:  Thank you.

MS. NIOU:  -- incredible bill and for helping us --

ACTING SPEAKER AUBRY:  Right.  Thank you, Ms. Niou.

Ms. Simon.

MS. SIMON:  Thank you.  To explain my vote.  Today we vote on a simple but powerful amendment to our State Constitution.  The amendment very simply says that each person shall have a right to clean air and water and a healthy environment, a healthful environment.  Quite simply, there can be no more fundamental right than the right to breathe free of environmental pollutants and to drink, cook with, bathe and/or swim in clean water.  Whatever could be the objection to clean air and water.  We've heard several, including an assumption of a private right of action for environmental damage.  I can assure my colleagues that this Constitutional Amendment does not do that.  I know because I have carried a bill to provide for a private right of action for environmental damage for several years.

We all know that air and water are the means by which toxins find their way into our bodies.  Like my colleague from Greenpoint, I, too, represent a Superfund site, the Gowanus Canal and

90

NYS ASSEMBLY                              FEBRUARY 8, 2021

its uplands, which were heavily polluted from colonial times until just recently with an enormous array of chemicals and metals and noxious combinations thereof. My district, as well as others, are also home to Interstate I-278, a/k/a, the Brooklyn Queens Expressway or BQE, which carries 175,000 cars and trucks a day, ravaging the health and safety of a million residents in its orbit with extremely high rates of asthma and pulmonary disorders.

So I am very pleased that we are voting on this bill today. I want to commend the sponsor for his leadership and his clarity and constancy of purpose, and I will be voting in the affirmative. Thank you.

ACTING SPEAKER AUBRY: Thank you. Ms. Simon in the affirmative.

Mr. Manktelow.

(Pause)

Mr. Manktelow.

MR. MANKTELOW: Thank you, Mr. Speaker. To explain my vote. As I talked about earlier today on this bill in regards to agriculture, we as farmers, we as agricultural producers do everything we possibly can to do what's best for our environment. We have now put in grass filter strips to make sure no chemicals, fertilizer or anything else that's on the ground gets into our water systems. We -- we are using technology beyond belief: GPS, global positioning services that allows us to spray and spread our fertilizers within just a few inches of the last pass, things that we are doing to improve our

91

environment.  We, of all people, are stewards of this great land, of the

land that we produce our crops on, whether it's feed for our animals,

whether it's crops, whether it's fruit for our -- for our producers, we do

everything we possibly can.

I truly want to support this bill, but there needs to be

some carve-outs because what I'm afraid of is with our agricultural

production here in New York State, everything that go -- that we're up

against, we're going to, again, stall agriculture production.  Let us do

what we do well, let the farmers do this.  We don't always need

government to fix things.  Sometimes we fix our own things, and we

can do a really good job at it.  So, please, allow our farmers to do this,

allow them to grow, and we can make a better New York.  And, again,

I -- I'm sorry I cannot support this bill tonight.  If we had some

carve-outs, I could absolutely do that, but until we do that, I'm going

to be in the negative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Santabarbara.

MR. SANTABARBARA:  Thank you, Mr. Speaker.

I, first of all, want to thank Chairman Englebright for his work on this

-- on this bill.  As a civil engineer, Chairman Englebright and I have

talked about a number of projects I've been able to work on in the

past, environmental protection projects, and they've all been important

to the communities I represent and communities throughout New

York State, just as this bill will be important to the State of New York.

It's great to see this re -- such a renewed interest in protecting our

**NYS ASSEMBLY**                          **FEBRUARY 8, 2021**

environment, and I think it's because more and more communities have seen just how damage caused to the environment puts our natural resources at risk, things like clean air, clean water, renewable energy. If we're serious about safeguarding public health, we simply cannot compromise on these important issues.

I'm supporting this bill here today because it makes a commitment to protecting our environment and the precious natural resources that we all depend on. There is nothing more important than the health of our families and I'm proud to be a cosponsor on this bill and I'll be voting in the affirmative.

ACTING SPEAKER AUBRY: Mr. Santabarbara in the affirmative.

Mr. Englebright.

MR. ENGLEBRIGHT: Thank you, Mr. Speaker. This simple language proposed Constitutional Amendment is about empowering people. It's also about formalizing citizenship expectations for the people of New York. And it's also true that every referendum is a teachable moment and an opportunity for an object lesson in participatory Democracy. And within this context for New Yorkers, this is an opportunity for them, through their vote in this proposed referendum, to formalize the presumption that environmental health and human health in New York are inextricably linked, that they are linked such that every citizen has a right to clean air, water, and a healthful environment, and that this understanding shall henceforth be Constitutionally-recognized as being part of the

93

**NYS ASSEMBLY**                    **FEBRUARY 8, 2021**

right of citizenship in our great State.

I want to take this moment to say thank you to Speaker Carl Heastie for his vision, his support, and guidance in this important initiative and I'm pleased to vote yes.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Englebright in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record the following Republicans voting in favor of this proposed amendment:  Mr. Ashby, Mr. Brown, Mr. DeStefano, Mr. Durso, Mr. Gandolfo, Mr. Mikulin, Mr. Miller, Ms. Miller, Mr. Ra, Mr. Reilly, Mr. Smith, Mr. Tannousis, and Mr. Walczyk.  I apologize, Mr. Miller has been excused today so he didn't vote either way yet.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, do we have any further housekeepings and/or resolutions?

ACTING SPEAKER AUBRY:  No resolutions, but a piece of housekeeping.

On a motion by Mr. Bronson, page 5, Calendar No. 85, Bill No. A01052-A, amendments are received and adopted.

Mrs. Peoples-Stokes.

94

NYS ASSEMBLY                                FEBRUARY 8, 2021

MRS. PEOPLES-STOKES:  Thank you.  Could you please call on Ms. Hunter for the purposes of an announcement?

ACTING SPEAKER AUBRY:  Ms. Hunter for the purpose of an announcement.

MS. HUNTER:  Yes, Mr. Speaker.  There will be a need for a Majority Conference at the conclusion of our Session.

ACTING SPEAKER AUBRY:  Immediate Majority Conference at the conclusion of Session.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I now move that the Assembly stand adjourned until 12:30 p.m., Tuesday, January [sic] the 9th, tomorrow being a Session day.

ACTING SPEAKER AUBRY:  The Assembly stands adjourned.

(Whereupon, at 5:37 p.m., the Assembly stood adjourned until Tuesday, February 9th at 12:30 p.m., Tuesday being a Session day.)

95