**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NEW YORKERS AGAINST CONGESTION
PRICING TAX, *et al.*,

                *Plaintiffs*,

        v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants*.

---

Case No. 1:24-cv-00367 (LJL)

 

**DEFENDANTS THE METROPOLITAN TRANSPORTATION AUTHORITY
AND THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY'S
MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFFS' CLAIMS AND IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 3

LEGAL STANDARD......................................................................................................... 7

ARGUMENT ..................................................................................................................... 8

    I.    TBTA Complied with SAPA .................................................................................. 8

        A.    Plaintiffs' SAPA Claim......................................................................... 9

        B.    The SAPA Rulemaking Framework ....................................................... 9

        C.    The Toll Rate Schedule Is a Type (ii) Rule ......................................... 10

        D.    The EA Found There Would Be No Significant Adverse Economic Effects.............. 15

    II.    Plaintiffs Have Not Shown Irreparable Harm.................................................... 16

    III.    A Preliminary Injunction Would Not Serve the Public Interest ...................... 18

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*A.X.M.S. Corp. v. Friedman,*
948 F. Supp. 2d 319 (S.D.N.Y. 2013)..................................................................18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...........................................................................................7

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.,*
No. 11 Civ. 6746, 2014 WL 6772058 (S.D.N.Y. Dec. 2, 2014)......................17

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.,*
842 F. Supp. 2d 672 (S.D.N.Y. 2012)..................................................... *passim*

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...........................................................................................7

*Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
No. 03 Civ. 599, 2004 WL 840140 (D. Conn. Apr. 15, 2004) .........................16, 17, 18

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC,*
22 F.4th 368 (2d Cir. 2022) ...............................................................................7

*Carey Transp., Inc. v. Triborough Bridge & Tunnel Auth.,*
38 N.Y.2d 545 (1976) .......................................................................................12

*City of Dania Beach v. U.S. Army Corps of Eng'rs,*
No. 12 Civ. 60989, 2012 WL 3731516 (S.D. Fla. June 6, 2012) ...................19

*Comm. of 100 on Fed. City v. Foxx,*
87 F. Supp. 3d 191 (D.D.C. 2015).....................................................................20

*D'Angelo v. Triborough Bridge & Tunnel Auth.,*
106 A.D.2d 128 (1st Dep't 1985) ......................................................................12

*Dep't of Fin. v. N.Y. Tel. Co.,*
262 A.D.2d 96 (1999) ........................................................................................12

*Dep't of Pers. v. N.Y.C. Civil Serv. Comm'n,*
79 N.Y.2d 806 (1991) ........................................................................................14

*Earth Is. Sci. v. Carlton,*
626 F.3d 642 (9th Cir. 2010) .............................................................................20

**CASES**                                                                   **PAGE(S)**

*Freedom Holdings Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005)...................................................................................3

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007).................................................................................2, 8

*Hudson River Sloop Clearwater v. N.Y. State Public Serv. Comm'n*,
Index No. 7242/2016, 2019 WL 5583492 (Sup. Ct. Albany Cnty. Oct. 8, 2019) .........................11

*Iazzetti v. City of N.Y.*,
94 N.Y.2d 183 (1999) .......................................................................................11

*Janes v. Triborough Bridge & Tunnel Auth.*,
977 F. Supp. 2d 320 (S.D.N.Y. 2013)......................................................................12

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013).................................................................................8

*Lisa T. v. King E.T.*,
30 N.Y.3d 548 (2017) .......................................................................................11

*McBeth v. Porges*,
171 F. Supp. 3d 216 (S.D.N.Y. 2016)........................................................................8

*Mental Hygiene Legal Serv. v. Sullivan*,
32 N.Y.3d 652 (2019) .......................................................................................14

*Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*,
838 F. Supp. 718 (E.D.N.Y. 1993) .........................................................................12

*Moore v. Consol. Edison Co. of N.Y.*,
409 F.3d 506 (2d Cir. 2005)..................................................................................1

*Mulgrew v. U.S. Dep't of Transp.*,
No. 24 Civ. 1644, 2024 WL 3251732 (S.D.N.Y. June 20, 2024)...........................................1, 3

*People v. Walters*,
913 N.Y.S.2d 893 (City Ct. 2010) ...........................................................................5

*Shapiro v. Cadman Towers, Inc.*,
51 F.3d 328 (2d Cir. 1995)...................................................................................8

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ...........................................................................18

**CASES**                                                                                           **PAGE(S)**

*W. Watersheds Project v. Bureau of Land Mgmt.*,
774 F. Supp. 2d 1089 (D. Nev. 2011) .......................................................................................20

*Walsh v. N.Y. State Comptroller*,
34 N.Y.3d 520 (2019) ...............................................................................................................11

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) .........................................................................................................................8

**STATUTES**

Consolidated Appropriations Act, 2020, Pub. L. No. 116–94, div. H, tit. I, § 126, 133 Stat. 2534,
2953.............................................................................................................................................12

N.Y. Pub. Auth. Law § 553 ......................................................................................................13

N.Y. Pub. Auth. Law § 553-k ....................................................................................................4

N.Y. Veh. & Traf. Law § 1701 *et seq.*......................................................................................3

SAPA § 102(2)(a)(i) .............................................................................................................10, 14

SAPA § 102(2)(a)(ii) .......................................................................................................... *passim*

SAPA § 201-a ......................................................................................................................9, 10, 14

SAPA § 202-b ......................................................................................................................9, 10, 15

SAPA § 202(5)(a) ........................................................................................................................5, 6

SAPA § 203(1)(iii)........................................................................................................................6

**RULES & REGULATIONS**

Fed. R. Civ. P. 12(b)(6)..............................................................................................................2, 7

21 N.Y.C.R.R. § 1021.1 (Sept. 2020) ..................................................................................12, 13

30 N.Y. Reg. 2 (Jan. 9, 2008) ...................................................................................................13

31 N.Y. Reg. 15 (Apr. 15, 2009) ..............................................................................................13

31 N.Y. Reg. 34 (Aug. 26, 2009)...............................................................................................13

**RULES & REGULATIONS**                                    **PAGE(S)**

32 N.Y. Reg. 46 (Nov. 17, 2010)........................................................13

35 N.Y. Reg. 2 (Jan. 9, 2013) ...........................................................13

37 N.Y. Reg. 9 (Mar. 4, 2015) ..........................................................13

39 N.Y. Reg. 11 (Mar. 15, 2017) .......................................................13

41 N.Y. Reg. 12 (Mar. 20, 2019) .......................................................13

42 N.Y. Reg. 26 (July 1, 2020)......................................................12, 13

43 N.Y. Reg. 10 (Mar. 10, 2021).......................................................13

45 N.Y. Reg. 32 (Aug. 9, 2023).........................................................13

45 N.Y. Reg. 52 (Dec. 27, 2023)........................................................11

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019)...............................................11

Merriam-Webster Dictionary (revised ed. 2024).....................................11

Defendants the Metropolitan Transportation Authority (the "MTA") and the Triborough Bridge and Tunnel Authority ("TBTA")[1] respectfully submit this consolidated memorandum of law in support of their renewed motion to dismiss Plaintiffs' Amended Class Action Complaint ("Complaint")[2] and in opposition to Plaintiffs' motion seeking a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiffs request that this Court grant the "extraordinary and drastic remedy" of a preliminary injunction prohibiting implementation of New York's Central Business District ("CBD") Tolling Program (the "Program") in opposition to the stated wishes and ongoing efforts of the Legislature, the Governor, and various State and City agencies, not to mention the federal government. *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). But Plaintiffs have not even plausibly stated a claim sufficient to allow them to proceed past a motion to dismiss, let alone made the clear, strong showing necessary to obtain preliminary injunctive relief. Nor have they shown that their putative economic harms would give rise to irreparable injury, or that an emergency injunction in their favor is in the public interest.

First and most fundamentally, the Court need not engage in an analysis of the standard for

---

[1] TBTA is an affiliate agency of the MTA. The MTA is a public benefit corporation responsible for North America's largest transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut. The MTA has taken no action challenged here because, as explained below, it is TBTA that promulgated the challenged toll rates pursuant to the State Administrative Procedure Act ("SAPA"). Therefore, the MTA is not a proper defendant to this claim. The Traffic Mobility Review Board (the "TMRB"), an independent board required by statute with a strictly advisory role, similarly had no part in the SAPA process or adoption of the toll rate structure and is not a proper defendant. Moreover, this Court has already recognized that Plaintiffs abandoned any claim against the TMRB. *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644, 2024 WL 3251732, *1 n.1 (S.D.N.Y. June 20, 2024).

[2] Defendants seek the full dismissal of the Complaint with prejudice. This Court already dismissed Count 1 with prejudice. *Mulgrew*, 2024 WL 3251732, *17. Adjudication of Count 2 (failure to supplement) was deferred until after completion of the reevaluation of the adopted toll structure; however, unlike the plaintiffs in the other related actions, Plaintiffs have neither amended their complaint to challenge the reevaluation nor sought summary judgment on this claim as provided for in the Court's scheduling order (ECF 119). Therefore, they have forfeited this claim. Plaintiffs' SAPA claim (Count 3) was previously dismissed without prejudice as premature. *Mulgrew*, 2024 WL 3251732, at *42. Plaintiffs have not amended their complaint to reassert their dismissed SAPA claim. However, in light of subsequent events, given Plaintiffs' request for a preliminary injunction, Defendants are treating the claim as live and herein reassert their arguments in favor of dismissal on the merits. Finally, Plaintiffs' Green Amendment claim under the New York State Constitution is the subject of a separate motion to dismiss.

1

preliminary relief; it should simply dismiss this claim with prejudice, on the merits, for the reasons the MTA and TBTA argued previously in their initial motion to dismiss in *New Yorkers* (ECF 106).  Plaintiffs' SAPA claim fails as a matter of law because, construed most generously, it is premised on the theory that TBTA's establishment of toll rates for the Program was, unlike any other toll rate setting that TBTA has previously ever undertaken, a "Type (i)" rulemaking requiring duplication of the extensive economic analyses undertaken in the Environmental Assessment ("EA") for the Program.  This premise fails; TBTA properly followed SAPA and its own longstanding precedent and promulgated the toll rates as a Type (ii) ratemaking regulation.

Obviously, if a claim cannot survive dismissal under Rule 12(b)(6), then there is no likelihood of success on the merits.  Beyond that, Plaintiffs cannot establish the other elements required to obtain a preliminary injunction.  Contrary to Plaintiffs' claim that Defendants are implementing an "unprecedented program with far reaching consequences," in reality, the Program establishes tolls that drivers must pay to drive in certain parts of New York City—and drivers already pay tolls all over the City, New York State, and the country.  For example, drivers currently pay tolls to cross the Verrazzano-Narrows Bridge, the Robert F. Kennedy Bridge, and the George Washington Bridge, and to use the Queens Midtown Tunnel and the Hugh L. Carey Tunnel.  As a matter of comment sense, there is nothing different about this toll, from the perspective of individual drivers and Plaintiffs, that would result in irreparable harm absent a preliminary injunction.

Indeed, payment of a toll could be easily refunded (mostly through payers' EZPass accounts) in the unlikely event Plaintiffs were ultimately to prevail.  And it is black-letter law that irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting

*Freedom Holdings Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

On the other hand, the Program is critical to maintaining the region's transportation network, including repairs and upgrades that should not be delayed. The public interest would hardly be served by derailing implementation of the Program. Notwithstanding the nature of Plaintiffs' policy objections to the Program, it is the solution chosen by New York's elected representatives at every level for addressing the serious challenges resulting from traffic congestion in Manhattan, improving the region's air quality, and maintaining the aging mass transit infrastructure.

## BACKGROUND

**Promulgation of Program Toll Rates**

The New York State Legislature enacted the Traffic Mobility Act (the "TMA") in 2019, N.Y. Veh. & Traf. Law § 1701 *et seq.*, authorizing TBTA to establish and implement a plan for tolling vehicles that enter or remain in the CBD. *Mulgrew*, 2024 WL 3251732, at *1. In 2019, the New York State Department of Transportation ("NYSDOT"), TBTA, and the New York City Department of Transportation (collectively, the "Project Sponsors") submitted an Expression of Interest to the Federal Highway Administration ("FHWA") under the federal Value Pricing Pilot Program ("VPPP") for authority to toll roadways within the CBD that had received federal funding. Declaration of Allison L. C. de Cerreño, Ph.D. ("C. de Cerreño Decl.") ¶ 2. Following this, FHWA conducted a lengthy environmental review process under the National Environmental Policy Act ("NEPA"), which culminated in April 2023 with a final Environmental Assessment ("EA") and in June 2023 with a Finding of No Significant Impact ("FONSI"). *Id.* ¶ 3; *see Mulgrew*, 2024 WL 3251732, at *4–7.

The TMA required the TBTA Board to establish the TMRB composed of regional

representatives to recommend the toll amounts and toll structure, such as exemptions, discounts, and/or crossing credits for existing tolls paid on bridges and tunnels. C. de Cerreño Decl. ¶ 4; *see* Pub. Auth. L. § 553-k. The TMRB issued its recommendation report on November 30, 2023, and on December 6, 2023, the TBTA Board voted to authorize TBTA to commence the ratemaking process under SAPA for the toll structure recommended by the TMRB. C. de Cerreño Decl. ¶ 4. On December 18, 2023, TBTA sent notices to the Administrative Regulations Review Commissions for the New York State Senate and Assembly of the proposed toll rate schedule, which stated clearly that the proposed toll rate schedule was being promulgated pursuant to SAPA § 102(2)(a)(ii). Neither Commission expressed any objections. *Id.*

Notice of the proposed rulemaking for the Program, along with the schedule for public comment and public hearings, was provided in the December 27, 2023, New York State Register. *Id.* ¶ 5. In addition, on December 26, 2023, the MTA, on behalf of TBTA, announced details of the more than 60-day public comment period on the toll rate schedule.[3] The public was informed that comments could be submitted from Wednesday, December 27, 2023, through Monday, March 11, 2024.[4] Members of the public could provide comments by mail, electronically, or via voicemail. *Id.* The announcement explained that four hybrid virtual/in-person public hearings would be held: one on February 29, 2024, one on March 1, 2024, and two on March 4, 2024, all of which were held as scheduled.[5]

On March 27, 2024, following the conclusion of the SAPA public notice and comment period, the TBTA Board held a meeting, during which TBTA adopted a toll rate schedule for the Program initially planned to go into effect in June 2024. *Id.* ¶ 6. On June 14, 2024, FHWA

---

[3] Press Release, MTA, *MTA Announces Details of Congestion Pricing Public Comment Period* (Dec. 26, 2023), https://new.mta.info/press-release/mta-announces-details-of-congestion-pricing-public-comment-period.
[4] *Id.*
[5] *Id.*

confirmed that a reevaluation of the adopted toll rate schedule was consistent with FHWA's regulations and that the FONSI remained valid.  *Id.*  On June 5, 2024, the Governor announced a pause in implementation of the Program, meaning that the tolling agreement under the VPPP that was needed for tolling to be authorized, which required NYSDOT to be a party, would not be executed during the pause.  *Id.* ¶ 7.  At the time of the pause, TBTA had not yet filed the adopted rule with the Secretary of State, meaning it was not effective and the SAPA process was not complete.  *Id.*[6]

On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll structure and rates that had been adopted by TBTA in March 2024 to be phased in gradually over several years.  *Id.* ¶ 8.  On November 18, 2024, as a continuation of the SAPA process commenced in December 2023, the TBTA Board adopted a resolution approving the phase-in feature of the toll rate schedule it had approved in March (the "Phase-In Approach").  *Id.*

Under the Phase-In Approach, the Program will be implemented in three interim steps, culminating with the toll rates originally adopted in March 2024.  *Id.*  The interim steps will have toll rates for each vehicle class and time of day, as well as tunnel crossing credits, proportionally reduced from the corresponding values in the March 2024 adopted toll rates.  *Id.* ¶ 9.  The proportional reductions will result in values for Phase 1 (2025, 2026, and 2027) equaling 60% of the corresponding values for the March 2024 adopted toll rates, with a $9 EZPass peak toll rate for automobiles.  *Id.*  For Phase 2 (2028, 2029, and 2030), the tolls and credits will equal 80% of the corresponding March 2024 adopted toll rates, with a $12 EZPass peak toll rate for automobiles.  *Id.*  The March 2024 adopted toll rates will come into full effect in 2031, with a $15 EZPass peak

---

[6] *See* SAPA § 202(5)(a); *People v. Walters*, 913 N.Y.S.2d 893, 900 (City Ct. 2010) (a rule is effective only after the adopted rule and notice of its adoption have been filed with the Secretary of State for publication in the New York State register).

toll rate for automobiles. *Id.* The Phase-In Approach was subject to a further reevaluation pursuant to NEPA before the execution of a tolling agreement with FHWA. *Id.* ¶ 10. (DOT_0047542–43.)

On November 21, 2024, FHWA confirmed that the second reevaluation was consistent with FHWA's regulations and that the FONSI remained valid. *Id.* ¶ 11. That same day, FHWA and the Project Sponsors signed an agreement under the VPPP authorizing the tolls. *Id.* ¶ 12. The Program is now scheduled to begin on January 5, 2025.[7] On November 26, 2024, TBTA submitted the Phase-In Approach with notice of its adoption to the Secretary of State for publication in the State Register, thereby making the adopted toll rate schedule regulation effective.[8] *Id.*

**Program Toll Collection and Refunds**

Eligible vehicles entering the CBD will pay the applicable toll in one of two ways. *Id.* ¶ 13. Toll payers with an EZPass account (the overwhelming majority of drivers) can pay using EZPass and, if necessary, could be refunded in this manner. *Id.* ¶ 14. If a vehicle is not associated with an EZPass account, the registered owner will receive a toll bill in the mail. *Id.* No matter the payment method used, the identity of the vehicle—and thus of the toll payer—and the amount that they have paid is recorded. *Id.* With this information, the MTA would be able to fully refund Plaintiffs and any other toll payers in the unlikely event that Plaintiffs prevail in this action.

**Implementation of the Program**

TBTA budgeted over $500 million to establish the Program, and much of that budget already has been spent, including on developing the back-office expertise to design and implement the necessary technology, installing the equipment on roadways, and outreach costs. *Id.* ¶ 18. If the Program is temporarily enjoined, TBTA will incur approximately $12 million per month in additional costs related to, among other things, operations and maintenance of the roadside tolling

---

[7] MTA, *Central Business District Tolling Program*, https://new.mta.info/project/CBDTP (last accessed Dec. 2, 2024).
[8] *See* SAPA §§ 202(5)(a), 203(1)(iii).

system and back-office operations.  These costs cannot be deferred pending implementation of the Program if the start date of tolling is delayed.  *Id.* ¶ 19.

Absent implementation of the Program, TBTA will lose estimated tolling revenue of over $40 million each month from the first phase of the tolls.  *Id.* ¶ 20.  This means that the MTA will be prevented from proceeding with vitally important work under the MTA's Capital Program, including improving outdated signaling and other measures to improve system reliability, enhancing accessibility to numerous subway stations consistent with the Americans with Disability Act, and extending public transit to under-served areas.  *Id.* ¶ 22.  Further, delaying implementation will leave the severe congestion plaguing the CBD unabated, with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors.  *Id.* ¶ 24.  It would also delay execution of the mitigation measures intended to benefit environmental justice ("EJ") communities already over-burdened by historic transportation and land use decisions, to which the Project Sponsors committed in the EA, FONSI, and reevaluations.  *Id.* ¶ 23.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor," *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 370 (2d Cir. 2022), it should not credit either "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  When evaluating a motion to dismiss, the Court may consider "documents attached to the complaint; statements or documents incorporated into the complaint by reference; matters of which judicial notice may be taken, such as public records; and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit."

*McBeth v. Porges*, 171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016); *accord, e.g.*, *Kleinman v. Elan Corp.*, *PLC*, 706 F.3d 145, 152 (2d Cir. 2013).

The exercise of judicial power to enjoin action before the merits have been resolved is an "extraordinary and drastic remedy" that should not be granted unless the movant carries its burden of persuasion "by a clear showing." *Grand River*, 481 F.3d at 66 (citation omitted). To satisfy that burden, a plaintiff must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, a plaintiff seeks to stop governmental action, they must "meet the more rigorous likelihood-of-success standard" by establishing a "clear or substantial likelihood of success on the merits." *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 842 F. Supp. 2d 672, 676 (S.D.N.Y. 2012).

To establish irreparable harm, a plaintiff must demonstrate that they will suffer an "actual and imminent" injury that cannot be remedied "if a court waits until the end of trial to resolve the harm." *Grand River*, 481 F.3d at 66. An irreparable injury is one "that cannot be remedied by an award of monetary damages." *Auto. Club of N.Y.*, 842 F. Supp. 2d at 676 (quoting *Shapiro*, 51 F.3d at 332). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016).

## **ARGUMENT**

### I.    **TBTA Complied with SAPA**

Plaintiffs fail to plausibly allege a violation of law and have come nowhere close to establishing the "clear or substantial likelihood of success on the merits" that would be necessary

(but not sufficient) to grant them relief at this stage. *Id.* Indeed, despite multiple rounds of briefing, Plaintiffs have yet to clearly explain the bases for their SAPA claim. Therefore, the claim should be dismissed outright, with prejudice.

### A. Plaintiffs' SAPA Claim

On its face, the Complaint fails to state a plausible claim under SAPA because it does not point to any specific statutory provision that TBTA is alleged to have violated. Rather, the Third Cause of Action (Plaintiff's only SAPA claim) alleges in principal part:

> [SAPA] mandates a socioeconomic assessment of Congestion Pricing's impact upon job retention and creation as well as economic impacts upon small businesses. This assessment was not carried out in the EA and there is no indication that such assessment is anticipated to be carried out with respect to TMRB's recommendations and during the SAPA rulemaking process.

ECF 54 ¶ 178. As discussed in Point I.D, *infra*, this allegation is demonstrably false because the EA did in fact include an assessment of economic impacts, including specifically in relation to small businesses.

Other allegations in the Complaint refer to SAPA §§ 201-a and 202-b, which require the consideration of job impacts and "regulatory flexibility for small businesses." *Id.* ¶ 132. The Complaint does not directly allege that TBTA failed to comply with these provisions, which on their own do not set forth any procedural requirements. Plaintiffs' brief also references the distinction between different types of rulemaking under SAPA without drawing a clear conclusion. ECF 121 at 4.

### B. The SAPA Rulemaking Framework

Construing the Complaint most favorably to Plaintiffs—and making multiple inferences in Plaintiffs' favor in order to avoid the possibility of Plaintiffs once again seeking to amend their pleadings—it appears Plaintiffs intended to assert that TBTA failed to undertake certain requirements set forth in SAPA that are inapplicable to the type of ratemaking action undertaken

by TBTA.  More specifically, SAPA describes two distinct types of rules.  Type (i) rules are defined as: "the whole or part of each agency statement, regulation or code of general applicability that implements or applies law, or prescribes a fee charged by or paid to any agency or the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof."  SAPA § 102(2)(a)(i).  Type (ii) rules, in turn, are defined as: "the amendment, suspension, repeal, approval, or prescription for the future of rates, wages, security authorizations, corporate or financial structures or reorganization thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs or accounting or practices bearing on the foregoing whether of general or particular applicability."  *Id.* § 102(2)(a)(ii).  Under SAPA, Type (ii) rules are exempt from many of the procedural requirements required of Type (i) rules, including the provisions cited by the Amended Complaint concerning consideration of job impacts and regulatory flexibility for small businesses.  *See id.* §§ 201-a(6)(a), 202-b(3)(a).

As relevant here, TBTA's notice of proposed ratemaking identified the toll rate schedule as a Type (ii) rule.  *See* 45 N.Y. Reg. 52 at 48 (Dec. 27, 2023).  Plaintiffs allege that certain analyses were required—a claim which appears, even reviewed in the light most favorable to Plaintiffs, to presume that the proposed toll rate schedule should have been classified as a Type (i) rule.  But Plaintiffs are wrong about that.[9]

### C.  The Toll Rate Schedule Is a Type (ii) Rule

SAPA does not define the terms within a Type (i) or Type (ii) rule, such as "rates," and

---

[9] The Complaint does not allege any non-compliance with the requirements applicable to Type (ii) rulemakings, in any event.  Plaintiffs' motion for a preliminary injunction includes the characteristically inscrutable statement, in relation to the adoption of the Phase-In Approach toll rate schedule in November 2024: "The commencement date was set for January 5, 2025 without explanation pertaining to the truncated time period between publication in the State Register and public notice," and refers to the "time period for notice and publication set forth in SAPA § 202." ECF 121 at 6.  To the extent Plaintiffs purport to challenge any aspect of the SAPA process that occurred in November 2024, no alleged violation can be discerned from this statement, and TBTA did comply with SAPA's notice and public comment requirements, as described in the Background section, *supra*.

state courts have had limited occasion to interpret the language governing these two types of rules. *See, e.g.*, *Hudson River Sloop Clearwater v. N.Y. State Public Serv. Comm'n*, Index No. 7242/2016, 2019 WL 5583492, at \*10 (Sup. Ct. Albany Cnty. Oct. 8, 2019). In such cases, New York courts instruct that "the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Lisa T. v. King E.T.*, 30 N.Y.3d 548, 552 (2017). Courts "construe words of ordinary import with their usual and commonly understood meaning" and consider dictionary definitions to be a useful tool in that exercise. *Walsh v. N.Y. State Comptroller*, 34 N.Y.3d 520, 524 (2019) (citation omitted). In addition, a "standard rule of construction" directs that "whenever there is a general and a particular provision in the same statute, the general does not overrule the particular but applies only where the particular provision is inapplicable." *Iazzetti v. City of N.Y.*, 94 N.Y.2d 183, 190 (1999) (citation omitted).

Under a straightforward application of these principles, TBTA's toll rate schedule falls squarely within SAPA's definition of Type (ii) rules because it is the "approval" or "prescription" of "future" "rates" of "general … applicability." SAPA § 102(2)(a)(ii).[10] "Rate" is commonly defined to include "an amount of payment or charge based on another amount," or "a charge, payment, or price fixed according to a ratio, scale, or standard." *Rate*, Merriam-Webster Dictionary (revised ed. 2024); *see also Rate*, Black's Law Dictionary (11th ed. 2019) ("An amount paid or charged []."). Put together, the toll rate schedule—which outlines a range of different charges based on different factors that will be applied to vehicles that enter or remain within the congestion zone, *see* 45 N.Y. Reg. 52 at 46–48 (Dec. 27, 2023)—qualifies as "establishing" a "charge" that is "fixed according to" a "scale" or "standard."

---

[10] Prescription is commonly defined as "the action of laying down authoritative rules or directions." *Prescription*, Merriam-Webster Dictionary (revised ed. 2024); *see also Prescription*, Black's Law Dictionary (11th ed. 2019) ("The act of establishing authoritative rules.").

This understanding is consistent with other indicators of common usage. People ordinarily refer to charges applied to vehicles for crossing designated roadways, bridges or tunnels as "toll rates." This usage of the term "rate" is also reflected in case law, where courts have long referred to similar charges as "toll rates." *See, e.g.*, *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 338 (S.D.N.Y. 2013); *Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 725 (E.D.N.Y. 1993); *Carey Transp., Inc. v. Triborough Bridge & Tunnel Auth.*, 38 N.Y.2d 545, 548–49 (1976); *D'Angelo v. Triborough Bridge & Tunnel Auth.*, 106 A.D.2d 128, 128–31 (1st Dep't 1985).

This is also consistent with historical practice. TBTA routinely uses Type (ii) rulemaking to prescribe toll rates, even when they establish a new tolling structure. For example, in 2019, the federal government repealed the longstanding ban on two-way tolling on the Verrazzano-Narrows Bridge. Consolidated Appropriations Act, 2020, Pub. L. No. 116–94, div. H, tit. I, § 126, 133 Stat. 2534, 2953. Following that repeal, TBTA published a notice of proposed ratemaking, which expressly stated that the rule's purpose was to "provide for the implementation of split tolling at TBTA's Verrazzano-Narrows Bridge as required by Federal law." 42 N.Y. Reg. 26 at 22 (July 1, 2020) (codified at 21 N.Y.C.R.R. § 1021.1).[11] The adopted toll schedule regulation imposed charges ranging from $1.70 to $73.76 based on several factors, including place of residence, vehicle type, and EZPass account status. *See* 21 N.Y.C.R.R. § 1021.1 (Sept. 2020). TBTA categorized the proposed rate schedule as a Type (ii) rule under § 102(2)(a)(ii). *See* 42 N.Y. Reg.

---

[11] Public Law 116-94 requires "tolls collected for motor vehicles on any bridge connecting the boroughs of Brooklyn, New York, and Staten Island, New York [to] be collected for any such vehicles exiting from such bridge in both Staten Island and Brooklyn." Pub. L. No. 116–94, div. H, tit. I, § 126, 133 Stat. 2534, 2953. The 2020 ratemaking implemented this requirement by splitting the toll previously charged only in the westbound direction so that vehicles crossing the Verrazzano-Narrows Bridge would be charged half of the former westbound toll in each direction, thereby establishing a new eastbound toll. MTA, *Split Tolling Coming to Verrazano-Narrows Bridge*, https://new.mta.info/article/split-tolling-verrazzano-narrows-bridge.

26 at 22 (July 1, 2020).  And TBTA has followed a similar regulatory process consistently for promulgating toll rate schedules for its various toll facilities.[12]  TBTA's authority to promulgate toll rates under the Program is contained within the same statutory provision as—and is largely identical to—its authority to promulgate toll rates for all of its other facilities.  *See* Pub. Auth. L. §§ 553(12), 533(12-a).  Far from disapproving the TBTA's historical practice of using Type (ii) rulemaking to prescribe toll rates when enacting the TMA, the Legislature in fact authorized tolling under the Program using largely similar language.  *See Dep't of Fin. v. N.Y. Tel. Co.*, 692 N.Y.S.2d 34 (1999) ("The practical construction put upon a constitutional provision, as well as upon a statute, by the Legislature or by departments of State government, is entitled to great weight, if not controlling influence, when such practical construction has continued in operation over a long period of time[.]" (citation omitted)).  Indeed, TBTA sent notices to the Administrative Regulations Review Commissions for the New York State Senate and Assembly of the proposed toll rate schedule, which stated clearly that the proposed toll rate schedule was being promulgated pursuant to SAPA § 102(2)(a)(ii).  Neither Commission expressed any objections.  C. de Cerreño Decl. ¶ 4.

Because TBTA's proposed rule is the "approval" or "prescription" of "future" "rates" of "general … applicability," it was correctly categorized as a Type (ii) rule under SAPA § 102(2)(a)(ii).  Any contention that TBTA, in conducting this ratemaking, is also "implementing laws" (namely, the TMA), should not lead to a Type (i) classification for at least two reasons.

*First*, agencies can only act pursuant to their enabling statutes or other sources of

---

[12] *See e.g.* 45 N.Y. Reg. 32 at 35–37 (Aug. 9, 2023) (codified at 21 N.Y.C.R.R. § 1021.1); 43 N.Y. Reg. 10 at 7 (Mar. 10, 2021) (codified at 21 N.Y.C.R.R. § 1021.1); 41 N.Y. Reg. 12 at 17–18 (Mar. 20, 2019) (codified at 21 N.Y.C.R.R. § 1021.1); 39 N.Y. Reg. 11 at 21–22 (Mar. 15, 2017) (codified at 21 N.Y.C.R.R. § 1021.1); 37 N.Y. Reg. 9 at 5–7 (Mar. 4, 2015) (codified at 21 N.Y.C.R.R. § 1021.1); 35 N.Y. Reg. 2 (Jan. 9, 2013) (codified at 21 N.Y.C.R.R. § 1021.1); 32 N.Y. Reg. 46 (Nov. 17, 2010) (codified at 21 N.Y.C.R.R. § 1021.1); 31 N.Y. Reg. 34 (Aug. 26, 2009) (codified at 21 N.Y.C.R.R. § 1021.1); 31 N.Y. Reg. 15 (Apr. 15, 2009) (codified at 21 N.Y.C.R.R. § 1021.1); 30 N.Y. Reg. 2 (Jan. 9, 2008) (codified at 21 N.Y.C.R.R. § 1021.1).

authorizing legislation. *Dep't of Pers. v. N.Y.C. Civil Serv. Comm'n*, 79 N.Y.2d 806, 807 (1991) ("An administrative agency has only those powers expressly or impliedly given it."). In this regard, TBTA could not prescribe toll rates if the legislature had not provided it with that authority. Therefore, when TBTA (or any agency) conducts rulemaking for a Type (ii) rule, it necessarily "implements or applies law," or else the agency action would be unlawful. If rules qualified as Type (i) purely on that basis, it would render meaningless all of SAPA's express exemptions for Type (ii) rules.

*Second*, the more specific provision controls as a matter of standard statutory interpretation. Here, the general provision ("implements or applies law") does not overrule the particular provision ("prescription" of "future" "rates" of "general … applicability"). SAPA §§ 102(2)(a)(i), (ii). Rather, the general provision "applies only where the particular enactment is inapplicable." *Mental Hygiene Legal Serv. v. Sullivan*, 32 N.Y.3d 652, 658 (2019) (citation omitted). Here, the definition of a Type (ii) rule is more particular and more apt, so it properly governs as the relevant classification. ECF 121, at 8. Moreover, as Plaintiffs themselves argue, "[s]tatutes must be interpreted as a whole," so any claim that applying a more specific provision within a statute "essentially repeal[s] statutory language in SAPA" must fail. *Id.* To find otherwise could lead to absurd and inconsistent applications of laws, with agencies applying each section of statutes in isolation without taking into consideration the overall purpose of the law. *Sullivan*, 32 N.Y.3d at 659 ("It is well settled that a statute must be construed as a whole and that its various sections must be considered with reference to one another.") (citations omitted).

Plaintiffs' argument that any additional economic analyses were needed before TBTA could adopt the toll rate under SAPA must hinge entirely on the toll rate being a Type (i) rule, as Type (ii) rules are explicitly exempt from such requirements. SAPA §§ 201-a(6)(a)(1) (job

14

impact), 202-b(3) (regulatory flexibility for small businesses).  For the reasons stated above, the toll rate is unquestionably a Type (ii) rule.

### D.  The EA Found There Would Be No Significant Adverse Economic Effects

Moreover, although SAPA did not require TBTA to consider the "socioeconomic consequences" of the Program, Plaintiffs' claim that the EA did not consider the economic impacts of the toll structure is not only legally irrelevant, but factually incorrect.  The EA, of which TBTA was a Project Sponsor, thoroughly analyzed the potential effects of the Program on socioeconomic conditions, dedicating an entire chapter of 80 pages in length to analyzing the "potential indirect displacement effects and potential changes in the operations of certain industries" at a regional, local, and neighborhood level, including the Program's "potential economic benefits and adverse effects utiliz[ing] guidance from the National Cooperative Highway Research Program's Guidebook for Assessing the Social and Economic Effects of Transportation Projects 1 and Chapter 5, 'Socioeconomic Conditions,' of the City of New York's 2021 City Environmental Quality Review (CEQR) Technical Manual."  (DOT_0036685.)  That section of the EA has an entire subsection devoted to analyzing the potential effects of the Program on "[s]mall businesses within the Manhattan CBD" and commuters of different industries, including those in public service positions.  (*Id.*)  This in-depth analysis resulted in the creation of a "Small Business Working Group" to solicit ongoing input on how small businesses are being affected by the Program, as an enhancement.  (DOT_0036766.)

The economic effects analysis concluded that the Program would not have an adverse economic effect. Through a detailed analysis of census data and reference to the experience of other cities with congestion pricing, the EA found, inter alia: (1) the Program would have economic benefits in the form of travel-time savings, vehicle operating cost savings, reliability, safety and

accessibility;  (2) the Program would not cause an adverse effect on any specific industries due to commuting costs because no industry specifically relies on commuters who drive; (3) the Program would have very small negative or positive effects on non-work (e.g. tourist or entertainment) journeys into the CBD; (4) the taxi/FHV industry would not be adversely effected as a whole; (5) CBD small businesses receiving truck-borne goods from outside the CBD would be able to share the toll cost, if passed through, with other businesses served by the shipper, whereas the costs of shipping would also be reduced due to travel time savings and decreased parking tickets. (DOT_0036684—767.)  The reevaluations conducted for the adopted toll rates and Phase-In Approach confirmed that they would not result in significant adverse economic impacts.  (DOT_0045624, DOT_0047539.)

## II.    Plaintiffs Have Not Shown Irreparable Harm

As demonstrated above, the Court should dismiss Plaintiffs' SAPA claim outright because it fails to state a claim for relief.  The Court therefore need not consider whether a preliminary injunction is appropriate, and it could deny Plaintiffs' motion for failure to demonstrate a likelihood of success on the merits.  Moreover, Plaintiffs fail to meet the other requirements for such extraordinary relief.  First, they have not shown that implementation of the Program will result in anything more than compensable economic harm.   According to Plaintiffs, they will suffer irreparable harm due to the economic effects of the Program, including the effects it may have on "[s]mall businesses" and "costs and overhead in relation to commuting," which may result in the "[d]isruption of life" for certain professionals and affect long-term delivery schedules.  ECF 121, at 9.  As demonstrated below, however, these points are flatly refuted by Judge Holwell's decision in *Automobile Club of New York, Inc.*, 842 F. Supp. 2d at 676–77, and then-District Judge Droney's decision in *Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, No.

03 Civ. 599, 2004 WL 840140, at *4 (D. Conn. Apr. 15, 2004).

In *Automobile Club*, the AAA sought to enjoin the Port Authority from collecting increased toll rates on its bridges and tunnels because those tolls supposedly violated the dormant Commerce Clause.  842 F. Supp. 2d at 676–77.  On the AAA's motion for a preliminary injunction, Judge Holwell made two determinations that are critical here.  First, he recognized that the plaintiffs needed to establish irreparable harm, separate and apart from a likelihood of success on the merits of the constitutional claim.  *See id.*  Second, he held that the plaintiffs could not show irreparable harm because the Port Authority had "persuasively argued that any harm alleged by AAA can be adequately remedied through a monetary refund," since 80% of drivers paying the toll would use EZPass, which would facilitate a refund if the court reversed the tolls, and any cash-paying customers could be offered a discounted rate following reversal.  *Id.*  While this latter component of compensation would "not be perfect," Judge Holwell held that the AAA had failed to meet its burden to show "that a substantial number of drivers would [be] unreimbursed."  *Id.*; *see also Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2014 WL 6772058, at *3 (S.D.N.Y. Dec. 2, 2014) (denying subsequent preliminary injunction where AAA had not shown "remedy proposed by the Port Authority (i.e., cash discounts for those who pay by cash) would leave large numbers unreimbursed").

Judge Droney reached a similar result eight years earlier in *Bridgeport Port Authority*.  In that case, the plaintiff challenged a ferry surcharge under the dormant Commerce Clause and right to travel, among other things, and sought a preliminary injunction.  The court recognized that the plaintiffs were required to show irreparable harm and that they could not do so because, "[a]s to whether all the passengers could be located to receive their portion of any repayment, the plaintiffs have not shown that it would be unlikely or that another method of relief is unavailable."  2004

WL 840140, at *4.

The facts with respect to irreparable injury in both of these cases are completely consistent with the situation here. As in *Automobile Club* and *Bridgeport Port Authority*, TBTA has affirmed that it will be able to issue refunds in the event that the toll is overturned. C. de Cerreño Decl. ¶ 15. Indeed, the record shows that a higher proportion of customers will pay the toll via EZPass here than in *Automobile Club* (95% as compared to 80%). *Id.* And unlike in *Automobile Club*, there is no mechanism for a customer to pay the toll in cash unless it is in-person at an authorized payment facility where the transaction and customer will be recorded, so there is no risk that TBTA would be incapable of refunding such customers. *Id.* ¶¶ 15–16. In other words, because Plaintiffs' alleged harm is economic, it is "the antithesis of irreparable." *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 331 (S.D.N.Y. 2013).

To the extent Plaintiffs claim that the toll will "disrupt" lives, such claims are hypothetical. Nonetheless, any damages resulting from such "disruption" could be entirely compensable by monetary damages and refunds through EZPass. Thus, such claims must fail. *See Auto. Club of N.Y. Inc.*, 842 F. Supp. 2d at 677 n.3 (concluding that any fear that a toll would irreparably harm the Staten Island manufacturing sector were "too remote and speculative" to support a preliminary injunction motion).

## III.    A Preliminary Injunction Would Not Serve the Public Interest

Finally, while "allowing challenged conduct to persist may certainly be harmful to a plaintiff and the public, harm can also result from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Here, Plaintiffs can identify no irreparable harm that will occur from the Program's implementation, and the Project Sponsors and the region's public will suffer substantial

prejudice if the Program does not proceed as scheduled.  According to Dr. C. de Cerreño, a preliminary injunction postponing the Program's start date by even a limited period would cause TBTA to incur substantial costs of $12 million each month; lose average monthly revenues of some $40 million; delay air quality improvements and mitigation measures for historically overburdened EJ communities; delay implementation of improvements critical to ensuring the continued reliability of North America's largest public transit system; and delay relief from congestion in the CBD, with concomitant economic and environmental costs.  C. de Cerreño Decl. ¶¶ 19–23.

The public has a clear interest in avoiding the loss of the value of public funds that have already been spent to prepare for the Program's design, implementation, and operation.  TBTA has already expended much of its $500 million budget for such work.  *See id.* ¶ 18.  The public also has a compelling interest in avoiding the unnecessary costs that would be incurred if, as a result of an injunction, TBTA was required to pay continued operating costs to avoid yet additional costs of stopping and starting the Program.  *See id.* ¶ 19.  The Program's operating costs are substantial and many need to be paid regardless of whether the Program is delayed.  *Id.*  These expenses would amount to a preventable loss of public resources which the public has an undeniable interest in avoiding.  *See City of Dania Beach v. U.S. Army Corps of Eng'rs*, No. 12 Civ. 60989, 2012 WL 3731516, at *9 (S.D. Fla. June 6, 2012) (denying preliminary injunction in action challenging airport runway expansion, "[g]iven the immense costs to [the] County and the community at large").

In sum, after decades of worsening congestion throughout the region, the public has a substantial interest in avoiding further delay in realizing the significant benefits of the Program, particularly congestion reduction and dedicated revenue to fund the MTA's capital projects, all of

which outweigh any individual effects or minor inconveniences on Plaintiffs. *See, e.g.*, *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011) (denying preliminary injunction in part because project would benefit Nevada's economic recovery); *Earth Is. Sci. v. Carlton*, 626 F.3d 462 (9th Cir. 2010) (affirming district court's denial of preliminary injunction based on economic harm that enjoining project would have on local economy); *see also Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 220 (D.D.C. 2015) (recognizing plaintiff's "understandable misgivings over the prospect of a large-scale construction project outside her front window in the coming years," but concluding that "her concerns do not outweigh the broader public's substantial interest in modernizing this deteriorating and outmoded tunnel"). Thus, the public interest, and well as the balancing of equities, militate in favor of denying the requested injunctive relief.

## **CONCLUSION**

For the reasons provided above, the MTA and TBTA respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction and dismiss all remaining claims.[13]

Dated: December 9, 2024                    Respectfully submitted,
      New York, NY


MURIEL GOODE-TRUFANT                    */s/ Mark A. Chertok*
Corporation counsel of the City of New York    Mark A. Chertok
By:  */s/ Nathan Taylor*                    Elizabeth Knauer
    Nathan Taylor                    John F. Nelson
    Senior Counsel                    Amy Cassidy
    Environmental Law Division            SIVE, PAGET & RIESEL, P.C.
    New York City Law Department        560 Lexington Avenue, 15th Floor
    100 Church Street                    New York, NY 10022
    New York, NY 10007                (212) 421-2150
    (212) 356-2315                    mchertok@sprlaw.com
    ntaylor@law.nyc.gov                eknauer@sprlaw.com

---

[13] Plaintiffs' entire Complaint should be dismissed because they did not avail themselves of the opportunity to seek further relief on Count 2. ECF 54.

jnelson@sprlaw.com
acassidy@sprlaw.com

*Counsel for Defendant the New York City Department of Transportation*

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, NY 10036
(212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*Counsel for Defendants the Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority*

21