**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NEW YORKERS AGAINST
CONGESTION PRICING TAX, *et al.*,

                    *Plaintiffs*,

       v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                    *Defendants*.

Case No. 1:24-cv-00367 (LJL)

**DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.**

I, Allison L. C. de Cerreño, Ph.D., hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA"). In that capacity and in my prior positions with the MTA, I have acted as the project lead for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Program"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT") and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") plan to introduce congestion pricing to Manhattan's Central Business District (the "CBD"). The legislation providing for the Program is the 2019 MTA Reform and Traffic Mobility Act (the "TMA"). The Program will reduce congestion and provide a stable source of revenue to improve subway, bus and commuter rail systems in the MTA's 2020-2024 capital program ("Capital Program") and successor capital programs.

A.  **The Current Status of the Program**

2.     Because the Program will impose tolls on highways that have received federal aid, "the project cannot be implemented without approval from the federal government."  *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644, 2024 WL 3251732, at *4 (S.D.N.Y. June 20, 2024) (Liman, J.).  As relevant here, authority to implement tolls on federal-aid highways may be conferred through the Value Pricing Pilot Program (the "VPPP").  *See* FHWA, U.S. Dep't of Transp., *Value Pricing Pilot Program*, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Dec. 1, 2024).

3.     In June 2019, an Expression of Interest to seek approval under the VPPP to implement a variable tolling program aimed at reducing congestion (i.e., a congestion pricing program) in the Manhattan CBD was submitted to the Federal Highway Administration ("FHWA") by New York State through NYSDOT, TBTA, and NYCDOT.  A lengthy environmental review process under the National Environmental Policy Act ("NEPA") ensued, culminating in the April 2023 Final Environmental Assessment ("Final EA") and the June 2023 Finding of No Significant Impact ("FONSI").  Because the final tolling structure had not yet been defined, for the purpose of evaluating the potential environmental impacts of various tolling options, the Final EA analyzed seven tolling scenarios.  The Final EA also included a detailed evaluation of the economic and socioeconomic impacts of the Program.

4.     On November 30, 2023, the Traffic Mobility Review Board, an entity required by the TMA to recommend a toll structure for consideration by the TBTA Board, issued its recommendation, which was informed by the Final EA.  On December 6, 2023, consistent with the TMA, the TBTA Board authorized TBTA to take the requisite steps to implement a CBD toll rate schedule, which included the publication of a public notice of a proposed toll rate schedule in

the New York State Register on December 27, 2023.  On December 18, 2023, TBTA sent notices to the Administrative Regulations Review Commissions for the New York State Senate and Assembly of the proposed toll rate schedule, which stated clearly that the proposed toll rate schedule was being promulgated pursuant to SAPA § 102(2)(a)(ii). Neither Commission expressed any objections. (The notices are annexed hereto as Exhibit "A".)

5.    A copy of the December 27, 2023 notice of proposed toll rate schedule published in the State Register is annexed hereto as Exhibit "B".  An erratum to correct a publishing error in one of the notice's column headings was published in the January 3, 2024 State Register.  (A copy of the erratum published in the January 3, 2024 State Register is annexed hereto as Exhibit "C"). TBTA conducted multiple hybrid virtual-in person public hearings: February 29, 2024; March 1, 2024; and two on March 4, 2024.  The public comment period provided by TBTA ended on March 11, 2024, thus providing a 75-day public comment period.  Members of the public could provide comments at the public hearings or electronically or via voicemail or U.S. Mail.

6.    On March 27, 2024, the TBTA Board adopted a toll rate schedule for the Program, with a planned implementation date in or about June 2024.  (A copy of the March 2024 toll rate schedule is annexed hereto as Exhibit "D").  The Project Sponsors prepared a reevaluation document consistent with FHWA's regulations, and as contemplated by the FONSI, to assess the effects of the March 2024 adopted toll schedule and determine whether the FONSI was still valid. On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.  The Notice of Adoption of the March 27 toll rate schedule was pending filing with the New York Department of State until the agreement between FHWA and the Project Sponsors under the VPPP was executed.

7.     On June 5, 2024, prior to the VPPP being executed, the Governor announced a pause in implementation of the Program, which at that point had been scheduled to begin on June 30, 2024.  Thus, the Notice of Adoption of the March 27 toll rate schedule could not be filed and did not become effective.

8.     On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll rates that had been adopted by the TBTA Board in March 2024 being phased-in gradually over several years.  On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach"). (A copy of the adopted Phase-In-Approach is annexed hereto as Exhibit "E").  A Notice of Adoption of the November 2024 toll rate schedule was filed with the New York Department of State on November 26, 2024, with publication in the State Register set for December 11, 2024.  (A copy of the acknowledgement of filing with the New York Department of State is annexed hereto as Exhibit "F").

9.     Under the Phase-In Approach, toll rates for each vehicle class and time of day, as well as tunnel crossing credits, are proportionally reduced from, and then gradually return to, the corresponding values in the March 2024 adopted toll rate schedule.  Thus, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for for-hire vehicles ("FHVs") on trips dispatched by high-volume for-hire services ("HVFHSs"), $1.50 per trip.  The toll rates and tunnel crossing credits later increase proportionally for each vehicle category, once in 2028, then again in 2031 to match those in the March 2024 toll rate schedule, as set forth in the November 2024 toll rate schedule.

10.     Contrary to the claims of some plaintiffs, taxis and FHVs are not exempt from tolls under the Program toll rate schedule.  The toll rate applicable to taxis and FHVs is set on a per-ride basis consistent with taxis and FHVs passing the toll on to their customers in accordance with existing regulations.  In turn, TBTA will collect the aggregate toll receipts from the taxi/FHV companies.

11.     The Project Sponsors prepared a second reevaluation consistent with FHWA's regulations to assess the effects of the Phase-in Approach of the March 2024 adopted toll structure, entitled Reevaluation 2.  Reevaluation 2 concluded that the effects of the Program were consistent with those disclosed in the Final EA, the mitigation set forth in the FONSI (and the first reevaluation) remained appropriate, and the FONSI remained valid.

12.     On November 21, 2024, FHWA confirmed that Reevaluation 2 was consistent with FHWA's regulations and determined that the FONSI remained valid.  That same day, FHWA and the Project Sponsors signed an agreement under the VPPP authorizing the Program's collection of tolls.  Thereafter, on November 26, 2024, Notice of Adoption of the November 2024 toll rate schedule was filed with the New York Department of State in order to become effective, as stated above.

**B.  Plaintiffs Will Not Suffer Irreparable Harm by Paying the Program's Tolls**

13.     There are mechanisms that will allow TBTA to fully refund Plaintiffs and any other toll payers in the unlikely event that Plaintiffs prevail in these actions.

14.     All eligible vehicles entering the CBD will be charged, and will pay, the applicable toll rate using one of two mechanisms.  Toll payers with an E-ZPass account will be able to pay the toll using their E-ZPass account.  If the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle will receive a toll bill in the mail.  No matter the method of payment

used, the identity of the toll payer and the amount paid by that toll payer is recorded. Because the Program uses these cashless methods of collection no one would pay with cash at a toll booth — an outdated method of collection that TBTA replaced at its bridge and tunnel facilities years ago.

15.     Between 92% and 95% of toll payers on current TBTA tolling facilities that enter Manhattan use E-ZPass, and it is anticipated that a significant majority of drivers would also use E-ZPass for the Program once it goes into effect. If required for toll payers with a New York E-ZPass account, TBTA is able to refund any tolls paid by crediting such E-ZPass accounts. Toll payers who pay the toll through a non-New York E-ZPass account will be traceable by their respective state tolling agencies, and their payments will also be traceable by those agencies. Consistent with TBTA's prior practice when issuing refunds to toll payers who use a non-New York E-ZPass account, any such refunds can be issued to the respective state tolling agency, which would then reimburse the toll payer. For example, someone driving into the CBD from Delaware with a Delaware E-ZPass account would pay the toll amount to the Delaware state tolling agency. This agency would have sent the toll amount, on the toll payer's behalf, to TBTA. In turn, if required, TBTA can refund the Delaware state tolling agency, which in turn could then credit the toll payer's account. Where warranted, TBTA already routinely reconciles New York E-ZPass accounts and non-New York E-ZPass accounts in the ordinary course of business in this manner for bridge and tunnel facilities; Program toll reconciliation would be no different.

16.     The remaining toll payers who do not use E-ZPass are also traceable and can be refunded by the same mechanism that they use to pay their bill. Toll payers without E-ZPass will receive a bill in the mail with a unique identifying bill number. These toll payers will then have the option of paying that bill through credit card, cash at an authorized payment facility, or by mailing in a check. If a toll payer has paid their bill, and thus paid the toll, TBTA can refund the

toll payer by reversing the charges if they used a credit card, or by issuing a refund check if the toll payer paid by cash or check.

**C. Government Resources Will Be Lost if the Program Is Not Permitted to Begin**

17.     Should the Program be enjoined from commencement until a final decision on the merits, TBTA would incur substantial additional expenses.

18.     Initially, TBTA budgeted over $500 million to establish the Program, and much of the budget has been expended. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the back-office system; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

19.     If the Program is temporarily enjoined, TBTA would incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and customer contact center, and consultant costs. This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program. These costs cannot be deferred even if start-up of the tolling is delayed. Further, these costs could not be paid by Program revenues, as there would be none during this period. These funds would be lost as a result of a preliminary injunction.

20.    Furthermore, an injunction would cause TBTA the loss of estimated monthly revenues from the first phase of the Program of over $40 million, based on projected net annual revenues forecasted in Reevaluation 2 of roughly $500 million in the first phase.

21.    These public dollars could never be recouped, even if the Program is restarted, as those months of tolling revenues would be lost forever.

**D.  The Public Interest Militates Against Injunctive Relief**

22.    An injunction would prevent the MTA, the recipient of Program revenues, from proceeding with vitally important work under the MTA's Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come.  The Capital Program identifies $52 billion of critical investments in the region's subways, buses, and commuter railroad, nearly one-third of which would be supported by the Program.  Key tenets of the Capital Program, which would be delayed by an injunction halting Program tolling revenues, include such undertakings as adding accessibility to numerous subway stations consistent with the Americans with Disability Act, improving outdated signaling and other improvements to system reliability, improving safety and customer service through technology, and extending public transit to under-served areas.  *See generally* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf (last accessed Dec. 2, 2024).

23.    In addition, because work on the Program would be halted, with only limited exceptions, TBTA could not advance the mitigation for environmental justice communities to which the Project Sponsors committed in the Final EA, FONSI, and reevaluations.

24.    Finally, delaying implementation of the Program means the unabated continuation of the severe congestion in the CBD, with its concomitant economic and environmental costs to

businesses, residents, commuters, workers, and visitors in this area.  Congestion in the CBD has been a $20 billion annual drag on the region's, and thus the country's, economy.  EA at 1-12.  And as the most congested urban area in the country, travel times—including for public buses and emergency vehicles—are extraordinarily slow.  *Id.* at 1-1.  Delay of the Program would mean the continuation of these conditions, and harm to the public, while allowing the Program to proceed would cause no harm to Plaintiffs.


Dated:     December 9, 2024
           New York, New York                    Allison L. C. de Cerreño, Ph.D.