UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
NEW YORKERS AGAINST CONGESTION
PRICING TAX, DANNY BUZZETTA, DR. GREGOR             Case No.1:24-cv-367(LJL)
WINKEL, LEE BERMAN, MEREDITH LeVANDE,
RITA SUE SIEGEL, TOMMY LOEB, KATHRYN FREED,
TREVER HOLLAND, RICKY YANG, PAUL ENG,
BARUCH WEISS, ROBERT FRIEDRICH, KEVIN
FORRESTAL, WARREN SCHREIBER, CHRISTOPHER
RYAN, BEN MASON, DENNIS ROSARIO, RABBI Y.S.
GINZBERG, JACOB ENGLANDER, AARON GONZALEZ,
HOWARD CHIN, ELAINE LA PENNA, THOMAS
ANTHONY SCARPACI, COUNCILMEMBER KRISTY
MARMORATO, COUNCILMEMBER VICKIE PALADINO,
COUNCILMEMBER JOANN ARIOLA, COUNCILMEMBER
SUSAN ZHUANG, COUNCILMEMBER KALMAN
YEGER, COUNCILMEMBER INNA VERNIKOV,
COUNCILMEMBER, ROBERT F. HOLDEN, RICHARD
PASSARELLI, STEVEN TRAUBE, FRANCISCO
GONZALEZ, JOSE COLLADO, VITO LaBELLA, AIXA
TORRES, JULIE VELEZ, DAPHNE BRUCCULERI,
DR. ALAN L. MINTZ, D.D.S., ASSEMBLYMEMBER
SIMCHA EICHENSTEIN, THOMAS ZABIELSKIS,
NINA JODY, MICHAEL KEKAFOS, NORMAN SPIZZ,
MICHAEL GROSS, EFRAIM REISS and ASSEMBLYMEMBER
MICHAEL NOVAKHOV, individually and on behalf
of all others similarly situated,

                              Plaintiffs,

                      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, SHAILEN BHATT,
in his official capacity as Administrator of the
Federal Highway Administration, RICHARD J. MARQUIS,
in his official capacity as Division Administrator of the
New York Division of the Federal Highway Administration,
METROPOLITAN TRANSPORTATION AUTHORITY,
TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, NEW YORK CITY DEPARTMENT
OF TRANSPORTATION and TRAFFIC MOBILITY
REVIEW BOARD,
                              Defendants.
------------------------------------------------------------------------x

```
-----------------------------------------------------------x
ELIZABETH CHAN, et al.,
                                                              Case No. 1:23-cv-10365 (LJL)
                       Plaintiffs,
       v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,

                       Defendants.
-----------------------------------------------------------x
MICHAEL MULGREW, et al.,
                                                              Case No. 1:24-cv-01644 (LJL)
                       Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,

                       Defendants.
-----------------------------------------------------------x
TRUCKING ASSOCIATION OF NEW YORK,
                                                              Case No. 1:24-cv-04111 (LJL)
                       Plaintiff,

       v.

METROPOLITAN TRANSPORTATION
AUTHORITY, et al.,

                       Defendants.
-----------------------------------------------------------x
```

# REPLY MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION MOTION

Respectfully submitted by:
The Law Offices of Jack L. Lester, Esq.
*Attorney for Plaintiffs*
41 Squaw Road
East Hampton, NY 11937
631-604-2228
Jllcomlaw@aol.com

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES………………………………………………………………………...ii

I.   INTRODUCTION……..………………………………………………………………...1

ARGUMENT

   1.  Defendants Have Failed to Comply with the Provisions of SAPA §§ 201 and 202 and Therefore Congestion Pricing Rules Promulgated November 18, 2024 Must be Annulled…………………………………………………………………………...5

   2.  Injunctive Relief is Appropriate…………………………………………………...9

CONCLUSION………..……………………………………………...…………………………...11

# TABLE OF AUTHORITIES

**Cases:**                                                                                                              Page(s)

## FEDERAL DECISIONS

*Wisconsin Gas Company v. FERC*,

    758 F.2d 669, 674 (D.C. Circuit 1985)……………………………………………….9

## NEW YORK STATE DECISIONS

*Industrial Liaison Committee v. Williams*,
    72 N.Y.2d 137, 144 (1988)……………………………………………………………….6

*Matter of Medical Society of New York v. Levin*,
    185 Misc.2d 536 (N.Y. Cty 2000) *aff'd* 280 A.D.2d 309 (1st Dept. 2001)…………………….6,9

*Matter of Town of Mamaroneck PBA v. New York State Pub. Employment Relations Bd.*,
    66 N.Y.2d 722, 724 [1985]……………………………………………………………………7

**State Statutes & Authorities**

PAL § 553(12)…………………………………………………………………………………..2

PAL § 553(12-a)……………………………………………………………………………….2

SAPA § 102(2)(a)(ii)…………………………………………………………………………….1

SAPA § 201……………………………………………………………………………………...5

SAPA § 201(a)…………………………………………………………………………………...8

SAPA § 201(a)(i)………………………………………………………………………….....3

SAPA § 202……………………………………………………………………………………...5

SAPA § 202(1)(f)………………………………………………………………………………..6

SAPA § 202(a)…………………………………………………………………………………..6

SAPA § 202(b)…………………………………………………………………………………..6

SAPA § 202[5][b]……………………………………………………………………………….6

SAPA § 202[8]…………………………………………………………………………………..6

SAPA 202(a)(3)(f)……………………………………………………………………………….6

**Other Authorities**

State Administrative Procedure Act § 201(a), *McKinney's Consolidated Laws of New York* (1996)………………………………………………………………………..………………8

## INTRODUCTION

Plaintiffs submit this Reply Memorandum of Law in further support of their motion for a preliminary injunction (ECF 121) enjoining the commencement of Congestion Pricing scheduled for January 5, 2025, in further support of their Amended Verified Complaint (ECF 54) seeking compliance with rulemaking procedures set forth in the State Administrative Procedure Act ("SAPA") and nullifying the implementation of the Congestion Pricing tolling scheme as violative of SAPA, unlawful, arbitrary, capricious and invalid as a matter of law. Plaintiffs also submit this Reply Memorandum in opposition to Defendants' motion to dismiss.

Defendants (Metropolitan Transportation Authority, or "MTA" and Triborough Bridge and Tunnel Authority, or "TBTA") essentially repeat the same false premise initially posited in their prior motion to dismiss. Defendants claim that establishing the nation's first Congestion Pricing Program with wide-ranging socioeconomic impacts is merely the "approval" or "prescription" of future "rates" of " general…applicability". In other words, Defendants argue, this is a SAPA § 102(2)(a)(ii) action. Defendants chose to ignore the wide-ranging socioeconomic impacts of the program, and they ignore Governor Hochul's explicit acknowledgment of the severe economic burdens of Congestion Pricing. The plain language governing Type (i) actions provides for public rights pertaining to the implementation or establishment of programs of this nature involving the establishment of tolls, fees and other charges.

The enabling legislation, authorizing the implementation of Congestion Pricing, specifically charges the Defendant TBTA with the responsibility of *implementing* the Program through a process of tolling impacting every vehicle entering the Central Business District from numerous entry points -- affecting millions of people on a daily basis.

The plain language of the Public Authorities Law ("PAL") explicitly provides TBTA with authority to **establish** the Traffic Mobility Act through a tolling program. *See* PAL § 553(12-a) (emphasis supplied):

> 12-a. **To establish and charge** variable tolls, fees and other charges for vehicles entering or remaining within the central business district and to make rules and regulations for the collection of such tolls, fees and other charges, subject to and in accordance with such agreement with bondholders and applicable federal law as may be made as hereinafter provided. Subject to agreements with bondholders and applicable federal law, all tolls, fees and other revenues derived from the central business district tolling program shall be applied to the payment of operating, administration, and other necessary expenses of the authority properly allocable to such program, including the capital costs of such program, and to the payment of interest or principal of bonds, notes or other obligations of the authority or the metropolitan transportation authority issued for transit and commuter projects as provided in § 553-J (Additional powers and provisions in relation to central business district tolling program), and shall not be subject to distribution under § 569-C (Transfer and receipt of surplus funds) or § 1219-A (Transfer and receipt of surplus funds). The provisions of § 2804 (Financial disclosure by public authorities or commissions prior to toll or fare increase) shall not be applicable to the tolls and fees established by the authority pursuant to this subdivision. Any such fares, tolls, and other charges shall be established and changed only if approved by resolution of the authority adopted by not less than a majority vote of the whole number of members of the authority then in office, with the chairman having one additional vote in the event of a tie vote, and only after a public hearing.

The use of the word "establish" in this provision differs drastically from the language in PAL § 553(12). The language in §§ 553(12) and 553 (12-a) are far from identical. The language in § 553(12) specifically omits the critical word "establish," thereby legislatively recognizing that the introduction of Congestion Pricing was not merely the promulgation of toll rates, but was ascribing TBTA the authority to utilize tolling to *establish* the Congestion Pricing Program.

2

TBTA's characterization of the introduction and commencement of Congestion Pricing as merely Type (ii) tolling wholly ignores the most critical language of SAPA. That language is set forth in SAPA § 201(a)(i). This provision defines the word "Rule" clearly and unequivocally as pertaining to the implementation and/or application of law.  When an agency undertakes rulemaking that implements or applies law, as is the case in establishing the first in the nation Congestion Pricing, public rights must be protected – particularly the rights of small businesses and wage earners.

The Governor's statement on June 5, 2024 emphasized the significant socioeconomic consequences of implementing Congestion Pricing and therefore announced a pause in the Program's implementation.

> After careful consideration, I have come to the difficult decision that implementing the planned congestion pricing system risks too many unintended consequences for New Yorkers at this time. For that reason, I have directed the MTA to indefinitely pause the program.

Watch her full video statement here. https://www.cbsnews.com/newyork/video/watch-gov-kathy-hochuls-full-statement-on-congestion-pricing-delay/

The Governor said congestion pricing was enacted before the COVID-19 pandemic, when commuters were in the office five days a week, crime was down and tourism was booming. She cited concerns about the city's economic recovery, saying it is "by no means complete." "Circumstances have changed, and we must respond to the facts on the ground, not to the rhetoric from five years ago," she said. "We cannot afford to undercut this momentum, and I won't allow this delicate recovery to be jeopardized." She added she still supports the goals of congestion pricing, but "hardworking New Yorkers are getting hammered on costs."

As the Governor further emphasized:

> Drivers can now choose to stay home altogether, telling employers they need to work fully remote again. Or they might just change their patterns and skip the visits to the city on a Saturday with their family, and going out to a theater or a restaurant. At a time when inflation is still cutting into New Yorkers hard-earned wages, the concern is that many people would do exactly that. Or that one more added cost would make residents rethink living or working here altogether, hurting our recovery even more.

[NYC congestion pricing start date postponed indefinitely. Watch Gov. Kathy Hochul's full video statement. - CBS New York](#)

In the "unpausing" of Congestion Pricing through a phase-in, Governor Hochul further acknowledged and reemphasized the severe socioeconomic consequences of implementing Congestion Pricing. On November 14, 2024, the Governor announced a phase-in rather than a jumpstart of the entire program at once. This was done by the Governor in an attempt to lessen the undeniable socioeconomic burdens upon small businesses and workers. As the Governor stated:

> State law requires that congestion pricing simultaneously raise money for the MTA and drive down traffic congestion. These are important priorities. But I believe that no New Yorker should have to pay a penny more than absolutely necessary to achieve these goals, and $15 was too much, I am proud to announce we have found a path to fund the MTA, reduce congestion and keep millions of dollars in the pockets of our commuters.
>
> This lower toll will save daily commuters nearly $1,500 annually, and that kind of money makes a big difference for our families.

https://www.cbsnews.com/amp/newyork/news/nyc-congestion-pricing-governor-hochul/

It is deeply troubling that rather than follow the carefully articulated and designed requirements of SAPA, which provides for an orderly and legislatively-prescribed process to

4

incorporate the precise socioeconomic concerns of the Governor into the implementation of Congestion Pricing, Defendants have chosen to act in an arbitrary and *ad hoc* manner to rush the implementation of Congestion Pricing prior to a change in the Federal Administration. According to Defendants, every month of delay causes them to lose monthly revenues of $40 million (ECF 130 p. 19). As of this date, therefore, Governor Hochul's six-month pause has cost $240 million. If Defendants and the Governor had acted from the start, in accordance with SAPA, and implemented the Program in a manner that evaluated socioeconomic problems from the outset, it is distinctly possible that no time or money would have been lost.

## ARGUMENT

**1.     Defendants Have Failed to Comply with the Provisions of SAPA §§ 201 and 202 and Therefore Congestion Pricing Rules Promulgated November 18, 2024 Must be Annulled.**

By virtue of the Governor's statements in conjunction with the unprecedented, far-reaching consequences of the first in the nation Congestion Pricing Program, there is no doubt that the challenged rules will have a profound impact on the daily lives of commuters in the Central Business District. The increased burdens upon small businesses and wage-earning members of the public were indisputably not evaluated in accordance with the provisions of SAPA.

Section 202 of SAPA establishes certain required procedures that an agency must follow when promulgating rules impacting public rights. These requirements include publication in the State Register, a notice of proposed rulemaking which affords the public an opportunity to submit comments on the proposed rule and, subsequently, a notice of adoption which includes an assessment of the following: (a) a summary and an analysis of the issues raised and significant alternatives suggested by any such comments; (b) a statement of the reasons why any significant

alternatives were not incorporated into the rule; and (c) a description of any changes made in the rule as a result of such comments (SAPA § 202[5][b]). The standard to be met in determining the validity of an agency's rulemaking under the statute is "substantial compliance" (SAPA § 202[8]). SAPA § 202(1)(f) requires the agency's notice of proposed rulemaking, among other things, to include a regulatory impact statement ("RIS") prepared pursuant to § 202(a), and a regulatory flexibility analysis ("RFA") prepared pursuant to § 202(b). SAPA § 202(a), entitled "Regulatory impact," provides in part:

> 1. In developing a rule, an agency shall, to the extent consistent with the objectives of applicable statutes, consider utilizing approaches which are **designed to avoid undue deleterious economic effects or overly burdensome impacts of the rule upon persons** . . . directly or indirectly affected by it or upon the economy or administration of state or local governmental agencies. . . .(*emphasis added*)

SAPA 202(a)(3)(f) states:

> (f) . . . A statement indicating whether any significant alternatives to the rule were considered by the agency, including a discussion of such alternatives and the reasons why they were not incorporated into the rule.

*See Matter of Medical Society of New York v. Levin*, 185 Misc.2d 536 (N.Y. Cty 2000) *aff'd* 280 A.D.2d 309 (1st Dept. 2001).

In rationalizing the introduction of Congestion Pricing as merely ratemaking, Defendants claim that ratemaking for Congestion Pricing is consistent with historical practice (ECF 130 p. 12). Defendants claim that the introduction of Congestion Pricing is equivalent to the repeal of the ban on two-way tolling on the Verrazano Narrows Bridge or split tolling. Even if this absurd comparison was true, prior practices of an agency are not a basis for abrogating statutory mandates. In the case of *Industrial Liaison Committee v. Williams*, 72 N.Y.2d 137, 144 (1988), the Court of Appeals held that the correct statutory interpretation of SAPA is not left to the

6

agency to decide. Rather, the statute outlines uniform administrative procedures that State agencies must follow in their rulemaking, adjudicatory and licensing processes, and that courts review in their usual *de novo* adjudicative function. Thus, the legislative direction to these agencies is compliance, not implementation. As specialized knowledge is not necessarily implicated, the courts use their "own competence" to decide issues of law raised, since those questions are of ordinary statutory reading and analysis (*see Matter of Town of Mamaroneck PBA v. New York State Pub. Employment Relations Bd*., 66 N.Y.2d 722, 724 [1985]).

  Defendants further claim that compliance with SAPA is not necessary because the Environmental Assessment ("EA") analyzed the potential effects of the Program on socioeconomic conditions, dedicating an entire chapter to analyzing "potential indirect displacement effects and potential changes in operations of certain industries." (ECF 130 p.15). However, the chapter was not an analysis of economic impacts upon small businesses or wage earners, but an overview relating to social conditions in general for the New York City region. Second, the Finding of No Significant Impact ("FONSI") in the National Environmental Policy Act ("NEPA") process prevented the kind of mitigating actions, alternatives and reduction of burdens upon small businesses necessitated by SAPA. The failure to conduct a full Environmental Impact Statement foreclosed the kind of fulsome review mandated by SAPA. Third, Defendants assert that the analysis in the EA resulted in the creation of the "small business working group". The creation of the small business working group is not the type of mitigation and alternatives envisioned by SAPA to lessen financial burdens and to retain jobs.

  Defendants claim that in accordance with the rules governing NEPA, the program would have no adverse economic impacts. However, the rules and procedures governing SAPA and the determination of findings and conclusions through the public hearing process are not the same as

7

NEPA. SAPA has specific and detailed procedural rules protecting wage earners and small businesses that are not protected by the environmental considerations set forth in NEPA. However, the EA's assessment of social conditions exhibited an awareness of Congestion Pricing's impact upon economic concerns that should have triggered the proper rulemaking procedures of SAPA. Although NEPA is no substitute for SAPA, findings within the EA confirmed that the procedures and protocols of SAPA are relevant to the final rulemaking decisions in Congestion Pricing. The review undertaken within the EA and the conclusions drawn were based upon a different set of statutory criteria. The NEPA statutory criteria are focused upon environmental considerations that do not prioritize the socioeconomic considerations of SAPA. SAPA was formulated by the Legislature with the explicit purpose and intent of fostering rulemaking decisions minimizing economic burdens and incorporating into final rulemaking proper mitigation and alternatives through a public hearing process. The purpose of § 201(a) of SAPA expressed by the Legislature is to assure that rules and regulations which may have a substantial impact on jobs and employment opportunities shall do so in a manner that, consistent with the objectives of applicable statutes, ensures the preservation of existing jobs and promotes the development of new employment opportunities for the residents of this State. *See* Historical and Summary Notes*, State Administrative Procedure Act § 201(a), McKinney's Consolidated Laws of New York* (1996).

      For example, the rules governing NEPA do not require : a) proper publication in the State Register affording the public an opportunity to submit comments on the socioeconomic impacts of the rule – in fact, the MTA public hearings explicitly refused to accept such comments; b) as summary and analysis of the socioeconomic impacts of Congestion Pricing with significant alternatives suggested by such comments; c) a statement of the reasons why any significant

alternatives were not incorporated into the rule; d) a consideration of utilizing approaches which are designed to avoid undue deleterious effects or overly burdensome impacts of the rule upon persons; and e) an indication of how the rule is designed to minimize any adverse economic impact of such rule on small businesses (*see Matter of Medical Society of New York supra*.).

Adherence to SAPA is particularly important in this post-pandemic timeframe. Recent studies align with the Governor's recognition that the pandemic has had a severe impact on small businesses within the areas impacted by Congestion Pricing (*see* November 2024 New York City Planning Survey entitled *Storefront Activity in NYC Neighborhoods,* annexed hereto as Exhibit "A").

2. **Injunctive Relief is Appropriate.**

Plaintiffs *New Yorkers* join with Plaintiffs in *Mulgrew, Chan* and *Trucking Association of New York* in their respective applications for injunctive relief. The irreparable harm in this case is neither speculative nor minimal (*see Wisconsin Gas Company v. FERC*, 758 F.2d 669, 674 (D.C. Circuit 1985). Financial refunds alone cannot cure the violations of law. That is because were Defendants to commence Congestion Pricing in its current *ad hoc* arbitrary fashion, it would not include a proper assessment of its impact on small businesses and job retention and the failure to consider viable alternatives. Initiating the process without proper safeguards forces vulnerable small businesses and financially burdened workers to endure financial hardships during the length of the unlawful tenure of Congestion Pricing. In contending that monetary refunds can cure the harm of Congestion Pricing, Defendants have not addressed the damage to small businesses in Chinatown, Little Italy and Times Square that may be irreversible, as people adjust and consider commuting costs, delivery costs and other factors. For these reasons, the requirements of SAPA are pre-enactment, not post-implementation. The statute

9

clearly outlines uniform administrative procedures that State agencies must follow in their rulemaking capacity. The failure of Defendants to follow such rules should not shift the burden of this failure onto individuals and businesses that fall under the protective umbrella of SAPA. The certain and immediate harm of imposing unlawful tolls cannot be remedied by a speculative promise of future refunds.

      Defendants' central argument in opposing injunctive relief is that the government will endure approximately $12 million per month in additional costs related to any delay. Moreover, Defendants' claim that the TBTA will lose estimated tolling revenues of over $40 million per month (ECF 130 p. 7). This argument, however, is not rationally based at this juncture. Plaintiffs brought their SAPA claims to Defendants' attention at least twelve months ago. Compliance with SAPA would have brought this process to an expeditious and fair resolution by now.

      Additionally, the Governor on her own volition paused the Program for the very reason implicated within the SAPA statutory scheme. No rationale is offered as to why the Governor's recognition of the hardships resulting from Congestion Pricing did not trigger the procedural safeguards of SAPA. It is Defendants who have delayed the implementation of Congestion Pricing, both through the "pause" and by the failure upon notification to comply with the law. Any hardship to the government resulting from delay at this point is self-created. The public has been and continues to be victimized by the government's failure to abide by the basic procedural provisions of SAPA. Allowing the Program to go forward in the absence of basic protections for small businesses and vulnerable wage earners is an abuse of the democratic process and further compounds the harm to the public.

## CONCLUSION

For the foregoing reasons, the rules, regulations and implementation of Congestion Pricing must be annulled or, in the alternative, enjoined pending compliance with SAPA.

Dated: December 12, 2024
    East Hampton, NY 11937

                                            Respectfully submitted,

                                            _____
                                            Jack L. Lester, Esq.
                                            *Attorney for Plaintiffs*
                                            41 Squaw Road
                                            East Hampton, NY 11937
                                            631-604-2228
                                            jllcomlaw@aol.com