UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORKERS AGAINST CONGESTION PRICING TAX, *et al.*,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>      *Defendants*. | Case No. 1:24-cv-00367 (LJL) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION
TO DISMISS BY DEFENDANTS THE METROPOLITAN
TRANSPORTATION AUTHORITY,
THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,
AND THE NEW YORK CITY DEPARTMENT OF TRANSPORTATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................... 1
ARGUMENT .................................................................................................................................. 2
I.   THE TOLL RATE SCHEDULE IS NOT TYPE (I) ............................................................. 2
a.   TBTA Acted Consistent With Past Practice, Without Objection From Officials Charged With Oversight ....................................................................................................................................... 3
b.   TBTA's Overall Role In Implementing The Program Has No Bearing On The Classification Of The Toll Rate Structure Under SAPA ........................................................................................... 5
c.   The Word "Establish" In The TMA Has No Bearing On Classification Under SAPA ........................ 6
II.   PLAINTIFFS' ARGUMENTS REGARDING ALLEGED SOCIOECONOMIC IMPACTS HAVE NO BEARING ON CLASSIFICATION UNDER SAPA ............................................................. 7
CONCLUSION ............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                                    **PAGE(S)**

*Dep't of Fin. v. N.Y. Tel. Co.*,
692 N.Y.S.2d 34 (1st Dep't 1999) ...................................................................................4, 6

*Indus. Liaison Comm. v. Williams*,
72 N.Y.2d 137 (1988) ........................................................................................................3

*Med. Soc. of N.Y. v. Levin*,
185 Misc.2d 536 (Sup. Ct. N.Y. Cty. 2000) .....................................................................3

*People v. Finnegan*,
85 N.Y.2d 53 (1995) ..........................................................................................................6

*Mamaroneck PBA, Inc. v. N.Y. State Pub. Empl. Rel. Bd.*,
66 N.Y.2d 722 (1985) ........................................................................................................3

**STATUTES**

Pub. Auth. Law § 553(12-a) .................................................................................................6, 7

N.Y. Pub. Auth. Law § 1005 ....................................................................................................5

SAPA § 102(2)(a)(i) ........................................................................................................5, 6, 7

SAPA § 102(2)(a)(ii) ..................................................................................................2, 4, 5, 7

SAPA § 202(1)(a) ......................................................................................................................7

SAPA § 202(1)(b) .....................................................................................................................4

SAPA § 202(6)(a) .....................................................................................................................3

SAPA § 202(9)(a)(iii) .......................................................................................................3, 4, 10

SAPA § 102(2)(b)(xi)(2) ..........................................................................................................3

**REGULATIONS**

7 N.Y. Reg. 7 (Feb. 13, 1985) ...................................................................................................3

11 N.Y. Reg. 8 (Feb. 22, 1989) .................................................................................................3

46 N.Y. Reg. 10 (Mar. 6, 2024) ................................................................................................5

46 N.Y. Reg. 50 (Dec. 11, 2024) ................................................................................................ 4

**PRELIMINARY STATEMENT**

In their reply/opposition memorandum of law, Plaintiffs invent a new standard for when proposed rules must be treated as Type (i) rules under the New York State Administrative Procedure Act ("SAPA"): namely, that any rule with potential "socioeconomic impacts" is Type (i). However, it is the nature of a rule, not its anticipated impacts, that dictate whether it is Type (i) or Type (ii). Indeed, under Plaintiffs' theory, virtually any increase in tolls could have socioeconomic impacts and would be Type (i); not only that, the overwhelming majority (if not virtually all) rules could be said to have some "socioeconomic impact." Plaintiffs' proposed new standard lacks any support in the law, would upend decades of ratemaking practice that both the New York Secretary of State and the Legislature have repeatedly accepted, and would effectively eliminate the Type (ii) rulemaking procedure that the Legislature adopted.

For decades, the Triborough Bridge and Tunnel Authority ("TBTA") has adopted toll rate schedules as Type (ii) rules and has consistently provided notice of its Type (ii) rule proposals to the Secretary of State and the Legislature through the Administrative Regulations Review Commissions for the New York State Senate and Assembly (the "Legislative Commissions"). TBTA followed this same practice when setting the toll rate schedule for New York's Central Business District ("CBD") Tolling Program (the "Program"). The Secretary of State accepted the notice for publication, and neither Legislative Commission expressed any concern about its completeness. Despite the lack of protest from any entity charged with vetting notices of proposed rulemakings, Plaintiffs now try to differentiate the Program's toll rate schedule from those adopted for TBTA's tolled facilities, including the Verrazzano-Narrows Bridge and the Robert F. Kennedy Bridge. But in reality, there is no difference from the perspective of individual drivers and Plaintiffs. All these rulemakings involve setting toll rates that drivers must pay to cross through

certain locations. And contrary to Plaintiffs' arguments, nothing in the Traffic Mobility Act (the "TMA") suggests that the Legislature intended for TBTA to deviate from its normal ratemaking practice when setting the Program's toll rate schedule.

## ARGUMENT

The parties agree that Plaintiffs' claims turn on whether the adoption of the Program's toll rate schedule was properly a Type (ii) rule under SAPA. This is an issue of pure statutory interpretation. However, in an attempt to create an issue of fact where none exists, Plaintiffs interject irrelevant opinions on the possible economic effects of the Program. Plaintiffs appear to offer the following three rationales for why this ratemaking, unlike all other toll rate schedules, should be considered a Type (i) rule: (1) it will have "wide-ranging socioeconomic impacts," (Pl. Opp. 1);[1] (2) TBTA is charged in the TMA with "implementing" the Program, *id.*; and (3) the Legislature intended to change how TBTA conducts ratemaking by adding the word "establish" to the Public Authorities Law through the TMA, *id.* at 2. These arguments are meritless.

### I. THE TOLL RATE SCHEDULE IS NOT TYPE (I)

None of Plaintiffs' arguments demonstrates that the Program's toll rate schedule should have been promulgated as a Type (i) rule. Indeed, Plaintiffs do not really even contest that the setting of a toll rate schedule fits better into the Type (ii) category of "approval, or prescription for the future of rates,… prices… or practices bearing on any of the foregoing whether of general or particular applicability." SAPA § 102(2)(a)(ii).[2] TBTA's historical practice is consistent with this

---

[1] "Pl. Opp." refers to Plaintiffs' reply memorandum of law in support of their preliminary injunction motion at ECF 133. Plaintiffs did not caption their responsive papers as an opposition to Defendants' motion to dismiss, although their brief addresses only the merits and fails to respond to Defendants' arguments as to why they fail to show irreparable harm or that a preliminary injunction would serve the public interest. In any event, Plaintiffs' claims should be dismissed for the reasons explained herein and in Defendants' memorandum of law in support of their motion to dismiss and in opposition to Plaintiffs' motion for preliminary injunction at ECF 130.

[2] If TBTA's toll rate schedule were understood as prescribing a "fee," which is the closest example to toll rates in the

2

plain reading of the statute, whereas Plaintiffs make a policy argument that does not even apply to this case, where the economic impacts of the Program were studied ad nauseum.

### a. TBTA Acted Consistent With Past Practice, Without Objection From Officials Charged With Oversight

Contrary to Plaintiffs' claim, Defendants have not argued that the Court must give deference to agency expertise when determining if SAPA's procedural requirements have been met. Pl. Opp. 6–7. Rather, Defendants pointed to agency practice to demonstrate that TBTA has consistently promulgated toll rates as Type (ii) ratemaking rules with the knowledge and tacit approval of the Secretary of State and the Legislative Commissions.[3] *See* ECF 130 at 12–13.[4] The Court should not disturb this practice in favor of Plaintiffs' proposal that redundant documentation of economic impact analysis was required.

Under SAPA, the Secretary of State is explicitly charged with reviewing each notice submitted for publication in the State Register and "reject[ing] those notices which are not in substantial compliance" with SAPA by giving "prompt notice of such rejection to the agency." SAPA § 202(9)(a)(iii). Agencies must also send notices of proposed rulemaking to the Legislative Commissions. *Id.* § 202(6)(a). TBTA sent such notices in December 2023, which stated clearly that the proposed toll rate schedule was being promulgated as a Type (ii) ratemaking rule pursuant

---

description of Type (i) rules, it would be exempt from rulemaking altogether. SAPA expressly exempts fees that are less than $100 from its rulemaking requirements. *See* SAPA § 102(2)(b)(xi)(2). The toll rate schedule does not include any toll greater than $54.00. MTA, *Central Business District Tolling Program*, https://new.mta.info/project/CBDTP (last accessed Dec. 17, 2024).

[3] The cases Plaintiffs cite for their argument that prior agency practice cannot be considered when determining if an agency has complied with SAPA are not relevant, as they solely address whether an agency's expertise is germane in such an inquiry or they do not address SAPA at all. *See Med. Soc. of N.Y. v. Levin*, 185 Misc.2d 536 (Sup. Ct. N.Y. Cty. 2000), *aff'd*, 280 A.D.2d 309 (1st Dept. 2001) (addressing whether agency's regulatory impact statement for Type (i) rule contained all necessary information as outlined in SAPA); *Indus. Liaison Comm. v. Williams*, 72 N.Y.2d 137 (1988) (holding agency's notice of proposed rulemaking complied with SAPA); *Mamaroneck PBA, Inc. v. N.Y. State Pub. Empl. Rel. Bd.*, 66 N.Y.2d 722 (1985) (addressing proper interpretation of New York State Town Law).

[4] *See also* 11 N.Y. Reg. 8 at 29 (Feb. 22, 1989); 7 N.Y. Reg. 7 at 32 (Feb. 13, 1985).

3

to SAPA § 102(2)(a)(ii). Therefore, the notices did not include the regulatory impact or regulatory flexibility statements required only for Type (i) notices of proposed rulemaking, *id.* § 202(1)(b), which Plaintiffs claim should have been prepared. There was no question that TBTA was treating the toll rate schedule as a Type (ii) rulemaking under SAPA.

The Secretary of State did not "promptly reject" TBTA's Type (ii) notice as non-compliant but rather accepted it for publication in the State Register. SAPA § 202(9)(a)(iii). During the ensuing 11 months (from December 2023 to November 2024, when the phase-in feature of the toll rate schedule was adopted), neither the Secretary of State nor the Legislative Commissions expressed any objections or concerns about the classification by TBTA of the toll rate schedule as a Type (ii) ratemaking rule. ECF 131 ¶ 4. If either the Secretary of State or the Legislative Commissions had believed the Program's toll rate schedule should have been accompanied by the additional statements required for Type (i) rules, the Secretary of State was required to reject the notice, and both of those entities could and would have raised such concerns.

Instead, the Program's notice of proposed rulemaking as a Type (ii) rule was published in the State Register, and in November 2024, the TBTA Board adopted a resolution approving the phase-in feature of the toll rate schedule it had approved in March 2024. ECF 131 ¶¶ 5, 8. Thereafter, on November 26, 2024, Notice of Adoption of the November 2024 toll rate schedule was accepted by the New York Department of State, and on December 11, 2024, a Notice of Adoption was published in the State Register. *Id.* ¶ 12.[5] As such, TBTA's regular practice in promulgating toll rates as Type (ii) rules, accepted by the Secretary of State and the Legislative Commissions, should be given "great weight." *See Dep't of Fin. v. N.Y. Tel. Co.*, 692 N.Y.S.2d 34, 98 (1st Dep't 1999) (holding that a City's particular application of a statute to its licenses for

---

[5] *See* 46 N.Y. Reg. 50 at 12 (Dec. 11, 2024).

4

over 15 years was a "controlling influence" on a statute's proper interpretation).

### b. TBTA's Overall Role In Implementing The Program Has No Bearing On The Classification Of The Toll Rate Structure Under SAPA

Plaintiffs' contention that the adopted toll rate is a Type (i) rule because TBTA is "implementing" the Program through toll ratemaking is also unavailing. Pl. Opp. 1. Plaintiffs argue that under SAPA § 102(2)(a)(i), "implementation…of programs of this nature" must be treated as a Type (i) rules. *Id.* TBTA's role in implementing the Program involves far more than establishing the toll rates and extends far beyond the scope of the SAPA process. It has included managing a budget of over $500 million to construct the necessary infrastructure and complete an environmental review under the National Environmental Policy Act ("NEPA"), holding a multi-year public information campaign, developing the software needed to charge tolls in the CBD, and implementing and testing the roadway infrastructure and system—all of which occurred outside of the SAPA process without the need for the adoption of new regulations. *See* SAPA § 102(2)(a)(i) (limiting the definition of "rule[s]" to an "agency's statement[s], regulation[s], or code[s]"); ECF 131 ¶¶ 3, 18; (DOT_0039267–70.)[6] As is the case here, agencies vested with ratemaking powers are often charged with implementing wider legislative mandates. *See, e.g.*, N.Y. Pub. Auth. Law § 1005 (setting forth the powers and duties of the New York State Power Authority). This does not mean that any time such agencies prescribe rates, they must do so as Type (i) rules. *See, e.g.*, 46 N.Y. Reg. 10 at 7-8 (Mar. 6, 2024) (Power Authority notice of proposed ratemaking under SAPA § 102(2)(a)(ii)). The setting of toll rates is just one part of TBTA's overall implementation responsibility under the TMA, and that component of the Program is in no way distinguishable from other toll ratemaking successfully undertaken for decades by TBTA for its

---

[6] References to the administrative record for Plaintiffs' prior NEPA claims cite to the Bates number of the relevant page(s).

5

other tolling facilities.  *See* ECF 130, fn. 12.

### c. The Word "Establish" In The TMA Has No Bearing On Classification Under SAPA

Plaintiffs also argue that the Legislature meant to distinguish setting toll rates for the Program from setting toll rates for other TBTA projects.  *See* Pl. Opp. 2.  Plaintiffs' entire theory rests on their belief that the Legislature, by including the word "establish" in § 553(12-a) of the Public Authorities Law, which was added with the enactment of the TMA, subtly expressed an intention that TBTA change its longstanding practice of setting toll rates through Type (ii) rulemaking.  Plaintiffs offer no theory as to why, if they are correct, (1) the Legislature did not simply make such intent clear, or (2) the Legislative Commissions charged with reviewing proposed rules did not object when informed that TBTA intended to treat the Program's toll rate as a Type (ii) rule.  *Id.*; ECF 130 at 13.

This nonsensical argument fails for several reasons.  First, the word "establish" is not included in SAPA's Type (i) definition, so its use in the TMA does not suggest that the Legislature meant to require the Program's toll rate schedule to be promulgated as a Type (i) rule.  *See* SAPA § 102(2)(a)(i).  The Legislature easily could have expressed such a mandate, but did not.  Therefore, it must be assumed that the Legislature did not intend to prescribe that the Program's toll rate schedule be promulgated differently from scores of prior TBTA toll rate schedules.  *See* Pub. Auth. Law § 553(12-a); *N.Y. Tel. Co.*, 692 N.Y.S.2d at 97 ("We have firmly held that the failure of the Legislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended.") (citing *People v. Finnegan*, 85 N.Y.2d 53, 58 (1995)).  Nor is there anything in the TMA's legislative history suggesting that the Legislature included the word "establish" in Public Authorities Law § 553(12-a) to demonstrate its intention that the

Program's toll rate schedule be a Type (i) rule.[7] Indeed, in sharp contrast to the lack of any explicit directive to deviate from prior practice and promulgate toll rates as Type (i), the TMA specifically provides that the adoption of the Program's toll rates could only occur "after a public hearing." Pub. Auth. Law § 553(12-a).[8] TBTA followed that sequence.

## II. PLAINTIFFS' ARGUMENTS REGARDING ALLEGED SOCIOECONOMIC IMPACTS HAVE NO BEARING ON CLASSIFICATION UNDER SAPA

Plaintiffs seemingly argue that certain Type (i) requirements must be met for any rule that may impact "public rights" or will have "wide-ranging socioeconomic impacts." Pl. Opp. 5. They have pulled this theoretical new rule out of thin air, as SAPA contains no support for the idea that the effects of a rule govern its classification. Neither of the definitions (Type (i) or Type (ii)) mention impacts of any kind as criteria. *See* SAPA § 102(2)(a)(i), (ii). Indeed, many of the types of rules listed as Type (ii) in the statute relate to economic issues such as wages, prices, financial structures, valuations, costs, or accounting and, under Plaintiffs' rubric, would be Type (i) rules. *Id.* Plaintiffs' invented rule would rewrite SAPA § 102(2)(a) entirely and effectively write § 102(2)(a)(ii) out of the statute.

Moreover, even entertaining Plaintiffs' policy argument—notwithstanding its irrelevance to the strictly legal issue presented in this case—the toll rate schedule adopted by TBTA was informed by a thorough analysis of economic and socioeconomic effects of the Program, which was subject to robust public review and comment during the NEPA process. The Environmental Assessment ("EA") for the Program analyzed all of the economic concerns Plaintiffs now raise, including the potential impacts on "small businesses and wage earners." *See* Pl. Opp. 7. Far from

---

[7] *See* Bill Jacket for Chapter 50 of the Laws of 2019.

[8] While SAPA imposes specific reporting requirements for Type (i) rules, it does not require hearings for all Type (i) or Type (ii) rules but leaves it to the underlying statute. SAPA § 202(1)(a).

7

ignoring the role small businesses play in New York City, the EA recognized that most of the businesses in the CBD (over 90 percent) are small businesses (those with fewer than 100 employees), and most small businesses (78 percent) are also micro-businesses (small businesses with fewer than 20 employees). (DOT_0036695.)

The EA also looked at the Program's effect on wage earners commuting into the City, including on a county level. (DOT_0036734–35, DOT_0036740.) For example, the EA explicitly evaluated the Program's potential impacts on workers in various occupational categories, including but not limited to construction, transportation, sales, food preparation, healthcare, education, maintenance, social services, manufacturing, and entertainment. (DOT_0036693–95, DOT_0036749.) Further, while Plaintiffs argue that creation of a small business working group fell short of the type of "mitigation and alternatives" envisioned by SAPA, they fail to explain how the efforts undertaken during the EA process fall short, substantively, of what SAPA requires for Type (i) rules. Pl. Opp. 7.

In addition to understating the EA's review of potential economic impacts, Plaintiffs make other blatant misstatements about the EA process and the current status of small businesses within the CBD. *Id.* 7, 9. Contrary to Plaintiffs' claims, the Project Sponsors (TBTA and the New York State and City Departments of Transportation) accepted and reviewed all public comments on the EA, including those addressing the Program's potential socioeconomic impacts.[9] *Id.* 8. And far from "preventing" any mitigating actions, *id.* 7, the Finding of No Significant Impact required mitigation measures where adverse effects were identified, and even included some enhancement

---

[9] (*See, e.g.*, DOT_0011042, DOT_0011048, DOT_0013392, DOT_0014252, DOT_0014640, DOT_0014640, DOT_0015428, DOT_0024523, DOT_0025320, DOT_0026469, DOT_0028577, DOT_0029104, DOT_0029964, DOT_0030499, DOT_0030506, DOT_0031054, DOT_0031056, DOT_0031058, DOT_0031062, DOT_0031066, DOT_0031068, DOT_0031070, DOT_0031074, DOT_0031084, DOT_0031086, DOT_0031088, DOT_0031600, DOT_0003315.)

measures—such as the Small Business Working Group—where they were not, in response to public concerns. (DOT_0040683–84.) The EA concluded that the Program would not have an adverse economic effect, which both reevaluations confirmed. (DOT_0045624, DOT_0047539.)

Plaintiffs' reliance on a November 2024 New York City Planning Survey (entitled *Storefront Activity in NYC Neighborhoods*) is not only belated, but also inaccurate. Although the Survey unsurprisingly reflects that the COVID-19 pandemic impacted small businesses within the CBD (and throughout New York City), it also concludes that storefront vacancies in the City are "trending down" and are "much recovered since the height of the pandemic," including in neighborhoods within the CBD. ECF 134-1 at 6, 11. For example, the West Village, Gramercy, Soho, Little Italy, Hudson Square, Murray Hill and Kips Bay are among the neighborhoods that have seen the greatest decreases in storefront vacancies from 2023 to 2024. *Id.* at 11.

Plaintiffs' reliance on statements from Governor Hochul to suggest the Program's toll rate schedule should have been a Type (i) rule is also misplaced. The Governor is not a party to this action, and she never took issue with the Program's toll rate schedule being adopted as a Type (ii) rule. Rather, the concerns the Governor expressed about the Program were rooted in policy—not TBTA's compliance with SAPA. And the Governor subsequently determined that the final adopted rate schedule—including the phase-in feature—helped address her previous concerns.[10] Thus, it is absurd to suggest that the Governor's expression of policy concerns about the Program's potential economic impacts, none of which had to do with SAPA and which she later deemed addressed, should undo TBTA's lawfully adopted toll ratemaking regulation for the Program. Indeed, the Secretary of State, the member of the Executive Branch tasked with reviewing each

---

[10] See Press Release, Gov. Kathy Hochul, Putting Commuters First, Keeping Costs Down: Governor Hochul Unveils Plan for Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls (Nov. 14, 2024), https://www.governor.ny.gov/news/putting-commuters-first-keeping-costs-down-governor-hochul-unveils-plans-future-transit-and.

9

notice submitted for publication in the State Register, did not raise any concern with the toll rate schedule's publication as a Type (ii) rule. SAPA § 202(9)(a)(iii).

## CONCLUSION

For the reasons provided above, the Metropolitan Transportation Authority (the "MTA") and TBTA respectfully request that this Court dismiss all remaining claims in this action.

Dated: December 18, 2024  
       New York, NY

Respectfully submitted,

| | |
|---|---|
| MURIEL GOODE-TRUFANT<br>Corporation Counsel of the City of New York<br>By: */s/ Nathan Taylor*<br>    Nathan Taylor<br>    Senior Counsel<br>    Environmental Law Division<br>    New York City Law Department<br>    100 Church Street<br>    New York, NY 10007<br>    (212) 356-2315<br>    ntaylor@law.nyc.gov<br><br>*Counsel for Defendant the New York City Department of Transportation* | */s/ Mark A. Chertok*<br>Mark A. Chertok<br>Elizabeth Knauer<br>John F. Nelson<br>Amy Cassidy<br>SIVE, PAGET & RIESEL, P.C.<br>560 Lexington Avenue, 15th Floor<br>New York, NY 10022<br>(212) 421-2150<br>mchertok@sprlaw.com<br>eknauer@sprlaw.com<br>jnelson@sprlaw.com<br>acassidy@sprlaw.com<br><br>*/s/ Roberta A. Kaplan*<br>Roberta A. Kaplan<br>D. Brandon Trice<br>Maximilian T. Crema<br>KAPLAN MARTIN LLP<br>1133 Avenue of the Americas<br>Suite 1500<br>New York, NY 10036<br>(212) 316-9500<br>rkaplan@kaplanmartin.com<br>btrice@kaplanmartin.com<br>mcrema@kaplanmartin.com<br><br>*Counsel for Defendants the Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority* |

10