UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/23/2024
```

| | |
|---|---|
| ELIZABETH CHAN, *et al.*,<br><br>     Plaintiffs,<br><br>  -v-<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>     Defendants. | |

23-cv-10365 (LJL)
24-cv-01644 (LJL)
24-cv-00367 (LJL)
24-cv-04111 (LJL)

<u>OPINION AND ORDER</u>

MICHAEL MULGREW, *et al.*,

     Plaintiffs,

  -v-

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

     Defendants.

NEW YORKERS AGAINST CONGESTION
PRICING TAX, *et al.*,

     Plaintiffs,

  -v-

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

     Defendants.

TRUCKING ASSOCIATION OF NEW YORK,

     Plaintiff,

  -v-

METROPOLITAN TRANSPORTATION
AUTHORITY, *et al.*,

     Defendants.

LEWIS J. LIMAN, United States District Judge:

Before the Court are four related cases, each seeking a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) that would enjoin implementation of the Central Business District Tolling Program ("Tolling Program"). The cases are *Chan et al. v. U.S. Department of Transportation et al.* ("*Chan*"), 23-cv-10365; *Mulgrew et al. v. U.S. Department of Transportation et al.* ("*Mulgrew*"), 24-cv-1644; *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of Transportation et al.* ("*New Yorkers*"), 24-cv-367; and *Trucking Association of New York v. Metropolitan Transportation Authority et al.* ("*Trucking*"), 24-cv-4111.

This opinion and order sets forth the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For the reasons that follow, Plaintiffs' motions for a preliminary injunction are denied.

## I.    PROCEDURAL HISTORY

### A.    *Chan*, 23-cv-10365

On November 22, 2023, the *Chan* Plaintiffs commenced suit by filing a *pro se* complaint in the United States District Court for the Southern District of New York. *Chan*, Dkt. No. 1.[1] The case was assigned to the undersigned on January 24, 2024, as related to *New Yorkers*. On February 23, 2024, Plaintiffs in *Chan* filed an amended complaint naming as defendants the Federal Highway Administration ("FHWA"), Shailen Bhatt in his official capacity as administrator of the FHWA, Richard J. Marquis in his official capacity as Division Administrator of the New York Division of the FHWA, Nicholas A. Choubah, P.E. in his official capacity as Chief Engineer for the New York State Department of Transportation ("NYSDOT"), the Metropolitan Transportation

---

[1] The *Chan* Plaintiffs are now represented by counsel and are no longer proceeding *pro se*.

Authority ("MTA"), the Triborough Bridge and Tunnel Authority ("TBTA"), the United States Department of Transportation ("USDOT"), and William J. Carry in his official capacity as Assistant Commissioner for Policy for the New York City Department of Transportation ("NYCDOT"). *Chan*, Dkt. No. 39. The amended complaint noted that Chief Engineer Choubah has been replaced by Stephanie Winkelhake, who currently acts as Chief Engineer for the NYSDOT. *Id.* ¶ 44 n.4. The parties' motions to dismiss the amended complaint and for summary judgment were filed on April 1, 2024. *Chan*, Dkt. Nos. 61, 64, 67. On June 20, 2024, the Court issued an opinion and order on the motions to dismiss and for summary judgment. *See Mulgrew v. United States Dep't of Transportation*, 2024 WL 3251732 (S.D.N.Y. June 20, 2024).

On July 26, 2024, the *Chan* Plaintiffs moved to amend the complaint. *Chan*, Dkt. No. 106. The motion was granted and the second amended complaint was filed on November 7, 2024. *Chan*, Dkt. No. 124. The second amended complaint asserts claims for: (1) violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; (2) violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3; (3) violation of the right to travel; and (4) violation of the Green Amendment, N.Y. Const. art. I, § 19. *Id.* Winkelhake moved to dismiss the federal constitutional claims on September 30, 2024, and filed a memorandum of law in support of the motion. *Chan*, Dkt. Nos. 115–116. On September 30, 2024, the MTA, TBTA, Traffic Mobility Review Board ("TMRB"), New York City Department of Transportation ("NYCDOT"), and Carry (the "Municipal Defendants") filed an omnibus motion to dismiss the constitutional claims and filed a memorandum of law in support of the motion. *Chan*, Dkt. Nos. 117–118.[2] The *Chan* Plaintiffs

---

[2] The Amended Complaint names William J. Carry in his official capacity as Assistant Commissioner for Policy for the NYCDOT as a defendant rather than the NYCDOT itself. The

filed a memorandum of law in opposition to the omnibus motion to dismiss on November 25, 2024. *Chan*, Dkt. No. 130.

On November 29, 2024, the *Chan* Plaintiffs filed a motion for a preliminary injunction on the basis of the constitutional claims "preliminarily enjoining Defendants from implementing the Central Business Tolling Program, and for such other and further relief as this Court deems proper." *Chan*, Dkt. No. 133. Plaintiffs' memorandum of law in support of the motion for a preliminary injunction adopted arguments made in opposition to the *Chan* motions to dismiss and in support of the *Trucking* Plaintiffs' motion for a preliminary injunction. *Chan*, Dkt. No. 134. Winkelhake filed a reply memorandum of law in support of her motion to dismiss and in opposition to the motion for a preliminary injunction on December 2, 2024. *Chan*, Dkt. No. 135. Also on December 2, 2024, the Municipal Defendants filed a reply memorandum of law and two declarations in support of the omnibus motion to dismiss and in opposition to the motion for a preliminary injunction. *Chan*, Dkt. Nos. 137–139. Plaintiffs filed a reply memorandum of law in support of their motion for a preliminary injunction on December 6, 2024. *Chan*, Dkt. No. 142.

### B.    *Mulgrew*, 24-cv-1644

On January 4, 2024, the *Mulgrew* Plaintiffs commenced suit by filing a complaint in the United States District Court for the Eastern District of New York. *Mulgrew*, Dkt. No. 1. The *Mulgrew* Plaintiffs filed an amended complaint naming as defendants the USDOT, Bhatt in his official capacity, the FHWA, Marquis in his official capacity, the MTA, the TBTA, the NYSDOT, and the NYCDOT. *Mulgrew*, Dkt. No. 19. Motions to dismiss were filed on March 18, 2024.

---

Court will refer to Carry as part of the Municipal Defendants for convenience. *See Mulgrew*, 2024 WL 3251732, at *8 n.11 (citing *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007)). The TMRB is not named as a defendant in *Chan* but joined the omnibus motion to dismiss in its capacity as a defendant in *New Yorkers* and *Trucking*.

*Mulgrew*, Dkt. Nos. 47, 49, 52.  On June 20, 2024, the Court issued an opinion and order on the motions to dismiss.  *See Mulgrew*, 2024 WL 3251732.

On July 26, 2024, the *Mulgrew* Plaintiffs moved to amend the complaint.  *Mulgrew*, Dkt. No. 93.  The motion was granted and the second amended complaint was filed on November 8, 2024.  *Mulgrew*, Dkt. No. 112.  The second amended complaint asserts claims for: (1) violation of NEPA; (2) violation of the Commerce Clause; (3) violation of the right to travel; and (4) violation of the Green Amendment.  *Id.*  The second amended complaint also added Winkelhake as a defendant.  *Id.* ¶ 78.  Winkelhake moved to dismiss the federal constitutional claims on September 30, 2024, and filed a memorandum of law in support of the motion.  *Mulgrew*, Dkt. Nos. 102–103.  On September 30, 2024, the Municipal Defendants filed an omnibus motion to dismiss the constitutional claims and filed a memorandum of law in support of the motion.  *Mulgrew*, Dkt. Nos. 104–105.  The *Mulgrew* Plaintiffs filed a memorandum of law in opposition to the omnibus motion to dismiss on November 25, 2024.  *Mulgrew*, Dkt. No. 118.

On November 29, 2024, the *Mulgrew* Plaintiffs filed a motion for a preliminary injunction on the basis of the constitutional claims "preliminarily enjoining Defendants from implementing the Central Business Tolling Program, and for such other and further relief as this Court deems proper."  *Mulgrew*, Dkt. No. 121.  The *Mulgrew* Plaintiffs' memorandum of law in support of the motion for a preliminary injunction adopted arguments made in opposition to the *Mulgrew* motions to dismiss and in support of the *Trucking* motion for a preliminary injunction.  *Mulgrew*, Dkt. No. 122.  Winkelhake filed a reply memorandum of law in support of her motion to dismiss and in opposition to the motion for a preliminary injunction on December 2, 2024.  *Mulgrew*, Dkt. No. 123.  Also on December 2, 2024, the Municipal Defendants filed a reply memorandum of law and two declarations in support of the omnibus motion to dismiss and in opposition to the motion

for a preliminary injunction. *Mulgrew*, Dkt. Nos. 125–127.  Plaintiffs filed a reply memorandum of law in support of their motion for a preliminary injunction on December 6, 2024.  Dkt. No. 130.

### C. *New Yorkers*, 24-cv-367

On January 18, 2024, the *New Yorkers* Plaintiffs commenced suit by filing a complaint in the United States District Court for the Southern District of New York.  *New Yorkers*, Dkt. No. 1. On February 27, 2024, the *New Yorkers* Plaintiffs filed an amended complaint naming as defendants the USDOT, the FHWA, Bhatt in his official capacity, Marquis in his official capacity, the MTA, the TBTA, the NYSDOT, the NYCDOT, and the TMRB.  *New Yorkers*, Dkt. No. 54. The amended complaint asserts claims for: (1) violation of NEPA; (2) violation of the State Administrative Procedure Act ("SAPA"), N.Y. A.P.A. Law §§ 100 *et seq*.; and (3) violation of the Green Amendment.  *Id.*  Motions to dismiss were filed on March 18, 2024.  *New Yorkers*, Dkt. Nos. 57, 59, 62.  On June 20, 2024, the Court issued an opinion and order on the motions to dismiss.  *See Mulgrew*, 2024 WL 3251732.

On September 30, 2024, the Municipal Defendants filed an omnibus motion to dismiss the constitutional claims along with a memorandum of law in support of the motion.  *New Yorkers*, Dkt. Nos. 105–106.  The *New Yorkers* Plaintiffs filed a memorandum of law in opposition to the omnibus motion to dismiss on November 14, 2024.  *New Yorkers*, Dkt. No. 112. On December 2 and 3, 2024, the Municipal Defendants filed a reply memorandum of law and two declarations in support of the omnibus motion to dismiss.  *New Yorkers* , Dkt. Nos. 123–125.

On December 2, 2024, the *New Yorkers* Plaintiffs moved for a preliminary injunction that would "preliminarily enjoin the MTA/TBTA from commencing the Congestion Pricing Program without first following the dictates of [the State Administrative Procedure Act]."  *New Yorkers*, Dkt. No. 120.  The *New Yorkers* Plaintiffs submitted a memorandum of law and declaration in support of that motion.  *New Yorkers*, Dkt. Nos. 121–122.  The Municipal Defendants submitted

a memorandum of law and a declaration in opposition to that motion on December 9, 2024. Dkt. Nos. 130–131. On December 12, 2024, Plaintiffs submitted a reply memorandum of law and a declaration in further support of the motion. Dkt. Nos. 133–134.

**D.** *Trucking*, **24-cv-4111**

On May 30, 2024, Plaintiff Trucking Association of New York ("TANY") commenced suit by filing a complaint in the United States District Court for the Southern District of New York. *Trucking*, Dkt. No. 1.[3] The complaint names as defendants the MTA, the TBTA, and Letitia James in her official capacity as New York State Attorney General ("NYAG"). *Id.* On September 20, 2024, the parties in *Trucking* submitted a stipulation dismissing the NYAG as a defendant and joining her as an intervenor pursuant to 28 U.S.C. § 2403(b). *Trucking*, Dkt. No. 57. The Court so ordered the stipulation on September 27, 2024. *Trucking*, Dkt. No. 58. The complaint asserts claims for: (1) violation of the Commerce Clause; (2) violation of the right to travel; and (3) violation of the Supremacy Clause, U.S. Const. art. VI, cl. 2.

On May 30, 2024, TANY moved for a preliminary injunction with a memorandum of law and four declarations in support of the motion. *Trucking*, Dkt. Nos. 4–8. On June 4, 2024, the United Parcel Service, Inc. ("UPS") filed an amicus brief in support of TANY's motion for a preliminary injunction. *Trucking*, Dkt. Nos. 26–27, 29. On September 30, 2024, the NYAG moved to dismiss the complaint and filed a memorandum of law in support of the motion. *Trucking*, Dkt. Nos. 60–61. On September 30, 2024, the Municipal Defendants also filed an omnibus motion to dismiss the constitutional claims and filed a memorandum of law in support of the motion. *Trucking*, Dkt. Nos. 62–63. TANY filed a memorandum of law in opposition to the motions to dismiss on November 25, 2024. *Trucking*, Dkt. No. 76. On December 2, 2024, the

---

[3] The May 30, 2024 complaint was rejected due to a filing error and the document was refiled on May 31, 2024. *Trucking*, Dkt. No. 14.

NYAG filed a reply memorandum of law in support of her motion to dismiss and in opposition to the motion for a preliminary injunction. *Trucking*, Dkt. No. 79. On December 2 and 3, 2024, the Municipal Defendants filed a reply memorandum of law and two declarations in support of the omnibus motion to dismiss and in opposition to the motion for a preliminary injunction. *Trucking*, Dkt. Nos. 80–82. On December 5, 2024, the Association of Contracting Plumbers of the City of New York, Inc. filed an amicus brief in opposition to the motions to dismiss and in support of TANY's motion for a preliminary injunction. *Trucking*, Dkt. Nos. 87–88, 97. The Municipal Defendants filed a letter of supplemental authority on December 9, 2024. *Trucking*, Dkt. No. 90. TANY filed a letter brief addressing the supplemental authority on December 12, 2024. *Trucking*, Dkt. No. 94. The Municipal Defendants filed a reply letter brief regarding the supplemental authority on December 16, 2024. *Trucking*, Dkt. No. 96.

*    *    *

The Court held a hearing on Plaintiffs' preliminary injunction motions on December 20, 2024. Plaintiffs eschewed the opportunity to present evidence at the hearing.

## II.    FINDINGS OF FACT

### A.    The Traffic Mobility Act

The Court's prior opinion and order dated June 20, 2024, set forth a brief history of the Tolling Program and its antecedents. *See Mulgrew*, 2024 WL 3251732, at *2–4 (tracing the history of the Tolling Program to Mayor John Lindsay's endorsement of William S. Vickrey's congestion pricing proposals and Mayor Michael Bloomberg's revival of the plan). Familiarity with that opinion is presumed. In short, the New York State Legislature enacted the Traffic Mobility Act ("Act") on April 1, 2019. N.Y. Veh. & Traf. Law §§ 1701 *et seq.* The Act's legislative findings noted the ongoing failures of transportation infrastructure throughout the New York City subway system and stated that those failures "continue to have a deleterious impact on the health, safety,

8

and livelihood of commuters, tourists, resident New Yorkers, as well as . . . the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding to repair and revitalize this significantly important mass transit asset." N.Y. Veh. & Traf. Law § 1701.  The Legislature further found that "traffic congestion in the city of New York ranks second worst among cities in the United States and third worst among cities in the world, and results in significant cost to the New York metropolitan area economy and in turn the state's economy at estimates exceeding one hundred billion dollars over the next five years." *Id.*  The Legislature noted that traffic speeds in the Manhattan Central Business District ("CBD") had continued to drop and that the extreme congestion impacted "the everyday lives of residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services, and is a significant contributor to decreased air quality."  *Id.*

The Act directed the TBTA to enter into a memorandum of understanding with the NYCDOT "for purposes of coordinating the planning, design, installation, construction and maintenance" of a program to establish tolls for vehicles entering or remaining in the CBD.  N.Y. Veh. & Traf. Law § 1704(2).  The Act defines the CBD as "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable" excluding the Franklin D. Roosevelt ("FDR") Drive, and New York state route 9A (the "West Side Highway") including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street.  *Id.*  The Act also requires the TBTA to ensure that the tolling program generates at least $15 billion dollars of net revenue to be used for MTA capital projects.  N.Y. Veh. & Traf. Law § 1704-a(1).

The Legislature also created the TMRB to assist the TBTA in the development of an appropriate variable tolling structure.  N.Y. Pub. Auth. Law § 553-k.  The Act sets forth certain

restrictions for the variable tolling structure. For example, passenger vehicles registered pursuant to N.Y. Veh. & Traf. Law § 401(6) may only be charged once per day for purposes of entering the CBD, and there can be no charge on qualifying authorized emergency vehicles or qualifying vehicles transporting a person with disabilities. N.Y. Veh. & Traf. Law § 1704-a(2). The Act further directed the TBTA to "implement a plan for credits, discounts and/or exemptions for tolls paid on bridges and crossings" and for tolls paid by for-hire vehicles based on the recommendations of the TMRB. N.Y. Veh. & Traf. Law § 1704-a(3)–(4). It additionally authorized the TBTA to provide further credits, discounts, and exemptions to be informed by both the recommendations of the TMRB and a traffic study that considers impact. N.Y. Veh. & Traf. Law § 1704-a(3)(b). The Legislature created a tax credit for low-income New Yorkers residing within the CBD. *See* N.Y. Tax Law § 606(jjj). The Legislature required that the ultimate tolling schedule undergo a public hearing and take effect only if approved by a majority vote of the TBTA. N.Y. Pub. Auth. Law § 553(12-a).

### B.    Environmental Assessments

In 2019, the NYSDOT, NYCDOT, and TBTA (together, the "Project Sponsors" or "Sponsors") submitted an Expression of Interest to the FHWA under the Value Pricing Pilot Program ("VPPP"). *Chan*, Dkt. No. 139 ¶ 3; *Mulgrew*, Dkt. No. 127 ¶ 3; *New Yorkers*, Dkt. No. 125 ¶ 3; *Trucking*, Dkt. No. 82 ¶ 3. The Sponsors required federal approval because the Tolling Program sought to impose tolls on federal-aid highways in Manhattan. *See* 23 U.S.C. § 301. The FHWA collaborated with the Sponsors in conducting an environmental review process in accordance with NEPA over the course of several years. *See Mulgrew*, 2024 WL 3251732, at *4–7. The FHWA and Sponsors invited public engagement, and more than 1,000 people attended

webinars hosted for that purpose, with nearly 400 of those attendees speaking.  DOT 37960–62.[4]
The FHWA and Sponsors received 7,338 comments.  DOT 37960.  The Sponsors additionally held
meetings with stakeholder groups including Connecticut, New Jersey, and New York Trucking
Associations.  DOT 37048–49.  In connection with this feedback, the FHWA published a draft
environmental assessment ("draft EA") on July 29, 2022, that accounted for several different
tolling scenarios (collectively referred to as the "CBD Tolling Alternative").  DOT 37262–63.  In
most of the assessed tolling scenarios, "the toll rates for different types of vehicles, like delivery
trucks, [were] different than the toll rates for noncommercial passenger vehicles."  DOT 37191.
The draft EA found that "[a]ll tolling scenarios within the CBD Tolling Alternative would result
in travel pattern changes that would support congestion relief: reduced automobile and truck trips
to the Manhattan CBD, reduced [vehicle miles traveled] to and within the Manhattan CBD and
regionally, and a shift from auto trips to transit."  DOT 37331.

The draft EA found that multiple state and city studies conducted over the previous forty-
five years "overwhelmingly pointed to congestion pricing, or introduction of tolls based on traffic
levels, as the most effective tool" to address congestion in the CBD.  DOT 37185.  By the time of
release, New York City's traffic congestion ranked worst among all cities in the United States, and
the draft EA stated that "[l]ow travel speeds and unreliable travel times to, from, and within the
Manhattan CBD increase commute and travel times for vehicles using the roadways, erode worker
productivity, reduce bus and paratransit service quality, raise the cost of deliveries and the overall
cost of doing business, and delay emergency vehicles."  DOT 37186, 37214, 37229.  The FHWA
and Sponsors invited public comment on the draft EA and ultimately received approximately

---

[4] Citations to "DOT" refer to the administrative record lodged by the FHWA.

70,000 submissions in the form of hearing testimony, letters, emails, voicemails, and online comments from residents, advocacy groups, businesses, and government agencies.  DOT 37063.

The FHWA and Project Sponsors published the final environmental assessment ("final EA" or "EA") on May 5, 2023.  DOT 506153.  The final EA affirmed that "there is a need to reduce vehicle congestion in the Manhattan CBD to improve the reliability and efficiency of the transportation system" and noted that "[t]ransit is critical to New York City's overall economy, and to the region's residents, workers, and visitors, and continued investment in transit is necessary to ensure ongoing mobility and accessibility."  DOT 36197.  All considered tolling scenarios were again predicted to "result in travel pattern changes that would support congestion relief: reduced automobile and truck trips to the Manhattan CBD, reduced [vehicle miles traveled] to and within the Manhattan CBD and regionally, and a shift from auto trips to transit."  DOT 36363.  The assessment analyzed how the CBD Tolling Alternatives would impact the environment (including with regard to air pollution, noise pollution, and natural resources) and additionally considered potential economic and social ramifications.  Some of the final EA's findings are summarized briefly below.

### 1.    Environmental Effects

The final EA analyzed the potential effects of the CBD Tolling Alternative on the New York City metropolitan region, using a regional study area consisting of 28 counties.  DOT 36917.  The assessment found that the Tolling Program "would decrease volumes on area highways and roadways to, from, and within the Manhattan CBD, resulting in less congestion and improved travel speeds and travel times for motorists who continue to use these roads, except for a limited number of locations where traffic volumes would increase as drivers adjust their routes to avoid the Manhattan CBD."  DOT 36917–19.  Overall, the number of vehicle miles traveled would decrease in the CBD and in the region overall, with some motorists choosing to utilize transit

options instead of auto travel and some declining to make the trip altogether. *Id.* Traffic in the CBD would decrease 7–9%, and traffic in other parts of the city and parts of the state north of the city would decrease 0–1%. DOT 36918. Traffic in Long Island, New Jersey, and Connecticut would increase less than 0.2%. *Id.*

Vehicle emissions would increase or decrease corresponding with vehicle miles traveled. Accordingly, the final EA predicted that air pollution would decrease across the region overall but that there would some small increases in localized areas. DOT 36838. Traffic in the CBD is expected to decrease by at least 7% with corresponding improvements to air quality. DOT 36839–41, 36853–85. In the short term, pollution would decrease in Manhattan, Queens, Brooklyn, Rockland County and Hudson County. DOT 36838–51. Pollution would increase in the Bronx, Staten Island, Nassau County, and Bergen County in the short term. *Id.* Suffolk, Westchester, and Putnam Counties would see mixed results in the short term with some pollutants increasing and others decreasing. In the longer term, the assessment predicted that pollution would decrease in Manhattan, Queens, Brooklyn, Suffolk County, and Hudson County. *Id.* Pollution would increase in Staten Island and Bergen County; and there would be mixed results in the Bronx, Nassau, Westchester, Rockland, and Putnam Counties. *Id.* Similar results were expected for mobile source air toxics. DOT 36852–58. A screening analysis was conducted to determine whether detailed microscale analyses of the impacts of carbon monoxide emissions and particulate matter would be required, or if the traffic would be below the screening thresholds and thus require no further analysis. DOT 36859. All 102 screened locations passed, indicating minimal impacts. DOT 36860–63. The Project Sponsors committed to continued carbon monoxide monitoring. DOT 36865. Overall, the assessment concluded that "[f]or all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in regional or localized

exceedances of National Ambient Air Quality Standards, and there would be no adverse effects on air quality from implementation of the CBD Tolling Alternative."  DOT 36942.

Noise pollution would decrease in most areas and the maximum noise level increases would be less than three decibels—nearly imperceptible by the human ear.  DOT 36882–87, 36926.

Constructing and maintaining the infrastructure and equipment used to implement the Tolling Program would have a negligible impact on the environment, as the equipment would replace or be similar in form to pre-existing streetlight poles and signs.  DOT 36916–17.  Some of the equipment and systems would require additional energy input, but total energy use would decrease across the region due to fewer vehicle miles traveled.  DOT 36874.  The final EA found that the CBD Tolling Alternative would not affect surface waters and wetlands, flood plans, ground water, protected species, or other natural resources.  DOT 36900–02.

The final EA also responded to the input received from the public, including by appending a technical memorandum examining "how environmental justice communities with preexisting air pollution and health burdens could be affected by Project-generated increases or decreases in highway traffic adjacent to these areas."  DOT 36156.  The memorandum explained that "regardless of the tolling structure eventually adopted," the Project Sponsors committed $155 million over five years to mitigate the potential effects.  DOT 36211, 36213.  Those efforts included further reductions to overnight tolls and expanding the NYCDOT Off-Hours Delivery Program[5] to decrease auto and truck diversions to environmental justice communities, renovating

---

[5] NYCDOT's Off-Hours Delivery Program is a pilot program that provides support for businesses that shift their deliveries to off-peak periods.  DOT 36753 (citing New York City Department of Transportation, *Off-Hour Deliveries* (2010), https://www.nyc.gov/html/dot/downloads/pdf/ssi10-offhour.pdf).

parks and greenspace in environmental justice communities, and developing electronic truck charging infrastructure.  DOT 36213, 36372.  In light of the Sponsors' mitigation commitments, the FHWA found that the project "would not result in a disproportionately high and adverse effect on environmental justice communities."  DOT 36211.

### 2.    Economic Effects

The final EA considered three primary measures of economic impact: (1) direct displacement, "which occurs when residents or businesses must move from a site or sites as a direct result of a project;" (2) indirect, or secondary, displacement, "which occurs when a project alters one or more of the underlying forces that shape real estate market conditions in an area, resulting in conditions that cause the displacement of residents, businesses, or employees;" and (3) "[c]hange in the economic and operational conditions of an industry, within or outside a directly affected area, that results in a loss or substantial diminishment of a particularly important product or service."  *Id.*  The final EA relied on the Best Practice Model, which is "the New York City region's primary long-range travel forecasting model," DOT 36304, as well as data from the U.S. Census Bureau, the U.S. Department of Labor, Esri Business Analyst (a private data provider for retail sales estimates by geography), the New York City Department of City Planning Neighborhood Tabulation Areas, the New York City Department of Consumer Affairs, and various industry literature.  DOT 36685–86.  The Project Sponsors also committed to establishing a Small Business Working Group to share information about implementation of the Tolling Program and findings from evaluating the effects of the Tolling Program, and to solicit ongoing input on how businesses are being affected.  DOT 36752.

Ultimately, the final EA concluded that the CBD Tolling Alternative "would provide an economic *benefit* to the Manhattan CBD, and thus to the region and nation."  DOT 36763 (emphasis added).  Because the CBD Tolling Alternative would reduce congestion, motorists

transporting goods or commuting by car, truck, or bus would experience reduced travel time and increased travel-time reliability. DOT 36626–27, 36763.[6] They would be able to increase productive hours because drivers and their passengers would spend less time sitting in traffic and would not have to depart earlier than necessary to account for the uncertain arrival times. *Id.* Motorists, cyclists, and pedestrians alike would enjoy a reduction in auto collisions and the attendant costs. DOT 36763. The Tolling Program would also "improve accessibility for disabled individuals throughout the region by providing benefits to improve paratransit services, such as reduced roadway congestion and travel-time improvements." *Id.*

As far as negative economic impacts, the final EA found that "[a]t a regional level, the CBD Tolling Alternative would not substantively alter one or more of the underlying forces that shape real estate market conditions, and therefore would not be likely to result in the involuntary displacement of residents, businesses, or employees." DOT 36732. It therefore focused on potential changes in workforce and the operations of certain industries. DOT 36733.

The final EA found that "[t]he disincentive to drive created by the Project would not adversely affect economic conditions within or outside of the Manhattan CBD" because "[m]ost of the potentially affected workforce who presently work inside the Manhattan CBD live and/or work near transit." DOT 36739. Approximately 99% of workers who commute into the Manhattan CBD by car have jobs that are close to transit. *Id.* One third of those commuters drive from residences that are close to transit. *Id.* And the 12,535 Manhattan CBD residents who

---

[6] A Travel-Time Reliability ratio of 1.0 demonstrates little variability in travel time resulting from congestion (and thus less wasted time spent in traffic). The assessment noted that "[i]n Manhattan, the daily level of travel-time reliability for all vehicle modes is 1.65 and for trucks it is 2.67." DOT 36256 (citing New York Metropolitan Transportation Council, *Congestion Management Process Status Report* (2021)). "[T]o arrive at a destination on time, drivers regularly need to assume that their trip could take more than four times what it would during free-flow periods." *Id.*

commute by car to work at jobs outside the Manhattan CBD represent approximately 0.01% of the regional labor force.  The assessment thus concluded that "the increased cost for those who commute by car would not disproportionately affect the operations of a specific industry, although it may incentivize workers currently incentivized to drive by the availability of free parking to switch to a transit mode."  DOT 36738.  The assessment similarly noted that "[w]ith respect to Manhattan CBD reverse commuters, the BPM projections indicate that in the aggregate, there would be minimal overall change in the number of workers who commute from the Manhattan CBD to other regional locations because of the CBD Tolling Alternative."  DOT 36739.

With regard to discretionary car travel, such as shopping or entertainment expeditions, the assessment found that the total number of journeys "would remain essentially the same" though the destinations might minimally vary.  DOT 36740–41.  Although members of the public and stakeholders expressed concern that the toll would impact New York City's tourism industry, the final assessment noted that "[t]he tourism industry in the Manhattan CBD is not dependent on travel by personal vehicles or taxis/[for-hire vehicles] because the Manhattan CBD and tourist destinations within it are very well-served by public transit."  DOT 36743.  Tourists often travel by transit and the EA cited studies that "have identified investments in mass transit as important to supporting the health and growth of New York City's tourism industry, both before and after the COVID-19 pandemic."  *Id.* (citing *Vanderbilt Corridor and One Vanderbilt Final Environmental Impact Statement* (2015); Office of the New York State Comptroller, *The Tourism Industry in New York City: Reigniting the Return* (2021)); *see also id.* (noting that "traffic congestion within the Manhattan CBD, which leads to low travel speeds and unreliable travel times, can contribute to a poor-quality experience for tourists").  Indeed, "[t]ourist visitation data from London, England, and Stockholm, Sweden, indicates that the number of tourists visiting these

cities continued to grow following the implementation of congestion-based pricing programs" and the hotel and restaurant industries located within the London charge zone "registered stronger business performance since the introduction of charging, with consistent growth in employment and the numbers of businesses." *Id.* (quoting Transport for London, *Central London Congestion Charging: Impacts Monitoring (Fifth Annual Report)* (2007)).

The EA noted that an increase in taxi and for-hire vehicle ("FHV") fares "could reduce demand and industry revenues for taxis and/or FHV." DOT 36744–47, 36975, 37003–09. However, the EA concluded that "[w]ith the CBD Tolling Alternative, reductions in vehicle volumes and [vehicle miles traveled] in the Manhattan CBD and other locations within the regional study area would benefit taxi and FHV drivers." DOT 37004–05. Reduced congestion and improved speeds would permit drivers to reach their customers more quickly and transport them to their destinations more quickly, thus allowing the drivers to complete more paid trips. *Id.*

Truck drivers are also expected to enjoy net benefits. The final EA stated that the CBD Tolling Alternative "would reduce costs for truck deliveries related to the time spent making the delivery" by reducing congestion. DOT 36751. Additionally, because the demand for parking in the Manhattan CBD would be reduced, trucks would have improved access to legal curbside parking and avoid tickets—fines for which frequently exceed $1,000 per truck per month. *Id.* (citing Jose Holguin-Veras, et al., *Integrative Freight Demand Management in the New York City Metropolitan* (2010)); *see also Trucking*, Dkt. No. 6 ¶¶ 12–13, 20 (The president of Lightning Express Delivery Service, Inc., a member of TANY, averred that "[e]ntering New York City is extremely expensive due to already existing bridge and tunnel tolls, not to mention parking meters and unavoidable fines."). The final EA noted that when Stockholm truck distribution companies were surveyed about the congestion pricing program trial in that city, their "feedback showed that

companies felt positively about the program regarding reduced congestion and more efficient deliveries."  DOT 26271–72 (citing Congestion Charge Secretariat for the City of Stockholm, *Facts and Results from the Stockholm Trials* (2006)).  In addition to benefiting the trucking companies, reduced delivery times would also reduce costs for businesses "such as the cost of remaining open for longer hours to process late deliveries; penalties for lost business revenue associated with missed schedules; [the] cost of spoilage for time-sensitive, perishable deliveries; [the] cost of maintaining greater inventory to cover the undependability of deliveries; [the] costs of reverting to less efficient production scheduling processes; and the additional cost incurred because of access to reduced markets for labor, customer, and delivery areas."  DOT 36751. "Additionally, when deliveries cannot be relied on to arrive on time, businesses must keep extra 'buffer stock' inventory on hand," whereas "[p]ricing of the nation's major thoroughfares to guarantee free flow of traffic will ensure that reliability is restored to the transportation system, keeping business and transportation costs low."  DOT 36732.  The final EA noted that "[r]eview of research on congestion-based pricing programs in Singapore; London, England; and Stockholm, Sweden found that these programs had not adversely affected retail markets."  DOT 36751–52.

The EA also reviewed possible neighborhood-level economic impacts and concluded that there was "no anticipated change to the overall operation or character of local streets and no effect on economic conditions."  DOT 36755.  The areas expected to experience increased traffic already experience high levels of vehicle traffic that influence market conditions, "and in any case, local market conditions are more heavily influenced by existing pedestrian traffic."  *Id.*  Car journeys to commercial businesses represent less than 10% of all consumer journeys in and immediately surrounding the Manhattan CBD, and thus the loss of consumer base from congestion pricing is expected to be less than 1.3%.  *Id.*  The main industry that the assessment noted would be

economically impacted were parking garages in certain parts of the city.  DOT 36762–63, 36765. However, the assessment noted that "given property values and consumer volumes" for the relevant area, "if one or more parking facilities were to close, these facilities could be redeveloped or repurposed with other uses; the sites would not remain vacant; therefore, their potential displacement would not create a climate of disinvestment that could lead to adverse effects on neighborhood character."  DOT 36763.

Ultimately, the final EA found that, in light of the CBD Tolling Alternative's beneficial effects and lack of adverse effects, no mitigation was required.  DOT 36766–67.  Plaintiffs do not offer any studies or industry literature contradicting the final EA's findings with regard to the predicted impact of the Tolling Program on congestion, the environment, or the economy.[7]

### C.    Finding of No Significant Impact

Alongside the final EA, the FHWA published a draft finding of no significant impact stating that the "FHWA has determined that the Proposed Action described in the Final Environmental Assessment . . . will have no significant impact on the human or natural environment."  DOT 40591.

The FHWA considered additional public comments before issuing the final finding of no significant impact on June 23, 2023.  DOT 363, 393.  It reaffirmed that the CBD tolling project described in the final EA "will have no significant impact on the human or natural environment" and that "[t]he Final EA provides sufficient evidence and analysis for determining that an environmental impact statement is not required."  DOT 363.  The FHWA took "full responsibility for the accuracy, scope, and content of the Final EA."  *Id.*

---

[7] Although Plaintiffs in *New Yorkers* submit as an exhibit a New York City Planning Survey noting that storefront vacancies are trending down since the height of the Covid-19 Pandemic, *New Yorkers*, Dkt. No. 134-1, nothing in that survey mentions the Tolling Program or otherwise disputes the final EA's findings.

### D.    TMRB Recommendations and Initial Adoption

The final EA stated that as the next steps, "the TMRB will recommend to the TBTA Board the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels," noting that "[t]he variable pricing structure could vary by time of day, day of week, and day of year and could be different for different types of vehicles." DOT 393.  "The Traffic Mobility Review Board's recommendation will be informed by the results of the Final EA, which includes a Traffic Study, and will consider such factors as traffic patterns, operating costs, public impact, and environmental impacts, including, but not limited to, air quality and emissions trends."  DOT 394.

In November 2023, the TMRB released its recommendation.  *See* Traffic Mobility Review Board, *Congestion Pricing in New York* (2023) ("TMRB Report").  The TMRB Report stated that "we have been guided by the groundbreaking legislation that mandated Congestion Pricing in New York City, as well as by the comprehensive National Environmental Policy Act [] process culminating in the Final Environmental Assessment [] and Finding of No Significant Impact." TMRB Report at 4.  It also stated that the TMRB's work was "informed by thousands of comments and feedback received from the public at hearings and outreach sessions and through online portals" and that "[w]e have paid particular attention to the impact of the program on environmental justice communities, people with disabilities, and other vulnerable groups."  *Id.* at 5.

The TMRB found that in 2018, for-hire vehicles and taxis made up 52% of vehicle traffic in the CBD, other automobiles and motorcycles made up 35%, commercial vans represented 5%, and trucks and buses each made up 4%.  *Id.* at 11.  It found that the "vast majority of those who drive to the CBD have access to transit" including commuter rail, urban rail, and express bus options.  *Id.*  The TMRB Report stated that the present traffic conditions cost "businesses,

commuters, and residents a staggering $20 billion a year" and threaten public health by "increasing air and noise pollution and increasing emergency vehicle response times." *Id.* at 6. To ameliorate those effects, the TMRB recommended the following tolling structure:

- Passenger vehicles and passenger-type vehicles with commercial license plates should be charged a $15 toll for entering the CBD, no more than once per day.

- Trucks should be charged a $24 or $36 toll for entering the CBD, depending on their size, as defined below.

- Buses providing transit or commuter services should be exempted from the toll. Other buses should be charged a $24 or $36 toll for entering the CBD, depending on their type, as defined below.

- Motorcycles should be charged half the passenger vehicle toll, no more than once per day.

- Tolls should be charged to vehicles only as they enter the CBD—not if they remain in or leave the zone.

- Congestion toll rates should apply during the most congested times of the day—from 5am to 9pm on weekdays, and from 9am to 9pm on weekends. Toll rates should be 75% lower in the nighttime.

- A credit against the daytime CBD toll rate should be provided to vehicles entering through the four tolled entries that lead directly into the CBD: the Queens-Midtown, Hugh L. Carey, Holland, and Lincoln Tunnels. The credit should be $5 for passenger vehicles, $2.50 for motorcycles, $12 for small trucks and intercity/charter buses, and $20 for large trucks and tour buses. No crossing credits should be in effect in the nighttime period when toll rates are 75% lower.

- NYC Taxi and Limousine Commission[]-licensed taxis and For-Hire Vehicles [] should be exempted from the daily system toll on vehicles. Instead, a per-ride CBD toll should be added to each paid passenger trip fare for rides made to, from, or within the CBD at the toll rate of $1.25 per-ride for taxis and $2.50 per-ride for app-based FHVs.

- Specialized government vehicles should be exempted from the CBD toll (in addition to emergency vehicles and vehicles transporting people with disabilities, as required by law).

- Low-income vehicle owners who qualify and register with TBTA should receive a 50% discount on the daytime auto toll after the first 10 trips made by that vehicle in a calendar month.

22

*Id.* at 8.  The TMRB stated that the proposed toll structure "prioritizes keeping the base toll as low as possible, avoiding unnecessary traffic diversions, supporting equity goals and environmental justice, and keeping the Program simple, easy to understand, and easy to administer."  *Id.* at 7.  Preliminary traffic models showed that the toll structure would result in an estimated 17% fewer vehicles entering the CBD and 9% fewer vehicle miles being driven in the CBD.  *Id.* at 16.

The TMRB noted that London, Stockholm, Singapore, and Milan all saw 20% to 30% reductions in traffic after implementing congestion pricing.  *Id.* at 10 (citing Center for Transport Studies, *The Stockholm Congestion Charges: An Overview* (July 2014); Federal Highway Administration, *Lessons Learned from International Experience in Congestion Pricing* (2021); Agency for Mobility Environment and Land Use*, Eco-Zone in Milan: Policy design, Enforcement and Impacts on Traffic and the Environment* (2014)).

The TMRB recommended a rate of $24 for small trucks (approximately 1.6 times the auto rate) and $36 for large trucks (approximately 2.4 times the auto rate).  *Id.* at 20.  It explained that "[a]lthough trucks make up only 4% of vehicles in the CBD, they have an outsized impact on congestion, because of their large size and large turning radii, their parking patterns, and the noise and air pollution they cause."  *Id.* (citing New York City Department of Transportation, *Miovision Vehicle Classification Data* (2018)).[8]  The TMRB explained that those "recommended truck tolls balance the need to encourage the optimization of deliveries, thereby reducing trucks' contribution to congestion in the zone, with the equal need to minimize unnecessary diversions through

---

[8] In the context of measuring noise pollution, vehicles are assigned a Passenger Car Equivalent ("PCE") value reflective of the noise output compared to a standard passenger automobile.  The PCE for an automobile is 1 unit, for one medium truck is 16 units, for one bus is 18 units, and for one heavy truck is 47 units.  DOT 36879.

communities that may already be burdened with comparatively high levels of air pollution and associated adverse health outcomes." TMRB Report at 20.[9]

In March 2024, the TBTA adopted the proposed toll rate schedule with an implementation date in or about June 2024. *Chan*, Dkt. No. 139 ¶ 4; *Mulgrew*, Dkt. No. 127 ¶ 4; *New Yorkers*, Dkt. No. 125 ¶ 4; *Trucking*, Dkt. No. 82 ¶ 4. On June 14, 2024, the FHWA "issued a re-evaluation finding that the conclusions in the Final EA remain valid in light of the final tolling schedule adopted by the MTA and thus that no further environmental review [wa]s warranted." *Mulgrew*, 2024 WL 3251732, at *9.

### E.    The Pause and Reinitiation of the Tolling Program

On June 5, 2024, Governor Hochul directed the MTA to pause implementation of the Tolling Program. *Chan*, Dkt. No. 91; *Mulgrew*, Dkt. No. 78; *New Yorkers*, Dkt. No. 85; *Trucking*, Dkt. No. 30.

A few months later, the Governor announced a proposal to proceed with the Tolling Program subject to a phase-in period for the first six years of the program. *Chan*, Dkt. No. 139 ¶ 6; *Mulgrew*, Dkt. No. 127 ¶ 6; *New Yorkers*, Dkt. No. 125 ¶ 6; *Trucking*, Dkt. No. 82 ¶ 6. On November 18, 2024, the TBTA Board adopted the Governor's proposed phase-in approach. *See* Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://new.mta.info/document/138931 ("Phase-In Tolling Structure"). The Phase-In Tolling Structure calls for tolls to be levied at 60% of the TMRB's recommended rates for the years 2025–2027, 80% for the years 2028–2030, and 100% for 2031 onward. *Id.*

---

[9] The final EA similarly stated that "[a]lthough all motor vehicles produce air pollutants, emissions from trucks are of particular concern to near-road air quality, in part because of the pollutants they emit, but also because they disproportionately contribute more emissions than other types of vehicles." DOT 36209.

The Project Sponsors prepared a second reevaluation of the Tolling Program to assess the effects of the phase-in approach. *Chan*, Dkt. No. 139 ¶ 9; *Mulgrew*, Dkt. No. 127 ¶ 9; *New Yorkers*, Dkt. No. 125 ¶ 9; *Trucking*, Dkt. No. 82 ¶ 9. The reevaluation concluded that the effects of the Phase-In Tolling Structure were consistent with the effects disclosed in the FHWA's final EA and finding of no significant impact. *Chan*, Dkt. No. 139 ¶ 9; *Mulgrew*, Dkt. No. 127 ¶ 9; *New Yorkers*, Dkt. No. 125 ¶ 9; *Trucking*, Dkt. No. 82 ¶ 9. On November 21, 2024, the FHWA confirmed that the prior finding of no significant impact remained valid and signed an agreement under the VPPP authorizing the Phase-In Tolling Structure. *See* Federal Highway Administration, *Central Business District (CBD) Tolling Program Reevaluation 2*, at 10 (2024), https://new.mta.info/document/158191 ("In conclusion, all NEPA requirements have been met and the mitigation measures identified in the [environmental assessment] and the [finding of no significant impact] are still applicable and will ensure that the Phase-In Approach, like the March 2024 adopted toll structure, does not result in significant effects."); *Chan*, Dkt. No. 139 ¶ 10, Dkt. No. 138–2; *Mulgrew*, Dkt. No. 127 ¶ 10, Dkt. No. 126-2; *New Yorkers*, Dkt. No. 125 ¶ 10, Dkt. No. 124-2; *Trucking*, Dkt. No. 82 ¶ 10, Dkt. No. 81-2.

## III.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.'" *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). In order to justify a preliminary injunction, a movant must demonstrate: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an

injunction.  *See Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)

(citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "When, as here, the

moving party seeks a preliminary injunction that will affect government action taken in the public

interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the

moving party meets the more rigorous likelihood-of-success standard."  *Id.*; *see Sussman v.

Crawford*, 488 F.3d 136, 140 (2d Cir. 2007); *Friends of the E. Hampton Airport, Inc. v. Town of

E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).

## IV.    CONCLUSIONS OF LAW

### A.    Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of several of their underlying

causes of action.  TANY argues that it is likely to succeed on the merits because (1) the Tolling

Program violates the Dormant Commerce Clause; (2) the tolling program violates TANY

members' constitutional right to travel; and (3) the Federal Aviation Administration Authorization

Act of 1994 (the "FAAAA") preempts the Tolling Program.  *Trucking*, Dkt. No. 4 at 14–25.

Plaintiffs in *Chan* and *Mulgrew* join in those arguments and additionally argue that they are likely

to succeed on the merits of their Green Amendment claims.  *Chan*, Dkt. No. 134; *Mulgrew*, Dkt.

No. 122.  Plaintiffs in *New Yorkers* argue that they are likely to success on the merits of their SAPA

claim.  *New Yorkers*, Dkt. No. 121 at 7–9.

In sum, Plaintiffs claim a likelihood of success on the merits of their claims that the Tolling

Program violates: (1) the Dormant Commerce Clause, (2) the constitutional right to travel, (3) the

Supremacy Clause, (4) the New York State Green Amendment, and (5) SAPA.

### 1.    Commerce Clause

The Commerce Clause contains a dormant aspect that denies the states "the power

unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *E.*

*Profit Corp. Ltd. v. Strategic Vision US LLC*, 2021 WL 2554631, at *22 (S.D.N.Y. June 22, 2021)

(quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994)).  A user fee is

reasonable and will not run afoul of the Dormant Commerce Clause "if it (1) is based on some fair

approximation of the facilities' use, (2) is not excessive in relation to the benefits conferred, and

(3) does not discriminate against interstate commerce."  *Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*,

510 U.S. 355, 369 (1994) (citing *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines,

Inc.*, 405 U.S. 707, 716–17 (1972)); *accord Selevan v. N.Y. Thruway Auth.* ("*Selevan I*"), 584 F.3d

82, 96 (2d Cir. 2009).

Plaintiffs in *Mulgrew* and *Chan* argue that the Tolling Program runs afoul of all three

components of the *Evansville*/*Northwest Airlines* test.  *Mulgrew*, Dkt. No. 118 at 6–20; *Chan*, Dkt.

No. 130 at 6–20.  TANY does not contend that the Tolling Program discriminates against interstate

commerce and instead argues that (1) the Tolling Program's charges to TANY trucks are not based

on a fair approximation of their use; and (2) the Tolling Program's charges to TANY trucks are

excessive in relation to the benefits conferred upon them.  *Trucking*, Dkt. No. 4 at 14–21.  The

Municipal Defendants and Winkelhake argue that the Tolling Program satisfies all three prongs.

*Mulgrew*, Dkt. No. 103 at 7–15, Dkt. No. 105 at 7–18, Dkt. No. 123 at 5–13, Dkt. No. 125 at 8–

16; *Chan*, Dkt. No. 116 at 7–15, Dkt. No. 118 at 7–18, Dkt. No. 135 at 5–13, Dkt. No. 137 at 8–

16.

Defendant Winkelhake additionally argues that  the Tolling Program is constitutional

because (1) the Tolling Program is not a user fee subject to the three-pronged test derived from

*Evansville* and articulated in *Northwest Airlines* "because congestion tolls are not fees to defray

the costs of using the roads in the Central Business District but are instead designed to reduce

congestion and air pollution in that district and to raise funds for public transit in New York City,"

and (2) the Tolling Program is a state action within the scope of congressional authorization and is therefore invulnerable to Commerce Clause challenge. *Mulgrew*, Dkt. No. 103 at 5, Dkt. No. 123 at 5; *Chan*, Dkt. No. 116 at 5, Dkt. No. 135 at 5. Winkelhake argues that because the Tolling Program is not a user fee, it passes constitutional muster under the more general test articulated by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Mulgrew*, Dkt. No. 103 at 6–8, Dkt. No. 123 at 5; *Chan*, Dkt. No. 116 at 6–8, Dkt. No. 135 at 5. The New York State Attorney General joins those arguments in her capacity as Intervenor in *Trucking*. *Trucking*, Dkt. No. 61 at 5–8.

### a.    User Fee

A threshold question is what analysis is to be applied to Plaintiffs' challenge to the Tolling Program. That question depends on whether the Tolling Program should be considered to impose a "user" fee and, if so, whether that user fee is for use of an integrated, interdependent transportation system, including both roadways and the transit system.

A "user fee" is "a charge designed as compensation for Government-supplied services, facilities, or benefits." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). User fees are "imposed by the State for the use of state-owned or state-provided transportation or other facilities and services." *VIZIO, Inc. v. Klee*, 886 F.3d 249, 258 (2d Cir. 2018) (quoting *Or. Waste Sys.*, 511 U.S. at 103 n.6)); *see Pace v. Burgess*, 92 U.S. 372, 375 (1875) ("They are simply the compensation given for services properly rendered.").

Defendant Winkelhake argues that the Tolling Program imposes a general tax rather than a user fee because "the Central Business District is not a facility built or maintained by New York, MTA/Triborough, or New York City" and the revenue collected through the Tolling Program will be used to support capital improvements to New York City's public transit rather than the roads in the CBD. *Mulgrew*, Dkt. No. 103 at 9–10; *Chan*, Dkt. No. 116 at 9–10. Where a government

28

charge is not connected to the payer's use of governmental facilities or services and the charge is a general revenue tax "imposed for the general support of the government," courts do not apply the *Evansville/Northwest Airlines* test.  *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621–22 (1981) (citing *Evansville*, 405 U.S. 707; *Clark v. Paul Gray, Inc.*, 306 U.S. 583 (1939); *Ingels v. Morf*, 300 U.S. 290 (1937)).

Winkelhake's argument (and the argument of the Plaintiffs that follow on it) is based on a faulty premise.  The definition of the relevant "facility" is not limited to the public transit system that will receive a large portion of the revenues generated by the Tolling Program.  The Second Circuit has held that a user fee "may reasonably support the budget of a governmental unit that operates facilities that bear at least a 'functional relationship' to facilities used by the fee payers." *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009); *see Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 567 (S.D.N.Y. 2014).  Courts in this Circuit have long held that certain bridges, tunnels, roadways, public transit systems and commuter railways may "form an 'integrated, interdependent transportation system'" such that components of the integrated system bear a functional relationship to tolls charged in connection with other components.  *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 887 F.2d 417, 418 (2d Cir. 1989) (quoting and affirming *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 706 F. Supp. 264, 280 (S.D.N.Y. 1989)); *see, e.g.*, *Janes v. Triborough Bridge & Tunnel Auth.* ("*Janes II*"), 774 F.3d 1052, 1055 & n.6 (2d Cir. 2014) (per curiam); *Angus Partners*, 52 F. Supp. 3d at 567; *Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F.Supp. 718, 725 (E.D.N.Y. 1993); *see also Am. Trucking Ass'ns, Inc. v. R.I. Turnpike and Bridge Auth.*, 2024 WL 5001908, at *12 (1st Cir. Dec. 6, 2024) (sustaining tolling program where "[t]he amount of the tolls was to be

determined based on the costs of replacement, reconstruction, maintenance, and operation of Rhode Island's system of bridges" (citation omitted)).

A transportation system may be integrated where its components contribute to the efficient provision of transportation between points. *See Auto. Club*, 887 F.2d at 422–23. Considerations include the cost-effectiveness of operating interrelated transportation facilities, traffic spillover, and substitution effects. *Id.*; *accord Angus Partners*, 52 F. Supp. 3d at 567. Although Defendant Winkelhake notes that the CBD is not built or maintained by defendants, operatorship need not be common for modes of transportation to bear a functional relationship with one another. *See Angus Partners*, 52 F. Supp. 3d at 566 (holding that it is not essential for "all means of transportation in a region to be exclusively operated by a single entity in order to establish the existence of an integrated transportation system" (collecting cases)); *contra Chan*, Dkt. No. 142 at 3–4; *Mulgrew*, Dkt. No. 130 at 3–4. The fact that a state may subdivide its transportation apparatus among multiple agencies is of no constitutional importance where smooth operation of the whole system is dependent upon its constituent parts operating in tandem. Nor is it necessary that the supposedly integrated mass transportation systems provide point-to-point alternatives to the tolled roads at issue. *See Molinari*, 838 F. Supp. at 726 (noting that "even though the Verrazano–Narrows Bridge is not normally used interchangeably with many of the other component parts of the MTA, the Bridge is part of a single integrated transportation system" and the commuter rail facilities "effectively reduce traffic on the same arteries, river crossings and streets that are used by commuters from Staten Island who use the Verrazano–Narrows Bridge"); *Auto. Club*, 887 F.2d at 422 (rejecting argument that only "origin and destination" analysis can establish a functional relationship and holding that "[t]he Port Authority is entitled to prove that PATH is related to the bridges and tunnels with evidence that a 'spillover' effect links even those river crossings that

travelers do not normally use interchangeably"); *R.I. Turnpike*, 2024 WL 5001908 (holding that tolls charged for use of any of Rhode Island's bridges could be used to replace, reconstruct, operate, and maintain the states' thirteen bridges).

In light of these guidelines, numerous courts have held that New York roadways and river crossings are functionally connected to New York's public transit and commuter rail systems.  *See Janes II*, 774 F.3d at 1055 & n.6; *Auto. Club*, 887 F.2d at 423; *Wallach v. Brezenoff*, 930 F.2d 1070, 1071 (3d Cir. 1991); *Angus Partners*, 52 F. Supp. 3d at 566; *Janes v. Triborough Bridge & Tunnel Auth.* ("*Janes I*"), 977 F. Supp. 2d 320, 341 (S.D.N.Y. 2013), *aff'd*, 774 F.3d 1052; *Molinari*, 838 F. Supp. at 726.

The Municipal Defendants argue that the same finding is warranted here, as the integrated transportation system at issue consists of "the means of transportation in [the] region," *Mulgrew*, Dkt. No. 125 at 10–11 (citing *Angus Partners*, 52 F. Supp. 3d at 566); *Chan*, Dkt. No. 137 at 10–11 (citing same), and  improvements to the "MTA's transportation network . . . will substantially reduce congestion within the CBD and on roadways leading into the CBD."  *Mulgrew*, Dkt. No. 105 at 12–13 (citing N.Y. Pub. Auth. Law § 553-j; *Mulgrew*, 2024 WL 3251732, at *25); *Chan*, Dkt. No. 118 at 12–13 (citing same).  The final EA noted the spillover effect, finding that "[i]nvestments in MTA's integrated transportation network would improve system reliability and accessibility, which would in turn attract new riders and further reduce vehicle demand for road capacity in and connecting to the Manhattan CBD."  DOT 36272.  The subway "connects with regional transit hubs in the Manhattan CBD, allowing for connections from other modes" of transit including commuter rail, buses, ferries, trams, bicycles, and trams, in addition to automobiles. DOT 36333–39.  The Tolling Program would cause individuals presently driving within the CBD to utilize other transit options, directly reducing congestion experienced by motorists still driving

within the CBD while increasing use of the transit facilities.  DOT 36355, 36361.  All this supports a finding that the MTA's transit systems and the CBD roadways form a single integrated system. Neither Plaintiffs nor Winkelhake nor the NYAG offer evidence compelling a contrary conclusion.

The Tolling Program operates as a user fee levied on users of New York City's integrated transportation system and is therefore subject to the *Evansville/Northwest Airlines* test as applied to the integrated transportation system.[10]

### b.    Congressional Authorization

The Dormant Commerce Clause limits the states' authority to regulate interstate commerce to preserve Congress' dominion.  *See W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652 (1981).  Accordingly, "[i]f Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge."  *Id.* at 652–53; *accord Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 472 U.S. 159, 174 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."); *Mid-Atl. Bldg. Sys. Council, a Div. of Penn. Builders Ass'n, Inc. v. Frankel*, 17 F.3d 50, 52 (2d Cir. 1994) ("When Congress has plainly and specifically delegated

---

[10]   If the Tolling Program did not operate as a user fee, Plaintiffs' Commerce Clause challenges would be evaluated under the more general *Pike* test.  The analysis would not lead to a different result.  The *Pike* test states that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142; *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 377–78 (2023). Accordingly, the Court finds that because Plaintiffs do not show facial discrimination or an impermissible burden on interstate commerce, they have not shown a likelihood of success on the merits even if the Tolling Program is not evaluated under the *Evansville/Northwest Airlines* test for user fees but rather under *Pike*.  *See infra* § IV.A.1.d. (finding that Plaintiffs fail to show that the Tolling Program has an economically protectionist effect); *see also Clover Leaf Creamery*, 449 U.S. at 473 (finding statute constitutional under the *Pike* test where "there is no reason to suspect that the gainers will be [in-state] firms, or the losers out-of-state firms").

[the authority to regulate a field of commerce] to the states, state regulations within the scope of that delegation are invulnerable to constitutional challenge.").  "The only limitation is that Congress must be clear about its intentions."  *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.* ("*N.Y. State Thruway I*"), 238 F. Supp. 3d 527, 533 (S.D.N.Y. 2017), *aff'd*, *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.* ("*N.Y. State Thruway II*"), 886 F.3d 238 (2d Cir. 2018). "[F]or a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear."  *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).

The Supreme Court has explained that "[t]he requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine" and is not "merely a wooden formalism."  *Id.* at 91–92.  "The Commerce Clause was designed 'to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"  *Id.* at 92 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979)); *see also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (invalidating protectionist New York law as unconstitutional because the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division").  Given the states' self-interested motivation to enact economically protectionist policies, state legislative processes are unlikely to provide the "political restraints normally exerted when interests within the state are affected."  *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 768 n.2 (1945).  However, when Congress acts—either in its own right or to authorize certain state action—"all segments of the country are represented, and there is significantly less danger that one State will be in a position to exploit others."  *S.-Cent. Timber*,

467 U.S. at 92. "Furthermore, if a State is in such a position, the decision to allow it is a collective one . . . and reduces significantly the risk that unrepresented interests will be adversely affected by restraints on commerce." *Id.*

Defendant Winkelhake and the NYAG argue that the Tolling Program was undertaken within Congress' delegation of authority because the Tolling Program "may proceed only if the New York State and New York City Departments of Transportation and Triborough enter into a cooperative agreement with the Federal Highway Administration pursuant to the Value Pricing Pilot Program established by Congress, 23 U.S.C. § 149." *Mulgrew*, Dkt. No. 103 at 5–6, Dkt. No. 123 at 5; *Chan*, Dkt. No. 116 at 5–6, Dkt. No. 135 at 5; *Trucking*, Dkt. No. 61 at 5–6; *see also Trucking*, Dkt. No. 81-2 (signed cooperative agreement pursuant to the VPPP).

The VPPP directs the Secretary of Transportation to "establish and implement a congestion mitigation and air quality improvement program" as outlined by the statute. 23 U.S.C. § 149(a). The VPPP further permits states to obligate certain federal funds to the congestion mitigation and air quality improvement program in accordance with certain requirements. 23 U.S.C. § 149(b)–(d). It uses general language that neither authorizes the structure of the Tolling Program at issue here nor unmistakably authorizes states to pursue any action intended to mitigate congestion or improve air quality without regard for interstate commerce. To be certain, Congress contemplated that some projects funded through the VPPP would involve tolls. In 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") which provided funds for the VPPP and set aside one quarter of those funds for congestion pricing pilot projects that do not involve highway tolls—thus affirming that the remaining portion could support toll-based projects. *See* Pub. L. No. 109–59 § 1604, 119 Stat. 1144 (2005).

The statute does not indicate that Congress unmistakably intended to authorize every toll-based project funded by the VPPP notwithstanding the Dormant Commerce Clause. The fact that a state policy "appears to be consistent with federal policy—or even that state policy furthers the goals . . . that Congress had in mind—is an insufficient indicium of congressional intent." *S.-Cent. Timber*, 467 U.S. at 92; *see Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 751 (5th Cir. 2006). Congress must "affirmatively contemplate otherwise invalid state legislation." *S.-Cent. Timber*, 467 U.S. at 91; *accord Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430 (3d Cir. 2011) (citation omitted); *see, e.g.*, *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 740 F.2d 203, 207 (2d Cir. 1984) (federal law provided that "no application by a bank holding company to acquire a bank located in another state could be approved by the [Federal Reserve] Board unless the state in which such bank was located had specifically authorized such acquisition by statute"), *aff'd*, 472 U.S. 159; *N.Y. State Thruway I*, 238 F. Supp. 3d at 533 (federal law "specifically provides that the New York State Thruway Authority (identified by name) is authorized to use toll revenues for 'any transportation project eligible for assistance under title 23' or for the 'costs associated with transportation facilities' under its jurisdiction"); *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1237 (10th Cir. 2011) (Congressionally-ratified compact regarding interstate waterway included broad language that "[e]ach state may freely administer water rights and uses in accordance with the laws of that state"), *aff'd*, 569 U.S. 614 (2013). Congress' approval of tolling programs for the reduction of congestion does not rise to the level of affirmative authorization for discriminatory economic policy and neither Winkelhake nor the NYAG point to any language in the VPPP that expressly authorizes any state act that would otherwise violate the Dormant Commerce Clause.

The fact that the FHWA has approved the Phase-In Tolling Structure, *Trucking*, Dkt. No. 81-2, does not render the Tolling Program invulnerable to all Dormant Commerce Clause challenges. "Only 'Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid.'" *Tri-M Grp.*, 638 F.3d at 432 (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). The VPPP "did not explicitly endow the [Federal Highway Administration] with authority to permit discrimination against interstate commerce." *Id.* The Tolling Program in its entirety is therefore not insulated from challenge pursuant to the Dormant Commerce Clause.

Congress did, however, expressly authorize states to allocate toll revenue toward other government services. The Intermodal Surface Transportation Efficiency Act ("ISTEA") provides that "[a] public authority with jurisdiction over a toll facility shall ensure that all toll revenues received from operation of the toll facility are used only for" five potential allocations: (1) debt servicing, (2) repayment of any private person's financing of the project including a reasonable return on investment, (3) improvement, operation, and maintenance of the toll facility, (4) payments owed under a public-private partnership agreement, and (5) "if the public authority certifies annually that the tolled facility is being adequately maintained, any other purpose for which Federal funds may be obligated by a State under this title." 23 U.S.C. § 129(a)(3)(A). As other courts have observed, pursuant to the fifth permissible allocation, "ISTEA contemplated that tolls exceeding the amount needed to fund a toll road would be collected and spent on non-toll road projects." *Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 934 F.3d 283, 292 (3d Cir. 2019); *N.Y. State Thruway II*, 886 F.3d at 246 ("Congress plainly authorized the Thruway Authority to use *at least some* excess highway toll revenues for [other] purposes.").[11]

---

[11] Although ISTEA requires that the public authority "certif[y] annually that the toll facility is being adequately maintained" before any toll revenues may be used for non-toll road purposes,

Because ISTEA provides for the use of excess tolling revenues, it is Congress' unmistakably clear intent that a public authority be permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects. *See Owner Operator*, 934 F.3d at 293 (citing *S.-Cent. Timber*, 467 U.S. at 91); *N.Y. State Thruway II*, 886 F.3d at 246–47. Congress thus statutorily displaced the second prong of the *Evansville/Northwest Airlines* test (i.e., excessive charges) for toll facilities such as the Tolling Program. The excessiveness prong is aimed at "the invalidation of state policies that impose an undue burden on interstate commerce—inasmuch as [it] require[s] the court to consider whether the fee supplies a benefit to users of a facility that is at least roughly commensurate with the burden it imposes on them." *Selevan I*, 584 F.3d at 97. By permitting tolling revenues to exceed costs, Congress has indicated that the burden on interstate commerce imposed by a toll may exceed the precise benefit the toll conveys to the facility's users. *See R.I. Turnpike*, 2024 WL 5001908, at *3 ("[N]o toll for an ISTEA-authorized [project] can be stricken merely because it exceeds the benefits conferred on the users, because Congress 'contemplated that tolls exceeding the amount needed to fund a toll road would be collected and spent on non-toll road projects.'" (quoting *Owner Operator*, 934 F.3d at 293)).

The Court therefore need not analyze for Dormant Commerce Clause purposes whether the Tolling Program represents an excessive charge in relation with the benefits conferred.[12] The two

---

23 U.S.C. § 129(a)(3)(A)(v), at this time the Court need not inquire whether the Municipal Defendants have submitted the annual certifications. "[T]he presence or absence of the annual certification does not otherwise affect Congress's 'unambiguous intent to authorize [a state authority] to allocate excess toll funds' to non-toll road projects." *Owner Operator*, 934 F.3d at 294 (quoting *N.Y. State Thruway II*, 886 F.3d at 247); *see also id.* (holding that the defendants' "failure to comply with this condition, however, does not diminish the fact that Congress has legislated in the area of interstate commerce at issue and blessed the use of tolls for non-toll road purposes").

[12] Even if Congress had not authorized excessive tolls, Plaintiffs fail to show that the Tolling Program violates the Dormant Commerce Clause's prohibition on excessive charges for reasons

remaining inquiries relevant to Plaintiffs' Dormant Commerce Clause claims are: (1) whether the toll represents a fair approximation of use and (2) whether the Tolling Program discriminates against interstate commerce.  The Court reviews each in turn.

### c.    Fair Approximation

The fair approximation test inquires whether the toll at issue is based on some fair approximation of the toll payers' use of the facilities.  *See Nw. Airlines*, 510 U.S at 369.  It is tied to the concept that "[w]hen the measure of a tax bears no relationship to the taxpayers' presence or activities in a State, a court may properly conclude . . . that the State is imposing an undue burden on interstate commerce."  *Am. Trucking Ass'ns., Inc. v. Scheiner*, 483 U.S. 266, 291 (1987) (quoting *Commonwealth Edison*, 453 U.S. at 629); *see also Massachusetts v. United States*, 435 U.S. 444, 467 (1978) (The "requirement that the measure be reasonable and nondiscriminatory precludes the adoption of a charge that will unduly burden state activities.").  The standard is a lenient one, and public facility fees will be found to be fairly approximated so long as they are not "wholly unreasonable."  *Evansville*, 405 U.S. at 718; *see R.I. Turnpike*, 2024 WL 5001908, at *11–12.

The Second Circuit has instructed district courts considering fair approximation of use to assess whether the "policy at issue reflects rational distinctions among different classes of motorists using the [roadway]."  *Selevan I*, 584 F.3d at 98 (citation omitted); *see Selevan v. N.Y. Thruway Auth.* ("*Selevan II*"), 711 F.3d 253, 259 (2d Cir. 2013) ("To determine whether the Grand Island Bridge toll policy is based on some fair approximation of use of the facilities we directed the District Court to consider whether the . . . policy at issue reflects rational distinctions among

---

discussed elsewhere in this Opinion.  *See infra* § IV.2. (holding that Plaintiffs have not shown a likelihood of success on the merits of their claim that the Tolling Program violates the right to travel on the ground that it represents an excessive charge under the *Evansville/Northwest Airlines* test).

different classes of motorists using the Bridge, so that each user, on the whole, pays some approximation of his or her fair share of the state's cost for maintaining the Bridge." (citations omitted)).  The fair approximation test "does not require a 'perfect fit'; 'it simply requires reasonableness.'"  *Janes I*, 977 F. Supp. 2d at 339 (quoting *Selevan I*, 584 F.3d at 98); *see also United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) (noting that the Supreme Court "has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services . . . [a]ll that we have required is that the user fee be a 'fair approximation of the cost of benefits supplied.'" (quoting *Massachusetts*, 435 U.S. at 463 & n.19)); *Selevan I.*, 711 F.3d at 259 ("Even assuming arguendo that some degree of inequity exists in the very small difference between the [toll rates], no evidence in the record suggests that the District Court erred in finding that plaintiffs are paying 'some approximation' of their fair share of the costs of using the Grand Island Bridge.").

The Supreme Court has sustained tolls that rationally distinguish between different classes of motorists "based on a variety of measures of actual use, including: horsepower, number and capacity of vehicles, mileage within the State, gross-ton mileage, carrying capacity, and manufacturer's rated capacity and weight of trailers."  *Evansville*, 405 U.S. at 715 (collecting cases).  However, it has "invalidated as wholly unrelated to road use a toll based on the carrier's seating capacity, and the amount of gasoline over 20 gallons in the carrier's gas tank."  *Id.*  The Supreme Court has also invalidated as unconstitutional a Pennsylvanian vehicle tax where "the amount of . . . taxes owed by a trucker does not vary directly with miles traveled or with some other proxy for value obtained from the State."  *Scheiner*, 483 U.S. at 291.

TANY contends that the Tolling Program's charges for different classes of vehicles are not rational distinctions because the Tolling Program charges trucks a high toll per entry into the

Manhattan CBD whereas certain other vehicle classes are charged lower amounts and only once per day. *Trucking*, Dkt. No. 4 at 16–19, Dkt. No. 89 at 6–9.

The Tolling Program readily passes the fair approximation test. There are rational reasons for the distinctions it draws. The "use" at issue here is not simply wear and tear upon the roads, but the physical space the vehicle takes up as well as the noise and air pollution it puts out during transit, parking, and onloading or offloading. The TMRB has found that "[a]lthough trucks make up only 4% of vehicles in the CBD, they have an outsized impact on congestion, because of their large size and large turning radii, their parking patterns, and the noise and air pollution they cause." TMRB Report at 20. TANY does not offer any evidence disputing that finding. The higher toll on trucks thus rationally reflects this greater use of New York's transportation infrastructure and contribution to deleterious environmental outcomes. *See id.*; DOT 36209, 36879 (discussing trucks' disproportionate contribution to noise and air pollution). *See Doran v. Mass. Tpk. Auth.*, 348 F.3d 315, 320 (1st Cir. 2003) ("'[S]o long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate [drivers] pay according to the facilities in fact provided by the State,' and the program places no undue burden on interstate commerce." (quoting *Scheiner*, 483 U.S. at 291)). Where the state chooses to set differential tolls, there need not be a "disproportionate, or outsized, benefit received by those who pay the higher fee." *Janes I*, 977 F. Supp. 2d at 342.

The frequency of the truck toll is also rational and permissible. TANY argues that the "Tolling Program penalizes trucks for needing to make multiple trips in to the [CBD]." *Trucking*, Dkt. No 4 at 16–17. But that is a distinction without a difference. Just as a higher fee may be levied where is it not based on a wholly unreasonable division between classes of vehicle, a more frequent fee may be imposed pursuant to the same standard. *See Angus Partners*, 52 F. Supp. 3d

at 568 ("Nor does the fact that tolls are assessed on a per-trip basis render the toll burden unfair.");

*accord Janes I*, 977 F.Supp.2d at 339–40; *Doran*, 348 F.3d at 319–21.  Defendants could have

imposed a "per day" toll on all trucks entering the CBD, assessing the same fee on a truck that

entered once as was assessed on a truck that entered multiple times.  But that blunt instrument

arguably would have been unfair to those trucks that entered only once and Defendants could have

rationally concluded that it would not be designed to optimally achieve the statute's purpose.

Under the Phase-In Tolling Structure, trucks pay an amount tagged to their use of the city's

transportation system; a truck that enters the CBD multiple times per day contributes to congestion

more than one that does not.  And because trucks represent an oversized contribution to congestion,

TMRB Report at 20, charging trucks more for those multiple entries is not a wholly unreasonable

distinction between vehicle classes.  The frequency of the toll does not have any impact on

interstate commerce beyond the higher aggregate cost it requires a re-entering truck to pay.  There

is no constitutional significance between a toll charged multiple times per day and a higher toll

charged once a day with a rebate for those who enter only once.  The impact to interstate commerce

would be the same under both tolls.

TANY compares the tolling frequency to the tolling structure at issue in *Rhode Island*

*Turnpike and Bridge Authority*, in which the First Circuit held that "a usage-based toll that is

capped after a certain number of gantries are passed, and then reset daily" was unconstitutional

because the caps were "only sometimes reachable, more likely by in-state tractor-trailers than by

out-of-state tractor-trailers."  *R.I. Turnpike*, 2024 WL 5001908, at *8; *see Trucking*, Dkt. No. 94

at 3.  However, the First Circuit based its holding of unconstitutionality on the fact that "39.9% of

the reductions in what the tolls would have been but for the caps went to Rhode Island vehicles

even though they accounted for only 18.6% of the transactions" meaning that "the privilege of toll

capping is considerably more valuable for intrastate carriers than it is for interstate carriers." *R.I. Turnpike*, 2024 WL 5001908, at *9. Here, by contrast, TANY submits no evidence that per-entry tolls disproportionately benefit intrastate carriers compared to interstate carriers and there is no reason to believe that they would. Indeed, it is quite possible that out-of-state trucking businesses will benefit relative to in-state trucking businesses by paying a lower effective rate per visit than their in-state peers because the former's trucks will pass through the CBD only once or twice per day en route to an out-of-state destination while the trucks doing primarily an in-state business will enter the CBD multiple times a day.

Multiple vehicle classes other than trucks are to be charged per entry or per trip. Buses are to be charged per entry, while taxis and FHVs are to be charged per trip (for example, a taxi dropping off a rider in the CBD, picking up and dropping off a second rider within the CBD, and then transporting a third rider out of the CBD will incur three charges despite only entering the CBD once). Only passenger vehicles and motorcycles are to be charged once per day. In total, 65% of current vehicles in the CBD are subject to per-entry or per-trip charges. TMRB Report at 11. However, even if trucks alone were subject to per-entry charges, that would not render the Phase-In Tolling Structure unconstitutional. *See Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 437 (2005) (sustaining tax as constitutional where the court "lack[ed] convincing evidence showing that the tax deters, or for that matter discriminates against, interstate activities").

TANY's argument comes down to the claim that the Tolling Program does not satisfy the fair approximation test because "trucks make up a mere 4% of all traffic in the [CBD]" and have no choice but to enter and reenter during peak hours. *Trucking*, Dkt. No. 4 at 18–19. Contrary to TANY's argument, however, the Second Circuit has already held that percentage use is not the

lynchpin when determining whether differing rates represent a fair approximation of use for different classes of motorists. *See Selevan I*, 584 F.3d at 97. Vehicles of different classes each using the tolled system the identical number of times can impose disproportionate costs and derive disparate benefits from that system. A municipality can rationally take those differences into account.

A municipality may also offer policy-based exemptions or discounts. In *Selevan II*, the Second Circuit affirmed the district court's holding that a bridge toll that levied a lower fare on residents of the connected island, a higher fare on commuters, and an even higher fare on general passengers was constitutional. *See Selevan II*, 711 F.3d at 259. Although residents crossing the bridge use the facilities just as much as commuters and general passengers do, the Second Circuit held that legislators are permitted to adopt exceptions or impose lower tolls on certain users for policy reasons. *See id.* ("[T]he *Northwest Airlines* test permits the state to make reasonable exceptions to its fee schedule, so long as the fee schedule, on the whole, reflects at least a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." (citation omitted)); *see also R.I. Turnpike*, 2024 WL 5001908, at *14–15. The district court in *Selevan* held that even if the preferential rate afforded to residents "may not be a precise quantification of the toll bridge-imposed isolation that confronts beneficiaries of the resident rate each time they desire to leave Grand Island, or the residuary effects of nearly 25 million non-resident travelers bisecting their island annually, it reflects a 'rational distinction[] among different classes of' motorists.'" *Selevan v. N.Y. Thruway Auth.*, 2011 WL 5974988, at *5 (N.D.N.Y. Nov. 28, 2011) (quoting *Selevan I*, 584 F.3d at 97). The Second Circuit affirmed, noting that "[w]hile the usage of the Grand Island Bridge might be one rational basis upon which to draw 'distinctions among different classes of motorists,' it need not be the only one." *Selevan II*, 711 F.3d at 259 n.5. It thus found

the considerations taken into account by the lower court "to be 'not [a] wholly unreasonable' basis upon which to draw a distinction between Grand Island residents, who, because of the small size and isolation of Grand Island, may need to use the bridge and pay the toll several times a day, and other motorists using the bridge." *Id.* at 259 (quoting *Evansville*, 405 U.S. at 718)).

Similarly, in *Janes I*, a court in this District held that toll discounts given to "people living in locations with limited transportation options other than the facility in question" do not render the toll unconstitutional because "under the Dormant Commerce Clause, it is reasonable, and consistent with the requirement of a fair approximation of usage, to enact a differential toll policy where doing so creates incentives for individuals and families to live in areas that are underserved by mass transit and are in locations that are at the edge of the rest of the city, and alleviates the burdens on frequent users." 977 F. Supp. 2d at 340 (citation omitted).

In their arguments in support of a preliminary injunction, Plaintiffs cited the holding in *Am. Trucking Associations, Inc. v. Alviti* that a trucks-only bridge toll was not a fair approximation of use and was thus unconstitutional. 630 F. Supp. 3d 357 (D.R.I. 2022). In *Alviti*, the district court found after a trial that the consumption-based methodology the state used to calculate how large trucks degrade the structural integrity of bridges was heavily flawed. *See id.* at 384. Furthermore, even if the state's methodology was accurate, the district court concluded that it would not have justified making heavy trucks responsible for 100% of the toll because other vehicles were responsible for non-negligible degradation of the bridge and yet irrationally exempted from the toll. *Id.* However, after the briefing on Plaintiffs' motions for a preliminary injunction here concluded, the First Circuit reversed the district court's holding. *See R.I. Turnpike*, 2024 WL 5001908. Plaintiffs' reliance on the district court decision thus is not persuasive and, to the contrary, the Circuit's decision is instructive. The First Circuit stated that "[a]t the most basic

44

level, it does not strike us as wholly unreasonable to presume that bigger trucks will cause more damage to bridges, and smaller trucks, less." *Id.* at \*12–14. The First Circuit also found no constitutional issue with the fact that only trucks were charged while other vehicles that contributed to bridge degradation were permitted to use the bridge without payment. *See id.* at \*14–15 & nn. 15–16. The Circuit pointed to *Evansville*, in which the Supreme Court sustained a flat fee charged to commercial airline passengers to fund airport maintenance even though no fee was charged to the majority of the airport's users. *See id.* (explaining that the fee at issue in *Evansville* "did not apply to noncommercial passengers, even though those passengers also used the airport's runways, navigational facilities, and aviation-related services" and "[t]he fee also did not apply to commercial passengers on nonscheduled flights, commercial passengers on light aircraft, military passengers, or nonpassenger airport users (e.g., people dining at airport restaurants)"); *Evansville*, 405 U.S. at 717–18 & nn. 7–11 ("We recognize that in imposing a fee on the boarding of commercial flights, both the Indiana and New Hampshire measures exempt in whole or part a majority of the actual number of persons who use facilities of the airports involved."). Accordingly, the First Circuit held that *Evansville* made clear "that a public authority may assess a fee on only the most significant group of facility users, even if other nonnegligible users of the facility are exempt, at least as long as its justification for doing so is not wholly unreasonable" and further suggested that "the state may exempt nonnegligible users for administrability reasons." *R.I. Turnpike*, 2024 WL 5001908, at \*15. Not every facility user need pay their fair share—or anything at all—so long as the distinctions made between the users are rational. *See id.*; *Selevan I*, 584 F.3d at 98; *Selevan II*, 711 F.3d at 259.

Here too, Plaintiffs have "not demonstrated that, as a matter of logic or fact, adopting a differential toll policy for these purposes is unreasonable." *Janes I*, 977 F. Supp. 2d at 340.

Plaintiffs do not provide any evidence that the TMRB's findings are so inaccurate as to provide a wholly unreasonable basis for the differential toll rates or for the exemptions for certain vehicles such as public buses, emergency vehicles and paratransit vehicles.  *See generally* TMRB Report. Indeed, Plaintiffs do not provide any evidence at all.  As stated, the Phase-In Tolling Structure subjects 65% of current vehicles in the CBD to per-entry or per-trip charges.  *Id.* at 11.  Although TANY argues that taxis and FHVS, which make up a combined 52% of all traffic in the CBD, are fully exempt from the Tolling Program, *Trucking*, Dkt. No. 4 at 4, 17, that is not so.  The incidence of the toll will not fall directly on drivers of those vehicle, but it will be assessed on passengers, who will be charged a fee per trip such that they still are paying for their use of the facility.  *Id.* at 4 n.3.  The TMRB based this pass-through model on the fact that "[u]ltimately, it is passengers— not drivers—who make the choice to add to vehicle congestion in the CBD . . . [a]nd it is passengers whose travel patterns must be influenced to fight congestion in the CBD."  TMRB Report at 23.  That is a rational distinction.  The TMRB additionally based the pass-through model on administrative concerns.  *See id.* at 22–23.  That too is a reasonable basis for the distinction. *See Massachusetts*, 435 U.S. at 466 (holding that agencies may take into account the administrative burden of implementing a more precisely calibrated user fee).  While legislators may assign lower fares or exemptions for rational policy-based reasons, TANY cites no case indicating that the New York Legislature was *obligated* to give trucks an exemption or discounted rate either because they make multiple trips per day or because they have fewer alternative routes available.

Plaintiffs in *Mulgrew* and *Chan* argue that the Tolling Program's fee schedule is not a fair approximation of actual use because Defendants "worked backwards from the revenue number they hoped to hit"—$15 billion—and constructed the fee schedule accordingly.  *Mulgrew*, Dkt. No. 118 at 10; *Chan*, Dkt. No. 130 at 10.  However, even if those Plaintiffs object to the method

by which Defendants derived the hoped-for total revenue, they do not argue that the formula used to apportion the tolls is unrelated to their use of the CBD. *See Jorling v. U.S. Dep't of Energy*, 218 F.3d 96, 102 (2d Cir. 2000) (noting that the fair approximation test "tilt[s] toward use, rather than cost"). Nor do they offer any evidence that that the $15 billion figure is an incorrect estimate of costs.

Plaintiffs in *Mulgrew* and *Chan* also argue that the cost of New York City's public transit network cannot inform whether the toll is a fair approximation of plaintiffs' use of the roads in the CBD which are not operated by the MTA. *Mulgrew*, Dkt. No. 118 at 10–11; *Chan*, Dkt. No. 130 at 10–11. That argument, however, is based on the flawed assumption that the appropriate measure of fairness relates to the use of the transit system. As discussed above, the public transit facilities and roads comprise a single integrated transportation system. Use of one part of the system taxes or can benefit other parts of the system. Accordingly, tolls levied on one part of the integrated transportation system may be used to support other components of the system. *See Molinari*, 838 F. Supp. at 725 ("[I]f a bridge toll generates more revenue than necessary to provide a fair profit or rate of return, the toll may not be challenged successfully if it is used to support a single integrated transportation system in which the successful operation of the bridge is dependent in whole or part on the operation of the other related facilities."); *accord Auto. Club.*, 887 F.2d at 421–22; *Angus Partners*, 52 F. Supp. 3d at 567–68. The premise of the Tolling Program and the evidence that supports it demonstrates that the improvements to the transit system from the toll will provide benefits to motorists who use the roadways. "Simply stated, it is just and reasonable for those who use a bridge to pay a toll that may be used to subsidize the system-wide operation of other transit facilities from which they benefit." *Molinari*, 838 F.Supp. at 725.

### d.     Discrimination Against Interstate Commerce

The Supreme Court has explained that the "central rationale" for the Dormant Commerce Clause "is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994); *see also Nat'l Pork Producers*, 598 U.S. at 369 (stating that the "antidiscrimination principles lies at the 'very core' of [the Court's] dormant Commerce Clause jurisprudence"). "[S]tate laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States.'" *Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). The Dormant Commerce Clause does not, however, displace a state's ability to tax "purely local activity." *Mich. Pub. Serv.*, 545 U.S. at 437.

"Accordingly, a state regulation 'discriminates' against interstate commerce only if it 'impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State.'" *Selevan I*, 584 F.3d at 95 (quoting *C & A Carbone*, 511 U.S. at 390). The Second Circuit has instructed that a plaintiff bringing a claim for discrimination in violation of the Commerce Clause, must "identify an[ ] in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." *Id.* (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005)). "Both an in-state interest and an out-of-state competitor are necessary because 'laws that draw distinctions between entities that are not competitors do not "discriminate" for purposes of the dormant Commerce Clause.'" *Id.* (quoting *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007)); *see also Nat'l Pork Producers*, 598 U.S. at 371–76 (rejecting argument that the Dormant Commerce Clause forbids enforcement of state laws that have the "practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate

against out-of-state economic interests" (punctuation omitted)). "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Nat'l Pork Producers*, 598 U.S. at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. 603 (1862)).

Plaintiffs in *Mulgrew* and *Chan* argue that the Tolling Program discriminates against interstate commerce because it fails the "internal consistency" test and because it unevenly distributes the burden to out-of-state payers. *Mulgrew*, Dkt. No. 118 at 17–20; *Chan*, Dkt. No. 130 at 17–20.[13]

"To pass the 'internal consistency' test, a state tax must be of a kind that, 'if applied by every jurisdiction, there would be no impermissible interference with free trade.'" *Scheiner*, 483

---

[13] At the preliminary injunction hearing, Plaintiffs also argued that the tax credits given to low-income New Yorkers are facially discriminatory. Tr. at 21–22. Plaintiffs did not make that argument in their memoranda of law prior to the hearing. *See Chan*, Dkt. No. 130 at 18 (noting that the Municipal Defendants contend that the tax credit is insufficient to show discrimination, but not addressing that argument); *Mulgrew*, Dkt. No. 118 at 18 (same); *see also Chan* Dkt. No. 142 at 4 (noting that the Municipal Defendants "argue only that the toll applies equally to all and that there are tax credits" but not addressing the impact of the tax credits on their Commerce Clause claims); *Mulgrew*, Dkt. No. 130 at 4 (same). "It is well established that '[i]ssues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Lima v. Hatsuhana of USA, Inc.*, 2014 WL 177412, at *1 (S.D.N.Y. Jan. 16, 2014) (quoting *Lyn v. Inc. Vill. of Hempstead*, 2007 WL 1876502, at *16 n.13 (E.D.N.Y. June 28, 2007)). Even if the argument was not waived, the tax credits do not show facial discrimination against out-of-state residents. The tax credit extends only to a small subset of New York residents: low-income CBD residents. *See* N.Y. Tax Law § 606(jjj) (the credit is available to "a resident individual whose primary residence is located in the central business district . . . and whose New York adjusted gross income for the taxable year is less than sixty thousand dollars"). In *Selevan II*, the Second Circuit affirmed the constitutionality of a residency-based discount designed to alleviate the toll's economic burden on motorists forced to pay the toll to drive out of their residential area. *See Selevan II*, 711 F.3d at 259; *see also Janes II*, 774 F.3d at 1054 (affirming residency-based toll discount because "plaintiffs have presented no persuasive evidence showing that the discounts at issue here are materially different from those in *Selevan*").

U.S. at 284 (quoting *Armco Inc. v. Hardesty*, 467 U.S. 638, 644 (1984)).[14]  Plaintiffs liken the instant case to *Scheiner*, in which the Supreme Court held that two Pennsylvanian flat taxes violated the internal consistency test.  *Mulgrew*, Dkt. No. 118 at 19–20 (citing *Scheiner*, 483 U.S. at 282–87); *Chan*, Dkt. No. 130 at 19–20 (citing same).  The taxes at issue in *Scheiner* were: (1) a fee charged to trucks over a certain weight that exempted trucks registered in Pennsylvania (on the basis that the fee was included in the registration fee required of local truckers); and (2) a per-axle charge on trucks that corresponded with a reduction in the registration fee for local trucks.  *See Scheiner*, 483 U.S. at 273–75.  The Supreme Court held that both taxes, if replicated by other states, "can obviously divide and disrupt the market for interstate transportation services" and that they "favor[] in-state business over out-of-state business for no other reason than the location of its business."  *Id.* at 286.  However, the Court also stated that "even if more than one jurisdiction applies a charge to participants in interstate commerce, the Commerce Clause may be satisfied if the revenue measures maintain state boundaries as a neutral factor in economic decisionmaking."  *Id.* at 283.  Thus, the *Scheiner* Court sustained Pennsylvania's fuel consumption taxes which it found were "simply payments for traveling a certain distance that happens to be within Pennsylvania."  *Id.*

The Municipal Defendants argue persuasively that the Tolling Program is more akin to an acceptable state-neutral user fee than a discriminatory flat tax.  *Mulgrew*, Dkt. No. 123 at 8–9, Dkt. No. 125 at 16 n.16; *Chan*, Dkt. No. 135 at 8–9, Dkt. No. 137 at 16 n.16.  The tax is not dependent on the motorist's residence or the vehicle's registration or starting point.  It is irrelevant whether

---

[14] As Justice Scalia has noted, the internal consistency test "bears some resemblance to Kant's first formulation of the categorical imperative:  'Act only according to that maxim whereby you can at the same time will that it should become a universal law' without contradiction."  *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 574–75 (2015) (Scalia, J., dissenting) (quoting Immanuel Kant, *Grounding for the Metaphysics of Morals* 30 (J. Ellington transl. 3d ed. 1993)).

the motorist starts in Westchester or Long Island or, to the contrary, in Connecticut or New Jersey. In-state and out-of-state drivers are charged the same toll. Plaintiffs introduce no evidence of an in-state commercial interest that is favored over an out-of-state one. *See Janes I*, 977 F. Supp. 2d at 337; *Janes II*, 774 F.3d at 1055. It is true that if the Tolling Program was replicated by every state, "an interstate truck would have to pay fees totaling several hundred dollars, or even several thousand dollars," but that high expense is not necessarily synonymous with discrimination. *Mich. Pub. Serv.*, 545 U.S. at 438. But that is of no constitutional moment. An interstate truck would be exposed to those fees "only because it engages in local business in all those States." *Id.*; *see also Colonial Pipeline Co. v. Traigle*, 421 U.S. 100, 108 (1975) ("It [i]s not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." (citation omitted)); *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 187–88 (1995) ("[T]he Commerce Clause does not forbid the actual assessment of a succession of taxes by different States on distinct events as the same tangible object flows along."). That some individuals who live out of state may have to drive into the CBD while some New York residents may have other transportation options is insufficient to show discrimination absent a showing that the toll will actually burden the out-of-state drivers' ability to conduct interstate commerce.[15] *See Selevan II*, 711 F.3d at 258 (holding that generally applied toll is a "minor restriction on travel" and does not discriminate against interstate commerce

---

[15] Plaintiffs acknowledge that not all New York residents can avoid driving into, out of, or through the CBD. *See Chan*, Dkt. No. 130 at 15 (stating that Plaintiff Chan lives in Battery Park City in New York and has a child with disabilities and related serious health issues that make transportation outside the neighborhood "implausible without a car"). Nor is it necessarily true that non-residents lack transit access. DOT 36512–21 (reviewing transit options that offer entry into the CBD including from New Jersey and Connecticut). Furthermore, the final EA noted that "[t]he ease of transit access within the Manhattan CBD allows the subset of car commuters to the Manhattan CBD who would be discouraged by toll costs and do not have transit access near their homes, to instead drive to a transit station and complete their commute by transit." DOT 336739.

even where certain plaintiff had to use the tolled facilities in the course of commuting to work); *Janes I*, 977 F. Supp. 2d at 337 ("To be sure, some plaintiffs here require use of the bridges to commute to work from out-of-state, and pay the non-discounted rate. But, as *Selevan* teaches, that fact is insufficient to show disadvantage to an out-of-state interest." (citing *Selevan II*, 71 F.3d at 258, 261 n.8)). The levy itself is on purely local conduct and the fact that it may impact conduct outside the state (i.e. the mode of travel out-of-state commuters choose to utilize) does not render the toll unconstitutional. *See Nat'l Pork Producers*, 598 U.S. at 371–76. Plaintiffs advance no evidence showing that the tolls will actually deter or burden interstate commerce.

Plaintiffs in *Mulgrew* and *Chan* argue that "differential allocation of the burden and benefit of a tolling scheme, even one that is facially neutral, can be discriminatory if out-of-state payers are burdened more than in-state payers." *Mulgrew*, Dkt. No. 118 at 19; *Chan*, Dkt. No. 130 at 19. The proposition is indisputably correct but is inapplicable on the record here. Plaintiffs again cite to *Scheiner*, in which the Supreme Court held that the flat tax structure was discriminatory because "the cost per mile of each of the flat taxes is approximately five times as high for out-of-state vehicles as for local vehicles." 483 U.S. at 276. Plaintiffs falsely argue that "even if in-state and out-of-state commuters pay the same toll at the entrances to the CBD, out-of-state commuters receive none of the tolls' benefit, sums where are to be spent entirely on in-state infrastructure . . . while diverting pollution into their communities." *Mulgrew*, Dkt. No. 118 at 20; *Chan*, Dkt. No. 130 at 20. However, it simply is not true either that out-of-state motorists receive no benefit from the toll or that the benefit conveyed to in-state motorists is different from that enjoyed by out-of-state motorists. All drivers, regardless of their state-of-residence or trip origin, will benefit equally from the reduced congestion, saving time otherwise spent in traffic, improving travel-time reliability, and reducing the potential for auto collisions. DOT 36626–27, 36763. And they will

benefit precisely because of the funding provided to the public transportation system. Moreover, although some locations both inside and outside of New York state will see increased traffic, other locations both inside and outside New York will see reduced traffic. *See* Tr. at 93 (Plaintiffs stated that "it is undisputed there will be diversion of traffic to Bergen County and that pollution will take place there and that is a disproportionate effect to folks who live there."). Bergen County in New York is expected to experience the state's largest increase in vehicle miles traveled with a 1.1% increase in the short term, falling to 0.84% in the longer term. DOT 36828, 36830. But eleven out of the fourteen New Jersey counties studied are predicted to experience either a decrease or no change in vehicle miles traveled, with Hudson County experiencing the greatest decrease at -2.45% in the short term and -1.79 in the long term. *Id.* And motorists hailing from New York do not disproportionately benefit from the transit infrastructure spending. *See Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 199 F. Supp. 3d 855, 879 (S.D.N.Y. 2016) (spending on Thruway Authority's recreational and educational facilities did not benefit toll payers in their capacity as toll payers because "while they are [driving], Plaintiffs are not engaged in recreational activities") (subsequent history omitted). The only benefits New York toll payers enjoy in their capacity as toll payers are the same ones that toll payers from other states enjoy.

The facts before the Court indicate that residents and non-residents alike will receive a variety of benefits that differ in kind, if not necessarily in degree. In-state and out-of-state travelers who opt to utilize transit options will benefit from the improved capital projects. DOT 36257–59, 37015, 37027 (discussing the need to create a new local, recurring funding source for MTA's capital projects). In-state and out-of-state motorists will benefit from reduced congestion because fewer people will travel to the CBD, and those who do will be incented to take public transportation because of the improvements to that system. DOT 36917–19. Plaintiffs show no evidence that

these benefits are more valuable to residents than to non-residents. "The benefits that flow to non-customers do not diminish the benefits received by those who pay the TBTA tolls." *Angus Partners*, 52 F. Supp. 3d at 570.

The Plaintiffs repeatedly argue that the Tolling Program is novel. But it is the genius of our federal system that the New York Legislature is free to enact experimental policies that offer an assortment of benefits and costs so long as the object of the law is not "local economic protectionism." *C & A Carbone*, 511 U.S. at 390. As the Supreme Court wrote in *National Pork Producers*, "[i]n a functioning democracy, policy choices like these usually belong to the people and their elected representatives." *Nat'l Pork Producers*, 598 U.S. at 382 (plurality op.). "They are entitled to weigh the relevant 'political and economic' costs and benefits for themselves, and 'try novel social and economic experiments' if they wish." *Id.* (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)); *see also Mulgrew*, 2024 WL 3251732, at *23 n.21 ("To stay experimentation in things social and economic is a grave responsibility. . . . It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." (quoting *New State Ice*, 285 U.S. at 311 (Brandeis, J., dissenting))). It was upon that theory that the VPPP was founded. *See* 23 U.S.C. § 149 (providing support for states' pilot programs to explore mechanisms for congestion mitigation and air quality improvement ). Where a state law impacts out-of-state interests in a deleterious manner, Congress may step in to preempt the legislation "[u]nder the (wakeful) Commerce Clause." *Nat'l Pork Producers*, 598 U.S. at 382–83. And, where a law violates the Dormant Commerce Clause, it is incumbent upon the courts to step

in.  But Congress has not preempted the Tolling Program and the program does not violate the Dormant Commerce Clause.

Plaintiffs have not shown a likelihood of success on the merits as to their Dormant Commerce Clause claims.

### 2.    Right to Travel

The Supreme Court has recognized that "[t]he constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union." *United States v. Guest*, 383 U.S. 745, 757 (1966).  "The textual source of the constitutional right to travel, or, more precisely, the right of free interstate migration, though, has proved elusive." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986).  Justices have variously traced the right to the Privileges and Immunities Clause of Article IV, the Commerce Clause, the Privileges and Immunities Clause of the Fourteenth Amendment, and the Constitution's general creation of a federal structure of government.  *Id.* at 902 & n.2 (collecting cases).  Despite the lack of clear origin, the right "is firmly established and has been repeatedly recognized." *Id.* at 903.  The right to travel encompasses (1) "the right of a citizen of one State to enter and to leave another State," (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999). Although the Supreme Court has not expressly recognized a right to travel intrastate, the Second Circuit has.  *See Jeffery v. City of New York*, 113 F.4th 176, 191 (2d Cir. 2024) (citing *Selevan I*, 584 F.3d at 100; *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990)).

"A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize

the exercise of that right." *Soto-Lopez*, 476 U.S. at 903 (citations omitted).  However, "[a] law does not 'actually deter' travel merely because it makes it somewhat less attractive for a person to travel interstate." *Abadi v. Am. Airlines, Inc.*, 2024 WL 1346437, at *55 (S.D.N.Y. Mar. 29, 2024) (quoting *Pollack v. Duff*, 793 F.3d 34, 46 (D.C. Cir. 2015)).  A requirement at a time of national crisis that a mask be worn when boarding a plane for the safety of other passengers may impose a cost (or a tax) on those who cannot wear masks and may require those individuals to travel by other means, but that does not mean that Congress would be disabled by the right to travel from passing a mask mandate or any other measure to protect passenger safety.  *See id.*  "If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue." *Southold*, 477 F.3d at 54 (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991)).  The Second Circuit has held that "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on travel simply do not amount to the denial of a fundamental right." *Southold*, 477 F.3d at 54 (citation and alterations omitted); *accord Weisshaus v. Port Auth. of N.Y. & N.J.*, 497 F. App'x 102, 104 (2d Cir. 2012) (summary order); *Torraco v. Port Auth. of N.Y. & N.J*, 615 F.3d 129, 141 (2d Cir. 2010). The Second Circuit has repeatedly found that tolls placed on one mode of travel are only minor restrictions that do not violate the right to travel.  *See, e.g.*, *Selevan I*, 584 F.3d at 101 ("[M]inor burdens impacting interstate travel, *such as toll roads*, do not constitute a violation [of the right to travel] . . ." (quoting *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (alterations in original))); *Janes II*, 774 F.3d at 1055; *Weisshaus*, 497 F. App'x at 104.

To assess whether a user fee imposes more than a minor restriction and violates the right to travel, courts apply the three-part *Evansville*/*Northwest Airlines* test.  *See Selevan I*, 584 F.3d at

102 ("A user fee . . . violates the right to travel unless 'it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce.'" (quoting *Nw. Airlines*, 510 U.S. at 369)).  Because Plaintiffs in *Chan*, *Mulgrew*, and *Trucking* argue that the Tolling Program violates the right to travel for the same reasons they claim the Tolling Program violates the Commerce Clause, *Mulrgrew*, Dkt. No. 118 at 7 n.5; *Chan*, Dkt. No. 130 at 7 n.5; *Trucking*, Dkt. No. 4 at 22, Plaintiffs fail to show a likelihood of success on the merits as to the fair approximation and discrimination prongs of their right-to-travel claims for the same reasons stated above with regard to Plaintiffs' Dormant Commerce Clause claims.

However, the right to travel is a restriction applicable to Congress and Congress thus does not have the same authority that it has under the Commerce Clause to permit a state to charge an excessive toll impermissibly burdening travel.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 n.7 (1993) (noting that the right to travel "does not derive from the negative Commerce Clause, or else it could be eliminated by Congress").  The Court therefore analyzes whether the tolls at issue here are "excessive in comparison with the governmental benefit conferred," *Evansville*, 405 U.S. at 717, for the purposes of Plaintiffs' right-to-travel claims.

The Second Circuit has stated "there need not be a perfect fit between the use of the [facilities] and the support of the [facilities] by the toll." *Selevan I*, 584 F.3d at 98.  The standard "simply requires reasonableness." *Id*.  "A fee is permissible if it supports a project with at least a functional relationship to facilities used by the fee payers." *Weisshaus v. Port Auth. of N.Y. & N.J.*, 814 F. App'x 643, 647 (2d Cir. 2020) (summary order) (citation omitted).  The benefit must be enjoyed in toll payers' capacity as toll payers. *See N.Y. State Thruway Auth.*, 199 F. Supp. 3d at 879.  TANY argues that the Tolling Program runs afoul of this dictate because the Tolling

Program's profits will go to New York City subways and buses (80%) and the railroads (20%) and "delivery trucks have no way to benefit from improvements to subways, buses, and railroads." *Trucking*, Dkt. No. 4 at 19.  Plaintiffs in *Mulgrew* and *Chan* similarly argue that many drivers who live outside New York City, live in "transit deserts," or have medical needs that make car travel the only option, will not benefit from improvements to the public transit system.  *Mulgrew*, Dkt. No. 118 at 10–17; *Chan*, Dkt. No. 130 at 10–17.

Plaintiffs' argument is based on the same impermissible move of dissecting the integrated transportation system and claiming that because they do not benefit from one part of that system, the fee is excessive with respect to the benefits Plaintiffs receive from the system as a whole. However, courts in this Circuit have consistently held that when a state funnels toll revenue from roadways to public transit options forming an integrated transportation system, those improvements to the public transit systems convey a benefit even on nonriders in the form of "reductions in traffic congestion . . ., along with associated reductions in fuel costs, stress, auto emissions, and wait times, as well as the benefits of agglomeration and improved access to the diverse economic markets and cultural attractions of New York City."  *Angus Partners*, 52 F. Supp. 3d at 570 *see, e.g.*, *Janes I*, 977 F. Supp. 2d at 341–42 (noting that the "benefit is enjoyed especially by commuters to and from locations where mass transit options also exist, providing an alternative option to those particular arteries for commuters and thus decreasing the traffic thereon" but the benefit is further enjoyed by "all commuters, including because those commuters eventually reach portions of the city that are served, and benefited by, a smoothly functioning mass transit system"); *Molinari*, 838 F. Supp. at 726–27.  Investments in the MTA's integrated transportation network are predicted to reduce congestion by incentivizing would-be drivers to utilize transit options instead.  DOT 36272,  DOT 36355, 36361.  This is the very basis for the

integrated system theory. *See Auto. Club*, 887 F.2d at 422–23 (it is appropriate to consider benefits afforded to and by the integrated system because the "existence and smooth functioning" of transit options benefits vehicle facilities, and vehicles "would suffer serious congestion if [the transit options] ceased to exist").

The argument of the *Mulgrew* and *Chan* Plaintiffs is based on a false premise. It may be that some persons entering into the CBD may be unable to use the public transit system.[16] But that does not mean that they will not benefit from improvements to the public transit system generated by the toll. Those drivers will benefit from the fact that would-be drivers for whom transit become more attractive (including because of the revenues generated by the Tolling Program) will forgo driving, freeing the streets within the CBD and reducing the congestion-related ills of high travel time, low travel-time reliability, and auto collisions. DOT 36272, 36626–27, 36763; *see also* DOT 36355, 36361 (noting that auto journeys to, from, and within the CBD are expected to decrease, while journeys by transit, foot, or bicycle, and expected to increase). And trucks in particular would enjoy the increased availability of legal parking spots and the labor and product savings associated with faster travel times. DOT 36751. These specific and associated benefits to New York's integrated transportation system thus benefit motorists and trucks in their capacities as such and are functionally related to the toll-payers' use of the CBD. *See Weisshaus*, 814 F. App'x at 647.

Plaintiffs invoke *Bridgeport*, in which the Second Circuit invalidated as unconstitutional a passenger wharfage fee imposed solely on ferry passengers but "used to accomplish a variety of tasks, only some of which afford actual or potential benefits to ferry passengers." *Trucking*, Dkt.

---

[16] "Most of the potentially affected workforce who presently work inside the Manhattan CBD live and/or work near transit," with one third living near transit and 99% working near transit. DOT 36739.

No. 4 at 20 (citing *Bridgeport*, 567 F.3d at 82–83, 87); *Mulgrew*, Dkt. No. 118 at 14 (citing same); *Chan*, Dkt. No. 130 at 14 (citing same).  In *Bridgeport*, the Second Circuit rejected the notion that general "quality-of-life improvements" such as reduced traffic and air pollution on an unassociated interstate could be considered benefits conferred in connection with a toll imposed on ferry passengers.  *Bridgeport*, 567 F.3d at 87; *see also id.* at 84 (noting that Bridgeport Port Authority also attempted to use fee revenue to fund other miscellaneous activities with no benefit to ferry passengers including "register[ing] a new trademark" and "purchasing season tickets to local minor league teams").  However, the port authority at issue in *Bridgeport* operated as a discrete governmental service and not an integrated transportation system such that improvements to one aspect of the system alleviated stress on the others.  *See Angus Partners*, 52 F. Supp. 3d at 570 (distinguishing *Bridgeport*).  Whereas the *Bridgeport* toll did not improve ferry passengers' experience on the ferry, the traffic reduction, environmental benefits, safety benefits, and vitalization associated with the Tolling Program are functionally related to the toll payers' use of the CBD.  *See Weisshaus*, 814 F. App'x at 647.  The evidence before the Court is that investments in transit will "reduce vehicle demand for road capacity in and connecting to the Manhattan CBD," DOT 36272, in turn leading to travel-time savings improvements, travel-time reliability improvements, and safety benefits for drivers (among others), DOT 36626–27.  The evidence before the Court is also that environmental effects, including an approximately 11% reduction in certain pollutants in the CBD, will accrue to drivers in the area no longer forced to breathe those pollutants—particularly if the drivers remain in the area to work, recreate, or reside.  DOT 36839–41, 36853–85.

TANY argues that any argument that the trucking industry will indirectly benefit from reduced congestion "is a complete fallacy" because the Tolling Program will not actually reduce

congestion.  *Trucking*, Dkt. No. 4 at 20.  TANY contends that because certain vehicles are charged

only once per day and other vehicles are charged a lower amount payable by the passenger instead

of the driver, the Tolling Program will disproportionately charge trucks and "do[] nothing to

advance the Tolling Program's other mandate to reduce congestion."  *Id.*  However, TANY

submits no evidence to support those propositions and the final EA expressly contradicts that

claim.  DOT 36363.  It does not follow that because other vehicles will be charged a lower toll and

less frequently than trucks, that there will be no downward impact on congestion.  Plaintiffs offer

no evidence that lower and less frequent fares would not deter other drivers or would-be taxi/FHV

passengers.  And improved public transportation facilities may also provide a more attractive

option than they had in the past.  Traffic modeling predicts exactly those outcomes.  For example,

absent the Tolling Program, auto trips are expected to comprise approximately 16.2% of journeys

into, out of, or within the Manhattan CBD in the short term and transit trips approximately 61.7%

(with the remaining trips to be completed by foot or bicycle).  DOT 36355.  Under the CBD Tolling

Alternative, auto trips are expected to fall to 14.5–15.5% with transit growing to 62.4–63.3%  *Id.*

In the long term, absent the Tolling Program, auto trips are expected to comprise approximately

15.3% of journeys, out of, or within the Manhattan CBD and transit trips approximately

62.9%.  DOT 36361.  Under the CBD Tolling Alternative, auto trips are expected to fall to 13.7–

14.7% with transit trips increasing to 63.5–64.4%.  *Id.*

Plaintiffs do not adduce any evidence that they will be unable to travel and instead show

that the Tolling Program represents, at most, a minor burden on the right to travel.  Plaintiffs

therefore have not shown a likelihood of success on the merits with respect to their claims that the

Tolling Program runs afoul of the right to travel.

### 3.    Preemption

TANY argues that the Tolling Program is preempted by the FAAAA.  *Trucking*, Dkt. No. 4 at 23–25.  The FAAAA contains an express preemption clause which states that:

> [A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  Defendants argue that the FAAA "does not[] apply to (let alone preempt) tolling programs" like the Tolling Program at issue, and "even if the [FAAAA] could theoretically apply to some form of tolling, the [Tolling] Program would not be preempted because it is permissible under the [FAAAA's] express statutory exceptions."  *Trucking*, Dkt. No. 63 at 18–22.

#### a.    Preemption Under the FAAAA

"Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are 'without effect.'"  *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).  "Where, as in this case, Congress has superseded state legislation by statute, [the Court's] task is to 'identify the domain expressly pre-empted.'"  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)).  "The key to the preemption inquiry is the intent of Congress."  *Clarkstown*, 612 F.3d at 104.  Generally, where the statute contains an express pre-emption clause, the plain wording of the clause constitutes the best evidence of Congress' preemptive intent.  *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).  However, a court's reading of an express preemption clause "does not occur in a contextual vacuum" and instead "is informed by two presumptions about the nature of pre-emption."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  "First, because the States are independent sovereigns in our federal system," courts presume that Congress does not "cavalierly" preempt

state law, "particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (citation omitted); *see Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  The Court begins by reviewing the history of the FAAAA, and then discusses the concerns courts have identified as relevant to whether Congress intended certain state acts be preempted by the FAAAA.

In 1978, Congress enacted the Airline Deregulation Act (the "ADA")—the basis for the FAAAA—on the premise that "maximum reliance on competitive market forces" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality . . . of air transportation services." *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (citing 49 U.S.C.App. §§ 1302(a)(4), 1302(a)(9)).  "To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." *Id.* at 378–79 (citing 49 U.S.C.App. § 1305(a)(1)).  In the years that followed, the Supreme Court held that the ADA preempted such state regulations as general consumer protection statutes to the extent they applied to allegedly deceptive airline conduct. *See, e.g.*, *id.*; *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).  The deregulation of the airline industry created a temporary imbalance in the trucking industry, as carriers organized as airlines were no longer bound by regulations with which certain of their competitors—organized as motor carriers—were still obliged to comply. *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 655 (9th Cir. 2021) (explaining that prior to the FAAAA, "although the ADA preempted state regulation of FedEx's trucking operations because FedEx was organized as an air carrier, many of FedEx's competitors, which were organized as motor carriers, did not receive similar protection from state regulation").

The FAAAA was enacted in 1994 to "'to create a completely level playing field' between air carriers and motor carriers." *N.Y. State Motor Truck Ass'n v. Pataki*, 2004 WL 2937803, at *5 (S.D.N.Y. Dec. 17, 2004) (quoting H.R. Rep. No. 103-677 at 83 (1994)).

The FAAAA's preemption clause copied the language of the ADA's preemption clause, and thus precedential ADA case law may be used to inform FAAAA preemption. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006). However, "[a]lthough § 14501(c)(1) otherwise tracks the ADA's air-carrier preemption provision, the FAAAA formulation contains one conspicuous alteration— the addition of the words 'with respect to the transportation of property.'" *Dan's City*, 569 U.S. at 260 (citing *Rowe*, 552 U.S. at 368); *compare* 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A) *with* 49 U.S.C.App. § 1305(a)(1). "That phrase 'massively limits the scope of preemption' ordered by the FAAAA." *Dan's City*, 569 U.S. at 260 (citing *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting)); *accord Cal. Trucking*, 996 F.3d at 655. Although the United States Supreme Court has read the FAAAA's preemption clause to embrace state laws "having a connection with or reference to carrier rates, routes, or services, whether directly or indirectly[,] . . . the breadth of the words 'related to' does not mean the sky is the limit" and where the state laws are "related to" neither the "transportation of property" nor the "service" of a motor carrier, they will not be preempted by the FAAAA. *Dan's City*, 569 U.S. at 260 (citing *Rowe*, 552 U.S. at 370). The FAAAA also "does not pre-empt state laws that affect rates, routes, or services in 'too tenuous, remote, or peripheral a manner.'" *Rowe*, 552 U.S. at 375 (quoting *Morales*, 504 U.S. at 390). And the Supreme Court has stated that "the state laws whose 'effect' is 'forbidden' under federal law are those with a 'significant impact' on carrier rates, routes, or services." *Id.* (quoting *Morales*, 504 U.S. at 388, 390).

The FAAAA's preemption provision also contains certain express exceptions.  The statute leaves intact:

> the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A).  The FAAAA's preemption provision further does not apply to the "intrastate transportation of household goods" or to the "regulation of tow truck operations performed without the prior consent or authorization of the owner or operator of the motor vehicle."  49 U.S.C. § 14501(c)(2)(B)–(C);  *see also Pataki*, 2004 WL 2937803, at *4 (summarizing express exceptions to FAAAA preemption).  The FAAA's explicit exceptions, however, are not exclusive and "do not in themselves delineate the scope of the rule."  *Dan's City*, 569 U.S. at 264.

The Second Circuit has held that "[t]he House Conference Report that accompanied the statute" is indicative of the preemptive scope that Congress intended the FAAAA to have.  *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 772 (2d Cir. 1999); *accord Bonta*, 996 F.3d at 664; *Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1199 (10th Cir. 2018); *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 38 (1st Cir. 2012).  In the House Conference Report, Congress identified forty-one jurisdictions that in 1994 regulated, "in varying degrees, intrastate prices, routes and services of motor carriers" with the "[t]ypical forms of regulation includ[ing] entry controls, tariff filing and price regulation, and types of commodities carried."  H.R. Conf. Rep. 103-677, 86 (1994).  Entry controls included restrictions preventing new applicants from competing with existing trucking businesses for "any given route and type of trucking business."  *Id.*  Tariff filing and price regulation included rules not designed to keep prices

low but instead to ensure "that they are kept high enough to cover all costs and are not so low as to be 'predatory'" and to require companies wishing to change their prices to "go through a costly and lengthy hearing proceeding in each State in which it operates." *Id.* Congress stated that the need for the FAAAA "has arisen from this patchwork of regulation" and that "[l]ifting of these antiquated controls will permit our transportation companies to freely compete more efficiently and provide quality service to their customers" because "[s]ervice options will be dictated by the marketplace; and not by artificial regulatory structure." *Id.* at 86, 88.

Tolls are the quintessential patchwork policy facing motorists transversing the country. Every toll a driver encounters forces the driver to choose between routes— a more direct or convenient route for which the driver will have to pay or a potentially more circuitous route that would be cost-free. As of January 1, 2023, there were 6,546.74 miles of toll roads, bridges, and tunnels in the United States. *See* Federal Highway Administration, *Toll Facilities in the United States*, Pub. No. FHWA-PL-18-018 (July 2023). A significant number of those toll facilities charge trucks a higher fare than other vehicles. *See id.* In 2020, tolls represented approximately 3% of motor carriers' average marginal cost per mile in the northeast United States ($0.055 per mile, with a total average marginal cost of $1.835 per mile). DOT 36722. And tolls on vehicles including motor carriers are no recent innovation. *See Cont'l Baking Co. v. Woodring*, 286 U.S. 352, 360 & n.7 (1932) (sustaining as constitutional a Kansas tax on motor carriers calculated based on gross ton mileage, i.e., the weight of goods and passengers transported per mile).[17]

---

[17] The history of toll roads in the United States stretches back practically to the country's founding. The first toll road in the United States, the Philadelphia and Lancaster Turnpike in Pennsylvania, was constructed in 1792 and was quickly joined by many more roadways funded by user fees. *See* Toll Facilities in the United States, Pub. No. FHWA-PL-18-018. Indeed, just a few decades later, the landmark Commerce Clause case, *Gibbons v. Ogden*, detailed some of the numerous toll bridges that dotted the country. *Gibbons v. Ogden*, 22 U.S. 1, 97 n.26 (1824).

The FAAAA does not preempt all state toll roads.  In the House Conference Report that accompanied the FAAAA, Congress noted that there were ten jurisdictions that "d[id] not regulate" intrastate prices, routes and services of motor carriers: Alaska, Arizona, Delaware, District of Columbia, Florida, Maine, Maryland, New Jersey, Vermont and Wisconsin.  *Id* at 86. Courts have construed this as "indirect evidence that Congress did not intend to preempt" laws that were on the books in those ten states at the time.  *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1188 (9th Cir. 1998); *accord Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 819 (3d Cir. 2019) ("By implication, Congress determined that the laws then in existence in those jurisdictions did not contravene its deregulatory goals and thus were not preempted."); *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 967 (9th Cir. 2018); *People ex rel. Harris v. Pac Anchor Transportation, Inc.*, 59 Cal. 4th 772, 783 (Cal. 2014).  At least seven of those ten "regulation-free" jurisdictions notably levied a toll on highway users at the time of implementation.  *See* Federal Highway Administration Office of Highway Information Management, *1994 Highway Statistics* (1994) (recording the 1993 state and local tolling revenues for states including Alaska, Delaware, Florida, Maine, Maryland, New Jersey and Vermont); *see also* Federal Highway Administration, *Toll Facilities in the United States*, Pub. No. FHWA-PL-93-009 (Feb. 1993) (identifying specific toll facilities).[18]

The Supreme Court has decided two particularly instructive cases concerning the preemptive scope of the FAAAA.

---

[18] Although the national statistics do not record the tolling revenues derived from motor carriers as opposed to other vehicles, case law from that time indicates that at least some of those seven "regulation-free" states did impose tolls on trucks.  *See, e.g.*, *Wallach v. Brezenoff*, 930 F.2d 1070, 1071 (3d Cir. 1991) (noting that the Port Authority of New York and New Jersey charged truck tolls in the amount of $3.00 per axle).

In *Rowe*, the Supreme Court held that the FAAAA preempted a Maine law that forbade licensed tobacco retailers to employ a "delivery service" unless that service implemented particular recipient-verification procedures to ensure that the purchaser was of legal age to purchase tobacco. *See generally* 552 U.S. 364.  The law "directly regulate[d]" a "service" of a motor carrier with respect to its transportation of property.  *Id.* at 373.  In particular, the Maine law "focuse[d] on trucking and other motor carrier services (which ma[d]e up a substantial portion of all 'delivery services),'" and "require[d] carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)."  *Id.* at 371–72 (citation omitted).  If it were upheld, the result "could easily lead to a patchwork of state service-determining laws, rules, and regulations."  *Id.* at 373.  The Court observed, "the state law is not general, it does not affect truckers solely in their capacity as members of the general public, the impact is significant, and the connection with trucking is not tenuous, remote, or peripheral."  *Id.* at 375.  The law "produc[ed] the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide."  *Id.* at 371–72 (quoting *Morales*, 504 U.S. at 378).

Conversely, in *Dan's City*, the Supreme Court held that the FAAAA did not preempt a New Hampshire law governing the sale of stored vehicles following a tow because "[t]he New Hampshire law in point regulates no towing services, no carriage of property," and instead concerns the treatment of property only after it has been towed.  569 U.S. at 255.  It was not sufficient that the law would have an effect on the price, route, or service of a motor carrier.  The Court noted that the target at which the FAAAA aimed was "a State's direct substitution of its own governmental commands for competitive market forces in determining (to a significant degree)

the services that motor carriers will provide." *Id.* at 263 (quoting *Rowe*, 552 U.S. at 372).  The Court observed that "[t]he state laws in question hardly constrain participation in interstate commerce by requiring a motor carrier to offer services not available in the market." *Id.*  "Nor do the state laws . . . 'freez[e] into place services that carriers might prefer to discontinue in the future.'" *Id.* at 263–64 (quoting *Rowe*, 552 U.S. at 373).  Zoning regulations might have an impact on the price, route or service of a motor carrier.  But the Court concluded, "[i]t is hardly doubtful that state or local regulation of the physical location of motor-carrier operations falls outside the preemptive sweep of the [FAAAA]." *Id.* at 264.

Zoning ordinances such as those approved in *Dan's City* may impact the routes motor carriers take (by altering the start and end points) and the rates they charge (by contributing to potentially different fuel and premises costs than the motor carriers would otherwise bear).  But those upstream impacts are insufficient to give rise to FAAAA preemption. *Id.*  Zoning ordinances are not unique in that capacity.  "Nearly every form of state regulation carries some cost" which carriers may elect either to internalize or to pass on to their customers. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014); *accord Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1053 (7th Cir. 2016) (recognizing that "virtually any state law, at some level, has an effect on the market price").[19]  By imposing a cost on accidents, the state common law of torts—just like its regulations on traffic speed or of traffic lights—may encourage or discourage particular forms or routes of travel. *See generally* Guido Calabresi, *The Costs of Accidents* (1970).  The fact that a local law may "shift[] incentives and make[] it more costly for motor carriers to choose some routes or services relative to others, leading the carriers to reallocate resources or make different business

---

[19] Notably, Congress exempted from the FAAAA's preemptive scope state and local safety regulations which undoubtedly raise the operating costs of motor carriers.  49 U.S.C. § 14501(c)(2)(A).

decisions," does not mean that the local law is preempted. *Dilts*, 769 F.3d at 647 (citing *Air Transp. Ass'n*, 266 F.3d at 1074. The important distinction is thus between laws that impact resource inputs—which are unlikely to be preempted—and product outputs—which are likely to be preempted. As the Seventh Circuit observed:

> For example, labor inputs are affected by a network of labor laws, including minimum wage laws, worker-safety laws, anti-discrimination laws, and pension regulations. Capital is regulated by banking laws, securities rules, and tax laws, among others. Technology is heavily influenced by intellectual property laws. Changes to these background laws will ultimately affect the costs of these inputs, and thus, in turn, the 'price . . . or service' of the outputs. Yet no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws because their effect on price is too 'remote.' Instead, laws that regulate these inputs operate one or more steps away from the moment at which the firm offers its customer a service for a particular price.

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am.*, 697 F.3d 544, 558 (7th Cir. 2012) (citing *Mendonca*, 152 F.3d at 1189; *Morales*, 504 U.S. at 390); *accord Bedoya*, 914 F.3d at 822; *Costello*, 810 F.3d at 1053; *Amerijet Int'l, Inc. v. Miami-Dade Cnty., Fla.*, 627 F. App'x 744, 751 (11th Cir. 2015) ("If, on the other hand, Amerijet is suggesting that an increase in an air carrier's costs will in turn raise the prices of that carrier's services . . ., such 'indirect economic influences' are insufficient to trigger preemption" under the ADA.).

Based on these cases and concerns, circuit courts have held that the relevant inquiry as to whether a law has a significant effect on carrier prices, routes, or services is whether the state law at issue (1) "applies to all businesses or whether it focuses on motor carriers;" (2) addresses the carrier's relationship with its customers or addresses another relationship such as the carrier's relationship with its employees; (3) "binds the carrier to provide a particular price, route, or service;" and (4) risks creating "patchwork" of differing state "service-determining laws." *Bedoya*, 914 F.3d at 823; *see also Dilts*, 769 F.3d at 644–47 (reviewing similar factors to determine preemption); *S.C. Johnson*, 697 F.3d at 558 (similar).

70

Because "[t]he target at which [the FAAAA was] aimed was 'a State's direct substitution of its own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide,'" *Dan's City*, 569 U.S. at 263 (quoting *Rowe*, 552 U.S. at 372), courts have primarily focused on the third factor—whether the state or local law compels the carrier to provide or not provide a certain price, service, or route than it would otherwise choose. *See, e.g.*, *Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*, 266 F.3d 1064, 1072 (9th Cir. 2001) ("[A] local law will have a prohibited connection with a price, route or service if the law binds the air carrier to a particular price, route or service and thereby interferes with competitive market forces within the air carrier industry."); *Boyz Sanitation*, 889 F.3d at 1200 (rejecting argument that the FAAAA preempts a local ordinance requiring that all garbage collected in the city be taken to a certain transfer station because the ordinance "would neither significantly determine what services garbage haulers in Rawlins will provide nor require garbage haulers to provide a service not available in the market"); *Amerijet*, 627 F. App'x at 751 (holding that the FAAAA and ADA did not preempt a local ordinance that did not "bind" carriers to any particular choice or preclude carriers from offering services they wish to provide).

### b. Application to the Tolling Program

TANY has not demonstrated a likelihood of success on the merits as to its argument that the Tolling Program is preempted because TANY has not shown that the Tolling Program will have a significant impact on the prices, services, or routes of motor carriers.

The Tolling Programs applies to multiple classes of vehicle, though it does impose a higher fare on trucks than on many other vehicle classes.[20]  On its own, that is insufficient to warrant

---

[20] Taxis and FHVs conducting numerous trips into, within, and out of the CBD could theoretically pay more than a truck.  A taxi would have to make 29 trips to eclipse the toll paid by a single-unit truck entering during peak period and 44 trips to eclipse the toll paid by a multi-unit truck entering

FAAAA preemption. "Even targeted laws . . . are not necessarily preempted" and the inquiry into "whether a law is applicable to every business or targets carriers is a helpful but nondispositive factor for determining whether a law has a direct effect on motor carriers' prices, routes, or services." *Bedoya*, 914 F.3d at 821 (citing *Morales*, 504 U.S. at 386); *see Su*, 903 F.3d at 966.

The Tolling Program is not aimed at the customer-carrier relationship. In general, "[l]aws that affect the way a carrier interacts with its customers fall squarely within the scope of FAAAA preemption" whereas laws that merely impact the carrier's relationship with its workforce or vendors are too tenuously connected to be preempted. *Costello*, 810 F.3d at 1054. As the Ninth Circuit has recognized, "[l]aws are more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices" but "background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide." *Dilts*, 769 F.3d at 646. The Tolling Program does not require that motor carriers charge any particular price for any particular service. It does not bar newcomers to the industry or constrain the prices at which a motor carrier may offer its services. It is not aimed at impacting prices but rather at making trucks bear the cost that they are imposing on the transportation system. TMRB Report at 20. Although TANY argues that any attempt to pass on the toll to its customers will "relate[] to the prices of motor carriers" and require TANY to renegotiate its annual rate agreements, *Trucking*, Dkt. No. 4 at 24–25, the Tolling Program does not mandate that pass-through (the way it does require taxi and other for-hire vehicles to charge the passenger instead of the driver), *see* 50 N.Y.

---

during peak period. An FHV dispatched by a high-volume for-hire service such as Lyft, Uber, or Via would have to make 15 trips to result in higher tolls than a single-unit truck entering during peak period and 22 trips to result in higher tolls than a multi-unit truck entering during peak period.

Reg. 12, 81–82 (citing Rules of City of NY Taxi & Limousine Comm'n §§ 58-26(f), 59A-23(b), 59D-17(c)).

Even though motor carriers may wish to adjust their prices to reflect the changed operating cost, it does not follow that the Tolling Program interrupts the carrier-customer relationship. TANY offers no evidence that the Tolling Program will actually result in increased costs for the trucking industry or that the Program will not have the congestion-mitigating effects that the models predict. DOT 36355, 36361. While the Tolling Program imposes a cost on motor carriers entering the CBD, it is expected to lower their operating costs. Trucks are projected to spend less time in traffic, and thus the cost of each delivery will be reduced by corresponding savings on labor and materials. DOT 36751. Because of the reduced congestion, trucks are also expected to be able to make more deliveries in the same time, thus increasing revenues and spreading the costs across a greater number of customers. And whereas trucks presently face high fine burdens due to the lack of legal parking options, other competition for parking would decline. *Id.* Moreover, even if TANY did offer evidence that the Tolling Program would increase the costs of its members doing business in the CBD, the Tolling Program does not prescribe or proscribe any specific price, route or service. And any incidental effect on the prices that motor carriers choose to offer does not implicate the primary concern underlying the FAAAA—it does not threaten competition between motor carriers. *See Dan's City*, 569 U.S. at 263; *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1259 (11th Cir. 2003).[21] Even if motor carriers choose to renegotiate their annual rate

---

[21] TANY does not argue that every policy impacting the price at which motor carriers will contract is preempted by the FAAA. Indeed, TANY's president submitted a declaration stating that "TANY has been a long-time supporter of the Off Hours Delivery Program, which provides financial incentives to those businesses that are able to implement it." *Trucking*, Dkt. No. 5 ¶ 36. That program arguably increases the price motor carriers may charge for eligible off hour deliveries, but similarly operates a step or two away from the price-determining moment. The tolling schedule

agreements with customers, that is a facet of their own contractual decision-making. *See Wolens*, 513 U.S. at 233 (noting that in the context of ADA preemption, there is a "distinction between what the State dictates and what the airline itself undertakes," with the latter to remain binding in breach-of-contract actions); *see also id.* (explaining that this promotes "maximum reliance on competitive market forces" because "[m]arket efficiency requires effective means to enforce private agreements" (citations omitted)); *Su*, 903 F.3d at 962 (applying *Wolens* in FAAAA context); *Gordon Cos., Inc. v. Fed. Express Corp.*, 2015 WL 13727903, at *2 (W.D.N.Y. Sept. 10, 2015) (similar). The Tolling Program does not require trucks to participate in any particular pricing scheme that would impede the ability of market forces to inform carrier prices; instead it only impacts the resource input—the price of trucks' use of certain roadways.

With respect to the third and most important consideration, the Tolling Program does not bind motor carriers to undertake any particular service or route or charge a certain price, nor bar the provision of any identified service, route, or price that they might wish to provide. *See, e.g.*, *Rowe*, 552 U.S. 364 (state law requiring recipient verification service for tobacco deliveries was preempted). The Tolling Program does not "mandate or prohibit certain routes, or tell motor carriers what services that they may or may not provide." *Ridgeway v. Walmart Inc*, 946 F.3d 1066, 1083 (9th Cir. 2020) (quoting *Dilts*, 769 F.3d at 647). Neither "a modestly increased cost of doing business" nor "the mere fact that a motor carrier must take into account a state regulation when planning services is . . . sufficient to require FAAAA preemption." *Dilts*, 769 F.3d at 648–49; *accord Bonta*, 996 F.3d at 657; *Ridgeway*, 946 F.3d at 1083; *S.C. Johnson*, 697 F.3d at 558–

---

for off-peak entry to the CBD similarly provides a 75% discount to tolls charged during peak hours, and time-based discounts are common across New York's tolled facilities. *See* Port Authority of New York and New Jersey, *2024 Toll Rates* (2024), https://www.panynj.gov/bridges-tunnels/en/tolls.html (discounted tolls are available for off-peak driving on the Lincoln & Holland tunnels, the George Washington, Bayonne & Goethals bridges, and the Outerbridge Crossing).

61; *see also Cal. Div. of Lab. Standards Enf't*, 519 U.S. at 334 (holding ERISA did not preempt certain state laws because "[t]he prevailing wage statute alters the incentives, but does not dictate the choices, facing ERISA plans").  Motorists whose desire to drive into the CBD during peak hours is relatively inelastic will continue to do so.  Although TANY protests that the Tolling Program is intended to discourage certain routes (those that pass through the CBD) and timing (driving at peak vs. off-peak hours), *Trucking*, Dkt. No. 4 at 24, TANY acknowledges that the Tolling Program in fact has two aims: to reduce congestion and to generate revenue, *id.* at 4.  These aims are mutually exclusive for each vehicle trip—a vehicle that travels into the CBD generates revenue but also contributes to congestion while a vehicle that alters its path to avoid the CBD or peak hours reduces congestion but does not generate revenue.  TANY thus does not argue that its members will in fact be obligated to drive at dispreferred routes and times—only that trucks will be incentivized to do so.  *See Dilts*, 769 F.3d at 648–49.[22]  The final EA determined that under the Tolling Program, "the volumes of truck journeys into and within the Manhattan CBD are expected to remain similar to today because the need to deliver goods would remain the same; deliveries would still need to be made to restaurants, businesses, and residents regardless of the Manhattan CBD tolling implementation."  DOT 36748–49; *see also* DOT 36752 ("[T]olling, as well as tolling with peak[] and offpeak rate variation, would not likely substantially alter urban freight delivery.").  TANY submitted four declarations, each of which acknowledged that other considerations (such as customer needs and workforce constraints) will require the trucks to maintain their current routes and pick-up and delivery hours.  *See Trucking*, Dkt. No. 5 ¶¶ 29–30, 35, 37, 40 (TANY's

---

[22] The amicus brief submitted by UPS tellingly argues not that motor carriers will be obligated to change their routes but that "[t]he prospect of repeated entry fees with interfere with *carrier judgment* regarding how service is provided—for instance they may sort and load packages differently to prioritize remaining within the CBD."  *Trucking*, Dkt. No. 27 at 7.

president averred that "TANY members have no alternative means of operating their businesses and making deliveries in Manhattan other than to subject their fleets to charges imposed by the Tolling Program."), Dkt. No. 6 ¶¶ 22, 25, Dkt. No. 7 ¶¶ 21–26, Dkt. No. 8 ¶ 27; *see also Trucking*, Dkt. No. 14 ¶¶ 49, 54, 59 (TANY alleged in its complaint that "TANY members have no alternative means of operating their businesses and making deliveries in Manhattan other than to subject their fleets to charges imposed by the Tolling Program."). These admissions that the Tolling Program will not mandate certain routes or the avoidance thereof starkly undermines TANY's preemption claim.[23]

Though TANY protests the choice its drivers are forced to make in light of the Tolling Program, that choice is mandated by every toll a driver encounters; some drivers will elect to avoid toll roads (by taking alternate paths or deciding not to drive altogether), while others will pay for the convenience or necessity of using the road. Despite this truism, Congress has not evidenced an intent to preempt the application of tolls to trucks. Rather, Congress has long acknowledged states' authority to impose tolls on motorists.[24] Congress incorporated toll highways into the interstate system by statute in 1956 and made federal financial support available to toll highways in 1978. *See Am. Trucking Ass'ns*, 886 F.3d at 241 (citing Pub. L. No. 84-627, § 113(a), 70 Stat. 374, 384; Pub. L. No. 95-599, 92 Stat. 2689 (1978)). In 1991—just a few years before the passage

---

[23] To be certain, one can imagine an exorbitant toll so excessive as to effectively constitute a bar to access. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995); *see also S. Dakota v. Dole*, 483 U.S. 203, 211 (1987) (acknowledging that there may be a point at which financial "pressure turns into compulsion" (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937))). However, TANY has not shown that the Tolling Program is one such coercive toll.

[24] Although the standard formulation of the toll road uses toll revenue to support resurfacing efforts and other facets of operation and maintenance while the Tolling Program uses toll revenue to alleviate congestion, the end result is the same: paying vehicles enjoy smoother and speedier travel along with a lower incidence of vehicle damage.

of the FAAAA—Congress enacted the ISTEA, which granted states "greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects." *Id.* (citing 23 U.S.C. § 129; Pub. L. No. 102-240, 105 Stat. 1914 (1991)).  In 2005, Congress passed the SAFETEA-LU, which both amended the FAAAA's preemption provision and provided funds for the VPPP, including projects that involve highway tolls.  Pub. L. No. 109–59 §§ 1604, 4105, 119 Stat. 1144 (2005).  Even more recently, Congress affirmed states' implementation of differential tolls, but capped them by stating in the Infrastructure Investment and Jobs Act of 2021 that the Secretary of Transportation may only approve the use of tolls on federally-funded highways if the maximum toll rate for any vehicle class is not more than five times the toll rate charged to any other vehicle class.  23 U.S.C. § 129(d)(6)(B)(ii); Pub. L. No. 117-58, 135 Stat. 429 (2021).  Congress' recognition of "pre-existing state efforts" to impose tolls, including on trucks, and "apparent[] expect[ation] that those efforts would continue" indicates that Congress did not intend the FAAAA to preempt the application of tolls to motor carriers.  *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330 (1997); *see also Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985) ("Where . . . the field that Congress is said to have pre-empted has been traditionally occupied by the States," courts presume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977))).

In fact, Congress has expressly signaled its support for tolled projects aimed at mitigating congestion such as the Tolling Program.  ISTEA, as amended, established the Value Pricing Pilot Program.  The VPPP authorizes the Secretary of Transportation to solicit and enter into cooperative agreements with "State or local governments or public authorities to establish, maintain, and

monitor congestion pricing projects." ISTEA § 1012(b).[25] ISTEA provides that notwithstanding the general bar against state-imposed tolls on federally funded highways, *see* 23 U.S.C. §§ 129, 301, "the Secretary shall allow the use of tolls on the Interstate System as part of a pilot program under this section." ISTEA § 1012(b)(4). On November 21, 2024, the FHWA, USDOT, and NYSDOT entered into a Value Pricing Program Agreement that permitted the TBTA to operate the Tolling Program as a tolled value pricing project, provided federal funding for the Tolling Program, and included a fee schedule explaining the Tolling Program's differential tolling structure, including the higher and more frequent tolls charged to trucks. *Trucking*, Dkt. No. 81-2. Congress' support for tolled congestion mitigation projects is at odds with TANY's contention that Congress intended to preempt the Tolling Program. *See Dillingham*, 519 U.S. at 330.

Finally, the Tolling Program does not impermissibly threaten a "patchwork of service-determining laws, rules, and regulations" that requires motor carriers to alter their conduct as they move from jurisdiction to jurisdiction. *City of New York v. FedEx Ground Package Sys., Inc.*, 2017 WL 740067, at *8 (S.D.N.Y. Feb. 21, 2017) (quoting *Rowe*, 552 U.S. at 373). "The fact that laws may differ from state to state is not, on its own, cause for FAAAA preemption." *Dilts*, 769 F.3d at 647. For example, labor laws may vary widely across different jurisdictions, prompting interstate motor carriers to deviate from otherwise preferred routes, make different staffing decisions, or bear higher costs than they would if exposed to uniform labor regulations. *See id.* at 648. Tort claims arising out of motor vehicle collisions may similarly be analyzed differently depending on the common law of the state in which the collision occurs. *See Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1030–31 (9th Cir. 2020) (holding that negligence claims

---

[25] Although the ISTEA refers to the program as the "Congestion Pricing Pilot Program," *id.*, the SAFETEA-LU amended the provision to the VPPP moniker it now bears, *see* SAFETEA-LU § 1604(a).

arising out of motor vehicle accidents fall into the FAAAA's "safety exemption" to preemption); *Covenant Imaging, LLC v. Viking Rigging & Logistics, Inc.*, 2021 WL 973385, at *6 (D. Conn. Mar. 16, 2021) (similar); *but see Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 455 (1st Cir. 2014) (rejecting similar argument in the ADA context because "[s]uch a finding would effectively supplant market forces with Massachusetts common-law definitions of reasonableness and, thus, create the very patchwork of state-based regulations that ADA preemption is meant to preclude").[26]    Courts generally consider these laws that operate as to resource inputs without constraining the provision of specific services too disconnected from the rates, services, or prices of motor carriers to create the legal patchwork FAAAA preemption was intended to avoid.  *See, e.g.*, *Su*, 903 F.3d at 966.  Tolls are one such background law whose interference with the rates, routes, and services that motor carriers offer is only tenuous.  It is significant that Congress characterized seven states with tolls as "jurisdictions which do not regulate" and thus do not contribute to the patchwork of regulation the FAAAA was designed to address.  H.R. Conf. Rep. 103-677 at 86; 1994 Highway Statistics.  Furthermore, despite the ubiquity of differential tolling programs that charge trucks higher user fees, no party has identified any case challenging tolls on the basis of FAAAA preemption at any point in the past three decades.  *Trucking*, Dkt. No. 56 at 4, Dkt. No. 63 at 19; *but see Jalbert Leasing, Inc. v. Mass. Port Auth.*, 2005 WL 1288108, at *8 (D. Mass. May 18, 2005) (construing the related statutory preemption provision in 49 U.S.C.

---

[26] As further evidence that Congress did not intend to mandate total uniformity, the Supreme Court has acknowledged that, under the safety exception to FAAAA preemption, "a State could, without affront to the statute, pass discrete, nonuniform safety regulations applicable to each of its several constituent municipalities."  *Ours Garage*, 536 U.S. at 44.  "Ohio thus could adopt the Columbus regulations to govern in that city, the Toledo regulations to govern there, and so on down the line." *Id.*

§ 14505 so as to avoid "preempt[ing] the imposition of state highway tolls on the motor carriers"), *aff'd*, 449 F.3d 1 (1st Cir. 2006).

Ultimately, because the Tolling Program does not significantly relate to the rate, route, or service of motor carriers, TANY has not demonstrated a likelihood of success on the merits with respect to its claim that the Tolling Program is preempted by the FAAAA.

### c.    Size and Weight Exception

Defendants argue that even if the FAAAA would otherwise preempt the Tolling Program, the Tolling Program would be saved by the FAAAA preemption exception that preserves "the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle." 49 U.S.C. § 14501(c)(2)(A); *Trucking*, Dkt. No. 63 at 21–22, Dkt. No. 80 at 19. TANY argues that the size and weight exception does not save the Tolling Program because (1) Defendants have not shown that the streets in the Manhattan CBD constitute "highways" within the meaning of the FAAAA; (2) the purported purpose of the Tolling Program is to reduce congestion and generate revenue, not to prevent vehicles of certain sizes and weights from entering the Manhattan CBD; and (3) Defendants have not shown that the Tolling Program's classification of commercial trucks is based on the size or weight of the motor vehicle. *Trucking*, Dkt. No. 76 at 25–26.

TANY's first argument is easily dispatched. The FAAAA defines highway as "a road, highway, street, and way in a State." 49 U.S.C. § 13102. The streets in the CBD inarguably fit that definition. *See Mulgrew*, 2024 WL 3251732, at *15.

Next, TANY argues that the purpose and intent behind the Tolling Program render the weight and size exception to FAAAA preemption unavailable. But TANY does not provide any explanation as to why Defendants' stated aims are unacceptable uses of a size and weight restriction. Congress expressed that in setting forth the exceptions to FAAAA preemption, it did

"not intend for States to attempt to de facto regulate prices, routes or services of intrastate trucking through the guise of some form of unaffected regulatory authority." H.R. Conf. Rep. 103-677, at 83; *see also Ace Auto Body*, 171 F.3d at 772. In the context of the safety exception to FAAAA preemption, the Supreme Court has held that "[l]ocal regulation of prices, routes, or services of tow trucks that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule." *Ours Garage*, 536 U.S. at 442. Following *Ours Garage*, the Second Circuit held that courts must "no longer consider simply whether a regulation is reasonably related to safety but must determine whether, in light of the legislative body's purpose and intent, the regulation is 'genuinely responsive' to safety concerns." *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006) (Sotomayor, J.); *accord Auto. Club of N.Y., Inc. v. Dykstra*, 520 F.3d 210, 214 (2d Cir. 2008). Unlike safety concerns, regulators are unlikely to restrict size and weight restrictions as an end unto themselves. [27] Therefore, in the context of the size and weight exception, the appropriate question is whether the law at issue is genuinely responsive to concerns actually related to the vehicle's size and weight.

Defendants argue that the Tolling Program charges trucks a higher and more frequent fare than smaller vehicles because trucks have an "outsized impact on congestion, because of their larger size." *Trucking*, Dkt. No. 80 at 19 (quoting TMRB Report at 20 (noting that trucks' large

---

[27] Size and weight restrictions are more likely aimed at reducing wear and tear upon the roadways, reducing truck traffic in residential areas, promoting the safety of motorists, cyclists, and pedestrians (in which case the law might doubly fall within both the safety and size and weight exceptions), or myriad other reasons. *See Scheiner*, 483 U.S. at 300 (O'Connor, J., dissenting) (noting that Arkansas "opened its highways to the heaviest trucks only upon the understanding that it might collect sufficient revenue from those trucks . . . to compensate for the damage they do to its roads"); *Ctr. for Auto Safety v. Dole*, 582 F. Supp. 1444, 1449 (D.D.C. 1984) (noting that wide trucks may require different lane sizes for safety reasons). So long as the law is properly motivated by the different impact of a vehicle's size or weight—and does not merely reference size and weight as a proxy to single out motor carriers—it is likely that the law is "genuinely responsive" to those concerns.

size and large turning radii along with their parking patterns disproportionately contribute to congestion)). TANY does not dispute that outsized impact. Because TANY does not establish that the Tolling Program's size and weight restriction does not genuinely further Defendants' goals of reducing congestion, it has not shown that the preemption exception is unavailable on that basis. The fact that the Tolling Program is additionally intended to generate revenue does not prevent application of the exception. *See Cal. Tow Truck Ass'n v. City & Cnty. of S.F.*, 693 F.3d 847, 860 (9th Cir. 2012) ("[T]he presence of such mixed motives . . . does not preclude the application of the safety exception, provided that the State's safety motives are not pre-textual." (citation omitted)); *see also Cal Tow Truck Ass'n v. City & Cnty. of S.F.*, 807 F.3d 1008, 1020 (9th Cir. 2015) ("Determining whether an asserted safety motive is not pretextual is equivalent to asking whether a law is 'genuinely responsive' to safety concerns—in other words, whether the challenged provision has a logical connection to motor vehicle safety." (citation omitted)).

Finally, TANY argues that the Tolling Program is not in fact based on the size or weight of the vehicles to which it applies.[28] TANY claims that the fact that "transit buses of at least the same size and weight as many delivery trucks are completely exempt from the Tolling Program" demonstrates that the Tolling Program is not a size and weight restriction. *Trucking*, Dkt. No. 76 at 25–26. In support, TANY cites *Colorado Motor Carriers Association v. Town of Vail*, in which the Colorado District Court held that a local ordinance that prohibited all vehicles from accessing

---

[28] Undoubtedly, restrictions based on factors other than the vehicle's size and weight—either as written or as applied—cannot claim the exception. *See Cal. Dump Truck Owners Ass'n v. Davis*, 302 F. Supp. 2d 1139, 1144 (E.D. Cal. 2002) (holding that the FAAAA did not preempt restrictions based on specified vehicle sizes but could preempt a state regulation that authorized local governments to enact ordinances regarding "'certain classes of vehicles' such as trucks, or tractors, or oversize or 'excessively noisy' vehicles, or those lacking air-inflated tires" to the extent that the regulation was used to permit classifications based on factors other than the vehicle's size and weight (quoting *City of Lafayette v. Cnty. of Contra Costa*, 91 Cal.App.3d 749, 756 n.2 (Cal. Ct. App. 1979))).

a pedestrian mall area but provided exceptions for a plethora of vehicles that threatened safety just as much as the non-exempted motor carriers did was preempted. 2023 WL 8702074, at *10 (D. Colo. Dec. 15, 2023).[29] The court held that the ordinance was not genuinely responsive to safety concerns because there was no logical nexus between the prohibition of delivery trucks in particular on the pedestrian mall and the town's stated safety concerns. *Id.* at *10. Here, there is a logical connection between the restriction on trucks and the associated exemption for public buses—Defendants state that trucks have an oversized contribution to congestion, while public commuter buses may reduce congestion by consolidating many cars' worth of passengers into a single vehicle. *Trucking*, Dkt. No. 80 at 19. The exception for buses does not indicate that the Tolling Program is not actually based on vehicular size and weight.

TANY fails to show a likelihood of success on the merits with respect to its claim that the FAAAA preempts the Tolling Program either because it has a significant impact on motor carriers' rates, routes, or services or because the size and weight exception does not apply.

### 4.    The Green Amendment

The Green Amendment to the New York State Constitution states that "[e]ach person shall have a right to clean air and water, and a healthful environment." N.Y. Const. art. I, § 19. Plaintiffs in *Mulgrew* and *Chan* argue that they are likely to succeed on the merits of their claims that the Tolling Program violates New York State's Green Amendment. *Mulgrew*, Dkt. No. 122 at 3–4, Dkt. No. 130 at 5–8; *Chan*, Dkt. No. No. 134 at 3–4, Dkt. No. 142 at 5–8. Plaintiffs contend that the Green Amendment establishes substantive rights and "requires state agencies to take

---

[29] The ordinance exempted "(1) public transportation vehicles; (2) emergency vehicles; (3) vehicles owned or specially permitted by the Town; (4) Town-approved contractors delivering commercial goods; (5) armored money vehicles; (6) waste and recycling collection vehicles; (7) vehicles entering or exiting a parking structure to access a business or residence; (8) property owners and their guests actively loading or unloading; [and] (9) guests checking in or out of any accommodation establishment located in the Pedestrian Mall Area[ ]s." *Id.* at *3–4.

appropriate action to ensure that their processes do not abridge individual environmental rights to 'clean air and water, and a healthful environment.'" *Mulgrew*, Dkt. No. 130 at 6; *Chan*, Dkt. No. 142 at 6.  Defendants argue that the Green Amendment "does not impose additional substantive or procedural requirements addressed by other laws such as NEPA." *Mulgrew*, Dkt. No. 105 at 22; *Chan*, Dkt. No. 118 at 22.

The Green Amendment's path to the New York State Constitution was a highly-involved one.  The New York State Constitution sets forth a three-step process for amending the constitution through a ballot initiative.  N.Y. Const. art. XIX, § 1.  First, both the Senate and Assembly must propose the amendment, whereupon the Attorney General will render a written opinion "as to the effect of such amendment or amendments upon other provisions of the constitution."  *Id.*  The amendment must then win the majority vote in both houses.  *Id.*  Next, the legislature waits until there is a general election, following which the newly-elected legislature must again pass the proposed amendment by majority vote in both houses.  *Id.*  Following the second passage, the proposal is submitted to the electorate, again requiring a majority vote.  *Id.*  The Green Amendment was first proposed in 2017 but failed to amass majority support in either legislative house.  A6279, 2017–2018 Reg. Sess. (N.Y. 2017); S5287 2017–2018 Leg. Sess. (N.Y. 2017).  The proposed amendment mustered enough support to proceed in the following legislative session.  A2064, 2019–2020 Reg. Sess. (N.Y. 2019); S2072, 2019–2020 Leg. Sess. (N.Y. 2019).  The Assembly and Senate passed the amendment by majority vote again the following session.  A1368, 2021–2022 Reg. Sess. (N.Y. 2021); S528, 2021–2022 Leg. Sess. (N.Y. 2021).  The Green Amendment was placed on the ballot during the 2021 election and the voters passed it by an overwhelming majority.  *See* N.Y. Bd. of Elections, Proposition Number Two (2021), https://elections.ny.gov/ 2021-general-election-ballot-proposal-2-results (2,129,051 New Yorkers voted in favor of the

Green Amendment, while 907,159 opposed the amendment).  The Green Amendment finally became part of the state constitution on January 1, 2022.  N.Y. Const. art. I, § 19.

The Green Amendment's influence on environmental jurisprudence in New York is still in its infancy.  *See Marte v. The City of New York*, 2023 WL 2971394, at *2 (N.Y. Sup. Ct. Apr. 17, 2023).  However, a review of the five states that adopted constitutional provisions safeguarding environmental rights before New York's indicates that "(1) that constitutional environmental rights have been interpreted primarily as procedural, not substantive, rights, and (2) that courts ignore the substantive rights language in the constitutional text in favor of other language, which is then given its content through other legal doctrines."  Amber Polk*, The Unfulfilled Promise of Environmental Constitutionalism*, 74 Hastings L.J. 123, 165 (2022); *see Marte*, 2023 WL 2971394, at *2.[30]  The few New York courts to have faced the issue have taken a similar approach.  *See, e.g.*, *People by James v. PepsiCo, Inc.*, 2024 WL 4685935, at *5 (N.Y. Sup. Ct. Oct. 31, 2024) ("While Plaintiff points to the Green Amendment to the State Constitution which establishes the right to clean water, clean air, and a heathy environment, Plaintiff is unable to reference any statutory obligations that Defendants have violated by producing these bottles and plastic wrappings."); *Streeter v. N.Y.C. Dep't of Env't Prot.*, 213 N.Y.S.3d 865, 870 (N.Y. Sup. Ct. 2024) (The Green Amendment[] . . . was not intended to change existing laws, such that it allow[s] this Court, in essence, to become the forum to modify the Administrative Code."); *Marte*, 2023 WL 2971394, at *3 ("The Court hesitates to create a brand-new route to challenge developments on an environmental basis.").

---

[30] The five states to have adopted constitutional provisions similar to the Green Amendment prior to New York's ratification are Hawaii, Illinois, Massachusetts, Montana, and Pennsylvania.  *See* Haw. Const. art. XI, § 9; Ill. Const. art. XI, § 2; Mass. Const. art XCVII; Mont. Const. art. II, § 3; Penn. Const. art. I, § 27.

The Court joins in those courts' hesitance to read the Green Amendment as creating a self-executing substantive right that imposes environmental standards above and beyond the state's preexisting—and robust—environmental regulatory regime.  "A [c]ourt is not the right forum to, essentially, modify the state's environmental regulatory scheme[;] . . . that is the province of the legislature."  *Marte*, 2023 WL 2971394, at *3; *accord Streeter*, 213 N.Y.S.3d at 870.  The two legislatures that passed the Green Amendment did so against the existing backdrop of laws and regulations including the State Smart Growth Public Infrastructure Policy Act, N.Y. Env't Conserv. Law §§ 6-0101 *et seq*.; the State Environmental Quality Review Act, N.Y. Envtl. Conserv. Law §§ 8–0101 *et seq*. ("SEQRA"); the New York Ocean and Great Lakes Ecosystem Conservation Act, N.Y. Env't Conserv. Law §§ 14-0101 *et seq*.; and a series of compacts with nearby states to control pollution.[31]  "A fundamental rule of statutory construction provides that the Legislature does not act in a vacuum, but is aware of the existing state of the law at the time it enacts new legislation."  *Delese v. Tax Appeals Tribunal of State of N.Y.*, 771 N.Y.S.2d 191, 194 (2004).  Had the New York Legislature wished to supplement the state's environmental regime by creating a higher legal standard, it could have done so with far less effort and fanfare by passing a law in a single legislative session.

Instead, the Green Amendment appears to operate more like the Education Article which guarantees only a "sound basic education."  *Campaign for Fiscal Equity, Inc. v. State*, 655 N.E.2d 661, 665–66 (N.Y. 1995) (discussing N.Y. Const. art. XI, § 1).[32]  In *Bd. of Educ., Levittown Union*

---

[31] These examples represent only a fraction of New York's environmental legislative landscape and do not account for the additional state regulations, municipal laws and regulations, or federal laws and regulations that provide further environmental safeguards including public and private causes of action.

[32] The proposed amendment's sponsors articulated a similar viewpoint.  Assemblymember Englebright, who sponsored the proposed amendment in all three legislative sessions in which it

*Free Sch. Dist. v. Nyquist*, the New York Court of Appeals held that the Education Article required only a "State-wide system assuring minimal acceptable facilities" such that "[i]f what is made available by this system . . . may properly be said to constitute an education, the constitutional mandate is satisfied." 439 N.E.2d 359, 368 (N.Y. 1982). "The Education Article does not guarantee any particular level or amount of state funding, but rather it guarantees students the opportunity to achieve a basic level of education." *Aristy-Farer v. State*, 81 N.E.3d 360, 363 (N.Y. 2017).[33]

The Green Amendment's guarantee of "clean air and water, and a healthful environment" thus should not be read to forbid every government action that in any way lessens the cleanliness of any New Yorkers air or water or makes the environment less healthful. Every infrastructure project will, by its nature, have disparate effects. Some, particularly those who live within or near the construction site, will experience environmental deterioration even if the vast majority do not. The question is not whether any New Yorker is made worse off. It is whether New York State operates a system that ensures all its citizens have a baseline level of clean air, clean water, and a healthful environment. The Court's reading does not render the Green Amendment a "nullity," as

---

was introduced, clarified during debate that the Green Amendment "does not change . . . any of the existing laws of the State." *Mulgrew*, Dkt. No. 126-4 at 35; *see also id.* (Assemblymember Englebright stated: "Anyone who wants to use the legal system to bring an action now can do that."). Senator Carlucci, a two-time sponsor of the amendment, likewise stated his understanding that the amendment would act as "backstop" as environmental laws changed. N.Y. Sen. Reg. Sess. (Apr. 30, 2019). Senator Jackson, who sponsored the amendment during the 2021–2022 legislative session, expressly compared the amendment to the Education Article, stating: "A lawsuit had to be filed in order for the court to decide what the entitlement was for a sound, basic education. I hope that that's not the case in defining clean water and clean air. But if necessary, then that's what has to happen." N.Y. Sen. Reg. Sess. (Jan. 12, 2021).

[33] Aggrieved students and parents may still seek recourse from their school districts or pursuant to enabling legislation. *Id.* at 368.

Plaintiffs in *Mulgrew* and *Chan* protest, but merely a lower standard than Plaintiffs might prefer. *Mulgrew*, Dkt. No. 122 at 4 n.2; *Chan*, Dkt. No. 134 at 4 n.2.[34]

Plaintiffs fail to show that the Tolling Program would deny their right to those constitutional minimums.  New York operates a system to preserve the environment and guard against public or private acts that would deprive New Yorkers of clean air and water or a healthful environment.  For example, SEQRA operates as a state analog to NEPA that requires agencies to identify and take a "hard look" at the relevant areas of environmental concern so as to properly inform decisionmakers.  *See Stewart Park & Rsrv. Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 558 (2d Cir. 2003) (citation omitted).  Plaintiffs do not establish that New York's legislative system is failing to ensure its baseline environmental aims.

Plaintiffs in *Chan* and *Mulgrew* argue that the diverted traffic will lead to negative environmental impacts and worse health outcomes for certain communities outside the CBD. *Chan*, Dkt. No. 142 at 4 (citing *Chan*, Dkt. No. 78-4 ¶¶ 2–7, Dkt. No. 78-14 ¶¶ 3–5, 13, Dkt. No. 78-15 ¶¶ 1, 5, Dkt. No. 78-16 ¶¶ 2–3); *Mulgrew*, Dkt. No. 130 at 4 (citing same).  For example, Elizabeth Chan avers that she is "concerned about the environmental impact of congestion pricing on BPC" and that due to the "likelihood of increased traffic on the lower sections of the FDR Drive," she also fears "that increases in ambulance response time, and in exposure to air pollution will increase [her] and [her] children's risk of suffering adverse health outcomes."  *Chan*, Dkt. No. 78-4 ¶ 4.  Rachel Ehrenpreis similarly avers that her "apartment sits on a low floor, with

---

[34] Other courts have also suggested that the Green Amendment widens parties' ability to assert standing for environmental challenges.  *See Streeter*, 213 N.Y.S.3d at 870 ("[A] key purpose of the Green Amendment's passage is to address the issue of standing in environmental cases."); *Marte*, 2023 WL 2971394, at *3 ("Including in New York's Bill of Rights an affirmative right to clean air, water and a healthful environment will undoubtedly make it easier for parties to seek relief where, potentially, they may not have been able to previously make such application.").

windows overlooking the very area of the FDR Drive that is slated to have increased congestion as a result of the proposed CBD toll, risking increased pollution and potential health risks for [her and her family] any time we leave our apartment, or even within" and that she has family in Rockland County and is worried that "every category of pollutant is set to increase in the area." *Chan*, Dkt. No. 78-15 ¶¶ 1, 5.[35]  Sean Carney avers that traffic diverted from Manhattan to New Jersey communities like Norwood, where he lives, will cause an increase in pollutants and toxins that may exacerbate his motor neuron disease.  *Chan*, Dkt. No. 78-16 ¶ 3.

None claim that their environment will be so deteriorated as to deny them access to clean air, clean water, or a healthful environment.  Although several Plaintiffs express concerns that the increased traffic will lead to negative health outcomes for themselves or family members, they do not show those fears are well-founded.  In *Hudson Riverkeeper Fund, Inc. v. Yorktown Heights Sewer District*, Judge Rakoff held that even though "defendants' wastewater treatment plant has repeatedly discharged pollutants in excess of limits set by applicable state permits[,] the extent of the offending efflux appears minimal."  949 F. Supp. 210, 211 (S.D.N.Y. 1996).  Although the plaintiffs complained that their fear that New York City water was contaminated had caused them to buy bottled water, filter their tap water, and switch from baths to showers, Judge Rakoff held those unsupported concerns to be "premised on conjecture and surmise" rather than actual evidence of environmental ills.  *Id.* at 212; *see also Matter of Defend H20 v. Town Bd. of the Town of E. Hampton*, 147 F. Supp. 3d 80, 103 (E.D.N.Y. 2015) (stating that unsupported declaration was insufficient to establish environmental injury).  Plaintiffs' concerns are similarly speculative.

---

[35] The final EA contradicts Ehrenpreis' worry as it states that most of the pollutant categories assessed are predicted to decrease in Rockland County both in the short and long term. DOT 36838–57.

The Tolling Program is a congestion mitigation and air quality improvement program aimed in part at improving access to clean air throughout the New York City metropolitan region. The environmental assessment found that it offered regional air quality benefits by reducing pollutants and greenhouse gases across the several multi-county studies. DOT 7251 (10 counties), 7289 (12 counties), 36838 (12 counties), 36983 (12 counties), 37014–15 (28 counties). While a few counties and intersections are expected to see an increase in traffic and pollution, most will not. For the majority, the environmental effects of the Tolling Program will be beneficial. The Green Amendment cannot be wielded to prevent an initiative with broad environmental benefits on the basis of a few localized harms that do not deprive those New Yorkers of access to clean air and water or a healthful environment. A rule that prevented any government act that worsened environmental outcomes for even a single New Yorker while improving those outcomes for everyone else would go far beyond the environmental scheme the New York Legislature has adopted and would essentially stymie any development project or pro-environment initiative. Absent a showing that the individuals made worse off by the Tolling Program are actually being denied the constitutional minimum of state systems to preserve a healthful environment, Plaintiffs fail to show a likelihood of success as to their Green Amendment claims.

### 5.    SAPA

The New York State Administrative Procedure Act imposes certain requirements on rulemaking agencies and provides for judicial review of agency rules. *See* N.Y. A.P.A. Law §§ 100 *et seq*. Plaintiffs in *New Yorkers* argue that they are likely to succeed on the merits of their claim that Defendants failed to comply with SAPA by neglecting to "incorporate the socioeconomic consequences of Congestion Pricing into its rulemaking process and decision making." *New Yorkers*, Dkt. No. 121 at 7–9. The Municipal Defendants argue that (1) SAPA did not require further economic analyses because the toll rate schedule is exempt from such

requirements and (2) the environmental assessment did consider the economic impacts of the toll structure. *New Yorkers*, Dkt. No. 130 at 10–16. The rule at issue is the Phase-In Tolling Structure that set forth the different rates to be assessed upon different classes of vehicles pursuant to the phase-in approach. 50 N.Y. Reg. 12, 81–82 (Dec. 11, 2024).[36]

### a.    Rulemaking Requirements

SAPA describes two types of agency rules, known as "Type (i) rules" and "Type (ii) rules." N.Y. A.P.A. Law § 102(a). Type (i) rules are "the whole or part of each agency statement, regulation or code of general applicability that implements or applies law, or prescribes a fee charged by or paid to any agency or the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof." N.Y. A.P.A. Law § 102(a)(i). Type (ii) rules are "the amendment, suspension, repeal, approval, or prescription for the future of rates, wages, security authorizations, corporate or financial structures or reorganization thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs or accounting, or practices bearing on any of the foregoing whether of general or particular applicability." N.Y. A.P.A. Law § 102(a)(ii). SAPA provides that rulemaking agencies must undertake different levels of economic analysis depending on the type of rule at issue. SAPA requires agencies to conduct two relevant economic assessments as part of the rulemaking process for Type (i) rules that are not required for Type (ii) rules. *See* N.Y. A.P.A. Law §§ 201-a(6)(a)(1) (before proposing a Type (i) rule—but not a Type (ii) rule—"an agency shall evaluate the potential impact of the rule

---

[36] In the Court's prior opinion and order, the Court held that the *New Yorkers* SAPA claim has not yet accrued because the final tolling structure adopted by the TBTA had not yet been filed with the Secretary of State or published in the State Register. *See Mulgrew*, 2024 WL 3251732, at *17–18. The Court therefore dismissed the claim without prejudice. *See id.* Since then, the Phase-In Tolling Structure been filed with the Secretary of State and published in the State Register, and the claim thus has now accrued. *See New Yorkers*, Dkt. No. 122–1; 50 N.Y. Reg. 12; *Isabella Geriatric Ctr., Inc. v. Novello*, 2005 WL 3816962, at *7 (Sup. Ct. 2005), *aff'd*, 833 N.Y.S.2d 5 (1st Dep't 2007).

on jobs and employment opportunities"); 202-b(3) (in developing a Type (i) rule—but not a Type (ii) rule—"the agency shall consider utilizing approaches that will accomplish the objectives of applicable statutes while minimizing any adverse economic impact of the rule on small businesses and local governments"); *Hudson River Sloop Clearwater, Inc. v. N.Y. State Pub. Serv. Comm'n*, 119 N.Y.S.3d 390, 390 (N.Y. Sup. Ct. 2019). The Municipal Defendants contend that the Phase-In Tolling Structure is a Type (ii) rule and therefore that no additional economic analyses were needed. *New Yorkers*, Dkt. No. 130 at 10–15. Plaintiffs argue that the rule should instead be viewed as a Type (i) rule because it "implements or applies law"—the Traffic Mobility Act. *New Yorkers*, Dkt. No. 121 at 5, Dkt. No. 133 at 3.[37] Defendants have the better argument.

The Court begins with SAPA's plain language. *See Lisa T. v. King E. T.*, 91 N.E.3d 1215, 1215 (N.Y. 2017) ("[T]he starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." (citation omitted)). The Municipal Defendants argue that the Phase-In Tolling Structure falls "squarely within SAPA's definition of Type (ii) rules because it is the 'approval' or 'prescription' of 'future' 'rates' of 'general . . . applicability.'" *New Yorkers*, Dkt. No. 130 at 11 (quoting N.Y. A.P.A. Law § 102(2)(a)(ii)). The proposed rule sets forth only the different toll rates and exemptions to be applied. *See Hudson River Sloop*, 119 N.Y.S.3d at 390 (finding rule "was properly promulgated as an economic rule under SAPA

---

[37] At the preliminary injunction hearing, Plaintiffs also argued that the rule should be classed as a Type I rule because it "prescribes a fee." Tr. at 37. Plaintiffs waived this argument by failing to raise it in any of their filings in support of the preliminary injunction motion. *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion."); *Moody v. Morris*, 608 F. Supp. 2d 575, 580 n.1 (S.D.N.Y. 2009), *aff'd*, 407 F. App'x 434 (Fed. Cir. 2011). Plaintiffs' fee argument would fail even if properly raised. SAPA's definition of rules expressly excludes "any fee which is . . . less than one hundred dollars." N.Y. A.P.A. Law § 102(2)(b)(xi). Therefore, even if the Phase-In Tolling Structure was read as implementing a fee rather than setting a rate, the TBTA still would not have been required to perform the economic assessments at issue in the *New Yorkers* Plaintiffs' SAPA claim.

§ 102(a)(ii)" where it acted as "a prescription for future allowances for facilities and services as well as a practice bearing on rates").  Indeed, Black's Law Dictionary defines rate as "[a]n amount paid or charged for a good or service."  *Rate*, Black's Law Dictionary (12th ed. 2024); *see also Carey Transp., Inc. v. Triborough Bridge & Tunnel Auth.*, 345 N.E.2d 281, 282 (N.Y. 1976) (referring to the TBTA's authority to fix "toll rates").  It is the New York Legislature's Traffic Mobility Act—not the TBTA's rule—that outlines the structure the Tolling Program is to take including the boundaries of the CBD, the parameters of the variable tolling structure, and the exemptions to be contemplated and applied.  *See* N.Y. Veh. & Traf. Law §§ 1701 *et seq.*

The Traffic Mobility Act grants the TBTA the authority to establish tolling rates and charge tolls "[c]onsistent with the goals of reducing traffic congestion within the central business district and funding capital projects" and subject to certain guidelines.  N.Y Veh. & Traf. Law § 1704-a(1).[38]  Such delegation is necessary to permit agency action such as setting and enforcing toll rates.  "As a creature of the Legislature, an agency is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication."  *Acevedo v. N.Y. State Dep't of Motor Vehicles*, 77 N.E.3d 331, 343 (N.Y. 2017) (citation omitted); *accord Dep't of Pers. of City of N.Y. v. N.Y.C. Civ. Serv. Comm'n*, 588 N.E.2d 71, 71 (N.Y. 1991) ("An administrative agency has only those powers expressly or impliedly given it.").  To read agency actions taken pursuant to the Legislature's grant of authority as necessarily implementing or applying the authorizing statute would be to swallow Type (ii) rules entirely.  In order to avoid

---

[38] The Act states that "the Triborough bridge and tunnel authority shall have the power, subject to agreements with its bondholders, and applicable federal law to establish and charge variable tolls and fees for vehicles entering or remaining in the central business district at any time and shall have the power, subject to agreements with bondholders, and applicable federal law to make rules and regulations for the establishment and collection of central business district tolls, fees, and other charges."  *Id.*

rendering Section 102(a)(ii) a nullity, a "standard rule of construction" directs that "whenever there is a general and a particular provision in the same statute, the general does not overrule the particular but applies only where the particular provision is inapplicable." *Iazzetti v. City of N.Y.*, 723 N.E.2d 81, 81 (N.Y. 1999); *see also Stefanik v. Hochul*, 211 N.Y.S.3d 574, 583 (3d Dep't 2024) ("[T]he general/specific [canon] of construction seeks to avoid 'the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012))), *aff'd*, 2024 WL 3868644 (N.Y. Aug. 20, 2024). The fact that the Phase-In Tolling Structure could also fit the Type (i) rule definition therefore does not remove it from the ambit of the more specific Type (ii) rule definition.

The TBTA has consistently promulgated toll rate schedules as Type (ii) rules for many years. *New Yorkers*, Dkt. No. 130 at 12–13 & n.12 (collecting toll rate schedules promulgated as Type (ii) rules). The Court does not accord deference to the TBTA's interpretation of SAPA. *See Indus. Liaison Comm. of Niagara Falls Area Chamber of Com. v. Williams*, 527 N.E.2d 274, 274 (N.Y. 1988) ("Regulatory promulgation consistent with the provisions of the State Administrative Procedure Act is not a matter which rests within the particular and specialized expertise of the [agency]"); *see also id.* (Because the agency's "specialized knowledge is not necessarily implicated, the courts use their own competence to decide issues of law raised, since those questions are of ordinary statutory reading and analysis."). Nonetheless, at the preliminary injunction hearing, Plaintiffs identified one rule that the TBTA had previously promulgated as a Type (i) rule. Tr. at 35 (discussing 21 N.Y.C.R.R. § 1021.3). That rule is highly distinguishable from the rule at issue here and provides a helpful illustration of the rate-setting nature of the Phase-In Tolling Structure. The TBTA's admittedly Type (i) rule did not merely adopt a schedule of toll

94

rates but instead set forth rules pertaining to penalties for nonpayment of tolls including procedures for notifying violators of nonpayment, enforcing penalties, receiving and evaluating disputes, and suspending violators' vehicle registrations. 21 N.Y.C.R.R. § 1021.3. Here, by contrast, the Phase-In Tolling Structure states only the variable amounts motorists must pay to access the CBD.[39]

Ultimately, because Plaintiffs fail to establish the Phase-In Tolling Structure is a Type (i) rule that would require the additional economic analyses they claim were not performed, Plaintiffs fail to show a likelihood of success as to their SAPA claims.

### b.    Economic Assessment

The Municipal Defendants also argue that the TBTA *did* consider the economic impact of the Tolling Program, as the TBTA was a Project Sponsor of the environmental assessment which "thoroughly analyzed the potential effects of the Program on socioeconomic conditions." *New Yorkers*, Dkt. No. 130 at 15–16. Chapter 6 of the final EA was devoted to assessing "the potential effects of implementing the CBD Tolling Alternative on economic conditions within the affected environment at both the regional and neighborhood levels." DOT 36684. As summarized above, that chapter represented a thorough analysis of the economic impacts the Tolling Program would have on workers, industries including trucking, tourism, real estate, and other facets of the regional economy. *Supra* § II.B.2. The final EA demonstrated focuses on impacts to labor, DOT 36733–47, 36766–67, and small businesses, DOT 36695–96.

However, the Municipal Defendants stop short of arguing that the TBTA's work in connection with the draft and final EAs satisfies its duties under SAPA. SAPA requires that even

---

[39] The New York Legislature appears to agree. On December 18, 2023, the TBTA sent notices of the proposed tolling schedule to the Administrative Regulations Review Commissions for the New York State Senate and Assembly stating that the proposed toll rate schedule was being promulgated pursuant to N.Y. A.P.A. Law § 102(2)(a)(ii). *New Yorkers*, Dkt. No. 131 ¶ 4. Neither Commission expressed any objections. *Id.*

if "it is apparent from the nature and purpose of the rule that it will not have a substantial adverse impact on jobs and employment opportunities," the agency shall include a statement to that effect in the notice of proposed rule making.  N.Y. A.P.A. Law § 201-a(2)(a).  Similarly, even where an agency finds that a proposed rule "does not impose an adverse economic impact on small businesses or local governments," the agency must include that "finding and the reasons upon which the finding was made, including what measures the agency took to ascertain that the rule would not impose such compliance requirements, or adverse economic impact on small businesses or local governments" in the rule making notice.  N.Y. A.P.A. Law § 202-b(3)(a).  The TBTA's participation in the environmental assessment pursuant to NEPA therefore does not entirely satisfy the requirements for a Type (i) rule under SAPA.

### B.    Irreparable Harm

"[T]he single most important prerequisite for the issuance of a preliminary injunction" is whether the litigant seeking the injunction "would be irreparably injured in the absence of preliminary injunctive relief." *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020).  "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (citation omitted).  The key word is "irreparable" and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *accord Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue.").

Plaintiffs offer a wide variety of purported irreparable harms.  Plaintiffs in *New Yorkers* state that the Tolling Program threatens them with irreparable injury because once the program is

implemented, it cannot be effectively wound back. *New Yorkers*, Dkt. No. 121 at 9. TANY argues that the economic injuries its members will suffer are irreparable and further argues that because the Tolling Program violates constitutional rights, irreparable injury is presumed. *Trucking*, Dkt. No. 4 at 25–26, Dkt. No. 89 at 13–16. Plaintiffs in *Chan* and *Mulgrew* similarly argue that irreparable injury is presumed in connection with the alleged constitutional violations and further that the environmental harms associated with diverted traffic are irreparable. *Chan*, Dkt. No. 134 at 4–5; *Mulgrew*, Dkt. No. 122 at 4–5. In the aggregate, Plaintiffs are therefore concerned with (1) economic impacts, (2) injury to constitutional rights, and (3) the environmental ramifications. The Court reviews each in turn.

### 1.    Economic Impacts

Plaintiffs argue that if the Tolling Program takes effect, they will be irreparably harmed by the expense of paying the toll and potential loss of business.

At the outset, while toll payers may be harmed by the fee, that harm is compensable by money damages. To put it simply, monies paid may be refunded. The Municipal Defendants aver that toll payers may pay the toll either through E-ZPass or, "[i]f the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle will receive a toll bill in the mail." *Chan*, Dkt. No. 139 ¶ 12; *Mulgrew*, Dkt. No. 127 ¶ 12; *New Yorkers*, Dkt. No. 125 ¶ 12; *Trucking*, Dkt. No. 82 ¶ 12. In either event, a record will be made and kept of the toll imposed and the entity or individual who paid it. Accordingly, should Plaintiffs prevail, the TBTA may refund the tolls paid by (1) crediting the E-ZPass accounts for New York account holders, (2) issuing refunds to the respective state tolling agency for out-of-state E-ZPass account holders, and (3) reversing credit card charges or issuing a refund check to individuals without E-ZPass accounts. *Chan*, Dkt. No. 139 ¶¶ 13–14; *Mulgrew*, Dkt. No. 127 ¶¶ 13–14; *New Yorkers*, Dkt. No. 125 ¶¶ 13–14; *Trucking*, Dkt. No. 82 ¶¶ 13–14. Courts in this Circuit have found similar repayment proposals to

foreclose a showing of irreparable harm. *See, e.g.*, *Auto. Club of N.Y. v. Port Auth. of N.Y. & N.J.*, 842 F. Supp. 2d 672, 676 (S.D.N.Y. 2012) ("Since E–Z Pass presumably maintains an electronic record of toll charges, drivers could have their E–Z Pass accounts or associated credit cards refunded if this Court were to reverse the tolls."); *Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 2004 WL 840140, at *4 (D. Conn. Apr. 15, 2004) (Droney, J.) ("[W]hile the individual passenger plaintiffs have demonstrated that they will be harmed by the surcharge, the Court finds that the Port Authority will be able to reimburse the individual plaintiffs for those amounts if the Court orders it later in the litigation."). TANY argues that "based on the tremendous number of vehicles entering the [CBD], . . . it is simply not workable to redress this harm several years in the future at the conclusion of this litigation." *Trucking*, Dkt. No. 4 at 26. But TANY does not make any evidentiary showing supporting this conclusory claim of impracticability. *See Bridgeport*, 2004 WL 840140, at *4 ("As to whether all the passengers could be located to receive their portion of any repayment, the plaintiffs have not shown that it would be unlikely or that another method of relief is unavailable").[40]

To the extent that Plaintiffs claim economic injury beyond the tolls they will pay, that harm too is reparable. Any business claiming lost profits can, upon an ultimate finding that its rights were violated, seek compensation for lost profits. Lost profits are the paradigmatic reparable harm. *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (business' potential inability to continue operations was not irreparable harm because the business could calculate money damages

---

[40] Even where money damages are available, a movant may still sometimes establish irreparable harm "if the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) (summary order) (citing *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999)). Plaintiffs do not argue that the MTA would be unable to pay a judgment and have therefore waived the argument. *See Halpert Enterprises, Inc. v. Harrison*, 2008 WL 4585466, at *3 (2d Cir. Oct. 15, 2008).

for lost profits and goodwill based on past performance); *Freeplay Music, Inc. v. Verance Corp.*, 80 F. App'x 137, 138 (2d Cir. 2003) ("Lost profits alone are not sufficient to show irreparable harm.").  No Plaintiff makes any showing that they will suffer incalculable financial injuries.

Plaintiffs in *New Yorkers* claim a more widespread form of economic impact in the form of city devitalization.  They assert that "[t]he loss of business, particularly in Chinatown, Little Italy, and Times Square may be irreversible, as commuting and travel times are adjusted to consider costs." *New Yorkers*, Dkt. No. 121 at 9, Dkt. No. 133 at 9.[41]  This "proffer with respect to the element of irreparable harm is wholly conclusory, and is unsupported by even a single specific allegation of fact." *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, 2015 WL 1055933, at *3 (S.D.N.Y. Mar. 11, 2015); *see Helios & Matheson N. Am., Inc. v. Vegasoft Oy*, 2007 WL 1541204, at *4 (S.D.N.Y. May 24, 2007) ("In the absence of any evidence, except for . . . speculative testimony, the Court finds it is at best plausible, but not probable, that [plaintiff] could lose business.").  TANY similarly alludes to potential loss of business without supporting evidence.  *Trucking*, Dkt. No. 6 ¶¶ 12–13, 20 (The president of Lightning Express Delivery Service, Inc., a member of TANY, averred that present costs of business "have already forced us to increase our rates to the point where we have lost customers, with other customers threatening to do the same if the rates keep going up" but also acknowledged that the carriers' rates may not go up because "[t]he unpredictable nature of the charges makes it impractical to pass the cost on to customers.").  Absent an evidentiary showing, Plaintiffs do not establish that business will be lost, let alone irreversibly so.  *See Auto. Club*, 842 F. Supp. 2d at 677 n.3 (holding that amici's fear

---

[41] Plaintiffs in *New Yorkers* additionally claim that "[d]isruption of life for civil servants, nurses, firefighters and small entrepreneurs may be irreversible." *New Yorkers*, Dkt. No. 121 at 9.  But Plaintiffs offer no evidence that the toll will disrupt such individual's lives and no explanation of why, should they prevail on the merits, any disruption of life would be "irreversible" or otherwise beyond compensation.

of what "may befall the Staten Island manufacturing sector if the tolls are left in place is too remote and speculative to support [plaintiff's] motion").

The fear of potential lost business or devitalization is undermined by the administrative record. The FHWA found that "changes in travel patterns brought on by the CBD Tolling Alternative would not adversely affect any particular industry or occupational category in the Manhattan CBD, including small businesses" and "[t]he analysis also indicates no adverse changes to commercial traffic providing goods and services to the Manhattan CBD." DOT 36669. Due to the "high level of transit access in the CBD and high percentage of transit share," the environmental assessment predicts "[n]o adverse effects to any particular industry or occupational category in the Manhattan CBD." DOT 36224. And because "[a]ny cost increase associated with the new toll . . . that would be passed along to receiving businesses would be distributed among several customers per toll charge," the environmental assessment also found that the Tolling Program was "[u]nlikely to result in meaningful change in cost for most consumer goods . . . especially for businesses, including small businesses and micro-businesses, receiving smaller deliveries." *Id.*[42] Where, as here, the purported irreparable harm "is remote, speculative, or a mere possibility, the motion must be denied." *Jay's Custom Stringing, Inc. v. Yu*, 2001 WL 761067, at *8 (S.D.N.Y. July 6, 2001).

### 2.    Constitutional Rights

As a general rule, "the alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (citations omitted); *see also* 11A Wright & Miller, Federal Practice and Procedure, § 2948.1 (3d

---

[42] However, the assessment noted that "[s]ome commodity sectors (construction materials, electronics, beverages) are more prone to increases due to less competition within delivery market." *Id.*

ed. 2020) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary.").

However, the Second Circuit has "not consistently presumed irreparable harm in cases involving allegations of the abridgement of" constitutional rights. *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003); *see, e.g.*, *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir.1999); *Kane v. De Blasio*, 19 F.4th 152, 171 (2d Cir. 2021) (per curiam); *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997) ("Though impairment of First Amendment rights can undoubtedly constitute irreparable injury, we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." (citation omitted)); *see also Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."), *cert. denied*, 493 U.S. 848 (1989). "[A]n allegation of a constitutional violation is not a magic wand that can be waved to conjure up irreparable harm." *Stallworth v. Joshi*, 2017 WL 8777378, at *7 (S.D.N.Y. Nov. 22, 2017) (Sullivan, J.). "Indeed, many courts have distinguished between a plaintiff whose First Amendment rights are directly regulated or restrained and one who retains her First Amendment rights but has suffered only economic injury in the pursuit thereof." *Lost Lake Holdings LLC v. Town of Forestburgh*, 2023 WL 8947154, at *6 (S.D.N.Y. Dec. 28, 2023).

Courts in this Circuit have identified two primary exceptions in which alleged violations of constitutional rights are not presumed to be irreparably injurious: violations of non-personal

constitutional rights and constitutional injuries that are compensable by money damages.  *See Burroughs v. Cnty. of Nassau*, 2014 WL 2587580, at *9 (E.D.N.Y. June 9, 2014); *Smith v. Fredrico*, 2013 WL 122954, at *7 (E.D.N.Y. Jan. 8, 2013).

First, "the cases where courts have held that a constitutional deprivation amounts to an irreparable harm []are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy, or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief."  *Barrett v. Harwood*, 967 F. Supp. 744, 746 (N.D.N.Y. 1997), *aff'd*, 189 F.3d 297 (2d Cir. 1999); *accord Marano v. N.Y.C. Transit Auth.*, 1993 WL 17434, at *3 (E.D.N.Y. Jan. 19, 1993); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009).  Where, for example, speech is actually chilled, no money damages can adequately compensate.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).  By contrast, a violation of structural rights such as those that allocate power to the states or certain branches of the federal government, does not necessarily injure—let alone irreparably injure—the complainant.  Where a government entity acts without proper constitutional authority and in so doing causes injury to persons, the relevant injury is not the constitutional violation itself, because that injury is certainly reparable upon cessation.  Instead, the relevant injury is whatever derivative injury the complainant suffered as a result of the unauthorized government act.  Courts in this Circuit have thus concluded that irreparable harm is presumed only for violations of:

> personal constitutional rights (coupled with, for example, some physical harm or loss of liberty, i.e., some tangible harm), to be distinguished from provisions of the Constitution that serve structural purposes—i.e., a provision of the Constitution relating to the division of power, say, between the States and the federal government, the violation of which is not necessarily accompanied by any tangible harm.

*Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431 (N.D.N.Y. 1989); *accord Spring Hill Cap. Partners, LLC v. S.E.C.*, 2015 WL 10714010, at *7 (S.D.N.Y. June 29, 2015); *United States v.*

*City of New York*, 2013 WL 12361934, at *5 (E.D.N.Y. Jan. 31, 2013); *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009); *E.E.O.C. v. Loc. 638*, 1995 WL 355589, at *5 (S.D.N.Y. June 7, 1995).

The Commerce Clause and Supremacy Clause both concern the division of power between the states and the federal government and therefore enshrine structural, rather than personal, rights. *See Livery Round Table, Inc. v. N.Y.C. FHV & Limousine Comm'n*, 2018 WL 1890520, at *10 (S.D.N.Y. Apr. 18, 2018) (noting that "the Supremacy Clause is a structural provision of the Constitution that does not confer personal rights"); *N.Y. State Rest.*, 545 F. Supp. 2d at 367 (holding that the alleged injury "flowing from a possible violation of the Supremacy Clause appears to be of a different nature than that which arises from an infringement of First Amendment rights"); *Am. Petroleum*, 710 F. Supp. at 432 (holding that litigant's "asserted violation of the Supremacy Clause cannot, without more, serve as the basis for a finding of irreparable harm"); *Loc. 638*, 1995 WL 355589, at *5 ("Commerce Clause violation is not 'necessarily equivalent to the unique, individual injury accompanying a violation of the First Amendment' and does not constitute per se irreparable injury." (quoting *Grand Cent. Sanitation, Inc. v. City of Bethlehem*, 1994 WL 613674, at *2 (E.D. Pa. Nov. 2, 1994))); *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 522 (D. Del. 1984) ("[A]ny violation of the commerce clause does not constitute irreparable injury *per se*."). Irreparable injury therefore cannot be presumed with respect to either Plaintiff's Commerce Clause or preemption claims. The right to travel is, however, a personal one. *See King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971). As are the rights afforded by the Green Amendment. *See* N.Y. Const. art. I, § 19 (recognizing the right of "[e]ach person").[43]

---

[43] Ultimately, however, Plaintiffs do not show that the constitutional nature of their Green Amendment claims should be deemed to convey irreparable injury because Plaintiffs do not show

Second, even "when 'personal' constitutional rights are violated and the harm that accompanies the violation is remediable or compensable, the damage is not irreparable." *Loc. 638*, 1995 WL 355589, at *5 (collecting cases); *see also Siracusa v. New Hyde Park-Garden City Union Free Sch. Dist.*, 2024 WL 3875793, at *8 (E.D.N.Y. Aug. 19, 2024); *Burroughs*, 2014 WL 2587580, at *9; *Wandering Dago Inc. v. N.Y. State Off. of Gen. Servs.*, 2013 WL 12131305, at *7 (N.D.N.Y. Nov. 8, 2013); *Smith*, 2013 WL 122954, at *7. This is tautological: an injury is not irreparable where post-injury relief is available. Dignitary rights violations may not be compensable, *see Elrod*, 427 U.S. at 373, but where the harm manifests as an unconstitutional termination, for example, reinstatement and backpay can make the victim whole, *see Kane*, 19 F.4th at 171 (collecting cases).

The Municipal Defendants argue that Plaintiffs' harms relating to their right-to-travel claims are compensable because "Plaintiffs do not and cannot assert that they are being prohibited from traveling, only that increased costs from the Program's tolls will cause them economic injury." *Chan*, Dkt. No. 137 at 27–28 (citing *Chan*, Dkt. No. 78-4 ¶¶ 4–5, Dkt. No. 78-14 ¶ 3, Dkt. No. 78-15 ¶¶ 1, 5, 17, Dkt. No. 78-16 ¶¶ 2–3); *Mulgrew*, Dkt. No. 125 at 27–28 (citing same); *Trucking*, Dkt. No. 80 at 27–28 (citing same). Laws that do not prohibit travel but instead implement only minor burdens, such as tolls, do not infringe the right to travel. *See Selevan I*, 584 F.3d at 101 ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right." (quoting *Southold*, 477 F.3d at 54)). As discussed, the minor economic burden on travel may be compensated by refunding the tolls. Having made no showing that the tolls will actually

---

that their constitutional rights pursuant to the Green Amendment have been infringed. *See supra* § IV.A.4. Nor do they show that a violation of the Green Amendment would impose the dignitary harm not compensable by money damages from which irreparable harm can be presumed.

deny Plaintiffs the right to travel, Plaintiffs have not established that the constitutional nature of the alleged violation itself causes irreparable harm.

### 3.     Environmental Harms

The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).  "In a typical environmental case, the alleged harm is purely environmental and truly irreparable: once the river is filled and the bass are gone, as a rule, the river stays filled and the bass stay gone." *Stand Together Against Neighborhood Decay, Inc. v. Bd. of Estimate of City of N.Y.*, 690 F. Supp. 1192, 1200 (E.D.N.Y. 1988).

Courts evaluating claims of irreparable injury on the basis of environmental harm look not to whether procedural safeguards constructed to protect environmental interests have been violated, but to whether the environmental interests themselves have been substantively harmed. *See Amoco Prod.*, 480 U.S. at 544–45 (rejecting argument that "[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action" and vacating preliminary injunction because "the Ninth Circuit erroneously focused on the statutory procedure rather than on the underlying substantive policy the process was designed to effect— preservation of subsistence resources").  In *Romero-Barcelo*, the Supreme Court held that even though the Navy had violated the Federal Water Pollution Control Act by discharging ordnance into the sea without a permit, no injunction should issue and the Navy should be permitted to continue operation during the permit application process.  456 U.S. 305.  The Supreme Court noted that the First Circuit—which had granted the preliminary injunction on the basis of the statutory violation—had "erroneously focused on the integrity of the permit process rather than on the integrity of the Nation's water." *Amoco Prod.*, 480 U.S. at 542–43 (discussing *Romero-Barcelo*,

456 U.S. 305).  Because "the discharge of ordnance had not polluted the waters," the Supreme

Court held that declining to enjoin the discharges while the Navy came into compliance with the

statute "neither ignored the statutory violation nor undercut the purpose and function of the permit

system."  *Romero-Barcelo*, 456 U.S. at 315.

      Plaintiffs in *Chan* and *Mulgrew* argue that the diverted traffic will lead to negative

environmental impacts and worse health outcomes for the communities in which they reside

including along the lower portion of the FDR Drive, Rockland County, and Bergen County.  *Chan*,

Dkt. No. 142 at 4 (citing *Chan*, Dkt. No. 78-4 ¶¶ 2–7, Dkt. No. 78-14 ¶¶ 3–5, 13, Dkt. No. 78-15

¶¶ 1, 5, Dkt. No. 78-16 ¶¶ 2–3); *Mulgrew*, Dkt. No. 130 at 4 (citing same).  The final EA provides

some support for their claims, predicting that "the lower FDR Drive between East 10th Street and

the Brooklyn Bridge would experience a net increase in traffic, with diverted traffic greater than

the suppression of traffic due to CBD tolling."  DOT 36452, 36471; *but see* DOT 36868 ("In

response to public comments received, a highway segment CO screening was conducted on FDR

Drive near 10th Street using NYSDOT's volume threshold screening.  The analyzed location

passed the screening.").[44]  Rockland is expected to experience at least some increased levels of air

pollution, DOT 36838–58, though it is also expected to experience reduced levels of the majority

of considered pollutants, *id.*; *see also* DOT 36840–41 (the final EA predicts a minor reduction in

vehicle miles traveled in Rockland).  The environmental assessment anticipates that Bergen

County (where Norwood is located) will experience slightly increased levels of pollution.

DOT 36838–58 (less than 1% increase in most considered pollutants).  In sum, Plaintiffs have

established that some localized areas will experience environmental harms.

---

[44] The Project Sponsors also committed to mitigation efforts including ramp metering, motorist
information, signage, and/or targeted toll policy modifications to reduce diversions to that part of
the FDR Drive, DOT 36455–56.

However, Plaintiffs cite no evidence in support of their arguments that the increased pollutants in their area are actually injurious to such a level that it will constitute irreparable harm. Where environmental danger is "*de minimis* or non-existent, there is no danger to the public interest for the purposes of irreparable injury." *Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 423 (S.D.N.Y. 2000). Although every additional car threatens marginal negative environmental externalities, it cannot be that a single rerouted car suffices to show irreparable injury. Minor environmental impositions will dissipate when ceased without causing lasting injury. *See Atl. Terminal Urb. Renewal Area Coal. v. N.Y.C. Dep't of Env't Prot.*, 1990 WL 3928, at *2 (S.D.N.Y. Jan. 16, 1990) (finding no irreparable harm where "municipal defendants have presented credible evidence from officials responsible for overseeing the Project that the negative impact of demolition on air quality will be minimal and that demolition will in fact improve air quality because it will permit widening of the adjacent streets, which should facilitate compliance with national carbon monoxide standards"); *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 203 (D.D.C. 2015) (finding no irreparable harm where construction-related noise, dust, and vibration were predicted to be below *de minimis* thresholds and thus mere "nuisances" or annoyances"); *Harrison v. Indiana Auto Shredders Co.*, 528 F.2d 1107, 1123 (7th Cir. 1975) (injunctive relief should not have been granted where plaintiff failed to show that the challenged business'" emission of particulate matter, earth vibrations, sound, and odorous matter" was not "in such quantities as to endanger the public health and safety").

Plaintiffs do not adduce any evidence showing that the environmental impacts on their communities will be more than *de minimis*. The final EA concluded that "[f]or all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in regional or localized exceedances of National Ambient Air Quality Standards, and there would be no adverse

effects on air quality from implementation of the CBD Tolling Alternative." DOT 36942. Plaintiffs neither contest that finding nor offer evidence that air impurities below the legal standard should be regarded as irreparably injurious.

### C.    Balance of the Equities and the Public Interest

Under the last injunction factor, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Yang*, 960 F.3d at 135–36; *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) ("When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge."); *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). Granting Plaintiffs' request for a preliminary injunction would negatively harm the public interest as it would delay the environmental and economic benefits the Tolling Program was designed to convey and force the TBTA to bear a sizeable financial burden.

The Tolling Program is predicted to reduce congestion thereby improving regional air quality, providing safety benefits, improving worker productivity, reducing noise pollution, among other benefits. *See supra* § II.B; *Ciszewski v. State of New York*, 2005 WL 1270216, at *9 (N.D.N.Y. May 26, 2005) ("Particularly in light of the strength of the countervailing public interest in proceeding with a project which has been shown to be necessary for public safety and well-being and in avoiding unwarranted costly delay, the Court denies plaintiffs' motion for a preliminary injunction."); *Broecker v. N.Y.C. Dep't of Educ.*, 585 F. Supp. 3d 299, 322–23 (E.D.N.Y. 2022) (injunction not in the public interest where it would enjoin government action taken to safeguard public health and safety), *aff'd*, 2023 WL 7485465 (2d Cir. Nov. 13, 2023), *and aff'd*, 2023 WL 8888588 (2d Cir. Dec. 26, 2023); *City of New York v. Wolfpack Tobacco*, 2013 WL 5312542, at *6 (S.D.N.Y. Sept. 9, 2013) (similar)). "Our Constitution principally entrusts

'[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect'"—including by piloting initiatives aimed at promoting public health." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)); *see also Nat'l Pork Producers*, 598 U.S. at 382 (plurality op.) ("In a functioning democracy, policy choices like these usually belong to the people and their elected representatives [who] are entitled to try novel social and economic experiments if they wish." (citation omitted)).

Numerous studies have established that the congestion addressed by the Tolling Program itself, if unchecked by that program, will also continue to impose tremendous costs on individuals and businesses throughout the New York metropolitan region. Those costs are economic and environmental. The study conducted by the Partnership for New York City cited in the final EA estimated that "traffic congestion in the New York metropolitan area has a $20 billion annual cost, including more than $9 billion in travel-time costs and nearly $6 billion in industry revenue losses." DOT 36730 (citing Partnership For New York City, *Growth or Gridlock? The Economic Case for Traffic Relief and Transit Improvement for a Greater New York* (2006)). The study estimated that "the cost per commuter from congestion is nearly $1,900 annually for Manhattan Workers and $767 per worker for the New York City metropolitan region." *Id.* "As a result, virtually every business and industry sector in all five boroughs and across the metropolitan region is suffering losses because of congestion." *Id.* Enjoining the tolling program would impair the public interest in lessening both congestion and the extreme financial costs it imposes.

Delaying implementation would also be financially injurious to the Municipal Defendants. The Municipal Defendants submitted a declaration averring that postponing the start of Tolling Program even briefly would result in costs of $12 million per month and lost revenue of about

$40 million per month.  *Chan*, Dkt. No. 139 ¶¶ 18–19; *Mulgrew*, Dkt. No. 127 ¶¶ 18–19; *New Yorkers*, Dkt. No. 125 ¶¶ 18–19; *Trucking*, Dkt. No. 82 ¶¶ 18–19; *see Comm. of 100*, 87 F. Supp. 3d at 220 (public interest weighed against preliminary injunction where government defendants would "suffer economically if the project is further delayed due the continuing cost of maintaining and repairing the aging tunnel and the lost revenue associated with operating an inefficient freight rail system").  Delaying Tolling Program revenues would additionally prevent the MTA from undertaking beneficial capital programs such as investments in the region's subways, buses, and commuter railroad, measures to make numerous subway stations more accessible to individuals with disabilities, improving outdated signaling, improving safety and customer service, and extending public transit to underserved areas.  *Chan*, Dkt. No. 139 ¶ 21 (citing MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019)); *Mulgrew*, Dkt. No. 127 ¶ 21 (citing same); *New Yorkers*, Dkt. No. 125 ¶ 21 (citing same); *Trucking*, Dkt. No. 82 ¶ 21 (citing same); *see Brody v. Vill. of Port Chester*, 261 F.3d 288, 291 (2d Cir. 2001) (holding that government project to redevelop blighted areas was in public interest and should not be enjoined).

Congestion pricing has been championed by public officials as far back as Mayor Lindsay. *See Mulgrew*, 2024 WL 3251732, at *2–4.  In light of the public interests that would injured by imposition of a preliminary injunction as well as Plaintiffs' failure to establish irreparable harm, this factor weighs against injunctive relief.

## CONCLUSION

Plaintiffs fail to establish a likelihood of success on the merits for any claim, do not show that they would be irreparably injured absent an injunction, and do not show that the balance of the equities and the public interest support an injunction.  Because no factor weighs in favor of a preliminary injunction, Plaintiffs' motions for a preliminary injunction are DENIED.

The Clerk of Court is respectfully directed to close the following docket numbers:

- *Chan et al. v. U.S. Department of Transportation et al*., 23-cv-10365, Dkt. No. 133;

- *Mulgrew et al. v. U.S. Department of Transportation et al.*, 24-cv-1644, Dkt. No. 121;

- *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of Transportation et al.*, 24-cv-367, Dkt. No. 120; and

- *Trucking Association of New York v. Metropolitan Transportation Authority et al.*, 24-cv-4111, Dkt. No. 4.

SO ORDERED.

Dated: December 23, 2024
     New York, New York

                                        LEWIS J. LIMAN
                                United States District Judge